IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BIRDA TROLLINGER, VIRGINIA BRAVO, KELLY KESSINGER, IDOYNIA MCCOY, REGINA LEE, PATRICIA MIMS, LORI WINDHAM and ALEXANDER HOWLETT, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>TYSON FOODS, INC., JOHN TYSON, ARCHIBALD SCHAFFER III, RICHARD BOND, KENNETH KIMBRO, GREG LEE, KAREN PERCIVAL, AHRAZUE WILT and TIM MCCOY,<br><br>            Defendants. | MISCELLANEOUS CASE No. 1:07-mc-00341 |

## ANA HART'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL USCIS TO COMPLY WITH PLAINTIFFS' SUBPOENA

Ana Hart, through undersigned counsel, hereby submits this Opposition to Plaintiffs' Motion to Compel USCIS to Comply with Plaintiffs' Subpoena seeking Ms. Hart's Alien File.[1] There is no justification for permitting Plaintiffs access to Ms. Hart's Alien File and the motion should be denied.

## BACKGROUND

The underlying civil RICO class action at issue here asserts that Tyson Foods consistently and intentionally hires unauthorized aliens as hourly production workers in order to

---

[1] Despite the fact that Plaintiffs' certificate of service states that Defense counsel was served a copy of their motion by fax on August 28, 2007, no copy of Plaintiffs' motion was served on Defendants until September 4, 2007 (by fax). Accordingly, Ms. Hart respectfully submits that her opposition is timely since it is being filed within 11 days of actual service.

depress the wages it pays. Plaintiffs allege that Tyson and two nationally prominent Hispanic Civil Rights organizations, the National Council of La Raza ("NCLR") and the League of United Latin American Citizens ("LULAC"), are engaged in a RICO association-in-fact enterprise. In a nutshell, Plaintiffs allege that Tyson has instructed its human resources personnel to regularly and consistently engage in felony criminal violations of the immigration law at the behest of NCLR and LULAC.

Ms. Hart, the subject of the subpoena to USCIS, is neither a defendant nor has she been identified as a co-conspirator. Nonetheless, by virtue of her job responsibilities as Tyson's Multicultural Community Relations Manager, Plaintiffs now *speculate* that Ms. Hart's "motive" for supporting and encouraging this hypothetical criminal conspiracy was that she either is or must have been an "illegal alien" at some point in time. Ms. Hart is of Hispanic descent and part of her job, as Multicultural Community Relations Manager, was to serve as Tyson's contact person with LULAC.[2] Of course, the principal focus of Tyson's relationship with LULAC is a common desire to promote the health, safety and well-being of Tyson's employees.

## ARGUMENT

Plaintiffs seek access to Ms. Hart's Alien File, including documents related to her "residency status" and "alien registration cards and numbers." *See* Ex. A to Pls. Mem. They offer no justification for this unwarranted invasion into Ms. Hart's highly private and personal information. Indeed, there is none. Moreover, the information Plaintiffs seek is not relevant to the underlying cause of action against Tyson Foods. Accordingly, Plaintiffs' motion should be denied.

---

[2] In her private life, Ms. Hart was a member of LULAC, and was voted LULAC's Woman of the Year in 2003.

**I.      Plaintiffs Have Offered No Justification For Their Request.**

There is absolutely no basis—other than to harass Ms. Hart—for Plaintiffs' request.  Indeed, the only grounds they can muster is their vague "suspicion" that Ms. Hart may not have entered the country legally.  They provide <u>no</u> basis, however, for that suspicion. Although they obliquely refer to Ms. Hart's deposition testimony, Pls. Mem. at 2, they neither quote from, cite to, nor provide the Court a copy of any portion of Ms. Hart's testimony that allegedly raises any suspicion.  This omission is telling.

Plaintiffs questioned Ms. Hart extensively about her entry into the country and her path to permanent residency.  During her deposition, Ms. Hart was forthcoming and honest, and answered each question posed to her.  Her testimony, which Ms. Hart attaches in pertinent part for the Court's reference, provides <u>no</u> basis for Plaintiffs to delve further into her private, personal information.  *See* Exhibit A attached.  Thus, Plaintiffs' failure to adequately articulate any basis for their request is reason alone to deny their motion.

**II.     The Information Sought Is Not Relevant To The Underlying Litigation.**

Even if Plaintiffs had an actual basis to suspect Ms. Hart entered the country illegally—which they do not—Ms. Hart's immigration status simply is not relevant to the RICO claims asserted by Plaintiffs in the underlying action.  Indeed, the Government already has reached the same conclusion in refusing to comply with the subpoena.  As the Government correctly summarized in its response to Plaintiffs' subpoena:

> If our understanding of your theory is correct, Tyson Foods could have formed a RICO enterprise with local and national Hispanic Rights Groups *regardless* of [Ana] Hart's immigration status….It would appear that no matter how the questions are cast or phrased, the immigration status of a lone corporate employee, Ms. Hart,

without more, would be wholly irrelevant to establishing the
existence of an ongoing RICO enterprise.

*See* Ex. B to Pls. Mem. at p. 2.[3]

Plaintiffs have offered no more evidence of relevance to this Court than they did
to the Government.  They provide the Court no explanation how Ms. Hart's immigration status
has any bearing on whether a RICO enterprise exists between Tyson and the Hispanic Rights
groups.  Instead, they claim that her immigration status would establish <u>Ms. Hart's</u> "motive" for
being a "key figure" in the alleged Hispanic Groups Enterprise.  Pls. Mem. at 2.  Although
Plaintiffs' language is dramatic, Ms. Hart's immigration file is not relevant to Plaintiffs' claims.

Having now failed twice—before the Government and before this Court—to
establish any relevance of the information sought, Plaintiffs' motion must be denied.

## III.    Producing Ms. Hart's File Would Be An Unwarranted Invasion Of Her Privacy And Fundamentally Unfair.

Subjecting Ms. Hart to this harassment and invasion of privacy would be
fundamentally unfair in a very real and practical sense.  Ms. Hart is preparing her application to
become a naturalized United States citizen.  Ms. Hart is concerned that Plaintiffs' efforts to root
around in her Alien File for non-existent evidence that she did not enter the United States legally
may place a "flag" on her file, which will, in turn, likely delay her naturalization process.
Although the Plaintiffs in this case have been given limitless leeway to conduct discovery, the
unwarranted interference in an innocent person's pursuit of American citizenship should not be
condoned by this Court.  This is especially true in light of the fact that the Customs and
Immigration Service—the federal agency tasked with immigration control—has previously

---

[3] If the Court has questions about the Government's position that are not addressed by the
Government's letter to Plaintiffs, Ms. Hart respectfully suggests that the Court contact Eric
Banks, Attorney-Advisor in the Office of Chief Counsel at U.S. Citizenship and Immigration
Services.

reviewed Ms. Hart's file and granted her permanent resident status, which she has maintained since 1996.

Ms. Hart has nothing to hide—indeed, she sat for a full day of deposition with Plaintiffs' lawyers and answered all of their questions about her migration to the United States and her immigration status. But she also has a right to privacy. And that right is paramount to the Plaintiffs' asserted need for the information in this instance. Indeed the Privacy Act, cited by the Government in its response to Plaintiffs, exists for a reason. It enables individuals to submit personal and confidential information to the Government without fear that the information will be shared with third parties absent compelling circumstances. No such circumstances exist here. Ms. Hart respectfully requests that this Court exercise its supervisory responsibility—which "in many cases [under the Privacy Act] may be weightier than in the usual discovery context," *Laxalt* v. *McClatchy*, 809 F.2d 885, 888-89 (D.C. Cir. 1987)—and deny Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, Ms. Hart respectfully requests that Plaintiffs' Motion to Compel be denied.

Dated: September 17, 2007                    Respectfully submitted,


                                             /s/ Matthew J. Warren
                                             Thomas C. Green
                                             Mark D. Hopson
                                             Frank R. Volpe
                                             Colleen M. Lauerman (D.C. Bar No. 459766)
                                             Matthew J. Warren (D.C. Bar No. 483357)
                                             SIDLEY AUSTIN LLP
                                             1501 K Street, N.W.
                                             Washington, D.C. 20005-1401
                                             (202) 736-8000


                                             *Attorneys for Ana Hart*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2007, a copy of the foregoing Opposition to

Plaintiffs' Motion to Compel was sent by fax and U.S. mail to:

Howard Foster
Johnson & Bell Ltd.
33 East Monroe Street
Chicago, Illinois  60603

Eric Banks
Office of Chief Counsel
Department of Homeland Security
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, Suite 4210
Washington, D.C.  20529

/s/ Matthew J. Warren
Matthew J. Warren

# ORIGINAL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

BIRDA TROLLINGER, et al.,   )
   )
      Plaintiffs,   )
   )
vs.   )
   ) Case No. 4:02-CV-23
TYSON FOODS, INC.,   )
   )
      Defendant.   )
   )

## DEPOSITION OF ANA LORENA HART

Taken at the Niblock Law Firm, 324 North College Avenue, Fayetteville, Arkansas, on June 7, 2005, at 11:00 a.m.

### A P P E A R A N C E S

**MR. HOWARD W. FOSTER**         FOR THE PLAINTIFF
Johnson & Bell
55 East Monroe Street, Suite 4100
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax

**MR. FRANK R. VOLPE**         FOR THE DEFENDANT
**MS. CASSIDY KESTER PINEGAR**
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8366
(202) 736-8711 Fax



# Donald Court Reporting, Inc.

*Court Reporting Excellence Since 1981*

P.O. Box 1733, Springdale, Arkansas 72765-1733

479.756.2256
888.438.7836
FAX 479.751.9153

www.getsteno.com

```
1                      I N D E X

2


3  TESTIMONY BY ANA LORENA HART                    Page

4          Examination by Mr. Foster ------------------  3
           Examination by Mr. Volpe -------------------168
5          Further Examination by Mr. Foster ----------170

6

7

8

9                    E X H I B I T S

10 Deposition
   Exhibit                                          Marked
11
   1 (January 29, 2003 E-mail)------------------------ 40
12 2 (May 7, 2003 E-mail)---------------------------- 51
   3 (April 29, 2002 E-mail)------------------------- 53
13 4 (October 15, 2003 E-mail)---------------------- 53
   5 (October 1, 2003 E-mail)----------------------- 67
14 6 (April 1, 2002 Letter)------------------------- 86
   7 (October 19, 2004 E-mail)----------------------141
15 8 (May 2, 2003 Letter)---------------------------165

16

17

18

19

20

21

22

23

24

25
```

1      ANA LORENA HART, having been called upon to

2   testify in the form of a deposition, and having been duly

3   sworn, testified as follows, to wit:

4                          EXAMINATION

5   BY MR. FOSTER:

6   Q.    Is it Ms. or Mrs.?  Which do you prefer?

7   A.    Miss.

8   Q.    Miss Hart?

9   A.    Uh-huh.

10  Q.    Okay.  Miss Hart, if you don't understand a

11  question, let me know.  I'll reask it.

12  A.    Okay.

13  Q.    I want you to understand my questions.  And I'll try

14  and let you finish your answers.  But if I start talking

15  before you're done, let me know, and I'll stop.  I don't

16  want to do that.

17        Could we start, please, with your date of birth?

18  A.    January 31st, 1970.

19  Q.    Where were you born?

20  A.    Mexicali, Baja, California, Mexico.

21  Q.    And your parents' names, please?

22  A.    David Moreno Oviedo and Maria Clotilde Garayde

23  Moreno.  Do you want me to write it down?

24  Q.    Moreno?

25  A.    Uh-huh.

1    Q.    You were born Ana Moreno?

2    A.    Ana Moreno Oviedo.

3    Q.    Moreno is spelled?

4    A.    M-O-R-E-N-O.

5    Q.    And Ana is A-N-A?

6    A.    Just one N.

7    Q.    When did you first enter the United States?

8    A.    It had to be somewhere around 1990 -- well, what do

9    you mean with that question?

10   Q.    Let me withhold that question for now.  Let's go

11   back.

12         Where did you go to high school?

13   A.    Mexico.  Mexicali.

14   Q.    And did you graduate from high school?

15   A.    Yes.

16   Q.    What year?

17   A.    I'm not good with dates.  Let me see.  '88.

18   Q.    Did you go to school beyond that?

19   A.    Yes.  I have a college degree.

20   Q.    Where did you go to college?

21   A.    Baja, California, Mexicali.

22   Q.    Did you graduate from that college?

23   A.    Yes.

24   Q.    What year?

25   A.    '95 -- no.  '92.  Sorry.

1   Q.    Did you have a degree in --

2   A.    Mass communications.

3   Q.    When was the first time that you entered the United

4   States?

5   A.    It was a border town, so I -- you know, I lived all

6   my life in Mexicali, and so I crossed the border pretty

7   often.

8   Q.    Do you need a border crossing card to do that?

9   A.    Yes, you do.

10  Q.    Did you have one?

11  A.    Yes, I did.

12  Q.    Was that issued by the Mexican government or --

13  A.    No.  The border cross is issued by the government of

14  the United States.

15  Q.    When did you first enter the United States on a

16  permanent basis to live here?

17  A.    Okay.  1994, the end -- the end part of 1994.  I

18  arrived here to this area the first of January of 1995 in

19  this area.

20  Q.    Let me go back to your entry to the United States in

21  1994.

22  A.    Right, the last part of 1994.

23  Q.    Did you have some sort of a visa or a document to

24  permit you to enter the country?

25  A.    Right.  Yes.

1  Q.    What document was that?

2  A.    My visa -- my border cross or visa allows me to get

3  into the United States.  However, when I moved to this

4  area, you need a permit.  And I had that permit for six

5  months or so, I think it was.

6  Q.    What was the name of that permit?

7  A.    It's just a permit to travel farther from the

8  border.  I don't know the number of it.  There's a form

9  that you fill out at the border and you request that form.

10  I had that.

11  Q.    So you're saying that you were issued a card or

12  permit of some kind to enter the United States for six

13  months?

14  A.    Yes.  I think that's what it was.  The permit,

15  usually it's six months.

16  Q.    And that was issued in 1994?

17  A.    It had to.

18  Q.    Did that permit allow you to move freely throughout

19  the country?

20  A.    For six months, yes, visiting.  I mean, that's a

21  visiting type of permit.

22  Q.    Did you intend when you came in at that time to

23  remain here for no more than six months or were you

24  intending to remain here on a more permanent basis?

25  A.    I was intending to stay here for longer than that.

1  My husband applied for the documentation proper for me to

2  stay here.

3  Q.    Were you married at that time, in 1994, when you

4  came in?

5  A.    Yes, I was.

6  Q.    What was your husband's name?

7  A.    Matt Leland.  Matthew Leland.

8  Q.    Could you spell Leland, please?

9  A.    L-E-L-A-N-D.

10  Q.    Was he an American citizen?

11  A.    Yes.

12  Q.    So when you entered the country in 1994, it was with

13  your husband; right?

14  A.    Yes.

15  Q.    Were you married in the United States or Mexico?

16  A.    Both.  I was married in Mexico by the church and

17  here by the civil law.  Even though I didn't need to do

18  that, but I insisted on having that as part of our

19  tradition in Mexico.

20  Q.    Was that the first time you were married?

21  A.    Yes.

22  Q.    And did you -- so am I correct, then, when you came

23  to the country in 1994 with your husband, you were

24  intending to live with him in the country permanently?

25  A.    Yes.

1  Q.    And did you indicate that to the United States

2  government when you obtained your six-month permit, that

3  you intended to remain permanently?

4  A.    I didn't need to.

5  Q.    You weren't asked about that?

6  A.    No.    That permit doesn't -- you know, it allows you

7  to move freely for the amount of that visa.    You don't

8  require to say that information.

9  Q.    Was that called a visa, do you believe?

10  A.    It's a permit.    It's a permit.    It's not a visa.

11  The visa was my border crosser.

12  Q.    You then said, if I'm correct, that your husband

13  then helped you get a -- some other more permanent status

14  after six months.

15       Could you tell me what happened?    What card you

16  obtained after the six months?

17  A.    Are you an immigration lawyer?

18  Q.    No.

19  A.    Then let me just go into detail because it is

20  complicated.    It's the right of every American citizen to

21  marry whoever they want to.    And the law allows for a

22  procedure so the -- in this case, my husband applied for

23  my residency.    So he fills out all the documentation,

24  submit it to the government, and then we just wait until

25  we receive that documentation.

1          The process is that initially you get a permanent

2    residency with a conditional.  It's conditional permanent

3    residency, the status that you get.  That conditional

4    status gets removed after a year.  And that is, I guess, a

5    mechanism to prove that these two people are not getting

6    married just because of one of them just wanting to stay

7    in the country or just to obtain the state to be here.

8    Q.    Are you a lawful permanent resident?

9    A.    Yes.

10   Q.    When did you get your -- I believe that's commonly

11   known as a green card?

12   A.    Yes.

13   Q.    When did you obtain your green card?

14   A.    I don't remember the date.

15   Q.    Do you remember the year?

16   A.    It had to be 1997.

17   Q.    So between 1994 and 1997 you were not a lawful

18   permanent resident; is that correct?

19   A.    1995, that's when I got here.

20   Q.    I thought it was 1994 you entered the United States.

21   A.    Well, the end part.  I mean, I got here to the

22   United States in this area 1995, January 1st of 1995.

23   Q.    Where did you first enter the United States?  You

24   weren't in this area.  I'm just trying --

25   A.    Mexicali, the border?  Where did I cross?

1   Q.    Yes.  And where did you live when you crossed into

2   the United States initially?

3   A.    Pineville, Missouri.

4   Q.    And that was in 1994 or --

5   A.    1995.  January 1st of 1995, that's when I came to

6   this area in Pineville, Missouri.

7   Q.    I'm asking you:  When did you first enter the United

8   States to remain here permanently?  Was it --

9   A.    Yes.

10   Q.    -- prior to January 1st, 1995?

11   A.    No.  I mean, that's when I crossed to stay here

12   permanently.  Before that we were married, but we were

13   living in Mexico, in Mexicali.

14   Q.    So about January 1st, 1995, you and your husband

15   entered the United States to remain here?

16   A.    Yes.

17   Q.    And you came initially to Missouri?

18   A.    Yes.  Pineville, Missouri.

19   Q.    Pineville, Missouri?

20   A.    Yes.

21   Q.    How long did you live in Pineville, Missouri?

22   A.    From January '95 'til '97, the second -- like June,

23   July.  Somewhere around there.

24   Q.    Were you employed during the time you lived in

25   Pineville, Missouri?

1    A.    Not until I got my documentation to work.  You can't

2    work if you don't have documentation.

3    Q.    When did you obtain your documentation?

4    A.    I can't remember the date, but I can look it up if

5    you need me to.

6    Q.    What was your first employer?

7    A.    I was self-employed.  I created a translation

8    business.  And I assisted the sheriff's department, the

9    police department, the prosecutor.  That was the first

10   thing I did.  A little bail bond system, I assisted with

11   interpretation.

12   Q.    When did you obtain your documentation that you

13   referred to?  You said that you --

14   A.    You want me to look it up?  I mean, I --

15   Q.    No.  You don't have to look it up.  Approximately.

16   Do you know what year?  '90 -- do you know what year?

17   A.    I mean, I don't know.  It had to be before me being

18   able to work, but I -- I can't remember.  I can't remember

19   the date.

20   Q.    The documentation that you obtained, you were

21   referring to, was your lawful permanent residency status?

22   A.    The conditional permanent residency, yes.

23   Q.    Conditional?

24   A.    Right.  That's the first step.

25   Q.    So you were a conditional LPR, if I can call it

1  that?

2  A.    Yes.

3  Q.    How long were you a conditional LPR?

4  A.    Usually it's a year, but I can't remember the date I

5  actually went before -- we got divorced -- my husband and

6  I got divorced.  And I had to go to immigration and go to

7  the process to remove the conditional, and prove that we

8  had got married because of love, and not because of me

9  wanting to be here in the United States.

10  Q.    When did you get divorced?

11  A.    It was finalized December of '97, I believe.

12  Q.    Did you get your conditional LPR, then, prior to

13  your divorce, before December of '97?

14  A.    Yes.

15  Q.    Do you think it was during the year 1997?

16  A.    There is a possibility that -- probably in the

17  beginning of that year, but I don't remember.  I don't

18  remember.

19  Q.    And so you were divorced in -- did you say December

20  1997?

21  A.    I think it was.  That's when it was final, 1997.

22  Q.    Do you know where your former husband lives now?

23  A.    I have no idea.

24  Q.    When was the last time you spoke to him?

25  A.    It had to be like three years ago or something like

1   that.

2   Q.    Did you have any children with him?

3   A.    No.

4   Q.    His name is Matthew Leland?

5   A.    Yes.

6   Q.    Do you know what occupation he's in?

7   A.    I don't know what he's doing right now, but he's a

8   record producer.  Sound technician, engineer.  Whatever

9   you want to call it.

10  Q.    You obtained your conditional LPR, and then you were

11  divorced.

12        What is the next step that you took --

13  A.    I hired an immigration lawyer -- I'm sorry.

14  Q.    If you could please let me finish.

15  A.    Sorry.  I apologize.

16  Q.    That's all right.  It happens.  What's the next step

17  that you took in the process of becoming an LPR?

18  A.    Hire an immigration lawyer, because I had to -- you

19  know, the removal of the conditional status had to take

20  place.  So I hired a lawyer.  And that process was removed

21  -- I mean, the status was removed, and then I was a

22  permanent resident.

23  Q.    So you were able to get your full LPR status, even

24  though you weren't married; right?

25  A.    Right.

1    Q.    Do you know when you got your LPR status?

2                MR. VOLPE:    Asked and answered.

3    Q.    (Mr. Foster continued.)    Where was the immigration

4    lawyer who helped you?

5    A.    She's in Kansas City.

6    Q.    So you were still living in Missouri --

7    A.    Yes.

8    Q.    -- at that point?

9    A.    Yes.

10   Q.    Do you remember the lawyer's name?

11               MR. VOLPE:    I'm going to object to the

12   relevancy of this line of questioning, but she can answer

13   the question.

14   Q.    (Mr. Foster continued.)    Do you remember the

15   lawyer's name?

16   A.    No, I don't remember.    But I can get it.

17   Q.    So you're still an LPR --

18   A.    Yes.

19   Q.    -- lawful permanent resident?

20   A.    Yes.

21   Q.    Have you attempted to become a U.S. citizen?

22   A.    It is a process.    And I am getting to the point

23   where I do feel, you know, that I can honor this country.

24   Q.    As a lawful permanent resident, are you allowed to

25   leave the United States and then re-enter?

1    A.    Yes.

2    Q.    Freely?  As much as you want?

3    A.    Yes.

4    Q.    Have you gone back to Mexico since you left in 1995?

5    A.    Yes.

6    Q.    How many times have you gone back?

7    A.    At least once a year, but probably more than that,

8    just to visit my family.  And for work I have gone back

9    twice, I guess.

10   Q.    When did you become employed by Tyson Foods?

11   A.    1997.

12   Q.    Was that here in Arkansas?

13   A.    No.  That was in Missouri.

14   Q.    What was your first job for Tyson?

15   A.    I was retention coordinator.

16   Q.    What is a retention coordinator?

17   A.    A retention coordinator assists to maintain a

18   balanced workforce so we don't have a turnover.

19   Q.    What did your responsibilities consist of in that

20   position?

21   A.    My responsibilities were to understand the reasons

22   why our team members were leaving work; and to make sure

23   that we were doing everything we could so they would have

24   a stable, good work environment, and they wouldn't leave

25   their employment.

1    MR. FOSTER:  Did she bring any documents in
2  conjunction with today's notice?
3              MR. VOLPE:  Yes, she did.
4              MR. FOSTER:  Is that what you have there?
5              MR. VOLPE:  Yes.
6              MR. FOSTER:  Can I look at those?
7              MR. VOLPE:  Sure.
8              MR. FOSTER:  Why don't we take a break.  I'm
9  just going to quickly review these and then I will go back
10 on the record.
11 (Wherein, a break was taken from 11:16 a.m to 11:28 a.m.)
12             MR. VOLPE:  Ms. Hart wanted to clarify one
13 of her answers to the question you gave, if you don't
14 mind.
15             THE WITNESS:  The date that you were asking
16 me for my permanent residency is August '96.  Now I feel
17 better.
18 Q.    (Mr. Foster continued.)  So it was prior to your
19 divorce; is that right?
20 A.    Yes.
21 Q.    Have you been remarried?
22 A.    Yes.
23 Q.    Are you currently married?
24 A.    Yes.
25 Q.    What is your husband's name?