IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BIRDA TROLLINGER, VIRGINIA BRAVO, KELLY KESSINGER, IDOYNIA MCCOY, REGINA LEE, PATRICIA MIMS, LORI WINDHAM and ALEXANDER HOWLETT, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | MISCELLANEOUS CASE No. 1:07-mc-00341 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TYSON FOODS, INC., JOHN TYSON, ARCHIBALD SCHAFFER III, RICHARD BOND, KENNETH KIMBRO, GREG LEE, KAREN PERCIVAL, AHRAZUE WILT and TIM MCCOY, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## OPPOSITION OF ANA HART AND AMICUS BRIEF OF TYSON FOODS IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION TO COMPEL USCIS TO COMPLY WITH PLAINTIFFS' SUBPOENA

Ana Hart, through undersigned counsel, hereby submits this Opposition to Plaintiffs' Amended Motion to Compel USCIS to Comply with Plaintiffs' Subpoena ("Motion"). In addition, Tyson Foods Inc, through undersigned counsel, submits this amicus brief supporting the opposition to Plaintiffs' Amended Motion to Compel USCIS to Comply with Plaintiffs' Subpoena. As detailed below, there is no justification for permitting Plaintiffs access to the highly personal information contained in these files and the motion should be denied.

## BACKGROUND

The underlying civil RICO class action is pending before the Honorable Curtis L. Collier in the United States District Court for the Eastern District of Tennessee. The Plaintiffs

allege that Tyson Foods intentionally hires unauthorized aliens as hourly production workers in order to depress the wages it pays.  *See* Mot. Ex. H at ¶ 2 (Second Amended Complaint). Plaintiffs also allege that these hiring practices are in furtherance of a RICO "association-in-fact" enterprise formed by Tyson and two nationally prominent Hispanic civil rights organizations, the National Council of La Raza ("NCLR") and the League of United Latin American Citizens ("LULAC").

Ms. Hart, one of the subjects of the subpoena to USCIS, is not a defendant.  She was for several years the Multicultural Community Relations Manager at Tyson.  Plaintiffs *speculate* that Ms. Hart's "motive" for supporting and encouraging the hypothetical criminal conspiracy between Tyson and LULAC was that she either is or was an "illegal alien."  Mot. at 4.  Ms. Hart is of Hispanic descent and part of her job as Multicultural Community Relations Manager was to serve as Tyson's contact person with LULAC.[1]  Tyson contributes to and supports LULAC (as well as other recognized civil rights and advocacy groups) because of their common interest in promoting the health, safety and well-being of Tyson's employees.

The other subjects of the subpoena are current and former Tyson employees who work or worked at one of the plants at issue in the case.  Plaintiffs' putative expert,  Michael Cutler, reviewed employment files and opined that 91 Tyson employees, including the individuals named in the subpoena, "appear[ed]" to be illegal aliens.  Mr. Cutler's identification of these individuals was based, at least in part, upon his opinion that any person who claims to be lawfully in the United States for a number of years but lacks some undefined level of "English language ability" is "likely" to be an illegal alien.  Thus, the 91 individuals in question were identified as "illegal" primarily because  (i) their I-9 form either contained errors or reflected the

---

[1] In her private life, Ms. Hart was a member of LULAC, and was voted LULAC's Woman of the Year in 2003.

fact that they obtained assistance from a preparer or translator; or (ii) they completed the Tyson employment application in a language other than English.  On the eve of the *Daubert* hearing challenging Mr. Cutler's methodology and opinion, Plaintiffs withdrew his opinion that the 91 individuals in question are illegal aliens.  Nevertheless, Plaintiffs pursue access to these individuals' alien files.

**I.    PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF ANA HART'S DOCUMENTS SHOULD BE DENIED**

Plaintiffs seek access to Ms. Hart's Alien File, including documents related to her "residency status," "work authorization" and "alien registration cards and numbers."  *See* Mot. Ex. A.  They offer no justification for this unwarranted invasion into Ms. Hart's highly private government files.  The fact is the information Plaintiffs seek is not relevant to the underlying cause of action against Tyson Foods.

**A.    Plaintiffs Have Offered No Justification For Their Request**

There is absolutely no basis for Plaintiffs' request—other than to harass Ms. Hart. Plaintiffs admit that the demand for Ms. Hart's file is based only upon their "susp[icion]" that Ms. Hart is an illegal alien.  Mot. at 4.  They provide <u>no</u> basis for that suspicion.  Although they refer to Ms. Hart's deposition testimony, *see id.*, they do not quote from or point to any portion of Ms. Hart's testimony that supports this suspicion.  In fact, Plaintiffs questioned Ms. Hart about her entry into the country and her path to permanent residency.  Her testimony, which Ms. Hart attaches in pertinent part for the Court's reference, provides <u>no</u> basis for Plaintiffs to delve further into her private, personal information.  *See* Exhibit 1 attached.  Plaintiffs' failure to articulate any basis for their request is reason to deny their motion.

**B.     The Information Sought Is Not Relevant To The Underlying Litigation**

Even if Plaintiffs had an actual basis to suspect that Ms. Hart is an "illegal alien"—which they do not—Ms. Hart's immigration status simply is not relevant to the claims against Tyson in the underlying action.  As the United States correctly stated in its response to Plaintiffs' subpoena:

> If our understanding of your theory is correct, Tyson Foods could have formed a RICO enterprise with local and national Hispanic Rights Groups *regardless* of [Ana] Hart's immigration status. . . . It would appear that no matter how the questions are cast or phrased, the immigration status of a lone corporate employee, Ms. Hart, without more, would be wholly irrelevant to establishing the existence of an ongoing RICO enterprise.

Mot. Ex. D at 2.

Plaintiffs have offered no argument or evidence in response to the United States' position other than the assertion that the DHS file might establish a "motive" for Ms. Hart's conduct.  Mot. at 4.  But, the "motive" argument is circular because Plaintiffs do not articulate what conduct of Ms. Hart's is at issue or why her "motives" might be relevant.  The bottom line is that Ms. Hart's immigration file is not relevant to Plaintiffs' claims, and the motion to compel its production should be denied.

**C.     Producing Ms. Hart's File Would Be An Unwarranted Invasion Of Her Privacy And Fundamentally Unfair**

Ms. Hart is preparing her application to become a naturalized United States citizen.  In this context, she has expressed anxiety that Plaintiffs' efforts to harass her by looking for non-existent evidence that she lied about her legal status might delay her naturalization process.[2]  Ms. Hart has nothing to hide—indeed, she sat for a full day of deposition with

---

[2] In light of the fact that the Customs and Immigration Service already has reviewed Ms. Hart's file and granted her permanent resident status, which she has maintained since 1996, the conduct of Plaintiffs and their counsel is not likely to have any impact on her status.  But, the fact

Plaintiffs' lawyers and answered all of their questions about her migration to the United States and her immigration status. But she does have a right to privacy. That right is superior to Plaintiffs' tenuous claim to the information sought. The Privacy Act exists for a reason: it enables individuals to submit personal and confidential information to the Government without fear that the information will be shared with third parties, absent compelling circumstances. No such circumstances exist here. Ms. Hart respectfully requests that this Court exercise its supervisory responsibility—which "in many cases [under the Privacy Act] may be weightier than in the usual discovery context," *Laxalt* v. *McClatchy*, 809 F.2d 885, 888-89 (D.C. Cir. 1987)—and deny Plaintiffs' motion.

## II.    PLAINTIFFS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS RELATED TO THE OTHER TYSON EMPLOYEES ON THE SUBPOENA SHOULD BE DENIED

Plaintiffs also seek production of the alien files for the other former and current Tyson employees listed on Exhibit A of the USCIS subpoena. As noted above, the list was compiled by Plaintiffs' putative expert, Michael Cutler, who reviewed the employment applications of 497 Tyson employees and opined that 91 individuals "appeared" to be unauthorized aliens. *See supra* at 2-3. Mr. Cutler identified the supposed 91 "illegal aliens" in May 2007.

### A.    Discovery in the Underlying Civil Action is Closed

Pursuant to the discovery schedule in the underlying action, Plaintiffs had until July 31, 2007 to issue discovery.[3] While specific discovery, including depositions, has been

---

remains that Ms. Hart is legitimately distressed and upset by the thought of Plaintiffs and their counsel invading her privacy.

[3] Plaintiffs may argue that the discovery schedule does not cover third party subpoenas and that a subpoena duces tecum seeking production of documents is not "written discovery." Plaintiffs are

permitted past the cut-off date, Plaintiffs have never asked the Eastern District of Tennessee for permission to issue the USCIS subpoena. And, that court already refused Plaintiffs' request to continue the *Daubert* hearing pending a ruling from this Court on the motion to compel these files:

> On February 9, 2007, the *Daubert* hearing was originally scheduled for October 15, 2007; it has since been delayed until November 7-8, 2007 (Court File No. 241). Plaintiffs had ample opportunity to collect documents necessary to prepare for the hearing. Instead, Plaintiffs waited until September 24, 2007 to issue a subpoena for the ninety-one immigration files from the DHS, and filed in the U.S. District Court for the District of Columbia on October 24, 2007 to enforce the subpoena (Court File No. 421, p. 2, n. 2). Plaintiffs have provided no reason for their delay in seeking these immigration files to warrant a delay in the *Daubert* hearing, and the Court knows of none.

Memorandum Opinion at 3, No. 4:02-cv-00023 (Oct. 30, 2007) (Doc. 431). Plaintiffs have had years of discovery, and discovery is now closed. Plaintiffs' motion to compel the USCIS files should be denied.[4]

### B. Plaintiffs' Claim That These Files Are Necessary to Their Case is Inconsistent With Their Position in Other Pleadings

Plaintiffs claim that the "records sought are essential for the Class to prove its case," Motion at 3—but this argument does not bear scrutiny. At the outset, Plaintiffs have taken more than two years of discovery since the filing of the Second Amended Complaint, yet until November 1, 2007, they never represented or suggested that discovery of these DHS files was even a contemplated part of their proof. Rather, Plaintiffs insisted that their proof of illegal

---

wrong on both scores. The deadline for issuing written discovery covers *all* written discovery—nothing, including third party subpoenas, was carved out.

[4] Defendants have asked the Eastern District of Tennessee to quash the DHS subpoena because of Plaintiffs' violation of the discovery cutoff. In opposition to this argument, Plaintiffs argued, *inter alia*, that the Defendants have addressed their arguments to the "wrong court" and that any basis for quashing the subpoena should be addressed in this Court. Pls.' Resp. Mem. to Defs.' Mot. to Quash at 3, No. 4:02-cv-00023 (E.D. Tenn. filed Nov. 13, 2007) (Doc. 444). The motion to quash the DHS subpoena is still pending.

hiring would rest upon the opinion of Mr. Cutler.  But, also on November 1, 2007, Plaintiffs made the strategic and tactical decision not to expose Mr. Cutler's reasoning and methodology to the trial court and withdrew his opinion.  That decision may have been theirs to make, but a tactical decision to retreat from their long-held position does not require this Court to credit their claim that these DHS files suddenly became "essential."

That the DHS files are not "essential" to Plaintiffs is reflected by the fact that two days *after* filing the instant Motion to Compel, Plaintiffs failed to identify these files as part of their proof that any Tyson employee was unauthorized.  Specifically, Plaintiffs were ordered to respond to an interrogatory seeking the "[i]denti[ty of] each former [and current] Tyson employee that Plaintiffs believe was not authorized to work in the United States [and the] factual and legal basis for [that assertion]."  Ex. 2 (Oct. 24, 2007 Order).  In their response, served on October 26, 2007, Plaintiffs made no mention of these DHS files being any part of the "factual" basis of their proof.  *See* Ex. 3.  In fact, the files are not mentioned at all in the interrogatory response.[5]  If the files were an "essential" part of their case, Plaintiffs had an obligation to identify them in their response to the Court's order.

Finally, the lack of real need for these files is reflected in the fact that Plaintiffs have not even bothered to request the files for all ninety-one individuals identified by Mr. Cutler.  Exhibit A to the USCIS subpoena lists only sixty-eight individuals, including Ms. Hart.  The fact is, Plaintiffs' demand for these protected DHS files is nothing more than a belated fishing expedition, and it should be rejected.

---

[5] This is not surprising.  Until recently, Plaintiffs insisted that their "proof" would be based upon Mr. Cutler's opinion and deposition testimony from those 91 individuals.  *See* Plaintiffs' Memorandum in Support of Motion to Take Additional Depositions at 4 ("Plaintiffs' expert compiled a list of suspected illegal aliens based on a review of a *random sample* of current Tyson employees' I-9 forms and employment applications.  Plaintiffs now seek to depose these individuals *to complete the inquiry/investigation*." (emphasis added).

**C.  There Is No Factual Predicate For Seeking These Files.**

1.    The Cutler opinion, which forms the only basis for identifying these 91 individuals, has been withdrawn by Plaintiffs.  Accordingly, there is no factual predicate for selecting the files of these 91 (or 68) employees from all of Tyson's current and former employees.  *See* Pls.' Resp. to Mot. to Exclude Test. of M. Cutler at 4 (Doc. 435) (filed Nov. 1, 2007) ("Plaintiffs have decided not to use Mr. Cutler to offer any opinion as to whether any particular Tyson employee or former employee is unauthorized.").

Because there is no factual predicate, Plaintiffs' demand for these files essentially is a fishing expedition.  They are casting a net over what are essentially a "random" group of Tyson employees in hope that the privacy-protected USCIS files might show something "wrong."

2.    Even if the opinion had not been withdrawn, the Cutler opinion provides no valid basis for seeking these files.  Plaintiffs articulate Mr. Cutler's opinion as:

> each former Tyson employee who claimed to be a U.S. citizen or lawful permanent resident alien but was unable to complete the I-9 form or Tyson employment application in English is unauthorized. Mr. Cutler identified 91 persons as unauthorized. Plaintiffs believe all are unauthorized.

*See* Ex. 3 (October 26 Interrogatory response).

The notion that all U.S. citizens or lawful permanent residents speak English is simply incorrect as a matter of fact and law.  All persons born in the United States are citizens, including citizens born in Puerto Rico or in one of the millions of American households in which a language other than English is spoken at home.  *See* U.S. Const. amend. XIV; 8 U.S.C. § 1401(a).[6]  And there is absolutely no legal requirement for a lawful permanent resident to

---

[6] According to the 2000 census, over 47 million Americans over the age of 5 speak a language other than English at home and over 21 million of those Americans do not speak English

speak English–which Plaintiffs have admitted.  *See* Ex. 4 at 6 (Pls.' Response to Third Set of Requests for Admission) (denying that "Plaintiffs contend that lawful permanent residents of the United States must be able to speak English").

Furthermore, the United States has affirmatively instructed employers not to use "language" as a proxy for deciding which individuals are authorized to work in the United States. Instead, employers are told not to "treat individuals differently" because of language ability, but to make work authorization determinations based upon whether an individual's identity and work authorization documents reasonably appear "on their face" to be genuine and to relate to the employee.  *See, e.g.*, Ex. 5 at 4 (OSC Update) ("Employers may not treat individuals differently because of their place of birth, country of origin, ancestry, native language, accent, or because they are perceived as looking or sounding 'foreign'.").  The Office of Special Counsel specifically instructs employers to base employment eligibility decisions on the face of the documents presented—not on whether employees "look" or "sound" legal.[7]

Moreover, Mr. Cutler's review of paper records is not a legitimate means of determining which employees speak or read English well enough to meet his standard.  For example, Mr. Cutler opined that Comechalla Youngblood was an illegal alien because Ms. Youngblood needed the assistance of a "translator" to complete her I-9 form.  But the I-9 form

---

fluently.  *See* Ex. 6.  These 21 million Americans comprise over 8 percent of the population of the United States.  *Id.*  Over 5.6 million of these non-fluent English speakers were born in the United States.  *See id.*  Plaintiffs' own damages expert—an immigrant himself—admits, "millions of legal immigrants do not speak English."  Ex. 7 at 214 (Borjas Dep.)

[7] Ex. 5 at 4; *see also* Ex. 9 at 18 (Handbook for Employers); Ex. 10 at 3 ("Look at the Facts. Not at the Faces" Employer Brochure) (employers may not base employment decisions "on appearance, *language*, name, or citizenship status") (emphasis added).  The Equal Employment Opportunity Commission also prohibits employers from basing hiring decisions on lack of English fluency unless fluency "is required for the effective performance of the position for which it is imposed."  EEOC Compliance Manual § 13.V.B.1; *see* 29 C.F.R. § 1606.6(b) (2006) (EEOC will "carefully investigate" allegations that an employer has imposed "[f]luency-in-English requirements").

does not allow a person providing assistance to designate whether they were a "preparer" *or* a "translator." In Ms. Youngblood's case, she needed the help of a *preparer* because—although she was born and raised in Louisiana—she needs help reading. *See* Ex. 8 (Transcript of *Daubert* hearing). Another example is Martin Soto, who Mr. Cutler identified as an illegal alien because Mr. Soto completed his Tyson employment application in 2000 in Spanish. Mr. Soto testified that although he could speak English in 2000, he felt more comfortable completing the written application in Spanish. Mr. Soto became a naturalized citizen on November 8, 2007.[8]

In the handful of instances in which Mr. Cutler claimed to base his opinion on something other than language skill (*e.g.* federal law, regulation or guidance), he got it wrong. For example:

- The law requires permanent residents to have a valid, unexpired I-551 card ("green card") at the time the I-9 form is completed.[9] The law <u>forbids</u> employers from attempting to "re-verify" an employee's work authorization if the green card expires after the time that the employee is hired.[10] Mr. Cutler, however, concluded that a

---

[8] The notion that "illegal aliens" may be uncovered from a review of I-9 forms does not make sense. Plaintiffs premise is that any "authorized" worker will <u>always</u> be willing to sign the I-9 form under penalty of perjury (and without translation or assistance)—even if that applicant's first language is not English. But, the United States government recognizes that *citizens* may prefer to complete important documents in a language other than English. That is why federal law requires ballots and federal election information to be provided in Spanish and other languages, despite the fact that only U.S. citizens can vote. *See* 42 U.S.C. § 1973b(f).

[9] An I-551 card is a registration receipt card which evidences alien registration if the person is a resident alien. It is also known as a green card, resident alien card, or permanent residence card. Ex. 11 at 151.

[10] Guidance from the U.S. Citizenship and Immigration Services provides that "once granted, [permanent residence] is permanent. However, the document that an alien carries as proof of this status may expire…. Expiration dates do not affect current employment, since employers are neither required nor permitted to re-verify the employment authorization of aliens who have presented one of these cards to satisfy I-9 requirements (this is true for conditional residents as permanent residents)." http://www.uscis.gov/portal/site/uscis/ (Search "About Form I-9, Employment Eligibility Verification" and select first link). In other words, if an applicant for

large number of Tyson employees whose records are being subpoenaed were "unauthorized" based upon his incorrect belief that Tyson was required to re-verify those employees' green cards. Ex. 11 at 262-64. In other words, the Plaintiffs' "expert" on work authorization applied one of the most basic rules in a manner completely contrary to what the law requires.

- Mr. Cutler also testified that one Tyson employee on the subpoena list was unauthorized solely based upon his mistaken belief that a foreign passport is not acceptable proof of identity. *Id.* at 232-33. But, *the I-9 form itself* lists foreign passports as acceptable proof of identity. *Id.* at 276.

3.   Finally, this motion should be denied because it is nothing more than a renewed effort to obtain Privacy Act-protected information that already has been rejected by the Eastern District of Tennessee. In February 2007, Plaintiffs filed a motion to compel Tyson to submit the social security numbers of all of its employees to the Social Security Administration for verification. In their supporting pleadings, Plaintiffs asserted–just as they do here–that the evidence was "crucial" [and went] to the heart of Plaintiffs' case, *i.e.* that Tyson knowingly hires illegal immigrants." Ex. 12 at 2 (Pls.' Reply Mem. in Supp. of Mot. to Compel). Based upon opposition from Tyson and the United States Department of Justice (which raised, *inter alia*, the same Privacy Act concerns at issue here), the court denied Plaintiffs' motion. Among other things, the court noted that using the Social Security Administration numbers in the manner suggested by Plaintiffs would be redundant because the name, birth date and social security

---

employment in 2007 presents a green card with an expiration date of January 15, 2008, the employer *is prohibited from* asking to see a new green card in 2008, after the original card expires.

number of every Tyson employee was verified through the Basic Pilot program[11] at the time the employees were hired.

Plaintiffs then turned to Mr. Cutler's opinions as their proof of illegal status.  To corroborate the Cutler opinion, Plaintiffs sought to "prove their case" by taking the depositions of thirty-one of the 91 individuals identified by Mr. Cutler.  In fact, the depositions yielded no evidence that the individuals in question are unauthorized to work.  That is why the depositions go unmentioned as any part of the "factual predicate" for the discovery sought.

Against this background, Plaintiffs' latest representation to this Court—that the DHS files will "prove" the illegal status of these individuals—is misleading, to say the least.  If the depositions had "proved their case"—as Plaintiffs previously stated—then the DHS files would be redundant, at least with respect to the thirty-one individuals Plaintiffs chose to depose. Many of the individuals in the group of 91 are citizens of the United States (either by birth or by naturalization), and there is no evidence that the others have anything other than bona fide documentation of their status as legal immigrants.  As noted, Tyson counsel brought several of these individuals to the recent *Daubert* hearing, including one to whom Plaintiffs' counsel stated on cross-examination, "[y]ou're a citizen of the United States, you're authorized to work in the United States, obviously."  Ex. 8 at 5.  Another of these individuals, Mr. Soto, told the Court (in plain English) that he was being sworn in as a United States Citizen the day after the *Daubert* hearing.

---

[11] The Basic Pilot program is a voluntary program through which participating employers electronically confirm employees' work eligibility by checking an employees' name, date of birth, and social security number or alien number against government records.  Participants in Basic Pilot enter new employees' names, date of birth, and social security number into a computer program.  The data is checked against government records, and a response is generated within seconds which indicates whether or not the employee's information matches government records.  Tyson has participated in Basic Pilot since 1998.

4.    Finally, the requested records would not support Plaintiffs' claims, even if they were produced.  Plaintiffs' RICO claim rests upon showing that Tyson hired "unauthorized" workers with "actual knowledge" those individuals were (1) unauthorized to work in the United States and (2) had been illegally brought into the United States in violation of 8 U.S.C. § 1324(a).  *See* 8 U.S.C. § 1324(a)(3)(A).  But, neither Tyson nor any other employer is permitted to check the alien files maintained by DHS to determine whether prospective employees have presented falsified documents.  Like the social security records, the documents sought simply are not probative of what Plaintiffs need to prove.[12]

In sum, Plaintiffs have come forward with no argument that would justify the widespread invasion of privacy that they are demanding.  To permit Plaintiffs to rummage randomly through these individuals' highly personal and sensitive files on such a flimsy basis is unfair to these individuals.  It also is inconsistent with the protections provided by the Privacy Act.

## CONCLUSION

For the foregoing reasons, the undersigned respectfully request that Plaintiffs' Amended Motion to Compel be denied.

---

[12] For example, even if one of the DHS records showed that an individual with temporary residence status presented fraudulent documentation of work authorization to Tyson, the DHS file would not be relevant to show a hiring violation because Tyson, as a matter of law, did not have access to that file.  They are also irrelevant for other reasons: persons born in the United States do not have a DHS file.  Thus, the absence of a file—which Plaintiffs would argue is proof of unauthorized entry—also could mean that the individual is a U.S. citizen.

Dated:  November 20, 2007                    Respectfully submitted,


                                             /s/ Frank R. Volpe
                                             Frank R. Volpe
                                             Colleen M. Lauerman (D.C. Bar No. 459766)
                                             Matthew J. Warren (D.C. Bar No. 483357)
                                             SIDLEY AUSTIN LLP
                                             1501 K Street, N.W.
                                             Washington, D.C. 20005-1401
                                             (202) 736-8000


                                             *Attorneys for Ana Hart and Tyson Foods, Inc.,*

**CERTIFICATE OF SERVICE**

   I hereby certify that on November 20, 2007, a copy of the foregoing Opposition to Plaintiffs' Motion to Compel was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.


        /s/ Frank R. Volpe
        Frank R. Volpe

# ORIGINAL TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

BIRDA TROLLINGER, et al.,          )
                                   )
            Plaintiffs,            )
                                   )
vs.                                )
                                   )  Case No. 4:02-CV-23
TYSON FOODS, INC.,                 )
                                   )
            Defendant.             )
_____)

## DEPOSITION OF ANA LORENA HART

Taken at the Niblock Law Firm, 324 North College
Avenue, Fayetteville, Arkansas, on June 7, 2005, at 11:00
a.m.

A P P E A R A N C E S

**MR. HOWARD W. FOSTER**              FOR THE PLAINTIFF
Johnson & Bell
55 East Monroe Street, Suite 4100
Chicago, Illinois 60603
(312) 372-0770
(312) 372-9818 Fax

**MR. FRANK R. VOLPE**                FOR THE DEFENDANT
**MS. CASSIDY KESTER PINEGAR**
Sidley Austin Brown & Wood LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8366
(202) 736-8711 Fax



# Donald Court Reporting, Inc.

*Court Reporting Excellence Since 1981*

P.O. Box 1733, Springdale, Arkansas 72765-1733

479.756.2256
888.438.7836
FAX 479.751.9153

www.getsteno.com

```
 1                      I N D E X

 2


 3    TESTIMONY BY ANA LORENA HART                        Page

 4            Examination by Mr. Foster ------------------  3
              Examination by Mr. Volpe -------------------168
 5            Further Examination by Mr. Foster ----------170

 6

 7

 8

 9                    E X H I B I T S

10    Deposition
      Exhibit                                            Marked
11
      1 (January 29, 2003 E-mail)-------------------------- 40
12    2 (May 7, 2003 E-mail)------------------------------- 51
      3 (April 29, 2002 E-mail)---------------------------- 53
13    4 (October 15, 2003 E-mail)-------------------------- 53
      5 (October 1, 2003 E-mail)--------------------------- 67
14    6 (April 1, 2002 Letter)----------------------------- 86
      7 (October 19, 2004 E-mail)--------------------------141
15    8 (May 2, 2003 Letter)------------------------------165

16

17

18

19

20

21

22

23

24

25
```

1              ANA LORENA HART, having been called upon to

2      testify in the form of a deposition, and having been duly

3      sworn, testified as follows, to wit:

4                     EXAMINATION

5      BY MR. FOSTER:

6      Q.    Is it Ms. or Mrs.?  Which do you prefer?

7      A.    Miss.

8      Q.    Miss Hart?

9      A.    Uh-huh.

10     Q.    Okay.  Miss Hart, if you don't understand a

11     question, let me know.  I'll reask it.

12     A.    Okay.

13     Q.    I want you to understand my questions.  And I'll try

14     and let you finish your answers.  But if I start talking

15     before you're done, let me know, and I'll stop.  I don't

16     want to do that.

17             Could we start, please, with your date of birth?

18     A.    January 31st, 1970.

19     Q.    Where were you born?

20     A.    Mexicali, Baja, California, Mexico.

21     Q.    And your parents' names, please?

22     A.    David Moreno Oviedo and Maria Clotilde Garayde

23     Moreno.  Do you want me to write it down?

24     Q.    Moreno?

25     A.    Uh-huh.

1   Q.    You were born Ana Moreno?

2   A.    Ana Moreno Oviedo.

3   Q.    Moreno is spelled?

4   A.    M-O-R-E-N-O.

5   Q.    And Ana is A-N-A?

6   A.    Just one N.

7   Q.    When did you first enter the United States?

8   A.    It had to be somewhere around 1990 -- well, what do

9   you mean with that question?

10  Q.    Let me withhold that question for now.  Let's go

11  back.

12        Where did you go to high school?

13  A.    Mexico.  Mexicali.

14  Q.    And did you graduate from high school?

15  A.    Yes.

16  Q.    What year?

17  A.    I'm not good with dates.  Let me see.  '88.

18  Q.    Did you go to school beyond that?

19  A.    Yes.  I have a college degree.

20  Q.    Where did you go to college?

21  A.    Baja, California, Mexicali.

22  Q.    Did you graduate from that college?

23  A.    Yes.

24  Q.    What year?

25  A.    '95 -- no.  '92.  Sorry.

1    Q.    Did you have a degree in --

2    A.    Mass communications.

3    Q.    When was the first time that you entered the United

4    States?

5    A.    It was a border town, so I -- you know, I lived all

6    my life in Mexicali, and so I crossed the border pretty

7    often.

8    Q.    Do you need a border crossing card to do that?

9    A.    Yes, you do.

10    Q.    Did you have one?

11    A.    Yes, I did.

12    Q.    Was that issued by the Mexican government or --

13    A.    No.  The border cross is issued by the government of

14    the United States.

15    Q.    When did you first enter the United States on a

16    permanent basis to live here?

17    A.    Okay.  1994, the end -- the end part of 1994.  I

18    arrived here to this area the first of January of 1995 in

19    this area.

20    Q.    Let me go back to your entry to the United States in

21    1994.

22    A.    Right, the last part of 1994.

23    Q.    Did you have some sort of a visa or a document to

24    permit you to enter the country?

25    A.    Right.  Yes.

1    Q.    What document was that?

2    A.    My visa -- my border cross or visa allows me to get

3    into the United States.  However, when I moved to this

4    area, you need a permit.  And I had that permit for six

5    months or so, I think it was.

6    Q.    What was the name of that permit?

7    A.    It's just a permit to travel farther from the

8    border.  I don't know the number of it.  There's a form

9    that you fill out at the border and you request that form.

10   I had that.

11   Q.    So you're saying that you were issued a card or

12   permit of some kind to enter the United States for six

13   months?

14   A.    Yes.  I think that's what it was.  The permit,

15   usually it's six months.

16   Q.    And that was issued in 1994?

17   A.    It had to.

18   Q.    Did that permit allow you to move freely throughout

19   the country?

20   A.    For six months, yes, visiting.  I mean, that's a

21   visiting type of permit.

22   Q.    Did you intend when you came in at that time to

23   remain here for no more than six months or were you

24   intending to remain here on a more permanent basis?

25   A.    I was intending to stay here for longer than that.

```
 1   My husband applied for the documentation proper for me to

 2   stay here.

 3   Q.    Were you married at that time, in 1994, when you

 4   came in?

 5   A.    Yes, I was.

 6   Q.    What was your husband's name?

 7   A.    Matt Leland.  Matthew Leland.

 8   Q.    Could you spell Leland, please?

 9   A.    L-E-L-A-N-D.

10   Q.    Was he an American citizen?

11   A.    Yes.

12   Q.    So when you entered the country in 1994, it was with

13   your husband; right?

14   A.    Yes.

15   Q.    Were you married in the United States or Mexico?

16   A.    Both.  I was married in Mexico by the church and

17   here by the civil law.  Even though I didn't need to do

18   that, but I insisted on having that as part of our

19   tradition in Mexico.

20   Q.    Was that the first time you were married?

21   A.    Yes.

22   Q.    And did you -- so am I correct, then, when you came

23   to the country in 1994 with your husband, you were

24   intending to live with him in the country permanently?

25   A.    Yes.
```

1   Q.    And did you indicate that to the United States

2   government when you obtained your six-month permit, that

3   you intended to remain permanently?

4   A.    I didn't need to.

5   Q.    You weren't asked about that?

6   A.    No.   That permit doesn't -- you know, it allows you

7   to move freely for the amount of that visa.   You don't

8   require to say that information.

9   Q.    Was that called a visa, do you believe?

10  A.    It's a permit.   It's a permit.   It's not a visa.

11  The visa was my border crosser.

12  Q.    You then said, if I'm correct, that your husband

13  then helped you get a -- some other more permanent status

14  after six months.

15        Could you tell me what happened?   What card you

16  obtained after the six months?

17  A.    Are you an immigration lawyer?

18  Q.    No.

19  A.    Then let me just go into detail because it is

20  complicated.   It's the right of every American citizen to

21  marry whoever they want to.   And the law allows for a

22  procedure so the -- in this case, my husband applied for

23  my residency.   So he fills out all the documentation,

24  submit it to the government, and then we just wait until

25  we receive that documentation.

```
 1          The process is that initially you get a permanent

 2    residency with a conditional.  It's conditional permanent

 3    residency, the status that you get.  That conditional

 4    status gets removed after a year.  And that is, I guess, a

 5    mechanism to prove that these two people are not getting

 6    married just because of one of them just wanting to stay

 7    in the country or just to obtain the state to be here.

 8    Q.    Are you a lawful permanent resident?

 9    A.    Yes.

10    Q.    When did you get your -- I believe that's commonly

11    known as a green card?

12    A.    Yes.

13    Q.    When did you obtain your green card?

14    A.    I don't remember the date.

15    Q.    Do you remember the year?

16    A.    It had to be 1997.

17    Q.    So between 1994 and 1997 you were not a lawful

18    permanent resident; is that correct?

19    A.    1995, that's when I got here.

20    Q.    I thought it was 1994 you entered the United States.

21    A.    Well, the end part.  I mean, I got here to the

22    United States in this area 1995, January 1st of 1995.

23    Q.    Where did you first enter the United States?  You

24    weren't in this area.  I'm just trying --

25    A.    Mexicali, the border?  Where did I cross?
```

1    Q.    Yes.  And where did you live when you crossed into

2    the United States initially?

3    A.    Pineville, Missouri.

4    Q.    And that was in 1994 or --

5    A.    1995.  January 1st of 1995, that's when I came to

6    this area in Pineville, Missouri.

7    Q.    I'm asking you:  When did you first enter the United

8    States to remain here permanently?  Was it --

9    A.    Yes.

10   Q.    -- prior to January 1st, 1995?

11   A.    No.  I mean, that's when I crossed to stay here

12   permanently.  Before that we were married, but we were

13   living in Mexico, in Mexicali.

14   Q.    So about January 1st, 1995, you and your husband

15   entered the United States to remain here?

16   A.    Yes.

17   Q.    And you came initially to Missouri?

18   A.    Yes.  Pineville, Missouri.

19   Q.    Pineville, Missouri?

20   A.    Yes.

21   Q.    How long did you live in Pineville, Missouri?

22   A.    From January '95 'til '97, the second -- like June,

23   July.  Somewhere around there.

24   Q.    Were you employed during the time you lived in

25   Pineville, Missouri?

11

```
 1   A.     Not until I got my documentation to work.  You can't

 2   work if you don't have documentation.

 3   Q.     When did you obtain your documentation?

 4   A.     I can't remember the date, but I can look it up if

 5   you need me to.

 6   Q.     What was your first employer?

 7   A.     I was self-employed.  I created a translation

 8   business.  And I assisted the sheriff's department, the

 9   police department, the prosecutor.  That was the first

10   thing I did.  A little bail bond system, I assisted with

11   interpretation.

12   Q.     When did you obtain your documentation that you

13   referred to?  You said that you --

14   A.     You want me to look it up?  I mean, I --

15   Q.     No.  You don't have to look it up.  Approximately.

16   Do you know what year?  '90 -- do you know what year?

17   A.     I mean, I don't know.  It had to be before me being

18   able to work, but I -- I can't remember.  I can't remember

19   the date.

20   Q.     The documentation that you obtained, you were

21   referring to, was your lawful permanent residency status?

22   A.     The conditional permanent residency, yes.

23   Q.     Conditional?

24   A.     Right.  That's the first step.

25   Q.     So you were a conditional LPR, if I can call it
```

1    that?

2    A.    Yes.

3    Q.    How long were you a conditional LPR?

4    A.    Usually it's a year, but I can't remember the date I

5    actually went before -- we got divorced -- my husband and

6    I got divorced.  And I had to go to immigration and go to

7    the process to remove the conditional, and prove that we

8    had got married because of love, and not because of me

9    wanting to be here in the United States.

10   Q.    When did you get divorced?

11   A.    It was finalized December of '97, I believe.

12   Q.    Did you get your conditional LPR, then, prior to

13   your divorce, before December of '97?

14   A.    Yes.

15   Q.    Do you think it was during the year 1997?

16   A.    There is a possibility that -- probably in the

17   beginning of that year, but I don't remember.  I don't

18   remember.

19   Q.    And so you were divorced in -- did you say December

20   1997?

21   A.    I think it was.  That's when it was final, 1997.

22   Q.    Do you know where your former husband lives now?

23   A.    I have no idea.

24   Q.    When was the last time you spoke to him?

25   A.    It had to be like three years ago or something like

```
 1   that.

 2   Q.    Did you have any children with him?

 3   A.    No.

 4   Q.    His name is Matthew Leland?

 5   A.    Yes.

 6   Q.    Do you know what occupation he's in?

 7   A.    I don't know what he's doing right now, but he's a

 8   record producer.  Sound technician, engineer.  Whatever

 9   you want to call it.

10   Q.    You obtained your conditional LPR, and then you were

11   divorced.

12         What is the next step that you took --

13   A.    I hired an immigration lawyer -- I'm sorry.

14   Q.    If you could please let me finish.

15   A.    Sorry.  I apologize.

16   Q.    That's all right.  It happens.  What's the next step

17   that you took in the process of becoming an LPR?

18   A.    Hire an immigration lawyer, because I had to -- you

19   know, the removal of the conditional status had to take

20   place.  So I hired a lawyer.  And that process was removed

21   -- I mean, the status was removed, and then I was a

22   permanent resident.

23   Q.    So you were able to get your full LPR status, even

24   though you weren't married; right?

25   A.    Right.
```

1   Q.    Do you know when you got your LPR status?

2          MR. VOLPE:  Asked and answered.

3   Q.    (Mr. Foster continued.)  Where was the immigration

4   lawyer who helped you?

5   A.    She's in Kansas City.

6   Q.    So you were still living in Missouri --

7   A.    Yes.

8   Q.    -- at that point?

9   A.    Yes.

10  Q.    Do you remember the lawyer's name?

11          MR. VOLPE:  I'm going to object to the

12  relevancy of this line of questioning, but she can answer

13  the question.

14  Q.    (Mr. Foster continued.)  Do you remember the

15  lawyer's name?

16  A.    No, I don't remember.  But I can get it.

17  Q.    So you're still an LPR --

18  A.    Yes.

19  Q.    -- lawful permanent resident?

20  A.    Yes.

21  Q.    Have you attempted to become a U.S. citizen?

22  A.    It is a process.  And I am getting to the point

23  where I do feel, you know, that I can honor this country.

24  Q.    As a lawful permanent resident, are you allowed to

25  leave the United States and then re-enter?

```
 1   A.      Yes.

 2   Q.      Freely?  As much as you want?

 3   A.      Yes.

 4   Q.      Have you gone back to Mexico since you left in 1995?

 5   A.      Yes.

 6   Q.      How many times have you gone back?

 7   A.      At least once a year, but probably more than that,

 8   just to visit my family.  And for work I have gone back

 9   twice, I guess.

10   Q.      When did you become employed by Tyson Foods?

11   A.      1997.

12   Q.      Was that here in Arkansas?

13   A.      No.  That was in Missouri.

14   Q.      What was your first job for Tyson?

15   A.      I was retention coordinator.

16   Q.      What is a retention coordinator?

17   A.      A retention coordinator assists to maintain a

18   balanced workforce so we don't have a turnover.

19   Q.      What did your responsibilities consist of in that

20   position?

21   A.      My responsibilities were to understand the reasons

22   why our team members were leaving work; and to make sure

23   that we were doing everything we could so they would have

24   a stable, good work environment, and they wouldn't leave

25   their employment.
```

1    MR. FOSTER:  Did she bring any documents in

2    conjunction with today's notice?

3    MR. VOLPE:  Yes, she did.

4    MR. FOSTER:  Is that what you have there?

5    MR. VOLPE:  Yes.

6    MR. FOSTER:  Can I look at those?

7    MR. VOLPE:  Sure.

8    MR. FOSTER:  Why don't we take a break.  I'm

9    just going to quickly review these and then I will go back

10   on the record.

11   (Wherein, a break was taken from 11:16 a.m to 11:28 a.m.)

12   MR. VOLPE:  Ms. Hart wanted to clarify one

13   of her answers to the question you gave, if you don't

14   mind.

15   THE WITNESS:  The date that you were asking

16   me for my permanent residency is August '96.  Now I feel

17   better.

18   Q.    (Mr. Foster continued.)  So it was prior to your

19   divorce; is that right?

20   A.    Yes.

21   Q.    Have you been remarried?

22   A.    Yes.

23   Q.    Are you currently married?

24   A.    Yes.

25   Q.    What is your husband's name?

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION**

| | | |
|---|---|---|
| BIRDA TROLLINGER, VIRGINIA BRAVO, KELLY KESSINGER, IDOYNIA MCCOY, REGINA LEE, PATRICIA MIMS, LORI WINDHAM, and ALEXANDER HOWLETT, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | No. 4:02-cv-23 |
| | ) | CLASS ACTION |
| Plaintiffs, | ) ) | JURY DEMANDED |
| v. | ) ) | Chief Judge Collier |
| TYSON FOODS, INC., JOHN TYSON, ARCHIBALD SCHAFFER, III, RICHARD BOND, KENNETH KIMBRO, GREG LEE, KAREN PERCIVAL, AHRAZUE WILT, and TIM MCCOY, | ) ) ) ) ) ) | Magistrate Judge Carter |
| Defendants. | ) ) ) | |

---

**ORDER ON DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO ANSWER
COMPLETELY THEIR SECOND SET OF INTERROGATORIES TO PLAINTIFFS**

---

This matter came before the Court on October 15, 2007, on Defendants' Motion To Compel Plaintiffs To Answer Completely Their Second Set Of Interrogatories To Plaintiffs (the "Motion"). After reviewing the parties' written submissions and hearing oral argument of counsel, the Court finds that the Motion is well-taken and is **GRANTED**. It is accordingly **ORDERED, ADJUDGED, AND DECREED** that Plaintiffs shall fully answer Defendants' second set of interrogatories no later than Friday, October 26, 2007, by identifying all current and former employees of Defendant Tyson Foods, Inc. who are or were not authorized to work in the United States, including providing the names of those individuals Plaintiffs can identify by name.

1

**ENTER** this _____ day of _____, 2007.

s/ *William B .Mitchell Carter*
_____
Hon. William B. Mitchell Carter,
United States Magistrate Judge

**AGREED FOR ENTRY:**

**HORTON, MADDOX & ANDERSON PLLC**

By: _William Colvin by RWD with perm_
　　　William G. Colvin, TN BPR No. 006733
Suite 600, One Central Plaza
835 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone (423) 265-2560
Facsimile (423) 265-3039

**JOHNSON & BELL, LTD.**
Howard W. Foster, Esq.
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603
Telephone (312) 372-0770

*Attorneys for Plaintiffs Birda Trollinger, et al.*

**MILLER & MARTIN PLLC**

By: _____
　　　Roger W. Dickson, TN BPR No. 001933
　　　Travis R. McDonough, TN BPR No. 018795
1000 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone (423) 756-6600
Facsimile (423) 785-8480

**SIDLEY AUSTIN LLP**
Thomas C. Green, Esq.
Mark D. Hopson, Esq.
Frank R. Volpe, Esq.
Colleen M. Lauerman, Esq.
1501 K Street, N.W.
Washington, D.C. 20005-1401
Telephone (202) 736-8000

*Attorneys for Defendants Tyson Foods, Inc., John Tyson,*
*Archibald Schaffer III, Richard Bond, Kenneth Kimbro,*
*Greg Lee, Karen Percival, Ahrazue Wilt, and Tim McCoy*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| BIRDA TROLLINGER, *et al.*, | | No. 4:02-cv-23 |
| | Plaintiffs, | CLASS ACTION |
| | | JURY DEMANDED |
| v. | | |
| | | Judge Curtis L. Collier |
| TYSON FOODS, INC., *et al.*, | | |
| | Defendants. | United States Magistrate Judge |
| | | William B. Mitchell Carter |

## PLAINTIFFS' REVISED ANSWER TO DEFENDANT TYSON FOODS INC.'S SECOND SET OF INTERROGATORIES

Plaintiffs, by undersigned Class Counsel, hereby submit their Revised Response to

Defendant Tyson Food Inc.'s Second Set of Interrogatories:

**GENERAL OBJECTIONS**: Plaintiffs object to these requests to the extent they seek

discovery of information protected by the attorney-client privilege and/or the work product doctrine.

Each response below incorporates this general objection. Without waiving these objections,

Plaintiffs respond to each specific request below.

**INTERROGATORY NO. 1**: Identify each former Tyson employee that Plaintiffs believe
was not authorized to work in the United States, including providing factual and legal basis for
Plaintiffs' belief that the former employee was not authorized to work in the United States.

**REVISED ANSWER**: Plaintiffs believe that each former Tyson employee who claimed to

be a U.S. citizen or lawful permanent resident alien but was unable to complete the I-9 form or

Tyson employment application in English is unauthorized. Mr. Cutler identified 91 persons as

unauthorized. Plaintiffs believe all are unauthorized. Additionally, Plaintiffs believe Dalia

Gutierrez, Gregorio Carbajal and all Tyson employees who were subjected to identity investigations

by Tyson (there are hundreds, if not thousands, during the class period) were unauthorized. The legal basis for this is based on 8 C.F.R. 312.1(a).

Additionally, Plaintiffs also believe the following factors indicate that other former Tyson employees were not eligible to work in the United States: 1) Tyson's records of notifications from third parties that particular workers are using a social security number issued to someone else; 2) employees who cannot pass basic pilot; 3) employees who completed I-9 forms that were pre-signed by Tyson (*i.e,* Tyson certified the I-9 form prior to the employee providing work authorization information); and 4) Tyson human resources personnel signed I-9 forms who have not inspected the employee's documents or personally saw the employee. Tyson therefore has constructive knowledge that all employees identified above are unauthorized.

Lastly, the class representatives identified certain individuals they believed to be unauthorized to work in the United States in their depositions. Others have submitted declarations in the course of discovery identifying still other illegal workers at Tyson.

**INTERROGATORY NO. 2**: Identify each current Tyson employee that Plaintiffs believe is not authorized to work in the United States, including providing the factual and legal basis Plaintiffs' belief that the current employee is not authorized to work in the United States.

**REVISED ANSWER:** Plaintiffs are unsure as to whether particular illegal workers are, or are not, currently employed by Tyson. Plaintiffs believe certain of the 91 workers referred to above may have ended their employment rather than be deposed by Class Counsel.

Dated this 26th day of October, 2007

                      BIRDA TROLLINGER, et al.,

                      By:_____

                      Howard Foster
                      Matthew Galin
                      Johnson & Bell, Ltd.
                      33 W. Monroe Street, Suite 2700
                      Chicago, IL 60603
                      (312) 372-0770

\                 William G. Colvin
                      Horton, Maddox & Anderson
                      One Central Plaza
                      835 Georgia Avenue, Suite 600
                      Chattanooga, TN 37402
                      (423) 265-2560

                      *Attorneys for Plaintiffs*

PLAINTIFFS' REVISED ANSWER        - 3 -        Johnson & Bell, Ltd.
TO DEFENDANT TYSON FOOD INC.'S        33 West Monroe Street, Suite 2700
SECOND SET OF INTERROGATORIES        Chicago, IL 60603-5405
                                                 (312) 372-0770

## CERTIFICATE OF SERVICE

I, Jerry Ritthaler, declare on October 26, 2007, I caused a copy of the foregoing
PLAINTIFFS' REVISED ANSWER TO DEFENDANT TYSON FOODS' SECOND SET OF
INTERROGATORIES to be served on Colleen Lauerman, Sidley & Austin, LLP, 1501 K Street,
N.W., Washington, D.C. 20005-1401, via facsimile and U.S. mail.

Jerry Ritthaler

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

BIRDA TROLLINGER, et al.,

                    Plaintiffs,

    v.

TYSON FOODS, INC., et al.,

                    Defendants.

No. 4:02-cv-23

CLASS ACTION
JURY DEMANDED

Chief United States District Judge
Curtis L. Collier

United States Magistrate Judge
William B. Mitchell Carter

## PLAINTIFFS RESPONSE TO DEFENDANTS' THIRD REQUEST FOR ADMISSION

Plaintiffs, by undersigned Counsel, hereby submit their Responses to Defendants' Third Request for Admission.

Request to Admit No. 1: Admit that the only "code phrase" (as that phrase is used in Plaintiffs' Response Brief to Defendants' Motion for Rule 11 Sanctions at p. 6: "The use of the phrase 'racial profiling' in these letters is a code phrase for taking into account factors which Plaintiffs contend indicate that a worker is illegal.") Plaintiffs claim that Tyson and/or National Council of LaRaza (NCLR) used is "racial profiling."

Response: Plaintiffs do not understand this Request and therefore object to it.

Request to Admit No. 2: Admit that Plaintiffs have no evidence of any "code phrase" (as that phrase is used in Plaintiffs' Response Brief to Defendants' Motion for Rule 11 Sanctions at p. 6: "The use of the phrase 'racial profiling' in these letters is a code phrase for taking into account factors which Plaintiffs contend indicate that a worker is illegal.") used between Tyson and the League of United Latin American Citizens (LULAC).

Response:   Plaintiffs deny this Request as the term "Racial profiling" is a code phrase.

Request to Admit No. 3: Admit that Plaintiffs have no evidence that any Tyson team member who participated in the Tyson Workforce Home Benefit Program is an illegal immigrant.

Response:   Admit, however, Tyson has not provided Plaintiffs with any evidence of which team members use the Program.

Request to Admit No. 4: Admit that Plaintiffs have no evidence that any Tyson team member from the eight named plants participated in the Tyson Workforce Home Benefit Program.

Response:  Admit, however, Tyson has not provided Plaintiffs with any evidence of which team members use the Program.

Request to Admit No. 5: Admit that Plaintiffs have no evidence that any illegal immigrant was brought into the United States by or at the behest of any of the Defendants.

Response:  Denied. Plaintiffs have considerable evidence of housing and transportation of illegal immigrants perpetrated at all eight of the complexes.  Plaintiffs also have evidence that these actions were taken by and ratified by Tyson management at the complexes and in Springdale.  By so doing, the individual Defendants have all conspired to perpetrate the "Illegal Immigrant Hiring Scheme," at these complexes, which includes the hiring, housing and transportation of these illegal immigrants.

Request to Admit No. 6:  Admit that Plaintiffs have no evidence that John Tyson has rented, leased, sold or otherwise provided housing to illegal immigrants employed at Tyson Foods.

Response:  Denied, for the reason stated in Response to No. 5.  Further, a motion to compel production of such evidence related to this Request is currently pending before the Court. Additionally, John Tyson's deposition has not yet taken place.

Request to Admit No. 7:  Admit that Plaintiffs have no evidence that Dick Bond has rented, leased, sold or otherwise provided housing to illegal immigrants employed at Tyson Foods.

Response:  Denied, for the reason stated in Response to No. 5. Additionally, Dick Bond's deposition has not yet taken place.

Request to Admit No. 8:  Admit that Plaintiffs have no evidence that Greg Lee has rented, leased, sold or otherwise provided housing to illegal immigrants employed at Tyson Foods.

Response: Denied, for the reason stated in Response to No. 5. Additionally, Greg

Lee's deposition has not yet taken place.

Request to Admit No. 9: Admit that Plaintiffs have no evidence that Ken Kimbro has rented, leased, sold or otherwise provided housing to illegal immigrants employed at Tyson Foods.

Response: Denied, for the reason stated in Response to No. 5. Additionally, Ken

Kimbro's deposition has not yet taken place.

Request to Admit No. 10: Admit that Plaintiffs have no evidence that Archie Schaffer has rented, leased, sold or otherwise provided housing to illegal immigrants employed at Tyson Foods.

Response: Denied, for the reason stated in Response to No. 5.

Request to Admit No. 11: Admit that Plaintiffs have no evidence that Karen Percival has rented, leased, sold or otherwise provided housing to illegal immigrants employed at Tyson Foods.

Response: Denied, for the reason stated in Response to No. 5.

Request to Admit No. 12: Admit that Plaintiffs have no evidence that Tim McCoy has rented, leased, sold or otherwise provided housing to illegal immigrants employed at Tyson Foods,

Response: Denied, for the reason stated in Response to No. 5.

Request to Admit No. 13: Admit that Plaintiffs have no evidence that the "common purpose of liberalizing U.S. immigration laws" that Plaintiffs contend the Hispanic Groups Enterprise pursues is an illegal purpose.

Response: Denied. Liberalizing immigration laws includes encouraging illegal

immigration, seeking employment and amnesty for illegal immigrants and opposing

workplace enforcement of the Immigration Reform and Control Act.

Request to Admit No. 14: Admit that Plaintiffs have no evidence that the "common purpose of liberalizing U.S. immigration laws" that Plaintiffs contend the Hispanic Groups Enterprise pursues is a RICO predicate act.

Response: Denied, for the reasons stated in the Response to No. 13.

Request to Admit No. 15: Admit that Plaintiffs have no evidence that the "common purpose of liberalizing U.S. immigration laws" that Plaintiffs contend the Hispanic Groups Enterprise pursues is a violation of any U.S. law or regulation.

Response: Denied, for the reasons stated in the Response to No. 13.

Request to Admit No. 16: Admit that Plaintiffs have no evidence that any communications between Tyson and the Hispanic Groups are or were made to further the policy of willful blindness, as described in the Second Amended Complaint.

Response: Plaintiffs object to this Request because discovery of this matter is ongoing.

Request to Admit No. 17: Admit that Plaintiffs have no evidence that Tyson contributed any money to the Hispanic Groups for the purpose of carrying out the "illegal objectives" of the Hispanic Groups Enterprise, as Plaintiffs have described those "illegal objectives" in the Second Amended Complaint.

Response: Denied, Tyson has contributed money to the Hispanic Groups in support of their general operations, which include their illegal objectives, which are well known to Tyson, as indicated in the Response to No. 13.

Request to Admit No. 18:  Admit that Plaintiffs have no evidence that any meeting with the leadership of the Hispanic Groups was undertaken to carry out the "illegal objectives" of the Hispanic Groups Enterprise, as Plaintiffs have described those "illegal objectives" in the Second Amended Complaint.

Response: Plaintiffs object to this Request because discovery of this matter is ongoing.

Request to Admit No. 19:  Admit that Plaintiffs have no evidence that Tyson, LULAC and NCLR were present at the same meeting.

Response: Plaintiffs object to this Request because discovery of this matter is ongoing.

Request to Admit No. 20:  Admit that Plaintiffs have no evidence that Tyson, LULAC and NCLR ever met to discuss the willful blindness policy.

Response: Plaintiffs object to this Request because discovery of this matter is ongoing.

Request to Admit No. 21: Admit that Plaintiffs have no evidence that Tyson hired a full-time liaison to maintain and promote the partnership with NCLR, as alleged in paragraph 54 of the Second Amended Complaint.

Response: Denied, Ana Hart is the liaison.

Request to Admit No. 22: Admit that Plaintiffs contend that a No-Match Letter Tyson receives from the Social Security Administration is proof that the Tyson employee who is the subject of the No-Match Letter is using a false identity.

Response: Denied, Plaintiffs contend it so indicates that possibility and that a reasonable employer would conduct a proper investigation, which Tyson does not do.

Request to Admit No. 23: Admit that Plaintiffs contend that Tyson is permitted under federal law to take adverse employment action against an employee solely based upon the receipt of a No-Match Letter from the Social Security Administration.

Response: Denied. Plaintiffs contend Tyson should not be blind to factors indicating employees, or potential employees, are using false or stolen identity documents. Tyson should, accordingly, take into account the inability to speak English by persons bearing social security numbers which do not match that person's name while claiming to be U.S. citizens or lawful permanent residents.

Request to Admit No. 24: Admit that Plaintiffs contend that an alien who enters the United States on a valid visa has been "brought" into the United States in violation of 8 U.S.C. § 1324(a).

Response: Plaintiffs object to this Request because it calls for a purely legal conclusion.

Request to Admit No. 25: Admit that Plaintiffs contend that an alien who enters the United States on a visa and illegally remains in the country after the expiration of that visa has been "brought" into the United States in violation of 8 U.S.C. § 1324(a).

Response: Plaintiffs object to this Request because it calls for a purely legal conclusion.

Request to Admit No. 26: Admit that Plaintiffs contend that an alien who illegally enters the United States without the assistance of a third party has been "brought" into the United States in violation of 8 U.S.C. § 1324(a).

Response: Plaintiffs object to this Request because it calls for a purely legal

conclusion.

Request to Admit No. 27: Admit that Plaintiffs contend that all persons who are unauthorized to work in the United States were "brought" into the United States in violation of 8 U.S.C. § 1324(a).

Response: Plaintiffs object to this Request because it calls for a purely legal

conclusion.

Request to Admit No. 28: Admit that Plaintiffs contend that lawful permanent residents of the United States must be able to speak English.

Response: Denied.

Request to Admit No. 29: Admit that Plaintiffs contend that lawful permanent residents of the United States must be able to read English.

Response: Denied.

Request to Admit No. 30: Admit that Plaintiffs contend that naturalized United States citizens must be able to speak English.

Response: Plaintiffs object to this Request because it calls for a purely legal

conclusion.

Request to Admit No. 31: Admit that Plaintiffs contend that naturalized United States citizens must be able to read English.

Response: Plaintiffs object to this Request because it calls for a purely legal

conclusion.

Request to Admit No. 32: Admit that Plaintiffs contend that naturalized United States citizens cannot use interpreters or translators to assist them in completing documents that must be signed under penalty of perjury.

Response: Denied

Request to Admit No. 33: Admit that Plaintiffs contend that lawful permanent residents cannot use interpreters or translators to assist them in completing documents that must be signed under penalty of perjury.

Response: Denied

Request to Admit No. 34: Admit that temporary employment agencies that provided temporary labor to the eight named plants were responsible under federal law for ensuring that the temporary employees they provided to Tyson Foods were authorized to work in the United States.

Response: Admit.

Request to Admit No. 35: Admit that Plaintiffs contend that Tyson was required under federal law to verify the work authorization of temporary workers supplied to it by temporary employment agencies.

Response: Denied.

Request to Admit No. 36: Admit that Plaintiffs contend that they can tell from looking at an I-9 Form whether the assistance provided was that of a translator or a preparer.

Response: Denied

Request to Admit No. 37: Admit that Plaintiffs contend that Tyson must complete Section 2 and the employer certification on an I-9 Form at the same time.

Response: Denied

Request to Admit No. 38: Admit that Plaintiffs contend that Tyson must complete Section 2 and the employer certification on an I-9 Form in the same color ink.

Response: Denied

Request to Admit No. 39: Admit that Plaintiffs contend that Section 2 and the employer certification section of an I-9 Form must be completed by the same individual.

Response: Plaintiffs object to this Request as the term "completed" is vague. The person verifying the documents must also examine the documents.

Request to Admit No. 40: Admit that Plaintiffs contend that during employment eligibility verification process, Tyson can refuse to accept documents which reasonably appear on their face to be genuine and to relate to the person tendering them.

Response: Denied

Request to Admit No. 41: Admit that Plaintiffs contend that job applicants who speak English may not use a preparer or translator to assist in completing an I-9 Form.

Response: Denied

---

PLAINTIFFS RESPONSE TO DEFENDANTS' THIRD REQUESTS FOR ADMISSION

Request to Admit No. 42: Admit that Plaintiffs contend that an employee who is a lawful permanent resident or an authorized alien must present a document from List A on the back of the I-9 Form.

Response: Denied

Request to Admit No. 43: Admit that Plaintiffs contend that any error on an employee's I-9 Form is proof the employee is an unauthorized alien.

Response: Denied

Dated: August 24, 2007                 BIRDA TROLLINGER, et al., Plaintiffs

                                       By:    _____
                                              Howard W. Foster
                                              William V. Johnson
                                              Matthew Galin
                                              Johnson & Bell, Ltd.
                                              33 West Monroe Street, Suite 2700
                                              Chicago, IL 60603
                                              (312) 372-0770

                                              William G. Colvin
                                              Horton, Maddox & Anderson
                                              One Central Plaza
                                              835 Georgia Avenue, Suite 600
                                              Chattanooga, TN 37402
                                              (423) 265-2560
                                              423- 265-3039 (Fax)

                                              *Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 24th day of August, 2007, I served a copy of PLAINTIFFS RESPONSE TO DEFENDANTS' THIRD REQUESTS FOR ADMISSION by facsimile and U.S. Mail at 33 West Monroe Street, Chicago, Illinois, 60603, before 5:00 p.m., to:

> Ms. Colleen Lauerman
> Sidley Austin Brown & Wood, LLP
> 1501 K Street, N.W.
> Washington, D.C. 20005-1401

Jerry Rathaler

# OSC UPDATE

## Office of Special Counsel for Immigration-Related Unfair Employment Practices

U.S. Department of Justice | Civil Rights Division                    November  2006

# 20th Anniversary Commemorative Edition

**Inside this Edition:**

➤ ## OSC's 20th Anniversary

Historical Overview of the Anti-Discrimination Provision: *Congressional Passage of the Anti-Discrimination Provision of the Immigration & Nationality Act, 8 U.S.C. § 1324b*

Summary of OSC's Major Accomplishments Over the Past 20 Years

Overview of OSC & the Anti-Discrimination Provision: *What constitutes discrimination under 8 U.S.C. § 1324b; How to File a Charge of Discrimination; & Remedies Available Under 8 U.S.C. § 1324b*

➤ ## OSC's Jurisdiction

OSC & EEOC: *Jurisdictional Differences*

Interagency & Policy Efforts: *Collaboration & Coordination*

➤ ## OSC's Outreach Efforts

OSC's Grant Program

OSC's 2006 Grants

OSC's Public Outreach Mission

## A Message from the Deputy Special Counsel

Dear Readers:

    This year, the Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC") celebrates 20 years of combating discrimination and securing the civil rights of thousands of U.S. citizens and lawful immigrants. OSC was created by Congress to enforce the anti-discrimination provision of the Immigration Reform and Control Act of 1986 ("IRCA"). IRCA was signed into law by President Ronald Reagan on November 6, 1986. To discourage illegal immigration, IRCA, which amended the Immigration and Nationality Act, imposed sanctions and criminal penalties on employers that knowingly hire undocumented workers. To allay concerns that these sanctions and penalties might lead to a discriminatory backlash against U.S. citizens and lawful immigrant workers who look or sound foreign, IRCA also prohibits employers from committing "immigration-related unfair employment practices." In addition to civil rights enforcement, Congress directed OSC to educate the public and prevent discrimination before it occurs.



**Katherine A. Baldwin**
Deputy Special Counsel

    Since its inception, OSC has secured employment and reinstatement for thousands of workers who have been discriminated against, collecting millions of dollars in back pay and civil penalties against employers who violated IRCA's anti-discrimination protections. OSC has also developed and executed an extensive public education campaign to inform workers and employers about their rights and responsibilities under the anti-discrimination provision. As part of this campaign, OSC conducts training for other government agencies, employer associations, public service organizations, and workers across the nation; operates a toll-free hotline for workers and employers; provides federal grants to organizations with the capacity to educate workers and employers on both a local and national level; and distributes thousands of outreach materials each year, including this newsletter, the *OSC Update*.

(Continued on Page 5)

## OSC's Telephone Interventions

    OSC's telephone intervention program is an innovative form of alternative dispute resolution. It allows a caller to OSC's employee or employer hotline to work informally with OSC's staff to resolve potential immigration-related employment disputes within hours or minutes, rather than weeks or months, without contested litigation. Employers love the program because it saves them time and money. Employees love the program because it keeps them on the job.

**Employer Hotline:**
1-800-255-8155
1-800-362-2735(TDD)
**Worker Hotline:**
1-800-255-7688
1-800-237-2515(TDD)

## Need a Speaker?

    OSC provides speakers to make presentations to educate workers, employers and the general public about their rights and responsibilities under the anti-discrimination provision of the Immigration and Nationality Act. Upon request, OSC also provides educational materials (printed and audiovisual) at no cost. Please contact us to learn more about these services. (See last page for contact information.)

# Historical Overview of the Anti-Discrimination Provision

This year marks the 20th anniversary of the enactment of the anti-discrimination provision of the Immigration and Nationality Act ("INA"), and the establishment of the Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC"). On October 17, 1986, the 99th Congress enacted the Immigration Reform and Control Act of 1986 ("IRCA"). IRCA is also known commonly as the Simpson-Rodino Act, named after the bill's sponsors, Senator Alan Simpson (R-Wyoming) and Representative Peter Rodino (D-New Jersey). Because Representative Romano Mazzoli (D-Kentucky) was the bill's original sponsor in the House in 1982, the legislation is also sometimes referred to as the Simpson-Mazzoli Act.

For the first time, the new law made it unlawful for any employer to knowingly hire individuals who are not authorized to work in the United States, and imposed employer sanctions and criminal penalties on businesses that knowingly hire undocumented workers. With IRCA's passage, employers were required to verify their employees' work eligibility. As part of the employment eligibility verification process, all new hires and their employers must now complete the U.S. Department of Homeland Security ("DHS") Form I-9. On the first day of employment, employees must certify that they are U.S. citizens or nationals, lawful permanent residents, or individuals otherwise authorized to be employed in the United States. Within three days of hire, every new employee must show their employer documentation establishing their identity and work authorization. Under the law, there are several combinations of legally acceptable documents from which employees can choose. The I-9 Form must be completed for every new employee, regardless of national origin, and whether or not a U.S. citizen. Under IRCA, an employer's failure to verify the identity and employment authorization of new employees by completing the I-9 Form violates federal immigration law.

Congress recognized that the employment eligibility verification requirements and sanctions against employers for hiring undocumented workers might discourage some employers from hiring U.S. citizens and legal immigrants who are authorized to work in the United States but who look or sound foreign.[1] Consequently, IRCA also contains an anti-discrimination provision that prohibits employers from committing "immigration-related unfair employment practices." The anti-discrimination provision was included as Section 102 of IRCA, and is codified at 8 U.S.C. § 1324b. The anti-discrimination provision outlaws unfair immigration related employment practices, and establishes procedures to enforce these prohibitions.

It is an unfair immigration-related employment practice to discriminate against a work authorized individual in hiring, discharging, or recruiting or referring for a fee because of an individual's national origin or, in the case of a U.S. citizen or a prospective U.S. citizen, because of that individual's citizenship status. The anti-discrimination provision also expands the national origin employment discrimination protections included in Title VII of the Civil Rights Act of 1964. Whereas Title VII covers national origin discrimination by larger employers - those that employ fifteen or more employees for 20 or more weeks during the preceding or current calendar year - the anti-discrimination provision covers smaller employers - those employing between four and fourteen employees on the date of the alleged discrimination.

The anti-discrimination provision also prohibits unfair documentary practices during the Form I-9 process. In general, employers may not request more or different documents than are required to establish a worker's identity and authorization to work in the United States, or reject documents that on their face appear reasonably genuine when verifying employment eligibility. They must accept all documents that are sufficient to complete the form, as long as they appear reasonably genuine on their face and relate to the employee. For example, any individual may present a driver's license and Social Security card to satisfy Form I-9 requirements. Employers may not require non-citizens to produce "green cards" or U.S. citizens who appear "foreign" to produce birth certificates. Instead, it is the employee's choice which of the acceptable Form I-9 documents to present. All employers with more than three employees are covered by the INA's prohibition against unfair documentary practices.

In order to enforce these prohibitions, the anti-discrimination provision created an Office of Special Counsel for Immigration Related Unfair Employment Practices within the U.S. Department of Justice in Washington, D.C. Among OSC's primary statutory responsibilities is the investigation of unfair immigration-related employment practices, either through conducting independent investigations or investigations of charges filed with OSC by aggrieved individuals or their representatives. The law also requires OSC to conduct an outreach and education program aimed at employers, potential victims of discrimination, and the general public regarding their rights and responsibilities under the INA's anti-discrimination and employer sanctions provisions.

---

[1] *Indeed, studies later conducted by the Government Accountability Office confirmed that employer sanctions led to widespread discrimination, primarily against U.S. citizens and legal immigrants who were Hispanic and Asian, and confusion among employers about proper employment eligibility verification procedures and appropriate documents to establish employment eligibility.*

# Statistical Summary of OSC Activities from Fiscal Year 2001 to Fiscal Year 2006

| | DATA ELEMENT | FY '01 | FY '02 | FY '03 | FY '04 | FY '05 | FY '06 (as of 9/06) |
|---|---|---|---|---|---|---|---|
| 1 | Charges Resolved: | 144 | 160 | 250 | 197 | 182 | **197** |
| 2 | Total Charges Received & Investigated or Dismissed for Failure to Make Complete: | 326 | 431 | 438 | 367 | 338 | **333** |
| 3 | Settlements: | 40 | 34 | 25 | 41 | 49 | **70** |
| 4(a) | Letters of Resolutions: | n/a | n/a | n/a | 36 | 43 | **68** |
| 4(b) | Out of Court Settlements: | 37 | 27 | 23 | 5 | 6 | **2** |
| 4(c) | ALJ rders: | 3 | 7 | 2 0 | 0 | | **0** |
| 5 | Successful Interventions: | 164 | 168 | 194 | 109 | 182 | **177** |
| 6 | Outreach Presentations: | 781 | 466 | 915 | 807 | 395 | **433** |
| 7 | Employer/Worker Hotline Calls | 58,615 | 17,254 | 18,580 | 15,173 | 21,038 | **18,885** |

# Summary of OSC's Major Accomplishments Over the Past 20 Years

Since its creation twenty years ago, OSC's most significant accomplishment has been to provide a means of legal redress for thousands of U.S. citizens and legal immigrants who face discrimination, and who would otherwise have no means to obtain justice. Overall, OSC has settled or otherwise resolved thousands of charges of immigration-related unfair employment practices since OSC's inception in 1986. Through OSC's enforcement efforts, victims of immigration-related unfair employment practices have been able to obtain various types of monetary and other relief, including reinstatement and back pay. From 1997 until 2005, OSC secured $1,374,664 in back pay for workers, as well as $1,578,865 in civil penalties from employers. In some cases, OSC's resolutions have impacted entire industries. For example, OSC engendered widespread reform throughout the airline and defense industries in the late 1980's, and the casino and food processing industries in the 1990's.

As noted above, in the anti-discrimination provision, Congress specified that OSC's mission must encompass public and community outreach. Through its comprehensive outreach efforts, including an annual public education grant program open to state and municipal agencies, employer groups, and non-profit, community and faith-based organizations that target immigrant communities, OSC has been able to directly educate thousands of workers and employers nationwide over the past 20 years about the Form I-9 employment eligibility verification process and the law's anti-discrimination requirements. OSC has distributed hundreds of thousands of brochures and other educational materials to the public and posts educational materials on its website. In recent years, OSC has conducted two public service announcement campaigns, airing information on OSC's mission on radio and television nationwide.

Another achievement of OSC is the development of a timely and cost efficient telephone intervention program. Through this innovative program, OSC attorneys and other staff members learn about potential discrimination from workers and employers over OSC's toll-free hotlines, and then mediate rapid resolutions to problems.

Telephone interventions often resolve matters quickly and to the satisfaction of all parties, getting workers back on the job quickly and obviating the need for workers to file charges of discrimination with OSC. The program is highly cost-effective for both employers and the Federal government, saving hundreds of thousands of dollars in time and expense that would be incurred if a formal investigation and trial ensued as a result of an allegation of discrimination. In 2005 alone, OSC completed 182 successful telephone interventions, and the office has completed over 1,300 successful telephone interventions since the inception of this program.

# Overview of OSC

## What Constitutes Discrimination Under § 1324b

The Office of Special Counsel for Immigration Related Unfair Employment Practices ("OSC") has the authority to investigate discriminatory conduct under the anti-discrimination provision of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1324b, falling into four categories: (1) citizenship status discrimination; (2) national origin discrimination; (3) document abuse; and (4) retaliation.

Specifically, OSC is authorized to investigate citizenship or immigration status discrimination with respect to hiring, firing, and recruitment or referral for a fee by employers with four or more employees. Employers may not treat individuals differently in hiring, firing or recruitment because they are, or are not, U.S. citizens or work authorized immigrants. U.S. citizens, recent permanent residents, temporary residents, asylees and refugees are protected from citizenship status discrimination. However, the law specifies that permanent residents are not protected from citizenship status discrimination if they fail to apply for naturalization within six months of eligibility.

OSC also investigates allegations of national origin discrimination with respect to hiring, firing, and recruitment or referral for a fee, by employers not otherwise covered by Title VII, i.e., generally these with more than three and fewer than 15 employees.[2] Employers may not treat individuals differently because of their place of birth, country of origin, ancestry, native language, accent, or because they are perceived as looking or sounding "foreign." All U.S. citizens, lawful permanent residents, and work authorized non-citizens are protected from national origin discrimination.

Unfair documentary practices in the employment eligibility verification process are also subject to investigation by OSC. At the time of hire, employers are required by law to verify employment eligibility by completing the U.S. Department of Homeland Security's Form I-9. Employers may not request more or different documents than are required to verify employment eligibility. Employers are also prohibited from rejecting reasonably genuine-looking documents, or from specifying certain documents over others with the purpose or intent of discriminating on the basis of citizenship status or national origin. U.S. citizens and all work-authorized immigrants are protected from document abuse.

Finally, OSC is authorized to investigate charges of retaliation. Individuals who file charges with OSC, who cooperate with an OSC investigation, who contest action that may constitute an unfair immigration-related employment practice, or who otherwise assert their rights under the INA's anti-discrimination provision, are protected from retaliation.

## Filing A Charge of Employment Discrimination with OSC

Injured parties may file charges of discrimination directly with the Office of Special Counsel's office within 180 days of the alleged act of discrimination. Through a language interpreter service, OSC is equipped to handle complaints in a number of languages. OSC may investigate claims for up to 210 days after receipt of a charge. Typical investigations include interviewing injured parties, employers, and witnesses, and reviewing company documents. During the final 90 days of the investigatory period, if OSC finds there is reasonable cause to believe that immigration-related unfair employment practices have occurred, OSC may file an administrative complaint against the employer. Complaints are heard by an administrative law judge (ALJ), who is especially trained to hear such cases. If OSC has not made a determination within 120 days of receipt of the charge, it must notify the parties, and the charging party then has the right to file his or her own complaint before an ALJ within the following 90 days. OSC may intervene in that case, or file its own complaint within the 90 day period, where the charging party has not done so.

OSC may also initiate independent investigations. These are triggered in a variety of ways. Sometimes in the course of investigating a charge, OSC will discover that an employer has a discriminatory policy affecting many employees or job applicants that is unrelated to the allegations of the charge. In these cases, the Special Counsel may open an independent investigation to investigate whether the company has a pattern or practice of discrimination. Other independent investigations may start with tips from media reports, public interest groups, and government agencies.

## Remedies Under 8 U.S.C. §1324b

There are several remedies that may result from an investigation. During the investigation, employers and employees may agree on how to resolve the charge of discrimination, and an employee will voluntarily withdraw the charge of discrimination ("bilateral resolution"). Before a complaint is filed, OSC may try to negotiate a settlement agreement to resolve the violation. Settlements or successful adjudications may result in civil penalty assessments against violating employers, the imposition of injunctive relief to end discriminatory practices, back pay awards, and reinstatement or hiring.

Individuals who believe they have suffered discrimination may call OSC's toll-free Worker Hotline at 1-800-255-7688 [Voice] or 1-800-237-2515 [TDD], or write to OSC. Employers may call OSC's toll-free Employer Hotline at 1-800-255-8155 [Voice] or 1-800-362-2735 [TDD].

(See last page for contact information)

---

[2] *The Equal Employment Opportunity Commission has national origin discrimination jurisdiction over employers with 15 or more full-time employees for 20 or more weeks during the preceding or current calendar year.*

## A Message from the Deputy Special Counsel (continued from Front Page)

Toward this end, we are always happy to hear from you and to assist you in any way that we can–whether it is a call to our hotline, a request for educational materials, or an invitation to participate in an outreach event. We look forward to continuing to work with you toward our common goal, the elimination of unfair immigration-related employment practices.

This commemorative edition of the newsletter celebrates the ongoing efforts of OSC to prevent, remedy, and eliminate immigration-related employment discrimination. Rather than represent an occasion for self-congratulation, however, we view our 20th anniversary as an opportunity to embrace new challenges ahead. The most recent U.S. Census statistics reveal communities of lawful immigrants expanding in nearly every state in the nation. As a result, OSC must redouble its efforts to combat unlawful discrimination and expand outreach opportunities to specifically address these new challenges. Now more than ever, we must all work together to protect lawful immigrants from workplace discrimination. We believe that with communication and cooperation among employers, workers, advocacy groups and the general public, we can better fulfill the mission of OSC in the decades ahead. We urge you to continue to assist us in this effort.

# Jurisdictional Differences Between OSC and EEOC

When a worker believes that he or she has experienced employment discrimination, the worker may be confused about which federal agency is the most appropriate one to accept the charge of discrimination. In some cases, different aspects of the alleged employment discrimination will be handled by more than one federal agency. At the federal level, the Equal Employment Opportunity Commission ("EEOC") is the government agency that handles the most employment discrimination charges. The EEOC enforces the civil rights protections set forth by Congress in Title VII of the Civil Rights Act of 1964 ("Title VII") and other statutes that protect workers from employment discrimination. OSC has exclusive jurisdiction, however, over immigration-related employment discrimination, as set forth in the anti-discrimination provision of the Immigration and Nationality Act ("INA").

Congress enacted the anti-discrimination provision of the INA in part to redress gaps in civil rights protections in Title VII. Title VII protects an individual from employment discrimination on the basis of national origin, but does not protect that same individual from discrimination based on citizenship or immigration status--even though the individual is legally authorized to work in the United States. As a result of this gap in Title VII's coverage, Congress enacted the anti-discrimination provision to protect against citizenship status discrimination, and assigned responsibility for enforcement of this provision to OSC. The anti-discrimination provision also expands the national origin employment discrimination protections contained in Title VII. Whereas Title VII covers national origin discrimination by larger employers - those that employ fifteen or more employees for 20 or more weeks during the preceding or current calendar year - the anti-discrimination provision covers smaller employers -those employing between four and fourteen employees on the date of the alleged discrimination. This and other jurisdictional differences between OSC and the EEOC are set forth below:

| Overview of OSC's Jurisdiction | Overview of EEOC's Jurisdiction |
|---|---|
| **Prohibited Conduct:** | **Prohibited Conduct Includes:** |
| Citizenship/immigration status and national origin discrimination with respect to hiring, firing, and recruitment or referral for a fee; unfair documentary practices during the employment eligibility verification (Form I-9) process; and retaliation. | Discrimination on the basis of religion, national origin, race, color, and sex with respect to any aspect of employment, including the terms and conditions of employment. |
| **Employers Covered:** | **Employers Covered:** |
| Employers with four or more employees are covered by the prohibition against citizenship/immigration status discrimination and unfair documentary practices. Employers with four to fourteen employees are covered by the prohibition against national origin discrimination. | Employers with fifteen or more employees. |
| **Covered Persons:** | **Covered Persons:** |
| U.S. citizens and work authorized aliens are protected from national origin discrimination and document abuse. U.S. citizens, many lawful permanent residents, asylees and refugees are protected from citizenship/immigration status discrimination. | All individuals, regardless of immigration status. |

# OSC's Interagency and Policy Efforts: Collaboration and Coordination

By collaborating with other government agencies, OSC is able to reach a wider audience and is able address specific issues of common concern among multiple federal and state agencies through a coordinated approach. OSC currently collaborates with several federal agencies, including the Equal Employment Opportunity Commission ("EEOC"), Social Security Administration ("SSA"), U.S. Department of Labor ("DOL"), U.S. Department of Health and Human Services ("HHS"), U.S. Department of Housing and Urban Development ("HUD"), and the U.S. Department of Homeland Security ("DHS").

One of OSC's most recent interagency efforts is working with DHS in the implementation of the Basic Pilot Program, which allows employers to verify the employment eligibility of new employees through an automated electronic verification system. OSC is working with DHS to ensure that the new program does not lead to increased discrimination. Through on-line training for employers and web-based information services for workers and immigration advocates, DHS and OSC will be able to educate the public in order to prevent abuse of the program.

OSC is also working with SSA to ensure that SSA's "no match" letters do not lead to immigration-related employment discrimination. SSA sends out "no match" letters to employers and workers when SSA's records do not match the names and Social Security numbers of employees provided to SSA by employers. Employers that receive a "no match" letter may unjustly assume that the employee provided fraudulent Social Security information or is an undocumented worker, when the discrepancy instead may have been caused by administrative error, name changes (e.g., marriage or divorce), or cultural differences in the use of surnames. In some instances, employers may then precipitously terminate employees for whom they have received a "no match" letter. Such termination may constitute discrimination under the anti-discrimination provision if employees are treated differently based on their national origin or citizenship status.

To prevent such discrimination, OSC and SSA advise employers that discrepancies in SSA's records can arise for several reasons, including simple administrative errors. Employers are encouraged to first consult with employees to make sure that the disparity is not a clerical error.

OSC currently educates employers through OSC's toll-free employer hotline on how to best respond to such letters. OSC also helped revise the training manual used by SSA phone operators, providing guidance on how to help employers avoid discrimination.

Many communities, such as the colonias on the U.S.-Mexico border, have special legal needs. Working alongside members of the DOL, HUD, Internal Revenue Service ("IRS"), and DHS, OSC helped educate local groups -- including legal aid groups -- that address the particular needs of migrant farm workers. The Federal Interagency Legal Working Group for Colonias and Migrant Farmworker Issues educates workers on their rights regarding national origin and citizenship discrimination, and creates videos and educational tools on related issues.

After the 9/11 terrorist attacks, South Asian and Middle Eastern workers became the target of increased national origin and citizenship discrimination. In conjunction with other components of the Civil Rights Division, OSC worked to ensure that individuals facing post-9/11 discrimination were educated about their rights and received appropriate remedies. OSC also created a fact sheet distinguishing between OSC's jurisdiction and EEOC'S jurisdiction over 9/11-related employment discrimination complaints.

OSC has also participated in the Worker Exploitation Task Force, which deals primarily with the issue of human trafficking. By lending its expertise on outreach matters and immigrant civil rights, OSC assisted with the implementation of the human trafficking legislation. OSC drafted English and Spanish language portions of the Justice Department's law enforcement brochure for trafficking victims, advocates and law enforcement agencies.

Asylees and refugees are also often subject to citizenship discrimination and unfair documentary practices. For example, they are frequently denied employment because many employers do not recognize their work authorization documents. OSC works with the HHS Office of Refugee Resettlement ("ORR") to create a joint OSC/ORR letter that provides guidance to refugees, asylees and employers regarding proper employment eligibility verification requirements and explains how the OSC can assist in the process.



Office of Special Counsel
for Immigration Related Unfair Employment Practices
U.S. Department of Justice Civil Rights Division

You Have a Right to Work

# Achievements of the OSC Grant Program

To further its community outreach mission and to maximize its impact, OSC awards federal grants, generally ranging from $35,000 to $80,000, to organizations throughout the country that are capable of conducting cost-effective public education programs. By funding groups that have a significant local presence, OSC can directly inform employees of their rights and employers of their responsibilities under the INA's anti-discrimination provision. Past grantees have included immigrant service organizations and state and local fair employment practices agencies. OSC grantees have also included community-based and faith-based organizations, as well as labor and business organizations. Through OSC funding, these organizations are able to distribute OSC-provided brochures; translate OSC-provided brochures into languages spoken in their communities; raise awareness of OSC's anti-discrimination enforcement efforts through inclusion of OSC in their informational materials and websites; develop collaborative networks with other local organizations to reach new immigrant populations; sponsor meetings and training seminars; update current legal manuals to include the anti-discrimination provision; and refer charges of discrimination to OSC. OSC assists these efforts by providing technical assistance and outreach materials to the grantees. Grantees can also request an OSC attorney to attend a grantee-sponsored outreach event (at OSC expense) to offer a face-to-face presentation on the anti-discrimination provisions of the INA.



OSC often awards grants to organizations capable of targeting efforts within a geographic area or areas of the country with a historically high concentration of immigrant residents or a high foreign-born population. For instance, Catholic Charities of Dallas -- along with its four sub-grantees in Lubbock, Oklahoma City, Little Rock, and Albuquerque, – serves immigrant communities throughout a four-state region and has been an OSC grantee for the past 15 years. As a grantee, Catholic Charities of Dallas disseminates anti-discrimination education to both immigrant workers and to employers. The organization hosts ESL (English as a Second Language) classes, High School GED (Graduate Education Degree) courses, and job training programs. Because immigrants and refugees are highly concentrated at these sessions, Catholic Charities of Dallas uses these courses to provide training on OSC and immigration-related employment discrimination. Information is also disseminated at PTA meetings, crime watch meetings, senior citizen meetings, health and nutrition classes, cultural events, and after-church socials. Catholic Charities of Dallas has also created a consortium of groups and agencies, such as the U.S. Department of Labor's Wage and Hour Division, Occupational Safety and Health Administration, Equal Employment Opportunity Commission, and the League of United Latin American Citizens, to work together to preserve the employment rights of immigrants. In addition, Catholic Charities of Dallas works with attorney organizations to ensure that immigrants and refugees are receiving proper counsel. It recently formed the Immigration Program Management Project to successfully connect volunteer lawyers to immigrant clients and to refer charges of discrimination to OSC.

## Achievements of the OSC Grant Program (Continued)

Finally, like many OSC grantees, the organization regularly sponsors employer seminars to train employers on how to complete the employment eligibility verification (Form I-9) procedures properly and how to avoid discriminatory policies and practices during the employment eligibility verification process.

Other grantees have a national scope. The National Immigration Law Center ("NILC"), for example, is a national organization that focuses on the rights of low-wage immigrant workers throughout the country. As a member of the Low-Wage Immigrant Worker Coalition, NILC trains other organizations and advocates on the employment eligibility verification (Form I-9) process, keeping members updated on anti-



discrimination policy. NILC focuses on working with groups that have significant contact with immigrants. By educating organizations around the country, NILC can reach an even more expansive audience. NILC publishes a newsletter and update briefs to distribute at conferences and trainings in areas with large immigrant populations, such as California and New York. Much of NILC's outreach is geared toward local immigrant worker organizations and labor unions, who then, in turn, educate their members on such topics as re-verification, no-match letters, and the Basic Pilot Program. Working with the U.S. Department of Labor and advocates in the Gulf Coast region, NILC is attempting to aid the thousands of immigrants affected by Hurricane Katrina. Because many immigrants lost their documentation during the hurricane, NILC aims to decrease the amount of abuse and employment discrimination occurring through education and assistance on specific cases.

Some grantees focus on very specific populations of immigrant workers and are awarded OSC grants through the demonstration of urgent need. For instance, OSC provided additional outreach to immigrant farmworkers in Oregon through a recent grant to the Legal Aid Services of Oregon ("LASO"). Working with the Oregon Legal Center ("OLC"), LASO educates agricultural workers about the anti-discrimination provision of the INA and offers farmworkers free legal services. LASO and OLC educate workers about their legal rights through presentations at hundreds of labor camps and public service announcements on Spanish-speaking radio shows. Although most agricultural workers speak Spanish, in the 1990's LASO and OLC began noticing that a significant number of immigrant farmworkers were speaking indigenous languages as their first language, so they developed and launched the Indigenous Farmworker Project in 2001. While there is no official census, recent studies show that approximately 40% of the 170,000 agricultural workers who live and work in Oregon each year are of Latin American indigenous heritage. Communication and cultural gaps make indigenous people particularly susceptible to employment and other forms of discrimination, meaning most members of indigenous farmworker communities were uninformed of their legal rights. In order to fill this cultural and language void, two former farmworkers from Oaxaca, Mexico, who speak Mixteco, were hired as outreach workers. Since most indigenous languages do not have a common written form, the organizations gave oral presentations at labor camps and community meetings and recorded radio programs in Mixteco. The LASO and OLC also developed cassette tapes in Spanish, Mixteco, and Triqui that contain information about the anti-discrimination provision.

# OSC OUTREACH ACTIVITIES

## OSC Announces 2006 Grants

OSC is pleased to announce the award of nearly $725,000 in grants to eleven nonprofit groups to conduct public education programs for workers and employers about immigration-related job discrimination. Recipients of the grants, ranging from $45,000 to $85,000, will assist discrimination victims; conduct seminars for workers, employers and immigration service providers; distribute educational materials in various languages; and publicize information in local communities through the media.

The selected grantees are known and respected in their communities and will work with OSC to provide assistance to employers to prevent discrimination and to workers to protect them against discrimination.

The 2006 OSC grant recipients are:

**Association of Farmworker Opportunity Programs** - Washington, D.C.- will educate thousands of agricultural workers and employers through a network of 340 member agencies' rural offices throughout the lower 48 states and Puerto Rico.

**Catholic Charities of Dallas** - Dallas, TX - will serve workers and employers in Texas, Arkansas, New Mexico, and Oklahoma.

**Catholic Charities of the Diocese of Arlington, Hogar Hispano -** Arlington, VA **-** will serve immigrant workers and employers in Virginia, Maryland and Washington, D.C.

**Centro Legal de la Raza** - Oakland, CA - will reach Latino workers and employers throughout the five-county San Francisco Bay area.

**Civil Society** - St. Paul, MN - will serve workers and employers in the Twin Cities' Asian, African and Hispanic communities.

**Colorado Legal Services** - Denver, CO - will educate service providers and newly-arrived Asian and Muslim immigrants in the Denver area as well as rural migrant and seasonal farm workers throughout the state.

**Employers' Association of New Jersey** - Livingston, NJ - will advise thousands of employers on the anti-discrimination provision of the Immigration and Nationality Act.

**Legal Assistance Corporation of Central Massachusetts -** Worcester, Mass - will educate workers, service providers and leaders among the Latino, Southeast Asian and African communities in central Massachusetts.

**National Immigration Law Center (NILC) -** Los Angeles, CA- will carry out a national program to educate immigration service providers and pro bono attorneys through regional seminars in California's Central Valley and in the post-Katrina Gulf Coast region.

**YMCA of Greater New York -** New York, NY- will provide education to employers, service providers and immigrant workers from Latin America, the Caribbean, Asia and South Asia.

## Celebrating 20 Years of Accomplishments:

### OSC's 20th Anniversary Commemorative Luncheon

On Wednesday, September 27, 2006, OSC commemorated its 20th anniversary at a luncheon held during OSC's 2006 annual grantee training conference. The conference and luncheon took place at the Charles Sumner School, a historic landmark in Washington, D.C., that houses the archives of the District of Columbia Public Schools and has served as OSC's grantee training conference venue since 2003.

The luncheon opened with welcoming remarks by Wan Kim, the Assistant Attorney General for Civil Rights, and Deputy Assistant Attorney General Loretta King. The Assistant Attorney General discussed the significance of OSC's 20th anniversary, and Ms. King discussed the role grantees play in educating the public about the anti-discrimination provision of the Immigration and Nationality Act.

After the welcome, Special Counsel Lawrence J. Siskind addressed the grantees and other assembled guests, including OSC staff. Mr. Siskind was appointed by President Ronald Reagan to be the first Special Counsel for Immigration-Related Unfair Employment Practices and served from 1987-1989. He is currently a partner at Harvey Siskind Jacobs LLP, a San Francisco law firm. Mr. Siskind discussed OSC's history and shared his personal memories about OSC's inception, including the unique challenges facing an office tasked with enforcing a new law. The remarks were both nostalgic for OSC veterans in the group and motivational to the newer members of the office.

# OSC's Public Outreach Mission

A fundamental aspect of OSC's mission is educating the public about its rights and responsibilities under the Immigration and Nationality Act's (INA's) anti-discrimination provision. Through public service announcements, outreach events, brochures, employee and employer hotlines, a public education grant program, and memoranda of understanding with other government agencies, OSC is able to target its outreach to employers, as well as potential victims of discrimination.

One of the most broad-ranging outreach programs that OSC has recently implemented is a public service announcement ("PSA") campaign. Through this campaign, radio and television public service announcements highlighting OSC's mission have been aired in both English and Spanish throughout the country. With over 3,000 television announcements already aired, OSC has been able to reach an audience of almost 24 million potential viewers.  The PSAs feature information on the anti-discrimination provision, and how to contact OSC with questions or complaints.

Similar information is distributed through videos, pamphlets, brochures, and fact sheets, many of which are available in multiple languages. One brochure, for example, is printed in English, Vietnamese, Korean, and Chinese.  Some publications focus on the rights of employees to be free from immigration-related employment discrimination, while other publications attempt to answer frequently asked employer questions. OSC's educational materials are easily accessible online, and are available free of charge to groups or individuals upon request.

OSC staff members also participate in public outreach opportunities throughout the country.  For instance, in response to a recent increase in the immigrant population in Alaska, the Anchorage Equal Rights Commission invited OSC to speak before a group of immigration attorneys, community service providers, and representatives of immigrant communities in Anchorage. The presentation included an overview of statutes protecting immigrant workers from discrimination, an explanation of how the employment eligibility verification Form I-9 should be completed, and a discussion of common issues regarding employment eligibility verification.

One of the most important goals of OSC's outreach program is to deter and resolve discrimination through OSC's employee and employer hotlines.  OSC staff members (who have access to language interpreters) can assist workers through a telephone intervention program, in which OSC attempts to secure an immediate resolution of  a worker's allegation of immigration-related employment discrimination and/or assist an employer in ensuring that its practices are non-discriminatory.  OSC has found this to be a very expedient and cost effective way of enforcing the anti-discrimination provision.

In an effort to ensure that all charges of discrimination that fall within OSC's jurisdiction are appropriately referred to it, OSC has secured memoranda of understanding ("MOUs") with over 50 local, state, and federal agencies.  The MOUs allow OSC to refer charges to other government agencies, and to accept from those agencies charges that allege possible violations of the anti-discrimination provision.  A key feature of the MOUs is that charges first filed with an MOU partner within 180 days of the date of the alleged discrimination are deemed timely when received by OSC.  This protects workers from being disenfranchised because they initially filed with the wrong office.  OSC continues efforts to train MOU partners on the anti-discrimination provision so that they know how to spot immigration-related unfair employment practices.

## How To Contact OSC

**Mailing Address:**
Office of Special Counsel for Immigration-Related
Unfair Employment Practices
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

**Main Number:** (202) 616-5594 /TDD: (202) 616-5525

**Fax Number:** (202) 616-5509

**Toll Free Information Number and Worker Hotline:**
1-800-255-7688
(202) 616-5525 or 1-800-237-2515 (TDD for hearing impaired)
(Language interpretation available)

**Employer Hotline:** 1-800-255-8155
1-800-362-2735 (TDD for hearing impaired)

**E-mail Address:** osccrt@usdoj.gov

**Web Address:** http://www.usdoj.gov/crt/osc

| **Special Counsel** | **Deputy Special Counsel** | **Special Policy Counsel** | **Special Litigation Counsel** |
| --- | --- | --- | --- |
| Vacant | Katherine A. Baldwin | Carol J. Mackela (Acting) | Robin M. Stutman |

**Table 6. Language Spoken at Home and Ability to Speak English by Nativity for the Population 5 Years and Over by State:  2000**

[Data based on a sample.  For information on confidentiality protection, sampling error, nonsampling error, and definitions, see http://www.census.gov/prod/cen2000/doc/sf3.pdf]

| State | Population 5 years and over | | | Speak language other than English | | | Speak English less than "very Well" | | | Spanish | | Other Indo-European languages | | Asian and Pacific Island languages | | Other languages | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Native | Foreign born | Percent foreign born | Native | Foreign born | Percent foreign born | Native | Foreign born | Percent foreign born | Native | Foreign born | Native | Foreign born | Native | Foreign born | Native | Foreign born |
| **United States** | 231,666,088 | 30,709,064 | 11.7 | 21,454,572 | 25,497,023 | 54.3 | 5,647,591 | 15,672,816 | 73.5 | 14,760,788 | 13,340,264 | 4,431,729 | 5,586,260 | 1,448,275 | 5,511,790 | 813,780 | 1,058,709 |
| Alabama | 4,066,305 | 85,973 | 2.1 | 98,051 | 64,432 | 39.7 | 27,998 | 35,919 | 56.2 | 60,345 | 29,384 | 28,834 | 14,978 | 5,973 | 16,149 | 2,899 | 3,921 |
| Alaska | 543,080 | 36,660 | 6.3 | 55,325 | 27,433 | 33.1 | 15,609 | 15,233 | 49.4 | 11,270 | 5,044 | 7,340 | 5,511 | 6,110 | 16,076 | 30,605 | 442 |
| Arizona | 4,109,084 | 643,640 | 13.5 | 682,932 | 546,305 | 44.4 | 178,065 | 361,872 | 67.0 | 496,964 | 430,431 | 46,798 | 55,206 | 13,968 | 48,236 | 125,202 | 12,432 |
| Arkansas | 2,420,009 | 72,196 | 2.9 | 65,037 | 58,718 | 47.4 | 18,398 | 39,311 | 68.1 | 43,768 | 38,697 | 15,839 | 6,856 | 3,525 | 11,713 | 1,905 | 1,452 |
| California | 22,654,569 | 8,762,060 | 27.9 | 4,598,053 | 7,803,703 | 62.9 | 1,201,707 | 5,076,072 | 80.9 | 3,577,653 | 4,527,852 | 400,725 | 934,607 | 551,039 | 2,158,140 | 68,636 | 183,104 |
| Colorado | 3,644,134 | 362,151 | 9.0 | 308,094 | 295,925 | 49.0 | 74,129 | 193,375 | 72.3 | 234,891 | 186,779 | 49,707 | 50,441 | 14,978 | 48,767 | 8,518 | 9,938 |
| Connecticut | 2,818,980 | 365,534 | 11.5 | 319,881 | 264,032 | 45.2 | 93,042 | 141,757 | 60.4 | 197,261 | 70,783 | 108,806 | 142,529 | 8,121 | 39,872 | 5,693 | 10,848 |
| Delaware | 688,187 | 44,191 | 6.0 | 36,947 | 32,586 | 46.9 | 11,910 | 16,470 | 58.0 | 22,451 | 12,239 | 12,148 | 10,436 | 1,436 | 7,923 | 912 | 1,988 |
| District of Columbia | 466,987 | 72,671 | 13.5 | 34,723 | 55,694 | 61.6 | 8,149 | 30,087 | 78.7 | 21,344 | 28,117 | 10,199 | 13,522 | 1,569 | 7,405 | 1,611 | 6,650 |
| Florida | 12,396,566 | 2,647,037 | 17.6 | 1,377,901 | 2,095,963 | 60.3 | 316,216 | 1,238,649 | 79.7 | 1,052,217 | 1,424,311 | 268,349 | 486,865 | 31,475 | 133,041 | 25,860 | 51,746 |
| Georgia | 7,027,395 | 567,081 | 7.5 | 289,557 | 461,881 | 61.5 | 83,019 | 291,232 | 77.8 | 181,551 | 244,564 | 74,784 | 93,845 | 23,376 | 93,080 | 9,846 | 30,392 |
| Hawaii | 923,928 | 210,423 | 18.6 | 123,091 | 179,034 | 59.3 | 36,300 | 107,205 | 74.7 | 13,982 | 4,838 | 7,049 | 7,193 | 101,237 | 165,920 | 823 | 1,083 |
| Idaho | 1,133,773 | 63,020 | 5.3 | 61,684 | 50,195 | 44.9 | 13,658 | 32,881 | 70.7 | 44,399 | 35,842 | 11,149 | 8,311 | 2,860 | 5,245 | 3,276 | 797 |
| Illinois | 10,038,244 | 1,509,261 | 13.1 | 884,633 | 1,336,086 | 60.2 | 228,506 | 826,216 | 78.3 | 587,984 | 665,692 | 228,622 | 411,615 | 42,573 | 206,227 | 25,454 | 52,552 |
| Indiana | 5,475,067 | 182,751 | 3.2 | 218,565 | 143,517 | 39.6 | 61,461 | 81,966 | 57.1 | 116,756 | 68,820 | 89,054 | 37,476 | 7,549 | 29,158 | 5,206 | 8,063 |
| Iowa | 2,649,650 | 88,849 | 3.2 | 88,527 | 71,495 | 44.7 | 24,356 | 43,752 | 64.2 | 49,905 | 29,586 | 31,285 | 17,747 | 5,043 | 20,292 | 2,294 | 3,870 |
| Kansas | 2,368,465 | 131,895 | 5.3 | 106,748 | 111,907 | 51.2 | 26,791 | 71,416 | 72.7 | 70,932 | 66,315 | 25,575 | 15,632 | 7,225 | 25,978 | 3,016 | 3,982 |
| Kentucky | 3,697,798 | 78,432 | 2.1 | 87,455 | 61,018 | 41.1 | 25,560 | 33,311 | 56.6 | 47,942 | 22,119 | 32,390 | 18,635 | 4,807 | 16,224 | 2,316 | 4,040 |
| Louisiana | 4,038,597 | 114,770 | 2.8 | 289,993 | 92,371 | 24.2 | 71,297 | 45,610 | 39.0 | 66,305 | 38,884 | 208,210 | 17,540 | 11,514 | 30,449 | 3,964 | 5,498 |
| Maine | 1,167,968 | 36,196 | 3.0 | 74,718 | 19,248 | 20.5 | 16,686 | 7,377 | 30.7 | 8,432 | 1,179 | 63,083 | 12,996 | 1,626 | 4,111 | 1,577 | 962 |
| Maryland | 4,433,162 | 511,881 | 10.4 | 226,209 | 396,505 | 63.7 | 53,798 | 192,489 | 78.2 | 110,895 | 119,934 | 78,905 | 120,027 | 24,123 | 111,776 | 12,286 | 44,768 |
| Massachusetts | 5,190,241 | 764,008 | 12.8 | 518,883 | 596,687 | 53.5 | 133,317 | 325,756 | 71.0 | 246,410 | 123,601 | 223,493 | 306,291 | 35,790 | 135,463 | 13,190 | 31,332 |
| Michigan | 8,754,087 | 514,695 | 5.6 | 394,673 | 386,708 | 49.5 | 95,697 | 198,909 | 67.5 | 173,854 | 72,834 | 153,250 | 149,872 | 20,808 | 83,659 | 46,761 | 80,343 |
| Minnesota | 4,337,241 | 254,250 | 5.5 | 191,630 | 198,358 | 50.9 | 51,951 | 115,560 | 69.0 | 80,156 | 51,910 | 69,148 | 41,496 | 27,579 | 75,941 | 14,747 | 29,011 |
| Mississippi | 2,602,184 | 39,269 | 1.5 | 66,911 | 28,611 | 30.0 | 20,331 | 15,728 | 43.6 | 38,376 | 12,139 | 17,778 | 5,922 | 4,127 | 9,431 | 6,630 | 1,119 |
| Missouri | 5,078,366 | 147,656 | 2.8 | 150,934 | 113,347 | 42.9 | 42,386 | 60,633 | 58.9 | 78,026 | 32,726 | 59,398 | 38,418 | 8,826 | 33,144 | 4,684 | 9,059 |
| Montana | 831,226 | 16,136 | 1.9 | 36,870 | 7,461 | 16.8 | 9,617 | 3,046 | 24.1 | 11,641 | 1,312 | 14,114 | 3,864 | 1,127 | 1,939 | 9,988 | 346 |
| Nebraska | 1,521,752 | 72,948 | 4.6 | 63,853 | 61,801 | 49.2 | 17,063 | 40,709 | 70.5 | 40,864 | 36,791 | 18,189 | 9,716 | 2,653 | 12,361 | 2,147 | 2,933 |
| Nevada | 1,540,924 | 312,796 | 16.9 | 161,858 | 266,114 | 62.2 | 39,527 | 168,160 | 81.0 | 119,924 | 180,023 | 22,141 | 25,042 | 14,186 | 54,337 | 5,607 | 6,712 |
| New Hampshire | 1,107,176 | 53,164 | 4.6 | 61,845 | 34,243 | 35.6 | 12,653 | 15,420 | 54.9 | 13,497 | 5,150 | 44,859 | 19,208 | 1,997 | 7,894 | 1,492 | 1,991 |
| New Jersey | 6,396,191 | 1,460,077 | 18.6 | 785,429 | 1,216,261 | 60.8 | 197,067 | 676,021 | 77.4 | 485,829 | 481,912 | 225,224 | 434,024 | 43,534 | 232,298 | 30,842 | 68,027 |
| New Mexico | 1,542,619 | 147,292 | 8.7 | 490,765 | 126,199 | 20.5 | 117,549 | 83,506 | 41.5 | 379,726 | 105,955 | 11,897 | 10,135 | 2,734 | 8,783 | 96,408 | 1,326 |
| New York | 13,914,631 | 3,834,479 | 21.6 | 2,090,014 | 2,872,907 | 57.9 | 569,593 | 1,740,663 | 75.3 | 1,312,300 | 1,103,826 | 591,731 | 1,062,809 | 111,722 | 559,297 | 74,261 | 146,975 |
| North Carolina | 7,092,208 | 420,957 | 5.6 | 257,262 | 346,255 | 57.4 | 75,317 | 222,541 | 74.7 | 167,074 | 211,868 | 62,557 | 57,404 | 18,926 | 59,320 | 8,705 | 17,663 |
| North Dakota | 591,187 | 11,919 | 2.0 | 31,302 | 6,674 | 17.6 | 8,095 | 2,908 | 26.4 | 7,264 | 999 | 20,663 | 3,528 | 481 | 1,452 | 2,894 | 695 |
| Ohio | 10,266,697 | 333,271 | 3.1 | 400,305 | 248,188 | 38.3 | 115,510 | 118,949 | 50.7 | 177,876 | 35,271 | 184,027 | 112,789 | 17,037 | 67,621 | 21,365 | 32,507 |
| Oklahoma | 3,086,055 | 129,664 | 4.0 | 131,293 | 107,239 | 45.0 | 33,773 | 65,217 | 65.9 | 80,610 | 60,450 | 22,064 | 14,828 | 7,339 | 27,178 | 21,280 | 4,783 |
| Oregon | 2,914,599 | 284,724 | 8.9 | 160,133 | 228,536 | 58.8 | 40,088 | 148,870 | 78.8 | 99,555 | 118,059 | 36,557 | 46,271 | 18,310 | 56,969 | 5,711 | 7,237 |
| Pennsylvania | 11,054,432 | 501,106 | 4.3 | 601,005 | 371,479 | 38.2 | 176,940 | 191,317 | 52.0 | 293,898 | 62,856 | 260,662 | 167,460 | 28,474 | 115,481 | 17,971 | 25,682 |
| Rhode Island | 867,080 | 118,104 | 12.0 | 97,035 | 99,589 | 50.6 | 24,398 | 59,226 | 70.8 | 41,296 | 38,147 | 48,399 | 43,050 | 5,627 | 14,299 | 1,713 | 4,093 |
| South Carolina | 3,634,840 | 113,829 | 3.0 | 111,340 | 85,089 | 43.3 | 33,648 | 48,631 | 59.1 | 67,811 | 42,219 | 34,655 | 20,461 | 6,428 | 19,106 | 2,446 | 3,303 |
| South Dakota | 690,755 | 13,065 | 1.9 | 36,309 | 9,266 | 20.3 | 11,154 | 5,222 | 31.9 | 7,885 | 2,167 | 16,104 | 3,406 | 754 | 2,299 | 11,566 | 1,394 |
| Tennessee | 5,160,373 | 155,547 | 2.9 | 132,274 | 124,242 | 48.4 | 36,972 | 71,293 | 65.9 | 78,445 | 55,486 | 40,087 | 28,792 | 9,245 | 30,456 | 4,497 | 9,508 |
| Texas | 16,383,122 | 2,858,396 | 14.9 | 3,455,624 | 2,555,129 | 42.5 | 952,226 | 1,717,377 | 64.3 | 3,204,932 | 1,990,250 | 158,504 | 199,515 | 71,161 | 303,169 | 21,027 | 62,195 |
| Utah | 1,868,863 | 155,012 | 7.7 | 126,250 | 126,999 | 50.1 | 27,033 | 78,658 | 74.4 | 71,655 | 78,589 | 28,216 | 21,649 | 14,178 | 23,627 | 12,201 | 3,134 |
| Vermont | 552,113 | 22,729 | 4.0 | 21,544 | 12,531 | 36.8 | 4,421 | 4,884 | 52.5 | 5,145 | 646 | 15,297 | 9,037 | 670 | 2,345 | 432 | 503 |
| Virginia | 6,057,049 | 562,217 | 8.5 | 275,017 | 460,174 | 62.6 | 66,500 | 237,229 | 78.1 | 152,963 | 163,311 | 82,709 | 113,137 | 28,276 | 141,860 | 11,069 | 41,866 |
| Washington | 4,896,058 | 605,340 | 11.0 | 300,930 | 469,956 | 61.0 | 71,417 | 279,497 | 79.6 | 165,240 | 156,250 | 69,537 | 107,185 | 55,806 | 187,030 | 10,347 | 19,491 |
| West Virginia | 1,687,826 | 19,105 | 1.1 | 33,330 | 12,565 | 27.4 | 8,955 | 4,595 | 33.9 | 15,854 | 1,798 | 14,383 | 5,108 | 1,583 | 4,455 | 1,510 | 1,204 |
| Wisconsin | 4,832,483 | 189,590 | 3.8 | 219,534 | 149,178 | 40.5 | 62,755 | 86,155 | 57.9 | 110,922 | 57,856 | 82,460 | 42,259 | 17,906 | 43,541 | 8,246 | 5,522 |
| Wyoming | 451,762 | 11,047 | 2.4 | 22,296 | 7,189 | 24.4 | 4,983 | 3,936 | 44.1 | 14,513 | 4,093 | 4,775 | 1,616 | 864 | 1,253 | 2,144 | 227 |

Source:  U.S. Census Bureau, Census 2000, Summary File 3 Table PCT12.
Internet release data:  February 25, 2003

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF TENNESSEE

3                    WINCHESTER DIVISION

4                      - - -      **CERTIFIED COPY**

5   BIRDA TROLLINGER, VIRGINIA        )
    BRAVO, KELLY KESSINGER, IDOYNIA   )
6   MCCOY, REGINA LEE, PATRICIA       )
    MIMS, LORI WINDHAM and            )
7   ALEXANDER HOWLETT, individually   )
    and on behalf of all others       )
8   similarly situated,               )
                                      )
9         Plaintiffs,                 )
                                      )
10        vs.                         )  No. 4:02-cv-23
                                      )
11  TYSON FOODS, INC., JOHN TYSON,    )
    ARCHIBALD SCHAFFER III, RICHARD   )
12  BOND, KENNETH KIMBRO, GREG LEE,   )
    KAREN PERVICAL, AHRAZUE WILT      )
13  and TIM MCCOY,                    )
                                      )
14        Defendants.                 )
                                      )

15

16

17              DEPOSITION OF GEORGE BORJAS

18                  Chicago, Illinois

19           Wednesday, September 5, 2007

20

21  Atkinson-Baker, Inc.
    Court Reporters
22  (800)288-3376
    www.depo.com
23

    REPORTED BY:  Kathleen Alexakis, CSR, State of Illinois
24               License No. 084-003141, Notary Public.

25  FILE NO.:  A107482

                                                            1

 1    they couldn't speak English or they needed help filling

 2    out their I-9 forms, et cetera?

 3        MR. FOSTER:  Objection.

 4            Assuming facts not in evidence.  Outside the

 5    scope of the report.

 6        MR. GREEN:  Well, he said he read Cutler's report.

 7        MR. FOSTER:  It's outside the scope of Dr. Borjas's

 8    report.

 9            That's my objection.

10        Q    BY MR. GREEN:  Do you understand --

11        A    I remember reading those lines in Dr. Cutler's

12    report.

13        Q    Okay.

14            But you know that millions -- you yourself know

15    the millions of illegal immigrants do not speak

16    English; isn't that right?

17        MR. FOSTER:  Objection.

18            Outside the scope of this report.

19        Q    BY MR. GREEN:  I'm sorry.  You know that

20    millions of legal immigrants do not speak English?

21        MR. FOSTER:  Same objection.

22        Q    BY MR. GREEN:  You do know that; right?

23        A    Yes.

24            (Defendants' Exhibit No. 13 was marked for

25            identification by the reporter and is included

7NOV07CY.txt

1

```
1              IN THE UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF TENNESSEE

3                         AT WINCHESTER
      ---------------------------------------------------------
4                                    :
   BIRDA TROLLINGER, et al.,         :
5                                    :
              Plaintiffs,            :
6  -versus-                          :          4:02-CV-23
                                     :
7  TYSON FOODS, INC., et al.,        :
                                     :
8             Defendants.            :
      ---------------------------------------------------------
9                                        Chattanooga, Tennessee
                                         November 7, 2007
10
              BEFORE:   THE HONORABLE CURTIS L. COLLIER,
11                      CHIEF UNITED STATES DISTRICT JUDGE

12
   APPEARANCES:
13
              FOR THE PLAINTIFFS:
14
              WILLIAM V. JOHNSON, ESQ.
15            HOWARD W. FOSTER, ESQ.
              Johnson & Bell Ltd.
16            33 West Monroe Street, Suite 2700
              Chicago, Illinois  60603-5404
17
              WILLIAM G. COLVIN, ESQ.
18            Horton, Maddox & Anderson, PLLC
              One Central Plaza
19            835 Georgia Avenue, Sixth Floor
              Chattanooga, Tennessee  37402
20

21

22

23                       DAUBERT HEARING
                      EXCERPT OF PROCEEDINGS
24            TESTIMONY OF COMECHALLA YOUNGBLOOD

25


                  UNITED STATES DISTRICT COURT
```

2

```
1  APPEARANCES:  (Continuing)
                          Page 1
```

7NOV07CY.txt

2

3              FOR THE DEFENDANTS:

4              THOMAS C. GREEN, ESQ.
               MARK D. HOPSON, ESQ.
5              COLLEEN M. LAUERMAN, ESQ.
               Sidley Austin LLP
6              1501 K Street N.W.
               Washington, D.C.  20005
7
               TRAVIS R. McDONOUGH, ESQ.
8              C. CELESTE CRESWELL, ESQ.
               Miller & Martin PLLC
9              Suite 1000 Volunteer Building
               832 Georgia Avenue
10             Chattanooga, Tennessee  37402

11

12                             -  -  -

13

14

15

16

17

18

19

20

21

22

23

24

25


                    UNITED STATES DISTRICT COURT


                                                          3

                  Youngblood - Direct Examination
1                     COMECHALLA YOUNGBLOOD,

2    called as a witness at the instance of the defendants,

3    having been first duly sworn, was examined, and testified as

4    follows:
                            Page 2

7NOV07CY.txt

DIRECT EXAMINATION

5

6    BY MS. LAUERMAN:

7    Q        Good afternoon, Ms. Youngblood.

8    A        Good afternoon.

9    Q        Would you please state your name for the Court?

10   A        Comechalla Youngblood.

11   Q        Can you tell us where you were born?

12   A        LSU Hospital in Shreveport, Louisiana.

13   Q        And where did you go to school?

14   A        Mansfield High School.

15   Q        And where is Mansfield?

16   A        In Louisiana.

17   Q        In Louisiana?  Where do you live now?

18   A        In Mansfield.

19   Q        Have you lived in Louisiana your whole life?

20   A        Yes.

21   Q        Where do you work?

22   A        At Tyson Food in Center, Texas.

23   Q        And how long have you worked for Tyson?

24   A        Five years and three months.

25   Q        Do you remember showing Tyson documents to establish

UNITED STATES DISTRICT COURT

4

Youngblood - Direct Examination

1    that you were allowed to work when you were hired?

2    A        Yes.

3            MS. LAUERMAN:  May I approach, Your Honor, with an

4    exhibit?

5            THE COURT:  Please give it to Ms. Palmer.

6            (Brief pause.)

7    BY MS. LAUERMAN:

Page 3

7NOV07CY.txt

```
 8    Q         Ms. Youngblood, I have shown you what's been marked
 9    as Defendants' Daubert Exhibit 81.  I'm just trying to get it
10    lined up here.  Can you take a look at this document and tell
11    me whether this is your signature at the top part of the
12    document?
13    A         It is.
14    Q         Yes?
15    A         Yes.
16    Q         And are you a United States citizen?
17    A         Yes.
18    Q         And is this your handwriting in the top section
19    above your signature on this document?
20    A         No.
21    Q         Did you need some help filling out the form?
22    A         Yes.
23    Q         And can you tell us why you needed some help?
24    A         Because sometimes I have trouble reading.
25    Q         Okay.  Do you speak any language other than English,
```

UNITED STATES DISTRICT COURT

5

Youngblood - Cross-Examination

```
 1    Ms. Youngblood?
 2    A         No.
 3    Q         If you'll flip two pages into that exhibit, I'd like
 4    to ask you, are these copies of the documents that you showed
 5    to Tyson when you were hired?
 6    A         Yes.
 7    Q         And is this your Social Security card, a copy of
 8    your Social Security --
 9    A         Yes.
10    Q         And is this a copy of your identification card?
```

7NOV07CY.txt

11    A        Yes.

12    Q        Ms. Youngblood, are you allowed to work in the

13    United States?

14    A        Yes.

15            MS. LAUERMAN:  Thank you very much.  I have no other

16    questions.

17            MR. JOHNSON:  Just a couple of questions.

18                      CROSS-EXAMINATION

19    BY MR. JOHNSON:

20    Q        You're a citizen of the United States, you're

21    allowed to work in the United States, obviously, correct,

22    ma'am?

23    A        Yes.

24    Q        All right.  And what's your job at Tyson?

25    A        Packing and trimming breasts, and debone.


                UNITED STATES DISTRICT COURT

                                                        6
                Youngblood - Cross-Examination

1     Q        Have you ever had anything to do with the employment

2     department at Tyson?

3     A        No.

4     Q        Have you ever had anything to do with hiring people

5     at Tyson?

6     A        No.

7     Q        Are you familiar with how they hire people at Tyson,

8     other than your own personal experience?

9     A        No.

10    Q        Do you know Mr. Cutler?

11    A        Who is that?

12    Q        You don't know a gentleman named Mr. Michael Cutler,

13    do you?

                      Page 5

7NOV07CY.txt

```
14   A        No.

15   Q        You don't know what his experience is, what his

16   training is, what his background is, correct?

17   A        No.

18            MR. JOHNSON:  Okay.  That's all I've got.  Thank you.

19            THE COURT:  Any redirect?

20            MS. LAUERMAN:  Nothing further.  Thank you,

21   Ms. Youngblood.

22            THE COURT:  You're free to go.

23            THE WITNESS:  Thank you.

24            (Witness excused.)

25                      END OF EXCERPT
```

UNITED STATES DISTRICT COURT

7

```
1        I, Elizabeth B. Coffey, do hereby certify that I

2   reported in machine shorthand the proceedings in the

3   above-styled cause, and that this transcript is an accurate

4   record of said proceedings.

5

6

7                          _____

8                          Elizabeth B. Coffey,
                           Official Court Reporter
9

10

11

12

13

14

15

16
```

Page 6

7NOV07CY.txt

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

♀=

# Handbook  for  Employers

Instructions for Completing Form I-9

*(Employment Eligibility Verification Form)*



If you have questions after reviewing this Handbook, please contact your local INS office at the address found in the back of this Handbook. Direct your letter to the attention of the *Employer Relations Offices.*
**DO NOT CONTACT THE INTERNAL REVENUE SERVICE (IRS)**

**U. S. Department of Justice**
Immigration and Naturalization Service



To United States Employers:

Thank you for your cooperation and assistance. For the past five years, you have worked with us to implement the employment eligibility verification and employer sanctions provisions of the Immigration Reform and Control Act of 1986. Your teamwork has made the law a success, ensuring fairness in applying the law and preserving jobs for those who are legally eligible to work -- citizens and nationals and aliens authorized to work in the United States.

Based on comments and suggestions received from the public and our experience in these first years, we have revised the *Employment Eligibility Verification Form* (I-9) and expanded this *Handbook for Employers.* We have sought to simplify and clarify.

This Handbook provides a step-by-step explanation of what you as an employer must do to meet your responsibilities under the law.      It also explains the responsibilities and rights of employees in the hiring and verification process. We have included additional illustrations of documents that may be used to establish identity and employment eligibility.   The Handbook also provides expanded information about how to avoid employment discrimination based on citizenship or national origin.

The Immigration and Naturalization Service thanks you for your compliance with these requirements, now an established part of our nation's laws. We are counting on your continued cooperation.

Gene McNary
Commissioner
Immigration and Naturalization Service

# Contents

## This Handbook is divided into eight (8) parts:

☞    **Part 1** - Why Employers Must Verify Employment Eligibility of New Employees.
See Page 1

☞    **Part 2 -** When You Must Complete the Form I-9.
See Page 3

☞    **Part 3 -** How to Complete the Form I-9.
See Page 3

☞    **Part 4 -** Unlawful Discrimination.
See Page 8

☞    **Part 5 -** Penalties for Prohibited Practices.
See Page 9

☞    **Part 6** - Instructions for Recruiters and Referrers for a Fee.
See Page 11

☞    **Part 7** - Some Questions You May Have About the Form I-9.
See Page 12

☞    **Part 8 -** Acceptable Documents for Verifying Employment Eligibility.
See Page 20

This Handbook includes two copies of the Form I-9. At the back, you will also find a list of INS offices for you to contact if you need more information.

**United States Department of Justice**
*Immigration and Naturalization Service*

November 1991

# Part One

## Why Employers Must Verify Employment Eligibility of New Employees

In recent years, Congress has worked to reform our nation's immigration laws. These reforms, the result of a bipartisan effort, preserve our tradition of legal immigration while closing the door to illegal entry. The employer sanctions provisions, found at Section 274A of the Immigration and Nationality Act, were added by the Immigration Reform and Control Act of 1986 (IRCA). These provisions further changed with the passage of the Immigration Act of 1990. References to "the Act" in this Handbook refer to the Immigration and Nationality Act, as amended.

Employment is often the magnet that attracts persons to come to or stay in the United States illegally. The purpose of the employer sanctions law is to remove this magnet by requiring employers to hire only persons who may legally work here: citizens and nationals of the United States and aliens authorized to work. To comply with the law, you must verify the identity and employment eligibility of anyone you hire, and complete and retain a Form I-9 like the one contained in this Handbook.

In addition, the law obliges you not to discriminate against individuals on the basis of national origin or citizenship, or to require more or different documents from a particular individual. (See Part 4.)

This law has been strongly supported by the public. Employers have joined, and continue to join, the effort to protect our heritage of legal immigration. This cooperation has made jobs available to American citizens and to aliens who are authorized to work in our country. In addition to being the law, it is good business practice for you to verify the identity and employment eligibility of your workers. The law deserves your support.

The Form I-9 was developed for verifying that persons are eligible to work in the United States. You should have completed a Form I-9 for everyone you have hired after November 6, 1986. The law requires you as an employer to:

☞    Ensure that your employees fill out Section 1 of the Form I-9 when they start to work;

- Review document(s) establishing each employee's identity and eligibility to work;

- Properly complete Section 2 of the Form I-9;

- Retain the Form I-9 for 3 years after the date the person begins work or 1 year after the person's employment is terminated, **whichever is later**; and

- Make the Form I-9 available for inspection to an officer of the Immigration and Naturalization Service (INS), the Department of Labor (DOL), or the Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) upon request. You will be given at least 3 days advance notice.

   **NOTE:** *This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

If you are an agricultural association, agricultural employer, or farm labor contractor who employs people, or recruits or refers people for a fee, these requirements apply to you. (See Part 6.)

If you employ anyone for domestic work in your private home on a regular basis (such as every week), these requirements apply to you.

If you are self-employed, you do not need to complete a Form I-9 on yourself unless you are also an employee of a business entity, such as a corporation or partnership, in which case the business entity is required to complete a Form I-9 on you.

The instructions in this Handbook will help you assess your responsibilities for completing the form and complying with the law.

## New Developments In the Law

### The Immigration Act of 1990

On November 29, 1990, the President signed into law the Immigration Act of 1990 which amended the Immigration and Nationality Act. You should be aware of several provisions in this new law which affect your responsibilities as an employer.

New Anti-Discrimination Provisions

For the purpose of satisfying the employment eligibility verification requirements, an employer cannot request that an employee present more or different documents than are required. Also, an employer cannot refuse to honor documents which on their face reasonably appear to be genuine and to relate to the person presenting them. The new law makes these actions unfair immigration-related employment practices. (See Part 4.)

New Document Fraud Provisions

Under the new law, it is unlawful for anyone knowingly to engage in any of the following activities for the purpose of satisfying a requirement of the Act:

- To forge, counterfeit, alter, or falsely make any document;

- To use, attempt to use, possess, obtain, accept, or receive any forged, counterfeit, altered, or falsely made document;

- To use or attempt to use any document lawfully issued to a person other than the possessor (including a deceased individual); or

- To accept or receive any document lawfully issued to a person other than the possessor (including a deceased individual) for the purpose of complying with the employment eligibility verification requirements. (See Part 5.)

## Where to Get the Form I-9

Two copies of the Form I-9 are included in this Handbook. If you need more forms, you can photocopy or print the forms, provided both sides are reproduced. The Instructions page must also be made available to both you and the employee during the completion of the form. You may obtain a limited number of copies from the INS or you may order them in bulk from the Superintendent of Documents at the following address:

   Superintendent of Documents
   U.S. Government Printing Office
   Washington, D.C. 20402

# Part Two

## When You Must Complete the Form I-9

Every time you hire any person to perform labor or services in return for wages or other remuneration, you must complete the Form I-9. This requirement applies to everyone hired after November 6, 1986.

Ensure that the employee fully completes **Section I** of the form at the time of the hire -- **when the employee begins work.**

Review the employee's document(s) and fully complete **Section 2** of the form **within 3 business days** of the hire.

**If you hire a person for less than 3 business days, Sections 1 and 2 of the Form I-9 must be fully completed at the time of the hire -- when the employee begins work.**

You **DO NOT** need to complete a Form I-9 for:

- Persons hired before November 7, 1986, who are continuing in their employment and have a reasonable expectation of employment at all times;

- Persons you employ for casual domestic work in a private home on a **sporadic, irregular,** or **intermittent** basis;

- Persons who are independent contractors; or

- Persons who provide labor to you who are employed by a contractor providing contract services (e.g., employee leasing).

   **NOTE:** *You cannot contract for the labor of an alien if you know the alien is not authorized to work in the United States.*

# Part Three

## How to Complete the Form I-9

### Section 1

- Have your employees complete Section 1 at the time of the hire -- when they begin to work -- by filling in the correct information and signing and dating the form.

- If your employees cannot complete Section 1 by themselves or if they need the form translated, someone may assist them. The preparer or translator must read the form to the employee, assist him or her in completing Section 1, and have the employee sign or mark the form in the appropriate place. The preparer or translator must then complete the Preparer/Translator Certification block on the Form I-9.

- You are responsible for reviewing and ensuring that your employees fully and properly complete Section 1.

### Section 2

- Employees must present to you an original document or documents that establish identity and employment eligibility within 3 business days of the date employment begins. Some documents establish **both** identity and employment eligibility (List A). Other documents establish **identity only** (List B) or **employment eligibility only** (List C). Employees can choose which document(s) they want to present from the lists of acceptable documents. These lists appear in Part 8 of this Handbook and on the back of the Form I-9.

- You must examine the original document or documents presented by the employee and then fully complete Section 2 of the Form I-9. You must examine one document from List A **or** one from List B and one from List C. Record the title, issuing authority, number, and expiration date (if any) of the document(s); fill in the date of hire and correct information in the certification block; and sign and date the Form I-9. You **must** accept any document(s) (from List A) or combination of documents (one from List B **and** one from List C) presented by the individual which reasonably appear on their face to be genuine and to relate to the person presenting them. You may not specify which document(s) an employee must present.

4

⁎  It employees are unable to present the required document(s) within 3 business days of the date employment begins, they must present a **receipt** for the application for the document(s) within 3 business days. The employees **must** have indicated, by having checked an appropriate box in Section 1, that they are already eligible to be employed in the United States. When they provide you with a receipt showing that they have applied for a document evidencing that eligibility, you should record the document title in Section 2 of the Form I-9 and write the word "receipt" and any document number in the "Document #" space. The employee must present the actual document within 90 days of the date employment begins. At that time, you should cross out the word "receipt" and any accompanying document number, insert the number from the actual document presented, and initial and date the change.

⁎  You must retain the Form I-9 for 3 years after the date employment begins or 1 year after the person's employment is terminated, **whichever is later.**

**Future Expiration Dates**

Future expiration dates may appear on the Form I-9 or on the employment authorization documents of aliens, including, among others, permanent residents, temporary residents, and refugees. INS includes expiration dates even on documents issued to aliens with permanent work authorization. The existence of a future expiration date:

⁎  Does not preclude continuous employment authorization;

⁎  Does not mean that subsequent employment authorization will not be granted; and

⁎  Should not be considered in determining whether the alien is qualified for a particular position.

Consideration of a future employment authorization expiration date in determining whether an alien is qualified for a particular job may constitute employment discrimination. (See Part 4.) You will, however, need to reverify the employee's eligibility to work when any expiration date on the Form I-9 is reached.

**Reverifying Employment Authorization for Current Employees**

When an employee's work authorization expires, you must reverify his or her employment eligibility. You may use Section 3 of the Form I-9 or, if Section 3 has already been used for a previous reverification or update, use a new Form I-9. If you use a new form, you should write the employee's name in Section 1, complete Section 3, and retain the new form with the original. The employee must present a document that shows either an extension of the employee's initial employment authorization or now work authorization. If the employee cannot provide you with proof of current work authorization, you cannot continue to employ that person.

**To maintain continuous employment eligibility, an employee with temporary work authorization should apply for new work authorization at least 90 days before the current expiration date.** If the Service fails to adjudicate the application for employment authorization within 90 days, then the employee will be authorized for employment on Form I-688B for a period not to exceed 240 days.

***You must reverify on* the Form I-9 *not later than the date the employee's* work *authorization expires.***

**Reverifying or Updating Employment Authorization for Rehired Employees**

When you rehire an employee, you must ensure that he or she is still authorized to work. You may do this by completing a new Form I-9 or you may reverity or update the original form by completing Section 3.

If you rehire an employee who has previously completed a Form I-9, you may **reverify** on the employee's original Form I-9 (or on a new Form I-9 if Section 3 of the original has already been used) if:

⁎  You rehire the employee within 3 years of the initial date of hire; and

⁎  The employee's previous grant of work authorization has expired but he or she is currently eligible to work on a **different** basis or under a **new** grant of work authorization than when the original Form I-9 was completed.

To reverify, you must:

- Record the date of rehire;

- Record the document title, number, and expiration date (if any) of any document(s) presented;

- Sign and date Section 3; and

- If you are reverifying on a new form, write the employee's name in Section 1.

If you rehire an employee who has previously completed a Form I-9, you may **update** on the employee's original Form I-9 or on a new Form I-9 if:

- You rehire the employee within 3 years of the initial date of hire; and

- The employee is still eligible to work on the **same** basis as when the original Form I-9 was completed.

To update, you must:

- Record the date of rehire;

- Sign and date Section 3; and

- If you are updating on a new form, write the employee's name in Section 1.

In all of the situations described above with respect to rehired employees, you always have the option of completing Sections 1 and 2 of a new Form I-9 instead of completing Section 3.

### Minors (Individuals Under Age 18)

If a minor -- a person under the age of 18 -- cannot present a List A document or an **identity** document from List B, the Form I-9 should be completed in the following way:

- A parent or legal guardian must complete Section 1 and write "Individual under age 18" in the space for the employee's signature;

- The parent or legal guardian must complete the "Preparer/Translator Certification" block;

- You should write "Individual under age 18" in Section 2, List B, in the space after the words "Document #"; and

- The minor must present a List C document showing his or her employment eligibility. You should record the required information in the appropriate space in Section 2.

### Handicapped Employees (Special Placement)

If a person with a handicap, who is placed in a job by a nonprofit organization or as part of a rehabilitation program, cannot present a List A document or an **identity** document from List B, the Form I-9 should be completed in the following way:

- A representative of the nonprofit organization, or a parent or a legal guardian, must complete Section 1 and write "Special Placement" in the space for the employee's signature;

- The representative, parent, or legal guardian must complete the "Preparer/Translator Certification" block;

- You should write "Special Placement" in Section 2, List B, in the space after the words "Document #"; and

- The handicapped employee must present a List C document showing his or her employment eligibility. You should record the required information in the appropriate space in Section 2.

6

**Section 1** - To be completed by the **EMPLOYEE**

**STEP 1**
Fill in the personal information.

**STEP 2**
Check the box for work eligibility.
Fill in other information if
applicable.



**STEP 3**
Read, sign, and date.



**STEP 4**
(*Preparer/Translator only*)
Read, fill in information, sign, and
date.




**Section 2** - To be completed by the **EMPLOYER**

**STEP 5**
Examine the document(s) and fill
in the document title, issuing
authority, number, and expiration
date (if any) in the space
provided.



**STEP 6**
Read, fill in information (including
the date employment begins in
the certification), sign, and date.



**Section 3** - To be completed by the **EMPLOYER**

**STEP 7**
Fill in the new name and/or date
of rehire (if applicable).



**STEP 8**
Examine the document(s) and fill
in the document title, number,
and expiration date (if any) in the
space provided.




**STEP 9**
Read, sign, and date.



Part Three of this Handbook gives instructions for completing the Form I-9 for minors and handicapped individuals who are unable to present a List A document or a List B **(identity)** document. This example shows a completed Form I-9 in which a parent has attested to a minor employee's identity.

**Section 1**. To be completed by the **PARENT, LEGAL GUARDIAN, OR REPRESENTATIVE OF THE NONPROFIT ORGANIZATION**

**STEP 1**
Fill in the personal information.

**STEP 2**
Check the box for work eligibility. Fill in other information as required.

**STEP 3**
Read, then write "Individual under age 18" in the space for the employee's signature.

**STEP 4**
(*Preparer/Translator*)
Read, fill in information, sign, and date.



**Section 2** - To be completed by the **EMPLOYER**

**STEP 5**
Examine a List C document establishing employment eligibility. Fill in the document title, issuing authority, number, and expiration date (if any) in the space provided. Under List B, write "Individual under age 18" in the space provided for "Document #."

**STEP 6**
Read, fill in information, sign, and date.

8

# Part Four

## Unlawful Discrimination

### General Provisions

The Immigration and Nationality Act, as amended, and Title VII of the Civil Rights Act of 1964, as amended, prohibit employment discrimination. Employers with 4 or more employees are prohibited from discriminating against any person (other than an unauthorized alien) in hiring, discharging, or recruiting or referring for a fee because of a person's national origin, or in the case of a citizen or protected individual, because of a person's citizenship status. Employers with 15 or more employees may not discriminate against any person on the basis of national origin in hiring, discharge, recruitment, assignment, compensation, or other terms and conditions of employment.

*NOTE:        For the definition of a "protected individual," see Question #41 on Page 18 of this Handbook.*

In practice, this means that employers must treat all employees the same when completing the Form I-9. Employers cannot set different employment eligibility verification standards or require that different documents be presented by different groups of employees.        Employees can choose which documents they want to present from the lists of acceptable documents. An employer cannot request that an employee  present more or  different documents that are required or refuse to honor documents which on their face reasonably appear to be genuine and to relate to the person presenting them. An employer cannot refuse to accept a document, or refuse to hire an individual, because a document has a future expiration date. For example, temporary resident aliens have registration cards and persons granted asylum have INS work authorization documents that will expire, but they are ordinarily granted extensions of their employment authorization and they are protected by law from discrimination.

Generally, employers who have 4 or more employees cannot limit jobs to United States citizens to the exclusion of authorized aliens. Such a limitation may only be applied to a specific position when required by law, regulation, or executive order; when required by a Federal, state, or local government contract; or when the Attorney General determines that United States citizenship is essential for doing business with an agency or department of the Federal, state, or local government.

On an individual basis, an employer may legally prefer a United States citizen or national over an **equally** qualified alien to fill a specific position. **However, an employer may not adopt a  blanket policy of always preferring a qualified citizen over a qualified alien.**

Verification of identity and employment eligibility is not required until an individual actually starts work. The Form I-9 should be completed at the same point in the employment process for **all** employees. Different procedures should not be established based on an individual's appearance, name, accent, or other factors.

### Procedures for Filing Complaints

Discrimination charges may be filed by an individual who believes he or she is the victim of employment discrimination, a person acting on behalf of such an individual, or an INS officer who has reason to believe that discrimination has occurred.

Charges of national origin discrimination against employers with 4 to 14 employees, and all charges of citizenship status discrimination against employers with 4 or more employees, should be filed with the Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) within the Department of Justice.

Discrimination charges must be filed with the OSC within 180 days of the discriminatory act. Upon receipt of a discrimination charge, the OSC will notify the employer within 10 days that the charges have been filed and that an investigation will be conducted. If the  OSC has not filed a  complaint with an administrative law judge within 120 days of receiving a charge of discrimination, it will notify the person making the charge of its determination not to file a complaint. The person making the charge (other than an INS officer) may  file a  complaint with an administrative law judge within 90 days after receiving the notice from the OSC. In addition, the OSC may still file a complaint within this 90-day period. The administrative law judge will conduct a hearing and issue a decision.

An employer is prohibited from taking retaliatory action against a person who has filed a charge of discrimination or who was a witness or otherwise participated in the investigation of another person's complaint. Such retaliatory action is a violation of the Act's anti -discrimination provision and of Title VII.

**Additional Information**

**For more information about immigration-related discrimination, contact the Office of Special Counsel for Immigration Related Unfair Employment Practices, P.O. Box 65490, Washington, D.C., 20035-5490, or call 1-800-255-7688 or for the hearing impaired TDD 1-800-237-2515. In Washington, D.C., call (202) 653-8121 or TDD (202) 296-0168.**

**For more information on Title VII and policies and procedures of the Equal Employment Opportunity Commission, call 1-800-USA-EEOC.**

# Part Five

## Penalties for Prohibited Practices

### A. UNLAWFUL EMPLOYMENT

#### 1. Civil Penalties

If an investigation reveals that an employer has knowingly hired or knowingly continued to employ an unauthorized alien, or has failed to comply with the employment eligibility verification requirements, with respect to employees hired after November 6, 1986, the INS may take action. When the INS intends to impose penalties, a Notice of Intent to Fine (NIF) is issued. Employers who receive a NIF may request a hearing before an administrative law judge. If a request for a hearing is not received within 30 days, the penalty will be imposed and a Final Order will be issued. When a Final Order is issued, the penalty is final and unappealable.

- Hiring or continuing to employ unauthorized aliens

  Employers determined to have knowingly hired unauthorized aliens (or to be continuing to employ aliens knowing that they are or have become unauthorized to work in the United States) may be ordered to cease and desist from such activity, and pay a civil money penalty as follows:

  - First Offense. Not less than $250 and not more than $2,000 for each unauthorized alien;

  - Second Offense. Not less than $2,000 and not more than $5,000 for each unauthorized alien; or

  - Subsequent Offenses. Not less than $3,000 and not more than $10,000 for each unauthorized alien.

  After November 6, 1986, if an employer uses a contract, subcontract, or exchange entered into, renegotiated, or extended, to obtain the labor of an alien and knows the alien is not authorized to work in the United States, the employer will be considered to have knowingly hired an unauthorized alien. The employer **will** be subject to the penalties set forth above.

Failing to comply with the Form I-9 requirements

Employers who fail to properly complete, retain, and/or make available for inspection Forms I-9 as required by law may face civil money penalties of not less than $100 and not more than $1,000 for each employee for whom the Form I-9 was not properly completed, retained, and/or made available.

Requiring indemnification

Employers found to have required a bond or indemnity from an employee against liability under the employer sanctions laws may be ordered to pay a civil money penalty of $1,000 for each violation and to make restitution, either to the person who was required to pay the indemnity, or, if that person cannot be located, to the United States Treasury.

Good faith defense

If an employer can show that he or she has complied with the Form I-9 requirements, then the employer has established a "good faith" defense with respect to a charge of knowingly hiring an unauthorized alien, unless the government can show that the employer had actual knowledge of the unauthorized status of the employee.

## 2. Criminal Penalties

Engaging in a pattern or practice of knowingly hiring or continuing to employ unauthorized aliens

Persons or entities who are convicted of having engaged in a pattern or practice of knowingly hiring unauthorized aliens (or continuing to employ aliens knowing that they are or have become unauthorized to work in the United States) after November 6, 1986, may face fines of up to $3,000 per employee and/or 6 months imprisonment.

Engaging in fraud or false statements, or otherwise misusing visas, immigration permits, and identity documents

People who use fraudulent identification or employment eligibility documents, or documents that were lawfully issued to another person, or who make a false statement or attestation for purposes of satisfying the employment eligibility verification requirements, may be fined, or imprisoned for up to 5 years, or both.

## B. UNLAWFUL DISCRIMINATION

If an investigation reveals that an employer has engaged in unfair immigration -related employment practices under the Act, the OSC or the EEOC may take action. An employer will be ordered to stop the prohibited practice and may be ordered to take one or more of the following steps:

Hire or reinstate, with or without back pay, individuals directly injured by the discrimination;

Lift any restrictions on an employee's assignments, work shifts, or movements;

Post notices to employees about their rights and about employers' obligations;

Educate all personnel involved in hiring and in complying with the employer sanctions and anti-discrimination laws about the requirements of these laws; and/or

Remove a false performance review or false warning from an employee's personnel file.

Employers may also be ordered to pay a civil money penalty as follows:

First Offense. Not less than $250 and not more than $2,000 for each individual discriminated against;

Second Offense. Not less than $2,000 and not more than $5,000 for each individual discriminated against;

Subsequent Offenses. Not less than $3,000 and not more than $10,000 for each individual discriminated against; or

Unlawful Request for More or Different Documents. Not less than $100 and not more than $1,000 for each individual discriminated against.

Employers may also be ordered to keep certain records regarding the hiring of applicants and employees. If a court decides that the losing party's claim has no reasonable basis in fact or law, the court may award attorneys' fees to prevailing parties other than the United States.

## C. CIVIL DOCUMENT FRAUD

If an investigation reveals that an individual has knowingly committed or participated in acts relating to document fraud (see Part 1), the INS may take action. When the INS intends to impose penalties, a Notice of Intent to Fine (NIF) is issued. Persons who receive a NIF may request a hearing before an administrative law judge. It a request for a hearing is not received within 30 days, the penalty will be imposed and a Final Order will be issued. When a Final Order is issued, this penalty is final and unappealable.

Individuals may be ordered to pay a civil money penalty as follows:

- First Offense. Not less than $250 and not more than $2,000 for each fraudulent document used, accepted, or created and each instance of use, acceptance, or creation; or

- Subsequent Offenses. Not less than $2,000 and not more than $5,000 for each fraudulent document used, accepted, or created and each instance of use, acceptance, or creation.

# Part Six

## Instructions for Recruiters and Referrers for a Fee

Under the Immigration and Nationality Act, as amended by the Immigration Act of 1990, it is unlawful for an agricultural association, agricultural employer, or farm labor contractor to hire, or to recruit or refer for a fee, an individual for employment in the United States without complying with the employment eligibility verification requirements. This provision applies to those agricultural associations, agricultural employers, and farm labor contractors who **recruit** persons for a fee and those who **refer** persons or provide documents or information about persons to employers in return for a fee.

**This limited class of recruiters and referrers for a fee must complete the Form I-9 when a person they refer is hired.** The Form I-9 must be fully completed within 3 business days of the date employment begins, or, in the case of an individual hired for less than 3 business days, at the time employment begins.

Recruiters and referrers for a fee may designate agents, such as national associations or employers, to complete the verification procedures on their behalf. If the employer is designated as the agent, the employer should provide the recruiter or referrer with a photocopy of the Form I-9. However, recruiters and referrers are still responsible for compliance with the law and may be found liable for violations of the law.

Recruiters and referrers for a fee must retain the Form I-9 for 3 years after the date the referred individual was hired by the employer. They must also make available Forms I-9 for inspection to an INS, DOL, or OSC officer after 3 days (72 hours) advance notice.

***NOTE**: This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

The penalties for failing to comply with the Form I-9 requirements and for requiring indemnification, as described in Part 5, apply to this limited class of recruiters and referrers for a fee.

***NOTE:  All recruiters and referrers for a fee** are still liable for knowingly recruiting or referring for a fee aliens not authorized to work in the United States.*

# Part Seven

## Some Questions You May Have About the Form I-9

### Questions About the Verification Process

1. **Q. Do citizens and nationals of the United States need to prove they are eligible to work?**

   **A.** Yes. While citizens and nationals of the United States are automatically eligible for employment, they too must present the required documents and complete an I-9. Citizens of the United States include persons born in Puerto Rico, Guam, the Virgin Islands, and the Northern Mariana Islands. Nationals of the United States include persons born in American Samoa, including Swains Island.

2. **Q. Do I need to complete an I-9 for everyone who applies for a job with my company?**

   **A.** No. You need to complete I-9s only for people you actually hire. For purposes of this law, a person is "hired" when he or she begins to work for you.

3. *Q.* **If someone accepts a job with my company but will not start work for a month, can I complete the I-9 when the employee accepts the job?**

   A. Yes. The law requires that you complete the I-9 only when the person actually begins working. However, you may complete the form earlier, as long as you complete the form **at the same point** in the employment process for **all** employees.

4. **Q. I understand that I must complete an I-9 for anyone I hire to perform labor or services in return for wages or other remuneration. What is "remuneration"?)**

   A. Remuneration is anything of value given in exchange for labor or services rendered by an employee, including food and lodging.

5. **Q. Do I need to fill out an I-9 for independent contractors or their employees?**

   A. No. For example, if you contract with a construction company to perform renovations on your building, you do not have to complete I-9s for that company's employees. The construction company is responsible for completing the I-9s for its own employees. However, you must not knowingly use contract labor to circumvent the law against hiring unauthorized aliens.

6. **Q. What should I do if the person I hire is unable to provide the required documents within 3 business days of the date employment begins?**

   A. If an employee is unable to present the required document or documents within 3 business days of the date employment begins, the employee must produce a receipt showing that he or she has applied for the document. In addition, the employee must present the actual document to you within 90 days of the hire. The employee **must** have indicated on or before the time employment began, by having checked an appropriate box in Section 1, that he or she is already eligible to be employed in the United States.

   **NOTE:** *Employees hired for less than 3 business days must produce the actual document(s) and the I-9 must be fully completed at the time employment begins.*

7. **Q. Can I fire an employee who fails to produce the required documents within 3 business days?**

   A. Yes. You can terminate an employee who fails to produce the required document or documents, or a receipt for a document, within 3 business days of  the date employment begins. **However, you must apply these practices uniformly to all employees.** If an employee has presented a receipt for a document, he or she must produce the actual document within 90 days of the date employment begins.

8.  **Q.**  **What happens if I properly complete a Form I-9 and INS discovers that my employee is not actually authorized to work?**

    A.  You cannot be charged with a verification violation. You will also have a good faith defense against the imposition of employer sanctions penalties for knowingly hiring an unauthorized alien, unless the government can show you had actual knowledge of the unauthorized status of the employee, if you have done the following:

    ·   Ensured that employees fully and properly completed Section 1 of the I-9 at the time employment began;

    ·   Reviewed the required documents which should have reasonably appeared to have been genuine and to have related to the person presenting them;

    ·   Fully and properly completed Section 2 of the I-9, and signed and dated the employer certification;

    ·   Retained the I-9 for the required period of time; and

    ·   Made the I-9 available upon request to an INS, DOL, or OSC officer.

**Questions About Documents**

9.  **Q.**  **May I specify which documents I will accept for verification?**

    **A.**  No. The employee can choose which document(s) he or she wants to present from the lists of acceptable documents. You **must** accept any document (from List A) or combination of documents (one from List B and one from List C) listed on the I-9 and found in Part 8 of this Handbook which reasonably appear on their face to be genuine and to relate to the person presenting them. To do otherwise could be an unfair immigration-related employment practice. Individuals who look and/or sound foreign must not be treated differently in the hiring or verification process.

10.  **Q.**  **If an employee writes down an Alien Number or Admission Number when completing Section 1 of the I-9, can I ask to see a document with that number?**

    A.  No. Although it is your responsibility as an employer to ensure that your employees fully complete Section 1 at the time employment begins, there is no requirement that employees present **any** document to complete this section.

    When you complete Section 2, you may not ask to see a document with the employee's Alien Number or Admission Number or otherwise specify which document(s) an employee may present.

11.  **Q.**  **What is my responsibility concerning the authenticity of document(s) presented to me?**

    A.  You must examine the document(s) and, if they reasonably appear on their face to be genuine and to relate to the person presenting them, you must accept them. To do otherwise could be an unfair immigration-related employment practice. If the document(s) do not reasonably appear on their face to be genuine or to relate to the person presenting them, you must not accept them.

12.  **Q.**  **Why are certain documents listed in both List B and List C?    If these documents are evidence of both identity and employment eligibility, why aren't they found in List A?**

    A.  Three documents can be found in both List B and List C- the U.S. Citizen ID Card and the ID Card for use of Resident Citizen in the U.S. -- acceptable as ID Cards in List B -- and a Native American tribal document. Although these documents are evidence of both identity and employment eligibility, they are not found in List A because List A documents are limited to those designated by Congress in the law. An employee can establish both identity and employment eligibility by presenting one of these documents.    You should record the document title, issuing authority, number, and expiration date (if any) for that document in the appropriate spaces for **both** list B and List C.

14

13. **Q.** **Why is a Canadian driver's license acceptable as a List B document and not a Mexican driver's license?**

**A.** The United States-Canada Free-Trade Agreement and other reciprocal agreements between these 2 countries form the basis for accepting a Canadian driver's license as a List B identity document. No such reciprocal agreements currently exist between the United States and Mexico that would allow or permit the use of a Mexican driver's license as a List B identity document.

14. **O.** **May I accept an expired document?**

**A.** You may accept an expired United States Passport. You may also accept an expired document from List B to establish identity. However, the document must reasonably appear on its face to be genuine and to relate to the person presenting it. You cannot accept any other expired documents.

15. **Q.** **How can I tell if an INS-issued document has expired?**

**A.** Some INS-issued documents, such as previous versions of the Alien Registration Receipt Card (I-151 and I-551), do not have expiration dates and are valid indefinitely. However, the 1989 revised version of the Alien Registration Receipt Card (I-551), which is rose-colored with computer readable data on the back, features a 2-year or 10-year expiration date. Other INS issued documents, such as the Temporary Resident Card (I-688) and the Employment Authorization Card (I-688A or I-688B) also have expiration dates. These dates can be found either on the face of the document or on a sticker attached to the back of the document.

16. **Q.** **Some people are presenting me with Social Security Cards that have been laminated. May I accept such cards as evidence of employment eligibility?**

**A.** You may not accept a laminated Social Security Card as evidence of employment eligibility if the card states on the back "not valid if laminated." Lamination of such cards renders them invalid. Metal or plastic reproductions of Social Security Cards are not acceptable.

17. **Q.** **Some people are presenting me with printouts from the Social Security Administration with their name, Social Security Number, date of birth, and their parents' names. May I accept such printouts in place of a Social Security Card as evidence of employment eligibility?**

A. No. Only a person's official Social Security Card is acceptable.

18. **Q.** **What should I do if persons present Social Security Cards marked "NOT VALID FOR EMPLOYMENT," but state they are now authorized to work?**

A. You should ask them to provide another document to establish their employment eligibility, since such Social Security Cards do not establish this.

19. **Q.** **What should I do if one of my employees tells me that his or her Social Security Number is invalid?**

A. You should tell the employee to get a proper Social Security Number by completing a Form SS-5. This form is available from the Social Security Administration. You do not need to amend your employment tax returns. However, when the employee gives you the new number, you should file a Form W-2C with the Social Security Administration for the years in which you reported income and withholding under the incorrect number. You will not be penalized or fined for the years during which you reported employees under incorrect numbers.

You should also be aware that any Social Security Number starting with a "9" is not a valid Social Security Number. Employees who are using such numbers should be instructed to get a proper Social Security Number using a Form SS-5.

20. **Q.** **May I accept a photocopy of a document presented by an employee?**

A. No. Employees must present original documents. The **only** exception is that an employee may present a **certified** copy of a birth certificate.

**21. Q.   I noticed on the Form I-9 that under List A there are 2 spaces for document numbers and expiration dates. Does this mean I have to see 2 List A documents?**

A.   No. One of the documents found in List A is an unexpired foreign passport with an attached INS Form I-94. The Form I-9 provides space for you to record the document number and expiration date for both the passport and the INS Form I-94.

**22. Q.   When I review an employee's identity and employment eligibility documents, should I make copies of them?**

A.   The law does not require you to photocopy documents. However, if you wish to make photocopies, you should do so for **all** employees, and you should retain each photocopy with the I-9. Photocopies must not be used for any other purpose. Photocopying documents does not relieve you of your obligation to fully complete Section 2 of the I-9 nor is it an acceptable substitute for proper completion of the I-9 in general.

*NOTE 1:   Although a Certificate of Naturalization (INS Forms N-550 and N-570) provides across the face of the document that it may not be copied, such certificates **may be copied** in this limited situation.*

*NOTE 2:   Copies of documents retained by Federal government employers must be kept separately from an employee's official personnel folder.*

**Questions About Completing and Retaining the Form I-9**

*23. **Q**.   When do I fill out the I-9 if I hire someone for less than 3 business days?*

*A.   You must complete **both** Sections 1 and 2 of the I-9 at the time of the hire. This means the I-9 must be fully completed when the person starts to work.*

**24. Q.   What should I do if I rehire a person who previously filled out an I-9?**

A.   You do not need to complete a new I-9 if you rehire the person within 3 years of the date that the I-9 was originally completed, and the employee is still eligible to work. You should review the previously completed I-9, and if the employee's work authorization has not expired, note the date of rehire in the Updating and Reverification Section on the I-9 (Section 3), and sign in the appropriate space. If the employee's work authorization has expired, you also need to examine a document that reflects that the employee is authorized to work in the U.S., and record the document title, number, and expiration date (if any) in Section 3.

**25. Q.   What should I do if I need to update or reverify an I-9 for an employee who filled out an earlier version of the form?**

A.   You may line through any outdated information and initial and date any updated information. You may also choose, instead, to complete a new I-9.

*26. **Q**.   Do I need to complete a new I-9 when one of my employees is promoted within my company or transfers to another company office at a different location?*

*A.   No. You do not need to complete a new I-9 for such promoted or transferred employees.*

**27. Q.    What do I do when an employee's work authorization expires?**

A.    You will need to reverify on the I-9 in order to continue to employ the person. Reverification must occur not later than the date that work authorization expires. The employee must present a document that shows either an extension of the employee's initial employment authorization or new work authorization. You must review this document and, if it reasonably appears on its face to be genuine and to relate to the person presenting it, record the document title, number, and expiration date (if any), in the Updating and Reverification Section on the I-9 (Section 3), and sign in the appropriate space. You may want to establish a calendar call-up system for employees whose employment authorization will expire in the future.

*NOTE: You cannot refuse to accept a document because it has a future expiration date. You **must** accept any document (from List A or List C) listed on the I-9 and in Part 8 of this Handbook which on its face reasonably appears to be genuine and to relate to the person presenting it. To do otherwise could be an unfair immigration-related employment practice.*

**28. Q.    Can I avoid reverifying the I-9s by not hiring persons whose employment authorization has an expiration date?**

A.    You **cannot** refuse to hire persons solely because their employment authorization is temporary. The existence of a future expiration date does not preclude continuous employment authorization for an employee and does not mean that subsequent employment authorization will not be granted. In addition, consideration of a future employment authorization expiration date in determining whether an alien is qualified for a particular job could be an unfair immigration-related employment practice.

**29. Q.    As an employer, do I have to fill out all the I-9s myself?**

A.    No. You may designate someone to fill out the I-9s for you, such as a personnel officer, foreman, agent, or anyone else acting in your interest. However, you are still liable for any violations of the employer sanctions laws.

**30. Q.    Can I contract with someone to complete the I-9s for my business?**

A.    Yes. You can contract with another person or business to verify employees' identity and work eligibility and to complete the I-9s for you. However, you are still responsible for the contractor's actions and are liable for any violations of the employer sanctions laws.

**31. Q.    As an employer, can I negotiate my responsibility to complete the I-9s in a collective bargaining agreement with a union?**

*A.*    Yes. However, you are still liable for any violations of the employer sanctions laws. If the agreement is for a multi-employer bargaining unit, certain rules apply. The association must track the employee's hire and termination dates each time the employee is hired or terminated by an employer in the multi-employer association.

**32. Q.    What are the requirements for retaining the I-9?**

A.    If you are an employer, you must retain the I-9 for 3 years after the date employment begins or 1 year after the date the person's employment is terminated, **whichever is later.** If you are an agricultural association, agricultural employer, or farm labor contractor, you must retain the I-9 for 3 years after the date employment begins for persons you recruit or refer for a fee.

33. **Q.    Will I get any advance notice if an INS, DOL, or OSC officer wishes to inspect my I-9s?**

A.    Yes. The officer will give you at least 3 days (72 hours) advance notice before the inspection. If it is more convenient for you, you may waive the 3-day notice. You may also request an extension of time in which to produce the I-9s.  The INS, DOL, or OSC officer will not need to show you a subpoena or a warrant at the time of the inspection.

*NOTE:  This does not preclude the INS, the DOL, or the OSC from obtaining warrants based on probable cause for entry onto the premises of suspected violators without advance notice.*

Failure to provide the I-9s for inspection is a violation of the employer sanctions laws and could result in the imposition of civil money penalties.

34. **Q.    Do I have to complete an I-9 for Canadians who entered the United States under the Free Trade Agreement?**

A.    Yes. You must complete an I-9 for all employees. Canadians must show identity and employment eligibility documents just like all other employees.

35. **Q.    If I acquire a business, can I rely on the I-9s completed by the previous owner/employer?**

A.    Yes.  However, you also accept full responsibility and liability for all I-9s completed by the previous employer relating to individuals who are continuing in their employment.

36. **Q.    If I am a recruiter or referrer for a fee, do I have to fill out I-9s on persons whom I recruit or refer?**

A.    No, with three exceptions. Agricultural associations, agricultural employers, and farm labor contractors are still required to complete I-9s on all individuals who are recruited or referred for a fee. However, **all** recruiters and referrers for a fee must still complete I-9s for **their own employees** hired after November 6, 1986. Also, **all** recruiters and  referrers for a fee are still liable for knowingly recruiting or referring for a fee aliens not authorized to work in the United States.

37. **Q.    Can I complete Section 1 of the I-9 for an employee?**

A.    *Yes.* You may help an employee who needs assistance in completing Section 1 of the I-9. However, you must also complete the "Prepare/Translator Certification" block. The employee must still sign the certification block in Section 1.

38. **Q.    If I am a business entity (corporation, partnership, etc.), do I have to fill out I-9s on my employees?**

A.    Yes, you must complete I-9s for all of your employees, including yourself.

39. **Q.** **I have heard that some state employment agencies can certify that people they refer are eligible to work. Is that true?**

**A.** Yes. State employment agencies may elect to provide persons they refer with a certification of employment eligibility. If one of these agencies refers potential employees to you with a job order or other appropriate referral form, and the agency sends you a certification within 21 business days of the referral, you do not have to check documents or complete an I-9 if you hire that person. However, you must review the certification to ensure that it relates to the person hired and observe the person sign the certification. You must also retain the certification as you would an I-9 and make it available for inspection, if requested. You should check with your state employment agency to see if it provides this service and become familiar with its certification document.

**Questions About Avoiding Discrimination**

40. **Q.** **How can I avoid discriminating against certain employees while still complying with this law?**

A. You can avoid discriminating against certain employees and still comply with the law by applying the employment eligibility verification procedures of this law to all newly hired employees and by hiring without respect to the national origin or citizenship status of those persons authorized to work in the United States. To request to see identity and employment eligibility documents only from persons of a particular origin, or from persons who appear or sound foreign, is a violation of the employer sanctions laws and may also be a violation of Title VII of the Civil Rights Act of 1964. You should not discharge present employees, refuse to hire new employees, or otherwise discriminate on the basis of foreign appearance, accent, language, or name.

41. **Q.** **I know that the Act prohibits discrimination on the basis of citizenship status against "protected individuals." Who are protected individuals?**

A. Protected individuals include citizens or nationals of the United States, lawful permanent residents, temporary residents, and persons granted refugee or asylee status. The term does not include aliens in one of those classes who fail to make a timely application for naturalization after they become eligible.

42. **Q.** **Can I be charged with discrimination if I contact the INS about a document presented to me that does not reasonably appear to be genuine and relate to the person presenting it?**

A. No. The anti-discrimination provisions of the Act only apply to the hiring and discharging of individuals. While you are not legally required to inform the INS of such situations, you may do so if you choose to.

## Questions About Employees Hired Before November 6, 1986

43. **Q.   Does this law apply to my employees if I hired them before November 7, 1986?**

A.   No.   You are not required to complete I-9s for employees hired before November 7, 1986. However, if you choose to complete I-9s for these employees, you should do so for all your current employees hired before November 7, 1986.

*NOTE: This "grandfather" status does not apply to seasonal employees, or to employees who change employers within a multi-employer association.*

44. **Q.   What if an employee was hired before November 7, 1986, but has taken an approved leave of absence?**

A.   You do not need to complete an I-9 for that employee if the employee is continuing in his or her employment and has a reasonable expectation of employment at all times. However, if that employee has quit or been terminated, or is an alien who has been removed from the United States, you will need to complete an I-9 for that employee.

45. **Q.   Will I be subject to employer sanctions penalties if an employee I hired before November 7, 1986, is an illegal alien?**

A.   No. You will not be subject to employer sanctions penalties for retaining an illegal alien in your workforce if the alien was hired before November 7, 1986. However, the fact that an illegal alien was on your payroll before November 7, 1986, does **not** give him or her any right to remain in the United States. Unless the alien obtains permission from the INS to remain in the United States, he or she is subject to apprehension and removal.

## Questions About Federal Income Tax Obliclations

46. **Q.   What advice should I give to my employees applying to legalize their status concerning their Federal income tax obligations?**

A.   You can advise employees that when they apply to INS for permanent resident status, they will be given an IRS publication explaining requirements for filing Form W-4 or W-4A to insure correct withholding of tax records (if an invalid social security number was used) and other guidelines relating to tax benefits.

47. **Q.   What advice should I give to newly-hired employees who ask about their Federal income tax obligations?**

A.   First, you can tell them it is important to have a valid social security number and to properly complete a W-4 or W-4A so that the employer can withhold the proper amount for income tax. Second, you can encourage employees to apply for social security numbers for their dependent children who will be five years old or older by the end of the year. Since 1987, such numbers have been required to be provided for dependents claimed on tax returns.

20

# Part Eight

## Acceptable Documents for Verifying Employment Eligibility

The following documents have been designated for determining employment eligibility by the Act.    A person must present a document or documents that establish identity and employment eligibility. A comprehensive list of acceptable documents can be found on the next page of this Handbook and on the back of the Form I-9. Samples of many of the acceptable documents appear on the following pages.

To establish **both identity and employment eligibility,** a person can present a passport, an Alien Registration Receipt Card, or one of the other documents from List A.

If a person does not present a document from List A, he or she must present one document from List B which establishes identity and one document from List C which establishes employment eligibility.

To establish **identity only,** a person must present a document from List B, such as a state-issued driver's license, a state-issued identification card, or one of the other documents listed.

To establish **employment eligibility only,** a person must present a document from List C, such as a Social Security Card, a United States birth certificate, or one of the other documents listed.

If a person is unable to present the required document(s) within 3 business days of the date employment begins, he or she must present (within 3 business days) a receipt showing that he or she has applied for the document. The person then must present the actual document within 90 days of the date employment begins. The person must have indicated on or before the time employment began, by having checked an appropriate box in Section 1, that he or she is already eligible to be employed in the United States.

## LIST A
## Documents That Establish Both Identity and Employment Eligibility

- United States Passport (unexpired or expired)

- Certificate of United States Citizenship (INS Form N-560 or N-561)

- Certificate of Naturalization (INS Form N-550 or N-570)

- Unexpired foreign passport which:

    - contains an unexpired stamp which reads "Processed for I-551. Temporary Evidence of Lawful Admission for permanent residence. Valid until _ _ _ _ _ _ Employment authorized;" or

    - has attached to it a Form I-94 bearing the same name as the passport and containing an employment authorization stamp, so long as the period of endorsement has not yet expired, and the proposed employment is not in conflict with any restrictions or limitations identified on the Form I-94.

    ***NOTE****: For more detailed information concerning the Form I-94,* see *page 23 of this Handbook.*

- Alien Registration Receipt Card (INS Form I-151 or I-551) provided that it contains a photograph of the bearer

- Unexpired Temporary Resident Card (INS Form I-688)

- Unexpired Employment Authorization Card (INS Form I-688A)

- Unexpired reentry permit (INS Form I-327)

- Unexpired Refugee Travel document (INS Form I-571)

- Unexpired Employment Authorization Document issued by the INS which contains a photograph (INS Form I-688B)

## LIST B
**Documents That Establish Identity**

For individuals 18 years of age or older:

- Driver's  license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address

- ID card issued by federal, state, or local government agencies or entities provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address (including  U.S.  Citizen ID Card [INS Form I-1971 and ID Card for use of Resident Citizen in the U.S. [INS Form I-1791)

- School identification card with a photograph

- Voter's registration card

- United States military card or draft record

- Military dependent's identification card

- United States Coast Guard Merchant Mariner Card

- Native American tribal document

- Driver's  license  issued  by  a  Canadian government authority

For individuals under the age of 18 who are unable to present one of the documents listed above:

- School record or report card

- Clinic, doctor, or hospital record

- Day-care or nursery school record

## LIST C
**Documents That Establish Employment Eligibility**

- U.S. Social Security Number Card other than one  which has printed on its face "NOT VALID FOR EMPLOYMENT"

    **NOTE:**  This must be a card issued by the Social Security Administration, a facsimile (such as a metal or plastic reproduction) is not an acceptable document.

- Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

- Original or certified copy of a birth certificate issued by a state, county, municipal authority, or outlying possession of the United States bearing an official seal

- Native American tribal document

- U.S.  Citizen ID Card (INS Form I-197)

- ID Card for Use of Resident Citizen in the U.S. (INS Form I-179)

- Unexpired  employment authorization document issued by the INS

# Document List A

## Documents That Establish Both Identity and Employment Eligibility

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

### United States Passport

Issued by the Department of State to United States citizens and nationals.



### Certificate of United States Citizenship
### N-560 or N-561

Issued by INS to individuals who: 1) derived citizenship through parental naturalization; 2) acquired citizenship at birth abroad through a United States parent or parents, or 3) acquired citizenship through application by United States citizen adoptive parent(s); and who, pursuant to section 341 of the Act, have applied for a certificate of citizenship.



### Certificate of Naturalization
### N-550 or N-570

Issued by INS to naturalized United States citizens.



### Certificate of Naturalization
### N-550

Issued by INS to naturalized United States citizens who file for naturalization after October 1, 1991.



## Unexpired Foreign Passport with I-551 Stamp

 

### I-94 Arrival/Departure Record

Arrival-departure record issued by INS to nonimmigrant aliens. An individual in possession of the departure portion of this document may only be employed if the document bears an "employment authorization" stamp **or** employment incident to the nonimmigrant classification is authorized with a specific employer (i.e. A-1, A-2, A-3, C-2, C-3, E-1, E-2, G-1, G-2, G-3, G-4, G-5, H-1A, H-1B, H-2A, H-2B, H-3, I, L-1, O-1, O-2, P-1, P-2, P-3, Q, NATO 1-7 and TC). The expiration date is noted on the Form I-94.

24

---

### Allen Registration Receipt Card I-151

Issued by INS prior to June 1978, to lawful permanent resident aliens, There are numerous versions of this card because it was periodically revised. Although this card is no longer issued, it is valid indefinitely. This card is also commonly referred to as a "green card" although most versions were blue.

 

### Allen Registration Receipt Card (Resident Allen Card) I-551

Issued by INS after March 1977, to lawful permanent resident aliens. Although this card is no longer issued, it is valid indefinitely, This card is commonly referred to as a "green card" and is the replacement for the Form I-151, This version is white with a blue logo.

 

### Allen Registration Receipt Card (Conditional Resident Allen Card) I-551

Issued by INS after January 1987, to conditional permanent resident aliens such as alien spouses of United States citizens or lawful permanent resident aliens. It is similar to the 1-551 issued to permanent resident aliens. Although this card is no longer issued, it is valid for 2 years from the date of admission or adjustment. The expiration date is stated on the back of the card. This version is white with a blue logo.

 

### Allen Registration Receipt Card (Resident Allen Card) I-551

Currently issued by INS since 1989 to both conditional and lawful permanent resident aliens. Although it is similar to the previously issued I-551s, this card is valid only for a limited period of time -- 2 years from the date of admission or adjustment for conditional permanent resident aliens and 10 years from issuance for lawful permanent resident aliens. The expiration date is stated on the front of the card. This version is rose-colored with a blue logo.

 

**Temporary Resident Card I-688**

Issued  by INS to aliens granted temporary resident status under the Legalization or Special Agricultural Worker program.  It is valid until the expiration date stated on the face-of the card or on the sticker(s) placed on the back of the card.



**Employment Authorization Card I-688A**

Issued by  INS  to  applicants  for  temporary  resident  status  after  their  interview  for  Legalization  or  Special Agricultural  Worker  status.  It  is  valid  until  the  expiration  date  stated  on  the  face  of  the  card  or  on  the  sticker(s) placed on the back of the card.



## Employment Authorization Card I-688B

Issued by INS to aliens granted temporary employment authorization in the U.S. The expiration date is noted on the face of the card.




## Unexpired Re-Entry Permit I-327

Issued by INS to lawful permanent resident aliens before they leave the United States for a 1-2 year period.




## Unexpired Refugee Travel Document I-571

Issued by INS to aliens who have been granted refugee status.  The expiration date is stated on page four (4).




28

# Document List B
## Documents That Establish Identity Only

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

### Sample Driver's License

A driver's license issued by any state or outlying possession of the United States (including the District of Columbia, Puerto Rico, the Virgin Islands, Guam, the Northern Mariana Islands, and American Samoa) or by a Canadian government authority is acceptable if it contains a photograph or other identifying information such as name, date of birth, sex, height, color of eyes, and address.

 

### Sample State Identification Card

An identification card issued by any state (including the District of Columbia, Puerto Rico, the Virgin Islands, Guam, and the Northern Mariana Islands) or by a local government is acceptable if it contains a photograph or other identifying information such as name, date of birth, sex, height, color of eyes, and address.



See List C for ID cards issued by INS.

# Document List C

## Documents That Establish Employment Eligibility Only

The following illustrations in this handbook do not necessarily reflect the actual size of the documents.

**Social Security Card** (other than one stating "NOT VALID FOR EMPLOYMENT" metal or plastic reproductions, or certain laminated cards.) There are many versions of this card.



**Certifications of Birth Issued by the Department of State**

|  |  |
|---|---|
| **FS-545** | **DS-1350** |
| Issued by U.S. embassies and consulates overseas to United States citizens born abroad. | Issued by the U.S. Department of State to United States citizens born abroad. |




## Sample Birth Certificates





United States Citizen Identification Card I-197
Issued by INS to United States citizens. Although INS no longer issues this card, it is valid indefinitely.





**Identification Card for Use of Resident Citizen in the United States I-179**
Issued by INS to United States citizens who are residents of the United States. Although INS no longer issues this card, it is valid indefinitely.





## I-20 ID Card Accompanied by a Form I-94

The Form I-94 for F-1 nonimmigrant students must be accompanied by an I-20 Student ID endorsed with employment authorization by the Designated School Official for off-campus employment or curriculum practical training. INS will issue Form I-688B (Employment Authorization Document) to all students (F-1 and M-1) authorized for a post-completion practical training period.





### Form I-20 Student ID (Reverse)

Endorsement by Designated School Official for Employment Authorization.

32

---

**IAP-66 Accompanied by a Form I-94**

Nonimmigrant exchange visitors (J-1) must have an I-94 accompanied by an unexpired IAP-66, specifying the sponsor and issued by the United States Information Agency (USIA). (J-1 students working outside the program indicated on the IAP-66 also need a letter from their responsible school officer.)



# REMEMBER:

\* Hiring employees without complying with the employment eligibility verification requirements is a violation of the employer sanctions laws.

\* This law requires employees hired after NOVEMBER 6, 1986 to present documentation that establishes identity and employment eligibility, and employers to record this information on Forms I-9.

\* Employers may not discriminate against employees on the basis of national origin or citizenship status.

**How to Obtain More Information:**    If you have questions after reviewing this handbook, you may obtain information from one of the following local INS offices. Direct your letter to the attention of the *Employer and Labor Relations Officer.*

**ALABAMA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**ALASKA**
620 East 10th Ave. Suite 102
Anchorage, AK 99501

**ARIZONA**
2035 N- Central Ave.
Phoenix, AZ 85004

**ARKANSAS**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**CALIFORNIA**
300 N. Los Angeles St.
Los Angeles, CA 90012

880 Front St.
San Diego, CA 92188

630 Sansome St.
San Francisco, CA 94111-2280

**COLORADO**
4730 Paris St. Albrook Center
Denver, CO 86239-2804

**CONNECTICUT**
JFK Federal Building
Government Center
Boston, MA 02203

**DELAWARE**
1600 Callowhill St.
Philadelphia, PA 19130

**DISTRICT OF COLUMBIA**
4420 N. Fairfax Dr.
Arlington, VA 22203

**FLORIDA**
7880 Biscayne Blvd.
Miami, FL 33138

**GEORGIA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**GUAM**
595 Ala Moana Blvd.
Honolulu, HI 96813

**HAWAII**
595 Ala Moana Blvd.
Honolulu, HI 96813

**IDAHO**
900 N. Montana Ave.
Helena, MT 59601

**ILLINOIS**
10 W. Jackson Blvd., Rm. 533
Chicago, IL 60604

**INDIANA**
10 W. Jackson Blvd., Rm. 533
Chicago, IL 60604

**IOWA**
3736 S. 132nd St.
Omaha, NE 68144

**KANSAS**
9747 N. Conant Ave.
Kansas City, MO 64153

**KENTUCKY**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**LOUISIANA**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**MAINE**
739 Warren Ave.
Portland, ME 04103

**MARYLAND**
530 Caton Center Dr., Bldg. D, Suite M
Baltimore, MD 21227

**MASSACHUSETTS**
JFK Federal Building
Government Center
Boston, MA 02203

**MICHIGAN**
Federal Building, 333 Mt. Elliott St.
Detroit, MI 48207

**MINNESOTA**
2901 Metro Dr. Suite 100
Bloomington, MN 55425

**MISSISSIPPI**
701 Loyola Ave. Rm. T-8005
New Orleans, LA 70113

**MISSOURI**
9747 N. Conant Ave.
Kansas City, MO 64153

**MONTANA**
900 N. Montana Ave.
Helena, MT 59601

**NEBRASKA**
3736 S. 132nd St.
Omaha, NE 68114

**NEVADA**
2035 N. Central Ave.
Phoenix, AZ 85004

**NEW HAMPSHIRE**
JFK Federal Building
Government Center
Boston, MA 02203

**NEW JERSEY**
Federal Building, 970 Broad St.
Newark, NJ 07102

**NEW MEXICO**
343 U.S. Courthouse, P,O. Box 9398
El Paso, TX 79984

**NEW YORK**
68 Court St.
Buffalo, NY 14202

26 Federal Plaza
New York, NY 10278

**NORTH CAROLINA**
77 Forsyth St. S.W., Rm. G-85
Atlanta, GA 30303

**NORTH DAKOTA**
2901 Metro Dr. Suite 100
Bloomington, MN 55425

**OHIO**
1240 E. 9th St., Room 1917
Cleveland, OH 44199

**OKLAHOMA**
4149 Highline Blvd., #300
Oklahoma City, OK 73108

**OREGON**
511 N.W. Broadway
Portland, OR 97209

**PENNSYLVANIA**
1600 Callowhill St.
Philadelphia, PA 19130

**PUERTO RICO**
P.O. Box 365068
San Juan, PR 00936

**RHODE ISLAND**
JFK Federal Building
Government Center
Boston, MA 02203

**SOUTH CAROLINA**
Room 110 Federal Building
334 Meeting St.
Charleston, SC 29403

**SOUTH DAKOTA**
2901 Metro Dr Suite 100
Bloomington, MN 55425

**TENNESSEE**
701 Loyola Ave., Rm. T-8005
New Orleans, LA 70113

**TEXAS**
8101 N. Stemmons Freeway
Dallas, TX 75247

P.O. Box 9398
El Paso, TX 79984

805 No. T St.
Harlingen, TX 78550

509 N. Belt
Houston, TX 77060

727 E. Durango Suite A301
San Antonio, TX 78206

**UTAH**
4730 Paris St. Albrook Center
Denver, CO 86239-2804

**VERMONT**
739 Warren Ave.
Portland, ME 04103

**VIRGINIA**
4420 N. Fairfax Dr.
Arlington, VA 22203

**VIRGIN ISLANDS**
PO Box 610, Charlotte Amilie
St. Thomas, VI 00801

Po Box 1270, Kingshill, Christiansted
St. Croix, VI 00850

**WASHINGTON**
815 Airport Way South
Seattle, WA 98134

**WEST VIRGINIA**
1600 Callowhill St.
Philadelphia, PA 19130

**WISCONSIN**
10 W. Jackson Blvd-, Rm. 533
Chicago, IL 60604

**WYOMING**
4730 Paris St. Albrook Center
Denver, CO 86239-2804

✩ U.S. GOVERNMENT PRINTING OFFICE: 1995 400-799/40336

If you have questions after reviewing this Handbook, please contact your local INS office at the address found in the back of this Handbook. Direct your letter to the attention of the Employer *Relations Officer*

**DO NOT CONTACT THE INTERNAL REVENUE SERVICE (IRS)**

ISBN 0-16-048040-X





U.S. Department of Justice

Civil Rights Division
Office of Special Counsel for Immigration-Related
Unfair Employment Practices

# Look At The Facts.
# Not At The Faces.

## Your Guide
## To Fair Employment



## What Do You Need to Know About IRCA?

The Immigration Reform and Control Act (IRCA), signed on November 6, 1986, requires that you, as an employer, verify the identity and work eligibility of every employee hired after that date. It is now illegal to hire anyone who is not authorized to work in the United States. As part of this process, you must complete the Immigration and Naturalization Service's Form I-9 for all your employees–citizens and noncitizens alike. Failure to comply with the I-9 requirements may result in sanctions against you.

Congress recognizes that these employer sanctions might unintentionally discourage you from hiring workers who are not U.S. citizens or who appear to be foreign. In order to protect work-authorized individuals, IRCA also contains a provision prohibiting discrimination in hiring and firing on the basis of citizenship status or national origin. Under this provision, you must treat all qualified, eligible job applicants equally. Employers found to discriminate may be required to pay fines and penalties, and to hire or rehire employees, with back pay.



## How Do You Avoid Immigration-Related Employment Discrimination?

● **Treat all people the same when you are announcing the job, taking applications, interviewing, offering the** job, filling **out the Form** I-9, **hiring and** firing**.**

● **Avoid** "**citizens** only" **hiring policies or** requirements **that applicants have a particular** immigration status, unless required by law**.**

● Give **out the same job** information over the **telephone** and use **the same application** forms for **all applicants.**

● **Base** your decisions about firing on job performance and/or behavior, not on appearance, language, name, or citizenship status of your employees**.**

## How Do You Comply with the Form I-9 Requirement?

● In order to avoid any appearance of discrimination, verify work eligibility after you have decided to hire an individual and allow your employee three days to provide the documents**.**

● **Let** your employee **choose which** documents to present, as long as they appear to be reasonably genuine**.**

● Realize **that there are** many different documents, with different appearances, **that your employee** may present**. You can find a list of these** documents on the back of the Form I-9**.**



## How Do You Comply with IRCA's Hiring Regulations?

- Hire only those persons that are authorized to work in the U.S.

- Ask all your new employees–U.S. citizens and noncitizens alike–to show documents that establish both identity and work authorization.

- Complete the INS "Employment Eligibility Verification" Form I-9 for every new employee.

## If You Have Any Further Questions About Compliance With IRCA's Antidiscrimination Provision, Call This Hotline Number For Information

1-800-255-8155

**T**DD for **hea**ring impair**e**d: 1-800-362-2735
Off**ice** of Sp**eci**al C**o**unsel for Immig**ratio**n-**Relate**d
Un**fa**ir Employment **P**ractices (OSC)

**o**r wr**ite to** OSC **at**:
U.**S.** Department **of** Ju**s**tice
P.**O. Bo**x 27728
Wa**shi**ngt**o**n, DC 20038-7728



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TENNESSEE

WINCHESTER DIVISION

- - -

BIRDA TROLLINGER, VIRGINIA        )
BRAVO, KELLY KESSINGER, IDOYNIA )
MCCOY, REGINA LEE, PATRICIA       )
MIMS, LORI WINDHAM and            )
ALEXANDER HOWLETT, individually )
and on behalf of all others       )
similarly situated,               )
                                  )
        Plaintiffs,               )
                                  )
        vs.                       )   No. 4:02-cv-23
                                  )
TYSON FOODS, INC., JOHN TYSON,    )
ARCHIBALD SCHAFFER III, RICHARD )
BOND, KENNETH KIMBRO, GREG LEE,   )
KAREN PERVICAL, AHRAZUE WILT      )
and TIM MCCOY,                    )
                                  )
        Defendants.               )
                                  )

DEPOSITION OF MICHAEL CUTLER

Chicago, Illinois

Thursday, September 6, 2007

Atkinson-Baker, Inc.
Court Reporters
(800)288-3376
www.depo.com

REPORTED BY:  Kathleen Alexakis, CSR, State of Illinois
              License No. 084-003141, Notary Public

FILE NO.:  A1074A7

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF TENNESSEE
 3                     WINCHESTER DIVISION
 4                         - - -
 5    BIRDA TROLLINGER, VIRGINIA    )
      BRAVO, KELLY KESSINGER, IDOYNIA )
 6    MCCOY, REGINA LEE, PATRICIA    )
      MIMS, LORI WINDHAM and         )
 7    ALEXANDER HOWLETT, individually )
      and on behalf of all others    )
 8    similarly situated,            )
                                     )
 9          Plaintiffs,              )
                                     )
10          vs.            ) No. 4:02-cv-23
11    TYSON FOODS, INC., JOHN TYSON, )
      ARCHIBALD SCHAFFER III, RICHARD )
12    BOND, KENNETH KIMBRO, GREG LEE, )
      KAREN PERVICAL, AHRAZUE WILT   )
13    and TIM MCCOY,                 )
                                     )
14          Defendants.             )
15
16          DEPOSITION OF MICHAEL CUTLER, a witness
17    herein, taken on behalf of the Defendants at
18    1 South Dearborn Street, 38th Floor, Chicago,
19    Illinois, commencing at 8:39 A.M., Thursday,
20    September 6, 2007, before Kathleen Alexakis, CSR,
21    State of Illinois License No. 084-003141, Notary
22    Public.
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S
 2
 3
      For the Plaintiffs:
 4
      JOHNSON & BELL
 5    BY:  HOWARD W. FOSTER
           MATTHEW A. GALIN
 6    33 East Monroe Street
      Suite 2700
 7    Chicago, Illinois  60603
 8
      For the Defendants:
 9
      SIDLEY AUSTIN LLP
10    BY:  THOMAS C. GREEN
           FRANK R. VOLPE
11         MARK D. HOPSON
           MEGHAN DELANEY
12    1501 K Street, NW
      Washington, D.C. 20005
13
14
15    ALSO PRESENT:  David Van Bevron, Tyson Foods
16                   Eric Campbell, Videographer
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    I N D E X
 2    WITNESS:  MICHAEL CUTLER
 3    EXAMINATION                     PAGE
 4    By Mr. Hopson                     8
 5    By Mr. Foster                   211
 6    By Mr. Volpe                    260
 7
 8    EXHIBITS:  (Exhibits bound separately)
 9                    DEFENDANTS'
      NUMBER        DESCRIPTION
10
11    1 a     Declaration of Michael Cutler     9
12    1 b     Chart containing names of 497    11
              individuals whose employment
              documents Mr. Cutler reviewed
13
14    1 c     Handwritten notes of Mr. Cutler   12
15    2       Mr. Cutler's expert report       17
              prepared on March 8, 2007
16    3       Immigration Officer's Field      24
              Manual for Employer Sanctions
17
18    4       Handbook for Employers,          27
              prepared by the INS, dated
              November 21 of 1991
19
20    5       Documents providing guidance     31
              to employers about I-9 and
              immigration issues
21
22    6       Copy of Immigration Reform &     36
              Control Act of 1986
23    7       Printout from website of USCIS,  79
              United States Citizenship and
              Immigration Services, printed
24            out September 6, 2007
25
```

Page 5

```
 1    8       Document entitled "Look at the   50
              Facts, Not at the Faces, Your
 2            Guide to Fair Employment, by U.S.
              Department of Justice, Civil
 3            Rights Division
 4    13      Email to Mr. Cutler from         14
              Mr. Galin, dated May 18, 2007
 5            Attachments:  Applications
 6    14      Page from the LexisNexis database 123
 7    18      U.S. Citizenship and Immigration 262
              Services document entitled "About
 8            Form I-9, Employment Eligibility
              Verification
 9
10    21 a, b    Employment documents for      152
                 Javier Garcia
11    22 a, b, c  Employment documents for     244
                  Mohamed Dirie
12
13    23 a, b    Employment documents for      162
                 Comechalla Youngblood
14    24 a       Employment documents for      165
                 Enrique Pacheco
15
16    25 a, b, c  Employment documents for     168
                  Kevin Heuerman
17    26 a, b    Employment documents for      173
                 Iveth Linares
18
19    27 (no a), b  Employment documents for   177
                    Abdalle Adde
20    28 a, b    Employment documents for      181
                 Aleksandr Kulyabin
21
22    29 a, b    Employment documents for      187
                 Pavel Shcherbina
23    30 a       Employment documents for      189
                 Eloy Cardenas-Martinez
24
25    31 a       Employment documents for      200
                 Hilario Gonzalez
```

| | | | Page 6 |
|---|---|---|---|
| 1 | 32 a, b | Employment documents for | 204 |
| | | Vong Phanphaya | |
| 2 | | | |
| 3 | 33 a, b | Employment documents for | 209 |
| | | Pedro Gaspar | |
| 4 | | PLAINTIFFS' | |
| | NO. | DESCRIPTION | |
| 5 | | | |
| 6 | 1 | Copy of a statute, Title 8. | 248 |
| | | Aliens and Nationality, | |
| 7 | | Chapter 12. Immigration and | |
| | | Nationality Adjustment and | |
| 8 | | Change of Status General Penalty | |
| 9 | | Provisions | |
| 10 | | | |
| 11 | | | |

12
13  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
14  (NONE.)
15
16
17  INFORMATION TO BE SUPPLIED:  (NONE.)
18
19
20
21
22
23
24
25

---

**Page 7**

1       CHICAGO, ILLINOIS; THURSDAY, SEPTEMBER 6, 2007
2                       8:39 A.M.
3
4       THE VIDEOGRAPHER:  We're on the record at 8:39 A.M.
5  on September 6th, 2007.  Here begins the videotape
6  deposition of Michael Cutler taking place in Chicago,
7  Illinois.
8       This deposition is being taken in the matter of
9  Trollinger et al. versus Tyson Foods Incorporated.
10       Will counsel please state their names starting
11  with Plaintiffs' counsel?
12       MR. FOSTER:  Howard Foster for the plaintiffs.
13       MR. GALIN:  Matthew Galin for the plaintiffs.
14       MR. HOPSON:  Mark Hopson for the Defendant, Tyson
15  Foods Incorporated.  Tom Green, Frank Volpe, Meghan
16  Delaney, all from Sidley Austin and David Van Bevron from
17  Tyson Foods.
18       THE VIDEOGRAPHER:  Thank you, Counsel.  The witness
19  will now be sworn in.
20               MICHAEL CUTLER,
21       having been first duly sworn, was
22           examined and testified as follows:
23  //
24  //
25  //

---

**Page 8**

1                   EXAMINATION
2  BY MR. HOPSON:
3       Q    Good morning, Mr. Cutler.
4       A    Good morning.
5       Q    Where are you currently employed?
6       A    Currently, I'm retired, but I'm working as a
7  consultant.
8       Q    Is that at the Center for Immigration Studies?
9       A    Well, I work with them as a fellow.  I get
10  sporadic fees for various things.  It's not really
11  regular employment.
12       Q    So it's not a salary position?
13       A    No.
14       Q    Ummm --
15       A    I get paid for doing studies, that kind of thing.
16       Q    Okay. Do you also work occasionally as an expert
17  witness; is that correct?
18       A    That is correct.
19       Q    How often have you been retained generally as
20  an expert witness?  Five times?  Ten times?  20 times?
21       A    So far about two or three times.
22       Q    Okay.
23            And you've been deposed before; is that right?
24       A    Yes, I have.
25       Q    And you've testified in a courtroom before

---

**Page 9**

1  under oath?
2       A    Many times.
3       Q    Many times.
4       A    I've testified before Congress many times.
5       Q    Can you recall when you were retained in this
6  case?
7       A    (No response.)
8       Q    Within a year?
9       A    Well, it was within the last year, I would say.
10       Q    And when you were retained, you were asked to
11  provide an opinion, I take it?
12       A    That is correct.
13       Q    Okay.
14            And in order to provide that opinion, as I
15  understand it, you conducted a review of employment
16  files, including employment applications, I-9s, and the
17  like, for 497 current Tyson employees; is that correct?
18       A    Yes.
19            (Defendants' Exhibit Nos. 1-A, B and C were
20            marked for identification and are bound
21            separately.)
22       Q    BY MR. HOPSON:  Let me show you what we're
23  going to mark as Exhibit 1-A, B, and C.  And just get
24  those on the record.
25            Let me just clarify, because Mr. Foster has

Page 10

1  asked a question. We're going to treat the declaration
2  itself as 1-A.
3      A  Okay.
4      Q  We're going to treat the document that looks
5  like a chart as 1-B.
6      A  You have 1-C on this one. Just so you know.
7      Q  It was good to see we didn't get too far into
8  the deposition without miss marking something.
9          Chart is identified as 1-B. And what I
10 understand to be some handwritten notes from Mr. Cutler
11 as 1-C.
12         Let's look at 1-A together first, Mr. Cutler.
13     A  Okay.
14     Q  That's a declaration that you prepared in
15 connection with this case; is that right?
16     A  That is right.
17     Q  And is it fair to say that your opinion, or at
18 least part of your opinion, is set forth in that
19 declaration?
20     A  Yes.
21     Q  Did you actually prepare this declaration in
22 your own words?
23     A  Yes.
24     Q  And did this declaration go through various
25 drafts as you were writing it?

Page 11

1      A  I'm just trying to refresh my memory. As I
2  recall, one draft. I wrote it and there it is.
3      Q  Did you write it in hand or on a computer?
4      A  Computer.
5      Q  And you were careful in preparing that
6  declaration?
7      A  Yes.
8      Q  You chose your words carefully, as well?
9      A  Yes.
10     Q  Look at 1-B for a second, if you would, please.
11     A  (Witness complies.)
12     Q  Can you describe for me what Exhibit 1-B is?
13     A  Yes. It's a chart that has -- it's a grid and
14 it was prepared by counsel. It has the names of
15 employees, their Social Security numbers, where they
16 were employed, whether there were any difficulties with
17 the application, the I-9, and then a space for me to
18 indicate my determination.
19     Q  So to paraphrase, this is a chart that contains
20 the names of the 497 individuals whose employment
21 documents you reviewed?
22     A  Correct.
23     Q  And then there are fill-ins in handwriting in a
24 number of the columns; right?
25     A  Correct.

Page 12

1      Q  Is that your handwriting, Mr. Cutler?
2      A  Wherever it's done by hand, yes.
3          If it was done by type, then it was not. If it
4  was printed, that was done by counsel.
5      Q  And is it fair to say that this is kind of a
6  summary of the analysis you did of those 497 files?
7      A  Well, what it is, is a worksheet.
8      Q  To keep track. It's usually --
9      A  Keep track, correct.
10     Q  -- of what's going on?
11     A  Correct.
12     Q  Let's look at Exhibit 1-C.
13         Can you tell me what Exhibit 1-C is, please?
14     A  Yes. This Exhibit 1-C are my notes that I took
15 as a guide for what my findings were as I went along.
16     Q  Did you prepare these handwritten notes
17 contemporaneously, that is, as you were reviewing the
18 files?
19     A  Yes.
20     Q  And am I correct in understanding that these
21 notes reflect your reasons to question certain Tyson
22 employees at least with regard to their immigration
23 status?
24     A  Correct, yes.
25     Q  And more specifically, as I understand it,

Page 13

1  these handwritten notes in Exhibit 1-C contain the
2  reasons why certain numbers, that is 91 of the
3  individuals were deemed by you to appear to be
4  unauthorized --
5      A  That's correct.
6      Q  Is that a fair statement?
7      A  That's a fair statement.
8      Q  Okay. Did you put all of the reasons that a person
9  appears to be unauthorized in Exhibit 1-C?
10     A  It was a short-hand approach where I was trying
11 to get a handle on what the situation was.
12     Q  But for example, if you look at the first page
13 of Exhibit 1-C --
14     A  Uh-huh.
15     Q  -- which is numbered at the bottom, 1487, do
16 you have that in front of you?
17     A  Right here.
18     Q  Do you see under Gatson, it says Pedro Gaspar
19 about two thirds of the way down the page?
20     A  I'm sorry, let me make sure I'm in the same
21 place where you are.
22         Yes.
23     Q  The reason, as I understand it, that Pedro
24 Gaspar is on your list of 91 individuals is that the
25 I-551 is expired; is that correct?

Page 14

1    A    That's correct.
2    Q    Am I correct in understanding that that's the
3    only reason that we know that Mr. Gaspar is on the list
4    of 91?
5    A    Based on this, yes.
6         If it was anything else, I don't know.  But
7    that was what called my attention to this individual.
8    Q    All right.
9         If there was any other reason that you relied
10   upon -- strike that.
11        If there's a reason you relied upon in your
12   analysis as it stands today, it's in Exhibit 1-C?
13   A    Right.
14   Q    There are no hidden or secret reasons why
15   somebody is on the list of 91 or not on the list of 91?
16   A    Oh, no.  Absolutely.  Nothing secret.
17   Q    Okay.
18        So is it fair to say that Exhibit 1-C, at least
19   in your shorthand, shows all your analysis and reasons
20   why you identified 91 individuals that appear to be
21   unauthorized?
22   A    Yes.
23   Q    Okay.
24        (Defendants' Exhibit No. 13 was marked for
25        identification by the reporter and is included

Page 15

1         herewith.)
2    Q    BY MR. HOPSON:  Let's look at Exhibit 13 for a
3    minute if you would please.
4    A    (Witness complies.)
5         Okay.
6    Q    Have you had the opportunity to look at least
7    at the first page?  And I'm only really going to focus
8    on the first page here.
9         Have you had an opportunity to look at the
10   first page there, Mr. Cutler?
11   A    The very top page?
12   Q    Yes.
13   A    Yes.
14   Q    What is this document?
15   A    It was just an email to me to let me know, you
16   know, what was coming up.  It was kind of a preparation
17   sheet so I would know what to anticipate.
18   Q    In this email, Mr. Galin was sending you, as I
19   understand it, examples of the types of packets that
20   you reviewed in forming your opinions, is that correct?
21   A    Yes.
22   Q    And am I correct that Mr. Galin or members of his
23   law firm physically assembled these documents in the
24   package for you to review?
25   A    That's correct.

Page 16

1    Q    Did you tell Mr. Galin or Mr. Foster or members
2    of their law firm what you wanted to see in those
3    packets?
4    A    No.  They provided me with the documents.
5    Q    And what was your understanding of their --
6    what parameters they used in deciding what documents to
7    send you?
8    A    I was told that it was a random sampling, every
9    10th employee's file was pulled.  And that was my
10   understanding of their methodology.
11   Q    Okay.  What was in the files that were sent to you
12   for a given individual or employee?
13   A    That wasn't sent to me.  I reviewed them here.
14        And it depended on each -- what was available,
15   you know, whether it was an I-9, whether it was the
16   employment application or if there were copies of
17   supporting documents.  That sort of thing.
18
19   Q    Is it your understanding you basically reviewed
20   what was available and what might be called the
21   employment file?
22   A    Yes.
23   Q    And would that include to your understanding,
24   sir, I-9 forms, copies of documents provided for
25   identification, and employment applications in most

Page 17

1    cases?
2    A    Were available in most cases.  Yes.
3    Q    Let's look at Exhibit No. 2.
4        (Defendants' Exhibit No. 2 was marked for
5        identification and bound separately.)
6    THE WITNESS:  Thank you.
7        (Witness complies.)
8    Q    BY MR. HOPSON:  Can you tell me what Exhibit
9    No. 2 is?
10   A    Yes.  Exhibit No. 2 is my expert report that I
11   prepared on March 8 of 2007 for counsel.
12   Q    So this -- is it fair to say that this expert
13   report -- to understand your opinion, this expert
14   report should be read in conjunction with the other
15   declaration we looked at?
16   A    Yes.
17   Q    It's part of your opinion in this case?
18   A    Correct.
19   Q    And as I read it, it appears to set forth some
20   analysis that supports the conclusions you reached in
21   the declaration we reviewed as Exhibit 1-A; is that
22   right?
23   A    Yes.
24   Q    Did you prepare Exhibit 2 yourself?
25   A    Yes.

Page 18

1    Q   Did you also prepare it on a typewriter or
2  computer or word processing?
3    A   Yes.
4    Q   That shows how old I am that I would actually
5  use the word typewriter.
6    A   You and me both.
7    Q   Mr. Cutler, just one clarifying question:  If
8  you look at the last two pages --
9    A   Sure.
10    Q   -- of Exhibit 2, there is some background
11  biographical information about you.
12    A   Right.
13    Q   That is -- doesn't look like it was prepared at
14  the same time as the rest of Exhibit 2.
15       Am I seeing that correctly?
16    A   That's correct.
17    Q   So you essentially just added this preexisting
18  biographical information to the back of Exhibit 2; is
19  that correct?
20    A   Yeah, I have a prepared bio that I simply did a cut
21  and paste with.
22    Q   Okay.  Fair enough.  And that's why the type is
23  different nonetheless --
24    A   Absolutely.
25    Q   And again, this expert report, Exhibit 2, is

Page 19

1  prepared in your own words?
2    A   Absolutely.
3    Q   And it contains your opinions; correct?
4    A   Absolutely.
5    Q   And it's prepared carefully and worded
6  carefully?
7    A   Yes.
8    Q   And you don't want to make any modifications or
9  changes to that opinion at this point; correct?
10    A   Correct.
11    Q   Let's start a little bit and kind of -- if I
12  could, and briefly review your background with you,
13  sir.
14    A   Sure.
15    Q   You started in 1971 with the INS as an
16  inspector at JFK Airport.
17    A   That's correct.
18    Q   And by 1975, having held various positions with
19  the INS, you became a criminal investigator; is that
20  correct?
21    A   That is correct.
22    Q   And you stayed in the INS as a criminal
23  investigator for approximately eight years?
24    A   No.  I mean, it was a balance of my career.
25  Criminal investigator is interchangeable with Special

Page 20

1  Agent.  They just change the job title.  But criminal
2  investigator/special agent.
3    Q   You spent approximately eight years from 1975
4  to 1983 working in the investigations unit that sought
5  to locate and apprehend illegal aliens; is that
6  correct?
7    A   That's correct.  It was called Area Control.
8    Q   And in 1988, you joined the Unified
9  Intelligence Division of the DEA's New York field office;
10  correct?
11    A   I was assigned to it as an INS agent, but I was
12  detailed along with law enforcement from a wide variety
13  of domestic and in fact foreign law enforcement agencies
14  as well.
15    Q   And that's when it was called a Unified
16  Intelligence --
17    A   Absolutely.  Local, State, Federal.  We had
18  British representatives, Canadians, so forth, who
19  worked with the Israelis.
20    Q   Okay.  In 1988, and going forward, while you were
21  working with Unified Intelligence Division, was the
22  primary focus of that DEA field office division to
23  enforce the drug laws?
24    A   Well, for me it was to enforce the immigration
25  laws as they related to narcotic investigations.

Page 21

1    Q   Okay. And in 1991, you joined the Organized Crime
2  Drug Enforcement Task Force; is that correct?
3    A   Well, I was promoted to the position of Senior
4  Special Agent.  Then again, assigned to the task force
5  which again was a multi-agency operation where again
6  the focus for me was aliens involved with significant
7  narcotics trafficking, and crimes related to narcotics
8  trafficking and terrorism.
9    Q   And again, there were people from various
10  Federal and State law enforcement agencies?
11    A   Yes.
12    Q   Either assigned or promoted or somehow
13  affiliated --
14    A   Right.  I'm trying to be as specific as I can
15  about it, yes.
16    Q   And I'm just trying to understand --
17    A   Absolutely, sure.
18    Q   -- the best I can.
19    A   No problem.
20    Q   You actually spent all-in-all 30 years with the
21  INS?
22    A   That's correct.
23    Q   Now, focusing back on the time that you spent
24  between 1975 and 1983 in the investigations unit, I
25  take it you worked in various units of that

Page 22

1  investigation branch; is that correct?
2      A   Correct.
3      Q   And part of your work during that time period
4  was locating and apprehending illegal aliens; is that
5  correct?
6      A   That's correct.
7      Q   I take it that in that role, you probably made
8  a number of arrests for violations of the immigration laws?
9      A   Innumerable.  On a daily basis.
10      Q   Right, and many of those arrests resulted in
11  convictions; is that correct?
12      A   Convictions in criminal matters and deportation
13  in administrative matters.
14      Q   And during that eight years, you must have
15  become -- at a minimum very conversant with criminal
16  law processes.
17      Is that fair to say?
18      A   Fair?
19      Q   Well, for example, did you prepare affidavits
20  in support of search warrants?
21      A   Yes.
22      Q   Did you prepare affidavits in support of arrest
23  warrants?
24      A   Yes.
25      Q   Did you become familiar with the concept of

Page 23

1  probable cause?
2      A   Yes.
3      Q   Did you become familiar with the concepts of
4  various burdens of proof that might apply?
5      A   Yes.
6      Q   Did you, during that period, participate in
7  developing any criminal cases against employers as
8  opposed to criminal cases against the aliens
9  themselves?
10      A   I assisted in certain cases of that nature.
11      Q   When did the sanctions against employers come
12  into the law?
13      A   After the Immigration Reform Control Act in
14  1986.
15      Q   Did you -- so the cases you worked on against
16  employers were after 1986?
17      A   No.  Somewhere before.
18      Q   It's my understanding -- again, I want you to
19  clarify for me that there were no criminal sanctions
20  against employers prior to 1986; is that correct?
21      A   There were times when criminal laws were
22  violated by people apart from that.
23      Q   And those criminal laws were not specifically
24  related to employing illegal aliens?
25      A   That is correct.

Page 24

1      Q   Let's take a minute and just talk about what
2  you did to prepare for your deposition today.
3      Can you tell me, in general terms, what you did
4  to prepare?
5      A   We discussed the material, what are labeled as
6  exhibits, just in terms of refreshing my recollection.
7      Q   Documents in addition to the ones I've already
8  shown you or basically just those?
9      A   Basically these.
10      Q   One of the things I note in Exhibit No. 2 is
11  that you say you were called upon to instruct various
12  employers as to the impending requirements of the 1986
13  Act; is that correct?
14      A   That's correct, yes.
15      Q   How much time did you spend instructing
16  employers about the '96 -- '86 Act excuse me?
17      A   Well, this was right after '86, a number of us
18  were assigned to doing them.  We called it officer
19  friendly, was the street term we used for it.
20      I believe I did that for approximately six
21  months, perhaps a little bit longer.
22      (Defendants' Exhibit No. 3 was marked for
23      identification and is bound separately.)
24      Q   BY MR. HOPSON:  Let me show you what is
25  unfortunately a huge exhibit, but we marked it as

Page 25

1  Exhibit 3.
2      A   (Witness complies.)
3      Q   Let me just start off by asking you right at
4  the outset, if you're familiar with that exhibit or
5  similar field manuals used by immigrations officers?
6      A   Yes.
7      Q   Did you use that manual or a similar manual
8  between 1978 and 1985?
9      A   Easy for you to say.
10      Q   Yeah.
11      A   We had other -- I don't recall exactly what it
12  was.
13      I know we certainly had literature, manuals,
14  guidelines.  It was, you know, we're talking about
15  something that occurred about 20 years ago.
16      But certainly there was documentation that we
17  referred to.
18      Q   Okay.
19      Just open up the first page of that exhibit, if
20  you don't mind.
21      A   (Witness complies.)
22      Sure.
23      Q   See down towards the bottom, it refers to an
24  initiative, as I understand it, by the INS to train
25  employers and the requirements of the '86 Act.

Page 26

1        Was that the initiative that you were involved in?
2    A   I'm looking to see where it says initiative.
3    Q   Why don't I come around, if you don't mind.
4    A   Please, if you could, I'd appreciate it.
5    Q   It says --
6    A   Resources.  I was looking for initiative.
7        Yes, that's correct.  That was part of a
8    program that was initiated so that employers would
9    understand what was going to be going on.
10   Q   And how did it come to be that you were
11   assigned to participate in that initiative program?
12   Educational --
13   A   It comes under the broad category of other
14   duties as assigned.
15       Your bosses decide who goes where, and it's
16   like the military.  You go where they point you and you
17   go.
18   Q   Can you give me a sense of how many employers
19   you visited or instructed or worked with in the course
20   of that program?
21   A   Goodness.  Many.
22       There's a Bush Terminal Complex in Brooklyn,
23   there's a whole series of factories.  Many of them
24   have since been outsourced, but back then, it was
25   building after building and it was an entire neighborhood,

Page 27

1    basically.
2        So I would say hundreds during that period of
3    time.  You know, I might do, you know, ten stops a day.
4    Q   Okay.  And we're going to look at a couple of
5    these documents in a minute.  But just basically, as I
6    understand it, what you probably did is tell them the
7    new rules that were going to apply after 1986 when it
8    came to hiring; is that right?
9    A   And try to encourage them to be cooperative and
10   understand that this is the way it was going to be.
11   Q   So for example, did you show them the I-9 form?
12   A   Yes.
13   Q   Did you talk to them about their need to review
14   certain identification documents?
15   A   Yes.
16   Q   Let's -- it's probably easier to do this with a
17   piece of paper in front of us.
18       (Defendants' Exhibit No. 4 was marked for
19       identification and is bound separately.)
20   Q   BY MR. HOPSON:  Let's look at Exhibit 4
21   together.
22   A   Okay.
23   Q   Again, not this particular piece of paper
24   because it may have gone through various iterations
25   over the years, but are you familiar with a document

Page 28

1    that looks like Exhibit 4 in one of its various
2    iterations?
3    A   Yes.  The one we used was earlier.  This one is
4    dated November 21st of 1991.  So the one we used was an
5    earlier version.
6    Q   But it was a similar document in the sense that
7    it was a Handbook for Employers, prepared by the INS?
8    A   Correct.
9    Q   Did you use the earlier iteration of this
10   document in connection with your training of employees?
11   A   As I recall, we distributed them to employers
12   when we visited with them.
13   Q   Let's look at page 20 of this together.
14   A   (Witness complies.)
15       Yes.  They've switched it around.
16   Q   Page 20 actually says part 8, right at the top
17   of the page.
18   A   Here we go.  Got it.
19   Q   Okay.  I don't want to get too technical but --
20   A   Okay.
21   Q   -- this document in front of you refers to
22   list A, list B and list C.
23       Are you familiar with those categories of
24   documents?
25   A   Yes.

Page 29

1    Q   And describe for me generally your
2    understanding of what list A, B and C documents are.
3    A   A documents that, in and of themselves, prove
4    that someone is legally in the United States and
5    entitled to work, for example, an alien registration
6    card.
7        List B would be a document that would show the
8    person's identity.
9        And list C would show that they're entitled to be in
10   the United States, whether it's their birth certificate
11   with a photo ID showing that the person is truly a
12   United States citizen.
13       That sort of thing.
14   Q   And that would have been one of the things you
15   trained employers on during your tenure back in the
16   mid-80's?
17   A   Correct.
18   Q   If you turn to page 6 of this same exhibit.
19   A   Uh-huh.
20   Q   I want to show you something else here.
21   A   Sure.  Okay.  Got it.
22   Q   Page 6 basically looks like a description or
23   instructions on completing an I-9 form; is that
24   correct?
25   A   Correct.

Page 30

1    Q    And did you provide similar instruction or use
2  similar documents in training employers back in the
3  mid-80's?
4    A    Well, again, I know we had a handbook that explained
5  how it was done.  To recall precisely 20 years ago, I
6  can't tell you that.
7        But I know that the paperwork would have shown
8  them how to do the paperwork.
9    Q    Well, for example, looking again at page 6 in
10  the exhibit in front of you, this shows that section 1
11  is to be completed by the employee; is that correct?
12    A    That's correct.
13    Q    And was that consistent with what you were
14  teaching people back in the 80's?
15    A    Yes.  Uh-huh.
16    Q    And section 2 is to be completed by the
17  employer.
18        Is that consistent with what you were teaching
19  people back in the 80's?
20    A    At the time that they were examining the
21  documents, yes.
22    Q    That's a good point.
23        You have to fill out this I-9 form at what
24  time?  What did you teach people?  What was the time to
25  fill this out?

Page 31

1    A    While they were going over the documents.
2    Q    And did you teach them that the documents need
3  to indicate that the person's actually authorized to be
4  hired at the time you're hiring them?
5    A    Yes.
6    Q    And did you teach them that this needed to be
7  completed before or at the time the person was hired as
8  opposed to a month down the road?
9    A    Right.  At the time of hiring.
10    Q    Did you talk to employers about the types of
11  sanctions that could be imposed for failing to follow
12  this I-9 process?
13    A    Yes, of course.
14    Q    Let's look at one more.  Let's look at
15  Exhibit 5 together.
16        (Defendants' Exhibit No. 5 was marked for
17        identification and is bound separately.)
18    A    Okay.
19        (Witness complies.)
20        Thank you.
21    Q    Have you seen Exhibit 5, this specific
22  document?
23    A    No, I have not seen it before.
24    Q    Have you seen similar documents that provide
25  guidance to employers about I-9 and immigration issues?

Page 32

1    A    I believe so.
2    Q    In the first paragraph, Mr. Cutler, the last
3  sentence says:
4        "Through the I-9 -- form I-9 verification
5        process, employers ensure that the employees
6        possess proper authorization to work in the
7        U.S. and their hiring practices do not
8        unlawfully discriminate based on immigration
9        status."
10        In your opinion, is that a fair statement of
11  the purpose of the I-9 verification process?
12    A    Yes.
13    Q    If you turn the page for me, sir.
14    A    (Witness complies.)
15        Sure.
16    Q    And look at the second page.
17    A    (Witness complies.)
18    Q    The second heading on the second page says:
19  Can I tell a potential employee what documents to
20  present for verification?  And the answer provided is:
21  No.  An employer cannot tell an employee what documents
22  to present for I-9 purposes.
23        Is that consistent with your understanding of
24  the rules surrounding the completion of the I-9 in the
25  hiring process that should be and followed by employers?

Page 33

1    A    When they determine that the documents relate
2  to the employee, yes.
3    Q    So to make sure I understand that, if Frank
4  comes to me to be employed by Sidley Austin --
5    A    Uh-huh.
6    Q    -- and he produces a driver's license and a
7  Social Security card, it would be impermissible for me
8  to say, no, I want to see your green card; is that
9  correct?
10    A    In part.
11        If there was a doubt that the documents were
12  truly issued to him, then you would have to go beyond
13  the document he provided to you.
14    Q    So to restate, I have to accept the documents
15  that are tendered to me unless I have a suspicion
16  there's something wrong with those documents?
17    A    Precisely.
18    Q    Or if I have a suspicion that there's something
19  wrong with the documents or a suspicion that those
20  documents do not relate to the person who tendered
21  them?
22    A    That he's an imposter, correct?
23    Q    Let's look at the next paragraph because I
24  think that gets to that.  The next paragraph says:  How
25  do I know if a document is genuine or false?

Page 34

1    The first sentence says: An employer is not
2 required to know with absolute certainty whether a
3 document is genuine or false.
4    So far does that comport with your expert
5 understanding of the I-9 rules?
6    A   Yes. If I could -- Thank you it's good stuff.
7    Q   I'm going to read the next sentence and ask you
8 the same question, Mr. Cutler.
9    A   Sure.
10    Q   It says:
11    "The law merely requires that an employer
12 examine the original of the document, not a
13 photocopy, and make a good faith determination
14 that the document appears to relate to the
15 employee, appears to be genuine, and is listed
16 as an acceptable document on the back of
17 form I-9."
18    Again, the question, sir, is: Is that
19 statement consistent with your expert understanding of
20 the I-9 hiring process?
21    A   Yes.
22    Q   Next sentence, sir, says:
23    "Please note that rejection of a document
24 that later proves to be genuine could result in
25 a violation of the anti-discrimination

Page 35

1 provisions of immigration law."
2    Is that also consistent with your understanding
3 of the rules that surround the I-9 hiring process?
4    A   I don't recall if that specific provision was
5 part of what we were doing back then.
6    Q   Okay.
7    That's a good point. Let me ask you: Were
8 there anti-discrimination provisions in the '86 Act?
9    A   Yes.
10    Q   And when you were out in the mid-80's training
11 hundreds of employers about the requirements of the '86
12 Act, did you also discuss the anti-discrimination
13 provisions?
14    A   Absolutely.
15    Q   Let me just ask you in an open-ended way, not a
16 memory test.
17    A   Sure.
18    Q   What would basically -- basic statement did you
19 tell them about the anti-discrimination provisions?
20    A   I said if somebody appears to you, after you
21 interviewed them and looked at the entire picture
22 presented by the prospective employee, if you believe
23 that he's a citizen or an alien authorized to work in
24 the United States, then you should hire that person.
25    You shouldn't be saying, well, the guy seems to

Page 36

1 be an alien. I'm safe if I don't hire him. I said
2 don't do that.
3    But you have to look at the overall situation
4 and make a determination. Do the documents relate to the
5 person? Is he an imposter? Is he on the level?
6    As an employer, you want people that are honest
7 anyway, but I said certainly you can't say I'm not
8 going to hire any aliens, because you know it doesn't work
9 that way.
10    As I recall, the way that I explained it to the
11 employers that I was training.
12    Q   Okay.
13    Let me turn to another subject for a minute.
14 Maybe we'll come back to that in a more focused way.
15    A   Sure.
16    (Defendants' Exhibit No. 6 was marked for
17    identification by the reporter and is included
18    herewith.)
19    Q   BY MR. HOPSON: Let's look together at
20 Exhibit 6 just for a minute.
21    A   (Witness complies.)
22    Okay.
23    Q   I'm not going to ask you to read the whole 1986
24 Act.
25    A   Thank you.

Page 37

1    Q   But I take it that you are familiar with the
2 statute itself?
3    A   Yes.
4    Q   The 1986 Immigration Act we've been talking
5 about?
6    A   Yes.
7    Q   Okay.
8    I'm just going to focus you, Mr. Cutler, on the
9 second page.
10    A   Okay.
11    Q   Right down at the bottom. And just --
12    A   Title IV.
13    Q   Hang on a second.
14    I've got a different printout than you do.
15 It's actually page 4, Mr. Cutler.
16    A   Oh, okay.
17    Q   Down at the bottom.
18    A   Fair enough. Let me get to it. Okay.
19    Q   Can you confirm for me that this generally,
20 this page that we're looking at, is referring to the
21 I-9 provisions, the obligations that employers are
22 going to have under this 1986 Act?
23    A   Let me just read this for a moment.
24    Q   Of course.
25    A   (Witness complies.)

Page 38

1      Yes.
2    Q   Okay.
3      And in particular, if we look down at the
4  bottom, without trying to be too precise about the
5  number of statutes, it says that there's a requirement
6  for attestation after examination of documents?
7    A   Right.
8    Q   Do you see that?
9    A   Yes.
10   Q   And you can confirm for me that that's what
11 employers are supposed to be doing when they fill out
12 these I-9 forms?
13   A   Yes.  So they understood that they had a burden
14 that they had to meet.
15   Q   Fair enough.
16     And the burden is defined again, if you continue
17 to focus at the bottom of page 4 --
18   A   Uh-huh.
19   Q   -- at least for statutory purposes by this
20 language right here; right?
21   A   Right.
22   Q   And in particular, the statute says:
23     "A person or entity has complied with
24  requirements of this paragraph with respect
25  to examination of a document if the document

Page 39

1  reasonably appears on its face to be genuine."
2      Is that consistent with your expert
3  understanding of the employer's obligation when it
4  comes to examining documents?
5    A   To examining the documents, yes.
6    Q   Now, let's read the next sentence together.
7      "If an individual provides a document
8   or combination of documents that reasonably
9   appears on its face to be genuine, and that
10  is sufficient to meet the requirements of
11  such sentence, nothing in this paragraph
12  shall be construed as requiring the person
13  or entity to solicit the production of any
14  other document or as requiring the individual
15  to produce such document."
16     I'm going to try to paraphrase that,
17 Mr. Cutler, and ask you --
18   A   Sure.
19   Q   And ask you the question is that the rule
20 that says if you get two documents or one document that
21 reasonably appears to be genuine, you're not entitled
22 to demand additional or other documents?
23   A   Well, yes.
24     But we have to be certain that the document is
25 truly -- it's not just that the document is legitimate,

Page 40

1  but that it was properly issued to the person
2  proffering them.
3    Q   Right.  So this is a two-step process.  When you
4  and I talk about the documents reasonably appear to
5  be genuine.
6      What you're saying to me is there's also an
7  implicit requirement that the document be genuine,
8  means that it actually relates to the person tendering the
9  document?
10   A   Absolutely.
11   Q   That it's not a counterfeit?
12   A   Not a counterfeit, or the person didn't obtain
13 it improperly.
14   Q   Like fraud or buying phony documents --
15   A   Absolutely.
16   MR. FOSTER:  Could I make an objection, please.
17     This statute, Mr. Hopson, is not the current
18 version of this statute as I understand it.  Right?
19   MR. HOPSON:  Right.
20   MR. FOSTER:  This is the version that as it
21 was enacted in 1986 without amendments that have
22 occurred since then.
23   MR. HOPSON:  That's correct.
24   MR. FOSTER:  Correct?  All right.
25   Q   BY MR. HOPSON:  Let's go back, if you don't

Page 41

1  mind, Mr. Cutler, to the Handbook for Employers which
2  is Exhibit No. 4.
3    A   This one.  Okay.
4    Q   And I'd ask you just to turn to page 3 of that,
5  if you would.
6    A   Okay.  Hold on a second.
7     (Witness complies.)
8     Okay.
9    Q   Again, I'm going to try to move through this
10 quickly, but again, if you see something that you
11 disagree with or want to clarify or point ME to the other
12 section, please feel free to do that.
13   A   Absolutely.
14   Q   In training employees, we talked how the rules
15 that you set out for people back in the mid-80's --
16   A   Training employers.
17   Q   Training employers.  Thank you.
18     Training employers in the mid-80's, you
19 basically told them the rules of the I-9 process; is
20 that right?
21   A   Right.  It was a training/public relations kind
22 of thing to enlist their support.
23   Q   And apropos to Mr. Foster's observation, you
24 didn't specifically get into saying this is part of the
25 statute and this is part of the regs and this is part

Page 42

1  of INS guidance.
2       You just said these are the rules and this is
3  what you should do, right?
4       A   We spoke to them on the level that a layman
5  would understand.
6       Q   Right.  You spoke to them in a way that tried to
7  communicate, to the best of your ability, what the
8  rules were?
9       A   Correct.
10      Q   On page 3, it says:  Have your employees
11 complete section 1 -- it's referring to the I-9 form --
12 at the time of hiring.
13      Again, that's consistent with the advice that
14 you were giving employers back in the mid-80's; right?
15      A   That's correct, yes.
16      Q   And it says in the next paragraph:
17      "If your employees cannot complete section 1
18 by themselves, or if they need the form translated,
19 someone may assist them."
20      Is that correct?
21      A   That's correct.
22      Q   And that's what you taught -- you trained and
23 taught employees back in the mid-80's; correct?
24      A   Correct
25      Q   The next sentence says:

Page 43

1       "The preparer or translator must read the
2   form to the employee, assist him or her in
3   completing of section 1, and have the employee
4   sign or mark the form in the
5   appropriate place."
6       Again, that's perfectly consistent with your
7   understanding of the law and consistent with what you
8   were training people back in the mid-80's?
9       A   Yes.
10      Q   Let's turn over to page 13 of this same
11  document.
12      A   (Witness complies.)
13      Q   Maybe a better statement of the law -- we'll
14  see if you agree.
15      In the left-hand column down towards the bottom
16  under the heading "May I specify which documents I will
17  accept for verification?"
18      Do you see that Mr. Cutler?
19      A   Yes.
20      Q   And basically, I'm going to paraphrase, but
21  what it says is -- it says:
22      "No.  You can't choose what documents you
23  want to see as long as you get the right
24  combination of documents."
25      A   Right.

Page 44

1       Q   And quoting now:
2       "Which reasonably appear on their face to
3   be genuine and to relate to the person presenting
4   them."
5       A   Correct.
6       Q   That, again, is correct with Mr. Cutler's view
7   of the world and consistent with what he has always
8   known and what he's been teaching employers back since
9   1986?
10      A   Correct.
11      Q   Have you ever been retained, Mr. Cutler, to
12  help an employer as a private individual, not as an INS
13  agent?
14      A   I understand.
15      Q   Help a company set up a compliance program? --
16      A   No, I have not.
17      -- That relates to these provisions?
18      A   I have not.
19      Q   Over in the next column, I want you to look at
20  this middle of the page in the right-hand column.
21      It says:
22      "What's my responsibility concerning
23  the authenticity of documents presented to
24  me?"
25      And it says, quoting:

Page 45

1       "You must examine the documents, and if
2   they reasonably appear on their face to be
3   genuine and to relate to the person
4   presenting them, you must accept them."
5       Is that again consistent with your
6   understanding of the rules?
7       A   Yes.
8       Q   You don't mind if I use the term rules as
9   opposed to saying statute, regulation, guidance?
10      A   It works for me.
11      Q   Okay.
12      Again, underneath that, it says:
13      "To do otherwise could be an unfair
14  immigration-related employment practice."
15      Is that also consistent with your understanding
16  of the rules?
17      A   Yes.
18      Q   Okay. Let me ask you to flip over to page 18 of this
19  exhibit.
20      A   (Witness complies.)
21      Okay.
22      Q   On page 18, at the top of the right-hand
23  column, there are certain questions about avoiding
24  discrimination.
25      And before I read this one specifically, let

Page 46

```
1   me just ask you if you would agree with my reading
2   of this document that it appears to be
3   essentially a kind of frequently asked questions by
4   employers.
5        Is that what's going on here?
6    A   I would guess.  I didn't write it; so I'm not
7   sure why they laid it out the way they did, but okay.
8    Q   All right, let me just read it, then, without that
9   premise:
10       "How can I avoid discriminating against
11   certain employees while still complying with the law?"
12       I'm not going to read the whole thing, but I'm
13   going to direct your attention to the last sentence and
14   ask you this:  The Handbook for Employees says you
15   should not discharge present employees, refuse to hire
16   new employees, or otherwise discriminate on the basis
17   of foreign appearance, accent, language or name.
18       The question is:  Is that consistent with the
19   Mike Cutler understanding of the rules that apply to
20   employers?
21    A   Yes.
22    Q   Is it consistent with what you taught
23   employers --
24    A   Yes.
25    Q   -- back in the mid-1980's?
```

Page 47

```
1        When we say that you can't discriminate against
2   foreign appearance, my understanding means that you
3   can't treat two similarly situated employees
4   differently solely because of foreign appearance; is
5   that correct?
6    A   That is correct.
7    Q   And the same thing applies to accents, language
8   or name?
9    A   (No response.)
10    Q   Do you want me to withdraw the question?
11    A   Well, the issue of language can become an
12   issue.
13    Q   Okay.
14       Can you treat an employee differently solely
15   because of determinations you make about their command
16   of the English language?
17    A   In certain cases, yes.
18    Q   Give me an example.  One of those cases.
19    A   Somebody who is a United States citizen who
20   can't speak the English language.
21    Q   And why is it your opinion that treating that
22   person differently because of language doesn't violate
23   the anti-discrimination provision we just read?
24    A   Because of the potential for imposters of
25   the law's requirement that the documents must relate to
```

Page 48

```
1   the person.
2        Statutory for an alien to naturalize, he or she
3   must demonstrate English proficiency.  And if they
4   can't, then you have to call into question whether the
5   person is who they claim to be.
6    Q   So if a person claims to be a U.S. citizen --
7    A   Uh-huh.
8    Q   -- and can't -- does this only apply to
9   naturalized U.S. citizens?
10    A   Pretty much all U.S. citizens in my
11   experience -- you look at the applicant in the totality,
12   not just the paper.
13       You're looking at the flesh and blood person
14   and you try to make a determination is the person being
15   truthful, is the person who they claim to be.
16       And I've never encountered a United States
17   citizen that couldn't speak English.  And I've never
18   encountered a naturalized citizen that couldn't speak
19   English unless they naturalized when they were 80 years
20   old and statutorily they don't have to demonstrate
21   proficiency.
22       But in the employment situation, if I found a
23   United States citizen, those folks spoke English, they
24   had English proficiency.
25    Q   How great is their English proficiency?
```

Page 49

```
1    A   It would certainly be enough to complete
2   paperwork such as the I-9.
3    Q   All right.  Well, we'll come back to that.
4   Let's go to page 8 for a second.
5    A   Sure.  Same document?
6    Q   Same document, working through these pieces of
7   advice here.
8       MR. FOSTER:  Excuse me.  I'd like to make an
9   objection to this.
10       Mr. Hopson, this document was revised in 1991.
11   Is there any reason why you're not using the current
12   version?
13       MR. HOPSON:  As far as I know, this is the current
14   version.
15       But your objection is noted.
16       MR. FOSTER:  Okay.
17       MR. HOPSON:  Let's go forward.
18       THE WITNESS:  You said page 8?
19    Q   BY MR. HOPSON:  Yes, sir, page 8.
20    A   Thank you.
21    Q   Top of the right-hand column.
22       Again, in describing the advice to employers, I
23   want to direct your attention to a sentence that says:
24       "Different procedures should not be
25   established based on an individual's
```

Page 50

1   appearance, name, accent or other factors."
2        And that's consistent with your understanding
3   of the rules, regulations, and laws; is that correct?
4     A    Correct.
5        (Defendants' Exhibit No. 8 was marked for
6        identification and is bound separately.)
7     Q    BY MR. HOPSON:  Let's look at Exhibit No. 8
8   together.
9     A    (Witness complies.)
10       Thank you.
11    Q    And again, just -- I'm not going to show you
12  everything in here.  But if you'll skip over to page 3.
13    A    (Witness complies.)
14    Q    I just want to ask you, Mr. Cutler, as a
15  foundational question.  Are you familiar with this
16  specific form of Government Guidance on the I-9
17  process?
18    A    I don't recall seeing this form.
19    Q    Okay.
20       Have you seen similar types of employment
21  guides during your career as an INS official?
22    A    As I recall -- and again, we're talking about
23  something that took place 20 years ago.
24       I don't recall having documentation from the
25  Civil Rights Division of the Department of Justice,

Page 51

1   which is the author of this particular document.
2     Q    What is the role of the Civil Rights Division
3   of the Department of Justice and the I-9 process or
4   immigration enforcement process?
5     A    My understanding is a concern about
6   discrimination.
7     Q    Have you, during the course of your career as
8   an INS agent, or frankly, at other times, had occasion
9   to interact with the Justice Department, Civil Rights
10  Division on these issues?
11    A    No, I have not.
12    Q    Let me just ask you this question, then, over
13  on page 3.
14    A    Sure.
15    Q    Last paragraph on the page says:
16       "Congress also recognized that these
17    employer sanctions might discourage you from
18    hiring certain eligible workers if they looked
19    or sounded foreign.
20       Therefore, the law also prohibits
21    discrimination in hiring and firing on the basis
22    of citizenship status, or national origin."
23       Again, consistent with Mike Cutler's
24  understanding of the law?
25    A    Yes.

Page 52

1     Q    As it existed in 1986?
2     A    Absolutely.
3     Q    And as it exists today?
4     A    Absolutely.
5     Q    Okay.  Let me ask you one more question about
6   that, Mr. Cutler, before we put it aside.
7     A    Okay.
8     Q    What's your understanding of the word
9   discriminate in these various laws, regulations, guidances
10  that say you may not discriminate based on national
11  origin?
12       What's that mean?
13    A    That's a fair question.
14       It's about not refusing employment for someone
15  that you know is lawfully entitled to work in the
16  United States and not hiring that person because you
17  don't like his particular ethnicity or background or
18  so forth.
19       Once you've established that he's legally
20  entitled to work, then you must consider him fairly in
21  terms as any other employee or prospective employee.
22    Q    Let me ask you this:  In the course of
23  determining whether someone is authorized to work, may
24  you treat them differently based on their national
25  origin?

Page 53

1     A    Say this again, I'm sorry.
2     Q    While we're still in the course of
3   determining --
4     A    Right.
5     Q    -- whether somebody is authorized to work --
6   we're still working through that process.
7     A    Okay.
8     Q    Can I treat -- can an employer treat that
9   person differently while they are getting to the
10  decision about whether they're authorized to work or
11  not authorized to work?
12    A    Well, what I recommended to employers or
13  prospective employers is to make the determination
14  about whether or not the person is who they claim to
15  be and whether or not they're entitled to work here.
16  And be fair about what you do after that.  But the
17  issue is to make that determination first.
18    Q    In the course of making that determination,
19  you're supposed to look at the documents and determine
20  whether they're reasonably genuine; right?
21    MR. FOSTER:  Objection.
22       There's some ambiguity as to whether you're
23  asking him what he did in his experience or you're
24  asking now what the law is?
25    MR. HOPSON:  Let him answer the question.  There's

Page 54

1  nobody here to rule on the objections.
2
3
4      THE WITNESS:  I understand.
5         The bottom -- rephrase it again.  I'm sorry to
6  do this to you.
7      Q   BY MR. HOPSON:  That's okay.
8      A   I want to make sure we're clear.
9      Q   I'm only asking you about your understanding
10  of what the rules are.
11         Okay?
12      A   Okay.
13      Q   Is it your understanding of the rules that the
14  employer is supposed to make the determination whether
15  somebody is authorized in the first instance by
16  determining if the documents are reasonably genuine and
17  relate to the person that presented them?
18      A   As long as you're convinced that they were
19  properly issued and relate to the person, yes.
20      Q   In the course of being convinced, as you just
21  stated, that the documents relate to the person, are
22  you saying that you can speak -- treat native English
23  speakers different from nonnative English speakers?
24      A   That's not what I'm saying.
25         What I'm saying is:  You look at the totality,

Page 55

1  the documentation, where the person claims to have been
2  born, did the person claim to be naturalized.  You're
3  looking at an application, not just paper.
4         The job interview process is a process that
5  encompasses a number of tasks, and in that context, you
6  then make a determination.
7      Q   I hear your answer, but I think your answer to
8  my question is:  Yes, you do treat people differently
9  if they're native English speakers and if they're not
10  native English speakers?
11      A   That's one of the components in terms of
12  determining if the person is who they claim they are.
13  One of the components.
14      Q   So your answer is "yes," you can treat native
15  English speakers differently from nonnative English
16  speakers -- in the context of determining whether the
17  documents relate to them?
18      MR. FOSTER:  Objection -- you're misstating his
19  testimony.
20      Q   BY MR. HOPSON:  Go ahead.
21      A   It's not about nonEnglish -- not native -- it's
22  a matter of language proficiency, not about whether
23  it's native -- in other words, it doesn't matter if a
24  person has an accent, which is what I take you're asking me.
25         And that the answer to that is "no."  You can't take

Page 56

1  an accent into account.
2      Q   You say you can take English proficiency into
3  account --
4      A   Proficiency into account.
5      Q   Okay.  So your view of the rules is that in
6  determining whether the document relates to the person
7  who tendered it --
8      A   Uh-huh.
9      Q   -- you can take a person's English proficiency
10  into account.
11         Is that a fair statement?
12      A   You may.
13      Q   When you answer my question by saying "you
14  may," are you meaning to say you don't have to?
15      A   Again, in the totality, I'll go back to my
16  prior example.
17         If the person is claiming to be a naturalized
18  citizen, to cite an example, and is unable to converse
19  in the English language, it would certainly call into
20  question if the person is really naturalized because
21  you're required to demonstrate English proficiency as a
22  statutory requirement for naturalization.
23         So in that case, if someone says "I'm
24  naturalized," yet he's unable to utter a coherent
25  sentence, you would have to be concerned as to whether or

Page 57

1  not the person is who he claims to be.
2      Q   So one example of the employer's right to take
3  English proficiency into account would be examining the
4  documents of someone who claims to be a naturalized
5  citizen?
6      A   Correct.
7      Q   And it's your view that taking English
8  proficiency into account in the circumstances you just
9  described would not violate the anti-discrimination
10  provisions of the law?
11      A   Correct.
12      Q   And you hold that position despite the fact
13  that the law states you should not treat people
14  differently because of, "language"?
15      A   That's correct.
16         Because again, the documents need to relate to
17  the person.  And knowing what the law requires for
18  naturalization, that would be a factor that would
19  mitigate against believing the person is who he claims
20  to be.
21      Q   So we're back to where we started.
22      A   Okay.
23      Q   When you and I look at various provisions that
24  say don't discriminate against language --
25      A   Correct.

Page 58

1    Q   -- it's your view that that does not prohibit you
2  from treating people differently because of language as
3  long as it relates to figuring out whether the
4  documents are correct or phony?
5    A   That's correct.
6    MR. FOSTER: I want to just make my objection to the
7  whole line of questioning here about the law which
8  Mr. Hopson is talking about that you haven't introduced
9  the text of the anti-discrimination law itself.
10       You're referring to old handbooks.
11   MR. HOPSON: Okay. Enough, enough. It's a
12  speaking objection. That's enough.
13   Q   Is your answer "that's correct"?
14   A   That's correct.
15   Q   Thank you.
16       Let me ask you another question about the same
17  issue.
18       What you just described to me about the ability
19  of an employer to treat people differently, based on
20  language, would that also apply to the employer's
21  ability to treat people differently based on the way
22  they look?
23   A   No.
24   Q   How about their ethnicity?
25   A   No.

Page 59

1    Q   How about their age?
2    A   No.
3    Q   Race?
4    A   No.
5    Q   Let's pick up Exhibit 5.
6    MR. HOPSON: I'm getting the signal that our time
7  is winding down. So let's go ahead and take a
8  five-minute break.
9    THE WITNESS: Okay. I'll grab some more coffee.
10   THE VIDEOGRAPHER: Going off the record. The
11  time now is 9:36 A.M. This is the end of videotape
12  No. 1.
13       (A recess was taken.)
14   THE VIDEOGRAPHER: We're back on the record. Time
15  now is 9:51 A.M. This is the beginning of videotape
16  No. 2.
17   Q   BY MR. HOPSON: We were having an interesting
18  discussion before we took the break to the extent to
19  which it is your position that you can, in certain
20  circumstances, treat applicants for employment
21  differently because of language.
22       Now, I'm going to try to restate your position
23  here.
24   A   Okay.
25   Q   And I want you to refine it or agree or

Page 60

1  disagree.
2        As I understand what you were saying, you were
3  saying it is permissible to treat people differently
4  based on their English language proficiency in certain
5  circumstances?
6    A   Correct.
7    Q   And as I further understand you, one of the
8  circumstances you described for me would be a person
9  who claims to be a naturalized U.S. citizen but who
10  lacks the certain degree of English proficiency.
11       Is that fair?
12   A   That's fair.
13   Q   At what point in the hiring process is an
14  employer allowed to ask the employee or prospective
15  employee if they are a naturalized citizen?
16   A   When they're looking at the I-9 and the
17  supporting documents, any question that the documents
18  reasonably raise can become the focus of the
19  conversation.
20   Q   Let me ask that with a hypothetical. Maybe we
21  can refine it a little bit.
22       If an individual comes to me as an employer and
23  presents to me a driver's license and a Social Security
24  card that reasonably appear to be genuine on their
25  face --

Page 61

1    A   Uh-huh.
2    Q   -- is it your view that the employer can ask
3  that employee "are you a naturalized citizen"?
4    A   He can ask if the person is entitled to work in
5  the United States and on what basis.
6    Q   Is it not the case, Mr. Cutler, that by
7  presenting the driver's license and the Social Security
8  card, that employee has already answered the question
9  about their authorization to work in the United States?
10   A   Not necessarily. We -- the question is: Are
11  the documents genuine, were they properly issued to
12  him.
13       Again, we're talking about an interview, not
14  just looking at paper. There's a warm body in front of
15  you and it's important that we define that the
16  documents, number one, relate; and number two, they're
17  legitimate and genuine and the person is who he
18  purports to be.
19   Q   Okay. So just to make sure I've got this, so I
20  understand it, your position is: If in a given
21  situation an employer can have somebody tender a Social
22  Security card and a driver's license, and based upon
23  that individual prospective employee's command of the
24  English language, the employer can start asking
25  additional questions.

Page 62

1        Is that your position?
2     A   Yes.
3     Q   Okay.  I want you to pick up and look at
4  Exhibit No. 4.  The Handbook for Employers.
5     A   (Witness complies.)
6     Q   Just looking at the front page for a minute.
7     A   Okay.
8     Q   You'll agree with me that regardless of the
9  date of this document, it's from the U.S. Department of
10 Justice Immigration and Naturalization Service;
11 correct?
12    A   That's correct.
13    Q   And you've seen similar, if not identical,
14 Handbooks for Employers; is that correct?
15    A   Correct.
16    Q   And would you agree with me that this appears
17 to be a relatively authoritative source of information
18 about the I-9 process and the immigration rules?
19    A   Yes.
20    Q   I would like to ask you to turn to page 18,
21 please.
22    A   (Witness complies.)
23        Okay.
24    Q   I want to draw your attention to the -- again,
25 to the bottom of the answer to question No. 40, which

Page 63

1  says, and I quote:
2        "You should not discharge present
3     employees, refuse to hire new employees
4     or otherwise discriminate on the basis of
5     foreign appearance, accent, language or
6     name."
7        First, I correctly read that; right?
8     A   Yes.
9     Q   And you'll agree with me that that's an
10 authoritative statement of the rules?
11    A   As of 1991.
12    Q   Is -- do you have any basis to believe that the
13 rules, as of 1991, are any different from the rules
14 that applied during the period here?
15    A   I believe there's been clarification as to the
16 language issue since then.
17    Q   Where is that clarification, Mr. Cutler?
18    A   I believe there was a change in law going back
19 to 1996.
20    Q   Was it a change in statute?
21    A   I don't recall if it was statute or by
22 regulation.
23        But what I do know and what I did teach back
24 when I was back doing my job is that, again, when you
25 conduct the interview, because employers always say to

Page 64

1  me, hypothetically, I was sitting there, it was one of
2  those rare times we're allowed to have a cup of coffee
3  with an employer.
4        We'd sit there and talk and they'd say, well,
5  Mr. Cutler, you know, what do we do about this and what
6  do we do about that.
7        One of the issues that came up is:  How do I
8  know if this guy is legit?
9        I said:  Well, look for things that don't match.  If
10 you've got a guy that has a driver's license that says
11 he's been here for five years, eight years, ten years
12 and he can't speak English, you may well have an
13 imposter.  You may well have something going on that
14 needs to be clarified.
15        And I said:  In good faith, you should then at that
16 point, if suspicion is created in your mind, then you
17 need to go further.
18        I said because if someone is here for that length of
19 time, in my experience -- and I've been doing this job
20 for many years -- those folks are suspect of being
21 imposters or otherwise lying about who they are, when
22 they've been here and so forth.
23    Q   I want you to hold in mind the question about
24 whether the law changed.  I want to come back to that.
25        I want to focus on the example you gave.

Page 65

1     A   Okay.
2     Q   If I can paraphrase correctly what you told
3  employers is:  Look, if in tendering their documents,
4  filling out the I-9 form --
5     A   Right.
6     Q   -- something creates a suspicion --
7     A   Right.
8     Q   -- you're allowed to follow up on that
9  suspicion; right?
10    A   Yes.
11    Q   Following up on something that gives you notice
12 that something is not right here --
13    A   Correct.
14    Q   -- is different from interrogating somebody or
15 treating them differently based on language --
16    A   Absolutely.
17    Q   -- correct?
18    A   Absolutely.
19    Q   So in my hypothetical, if the person tenders
20 their driver's license and their Social Security
21 card --
22    A   Right.
23    Q   -- and the documents on their face appear to be
24 genuine --
25    A   Uh-huh.

Page 66

1    Q  -- you would agree with me that a lack of
2  proficiency in English, standing alone, is not a reason
3  to treat that person differently; right?
4    A   What do you mean by treat the person
5  differently?
6    Q   Could you, in that circumstance, demand to see
7  their green card?
8    A   You would want to know prior working history,
9  that sort of thing.  Some way of explaining in your own
10  mind why the person is unable to speak the language if
11  they've been here for a good number of years.
12       Because the likelihood is if they're in
13  the work force, they would have acquired that English
14  proficiency.  My experience has been just that.
15    Q   Is the answer to the question, no, you couldn't
16  demand the green card in those circumstances?
17    A   You could ask to see either another document,
18  if there's a reasonable suspicion that something is
19  amiss.  You could ask the person to explain it.
20       It's certainly a reasonable question to say to
21  someone, "Your driver's license says you've been here
22  for ten years.  You've been here for 15 years; so why
23  is it you don't speak English?"
24    Q   What if the driver's license said you've been
25  here a year?  Is that a good reason to ask the

Page 67

1  additional questions?
2    A   It would depend on who the person is -- again,
3  when you're doing an interview, there's no
4  hard-and-fast rules.
5       It's a matter of does the person raise
6  suspicions because, in the totality, something appears
7  to be amiss.
8    Q   Okay.  Back to our question about what the law is.
9       I understand you're telling me that you don't
10  think that this 1991 Employee Handbook is entirely
11  accurate because the law has changed; is that right?
12    A   The issue of language has changed.  At least to
13  the point where you can use language as a determining
14  factor if someone is unable to converse or demonstrate
15  proficiency where it raises suspicion.
16    Q   Okay.
17       The question I have for you is:  Where does
18  that come from?  That statement you just made that you
19  can now distinguish or discriminate against language.
20       Does it come from a statute, law, regulation,
21  guidance?  Where do you get that?
22    MR. FOSTER:  Objection.
23       You misstated his testimony.
24    THE WITNESS:  My understanding is that the way that
25  the instruction is being done -- and I don't recall if

Page 68

1  it's law or regulation -- but I know that there has
2  been a change where language can be a factor if it
3  calls suspicion to the identity of the person in terms
4  of whether or not the documents relate to him or
5  whether or not he's an imposter.
6    Q   So sitting here today, is it fair to say that
7  you believe you've seen some official U.S. government
8  guidance that says what you just articulated?
9    A   I believe I have.  I know I've heard it
10  anecdotally from agents currently on the job when we've
11  discussed issues and so forth.
12    Q   I want you to put aside you heard it
13  anecdotally.
14       Okay?
15    A   Okay.
16    Q   Put that aside.
17       Can you recall, sitting here today, any
18  statute, regulation, official U.S. government guidance
19  that supports your position that language can be a
20  factor in how you treat a job applicant?
21    A   I know I've seen it.  I don't recall where.
22    Q   Do you, in your current work, whether it's
23  consulting or expert work, keep up with the various
24  guidances that are published occasionally as in the
25  INS?

Page 69

1    A   As much as I'm able, it's voluminous.  It come
2  at you fast and furious.
3    Q   Have you looked at the INS website lately?
4    A   On occasion, I have, yes.
5    Q   Have you looked at any Office of Special
6  Counsel in the Civil Rights Division's website lately?
7    A   Not that I recall.
8    Q   The ability or right, as you put it, of an
9  employer in certain circumstances to consider English
10  language proficiency, does that only apply to
11  naturalized citizens and people who claim to be
12  naturalized citizens?  Or does that apply more broadly?
13    A   In my judgment, it applies more broadly if, in
14  the totality, the inability of an individual to
15  demonstrate English proficiency calls into question his
16  truthfulness as to who is he -- who he is, whether his
17  documents truly relate to him and so forth.
18    Q   Let's look at Exhibit No. 8 please.
19    A   Do I have that one?  Here it is.  Sorry about
20  that.  I've got it.
21    Q   It looks like this.
22    A   Yes.  I've got it.  It's from the Civil Rights
23  Division.
24    Q   Right.
25       Again, this is a Department of Justice

Page 70

1   publication; correct?
2      A.   Correct.
3      Q.   And you don't have any basis, sitting here
4   today, to believe that this is not an authoritative or
5   accurate statement of what the rules are as they apply
6   to these employment issues we're talking about; right?
7      A.   There's no date on this; so I'm not certain as
8   to whether there is a superseding document or not.
9      Q.   Okay.
10        Well, given that, let's look at page 4.
11     A.   (Witness complies.)
12        Okay.
13     Q.   And I want to read to you and ask you a couple
14   questions about the left-hand bottom paragraph.
15        "You must treat all job applicants and
16   employees equally whether they are U.S.
17   citizens or noncitizens."
18     A.   Correct.
19     Q.   Have I read it correctly so far?
20     A.   Yes.
21     Q.   I'll continue reading.
22        "This means you may not discriminate in
23   hiring, firing, recruiting or referring for
24   a fee, nor are you permitted to retaliate
25   against an employee who has filed a

Page 71

1   discrimination charge or participated in
2   an investigation."
3        Do you dispute that what I just read in those
4   two sentences is an accurate statement of the rules
5   as you understand them and applied them in this case?
6      A.   No, I don't.
7      Q.   Can you show me anything from any source
8   whatsoever that's a U.S. government publication,
9   statute, rule or regulation that supports your
10   contention that this government guidance I've shown you
11   is inaccurate?
12     A.   No.  This guidance is accurate.
13        What they're saying is that if a person comes
14   to you and you believe that the person is either a
15   resident alien, United States citizen, or otherwise
16   employable in the United States by law, then you should
17   not take the immigration status into account.
18        In other words, a resident alien should be
19   treated equal to a U.S. citizen, for example, if you
20   believe that the person is a U.S. citizen and if you
21   believe the person is a resident alien, you hire the
22   best qualified person for the job.
23        But you must first believe that the documents
24   relate to the person, that the person is legally
25   present in the United States, and legally entitled to

Page 72

1   work in the United States.
2        Putting this into that context, this is
3   accurate.  This is what I believe and this is what I
4   taught.
5      Q.   But if we take the clean clear statement that
6   you may not treat a job applicant differently based on
7   whether they are U.S. citizens or noncitizens, you
8   disagree with that?
9      A.   If it was a noncitizen who is not eligible to
10   work in the United States, if you have someone claiming
11   to be a U.S. citizen and you don't believe they're a
12   U.S. citizen, then you shouldn't be hiring them.
13     Q.   So your view is again, back to where we started
14   this, if somebody claims to be a naturalized citizen?
15     A.   Right.
16     Q.   And presents a Social Security card?
17     A.   Correct.
18     Q.   And presents a driver's license?
19     A.   Correct.
20     Q.   And those documents look perfectly valid on
21   their face?
22     A.   Right.
23     Q.   Your view is that you could treat someone who
24   is proficient in English different from someone who's
25   not proficient; correct?

Page 73

1      A.   If the language proficiency goes to the
2   credibility of the person, inconsistency with what the
3   person should be able to do.
4      Q.   So the answer to the question is "yes"?
5      A.   The answer to the question is it depends on the
6   circumstances.
7      Q.   Okay.  And there are circumstances where you can
8   treat people differently based upon their degree of English
9   language proficiency?
10     A.   Yes.
11     Q.   In the circumstance I described to you in which
12   an individual sitting in front of you tendering a
13   reasonably genuine Social Security card and driver's
14   license, is it your view you can then interrogate that
15   person as to how they came to be a U.S. citizen based
16   on a lack of proficiency in English?
17     A.   I don't like the word interrogate, but you can
18   certainly question it.
19     Q.   So the answer is "yes."  You can question them
20   about how they came to be a U.S. citizen?
21     A.   If the person's language proficiency or lack
22   thereof arouses reasonable suspicion, absolutely.
23     Q.   Let me go back and ask you this:  When I showed
24   you Exhibit No. 4 and we talked about it a little bit,
25   you said that you think that this may not be

Page 74

1  current.
2      Exhibit No. 4 is the Handbook for Employers.
3      A   I got you.
4      Q   Is there a new iteration of the Handbook for
5  Employees if you know?
6      A   I do not know.
7      Q   Do you know whether the law as relevant to
8  the provisions we looked at on page 18 has changed
9  since 1991?
10     A   Which provision are we talking about?
11     Q   The provision we looked at on page 18 that says
12  you should not discharge present employees or refuse to
13  hire new employees or otherwise discriminate on the
14  basis of foreign appearance, accent, language or name.
15     You said to me -- I thought -- that you did not
16  believe that was an entirely current statement of law?
17     A   The issue of language is the issue.
18     Whether or not the person's ability or lack of
19  ability in language calls into question the
20  truthfulness of the applicant and whether or not, in
21  fact, he relates to the documents that he offers.
22     If there is reason to believe that there's
23  something amiss, then you are entitled to go -- in
24  fact, you should go beyond that.
25     Q   I'm with you on that, Mr. Cutler.

Page 75

1      But the question pending now is:  Does the 1991
2  handbook and the statement contained therein heed current
3  law?
4      A   I'm not entirely certain.
5      But I do know by practice that language is a
6  component if it calls into question whether or not the
7  documents relate.
8      Q   Are you an expert in anything other than
9  immigration law?
10     A   No.
11     Q   And you're sitting here today as a tendered
12  expert in immigration law and you don't even know
13  what's the most current guidance for employers; is that
14  your testimony?
15     MR. FOSTER:  Objection to the form of the question.
16     THE WITNESS:  Even with this law, as we were
17  instructing back in 1986, the way that we were trained
18  to explain it to employers is to use the interview as
19  an opportunity to determine if the documents relate to
20  the person.
21     If you don't believe the documents relate, then
22  you should not be hiring the person unless you can be
23  satisfied.
24     This is more than looking at a driver's license
25  and a Social Security card.  You're doing an interview

Page 76

1  and you're trying to make certain that the person is
2  who they claim they are and that they're therefore
3  entitled to work in the United States.
4      Q   BY MR. HOPSON:  You testified earlier that you
5  had seen something that proved to you or that you
6  recalled something that proved to you that the law had
7  changed since --
8      A   Law or regulation.  I know there was a point
9  made that language can be used as a determining
10  factor in an employment situation.
11     Q   And you're relying on that change in the law,
12  to some extent, in connection with your opinion; right?
13     A   I'm also going back to what we were instructing
14  employers in 1986 --
15     Q   Can I get an answer to my question?
16     A   Not entirely, no.  It goes back to the way that
17  we were instructing employers.
18     We told the employers that if you believe the
19  documents don't relate to the applicant, then you may
20  go further because there are imposters out there.
21  There are phony documents and so forth.
22     Q   I'm with you on that point.
23     A   So we were doing this as far back as '86.
24     Q   I've heard your description of why you think
25  that an employer can discriminate or take into account

Page 77

1  English language proficiency.
2      A   Not discriminate, take into account.  The goal
3  is not to discriminate.
4      Q   If you treat two people differently because of
5  their English language proficiency, at some level you're
6  discriminating between them, aren't you, Mr. Cutler?
7      A   I don't believe so.
8      Q   We'll use your language and say Mike Cutler
9  believes, sitting in this room under oath today, that
10  you can treat people differently based on their English
11  language proficiency.
12     And I understand the reason that you have
13  articulated --
14     A   As long as you understand the caveat that I
15  attached to that.
16     Q   And the caveat is one more time?
17     A   That we want to make certain that the documents
18  relate to the person and that the person is being
19  truthful about his identity about who he is.
20     Q   Fair enough.
21     Now, let's go to what I want to talk about,
22  which is your statement that something has changed
23  since this 1991 handbook.
24     And specifically, the question to you, sir, is:
25  Are you telling me, sitting in this deposition, that

Page 78

1  you recall some change in law, regulation, or guidance
2  that has further elaborated on the extent to which
3  employers may take language skills into account?
4      A   Yes.
5      MR. FOSTER:  Objection.
6      Asked and answered several times.
7      THE WITNESS:  Yes.
8      Q   BY MR. HOPSON:  Can you be any more specific or
9  give me any more guidance as to whether that is a
10  change in statute, regulation, guidance, website or
11  something you heard from some other INS agent?
12      A   I don't recall.
13      Q   When you articulate your opinions, and answer
14  my questions, are you taking that change that you
15  believe you saw in the guidance into account in
16  answering those questions?
17      A   No.
18      Q   So as far as you're concerned, the 1991
19  handbook is still the current statement of the INS position
20  about how employers should go about filling out their I-9
21  forms and complying with the obligations under this
22  law?
23      A   That's not -- let's go back.  I don't know if
24  this is the current.
25      What I'm saying to you specifically about the

Page 79

1  language component -- what I'm saying about the
2  language component is that even back in 1986, we were
3  instructing employers that language can be looked at if
4  it arouses suspicion.
5      That's all that I'm referring to.  I'm not
6  going back to this entire document and saying that I
7  know whether or not there have been other changes.  I'm
8  focused narrowly on the language issue.
9      Q   So back again in Exhibit 4.
10      When Exhibit 4 says you should not,
11  "refuse to hire a new employee or otherwise discriminate
12  on the basis of language", you're to some degree taking
13  exception with that as being an overbroad statement of
14  the rule?
15      A   Yes.
16      (Defendants' Exhibit No. 7 was marked for
17      identification and is bound separately.)
18      Q   BY MR. HOPSON:  Let's -- Exhibit 7 has been
19  marked.  I want to show you Exhibit 7.
20      A   Okay.
21      Q   Ask you to take a look at that.
22      A   (Witness complies.)
23      Q   The only thing I want to ask you about this,
24  Mr. Cutler, is to direct your attention to the second
25  paragraph of this printout from the website.

Page 80

1      And can you tell me whose website this is?
2      A   This comes from USCIS, United States
3  Citizenship and Immigration Services.
4      Q   Between you and me, can we continue to refer to
5  them as the INS for purposes of this deposition?
6      A   Well, they're a component of what was the INS.
7      Q   Okay.
8      A   They've split it into three agencies.
9      Q   And they split it into three agencies, as I
10  understand it, when the reorganization that created the
11  Homeland Security Department came about is that right --
12      A   They were under DHS when they were removed from
13  the Justice Department to DHS.
14      Q   Okay.
15      I want to direct your attention to the sentence
16  that says:  The current version of form I-9 and the
17  Handbook for Employers, M274 are dated November 21,
18  1991.
19      Do you see that?
20      A   Hold on one second.  Yes.
21      Q   And do you see down at the bottom right-hand
22  corner of the page that this website page was printed
23  out on September 6th, 2007?
24      A   Yes.
25      Q   Does that refresh your recollection that

Page 81

1  Exhibit 4, the Handbook for Employers M274, is, in
2  fact, the current version of the INS guidance on the
3  issues we're talking about?
4      A   Yes.  That would seem to be consistent with
5  that.  Yes.
6      Q   Do you want to change your testimony that there
7  has been some updating, revision, or modification of
8  guidance contained in Exhibit 4?
9      A   Procedurally, as I said, this goes back to '86.
10      The point that I made is that language is a
11  component that can be considered in the totality to
12  determine the authenticity of documents and whether or
13  not the job applicant really relates to those
14  documents.
15      Q   How do you know that is the question,
16  Mr. Cutler?  Who told you that?
17      A   We were instructed that way by our own
18  instructors when we went out into the field to do the
19  training program because that was one of the questions
20  we raised.
21      Q   Okay.  So is this testimony on this point based
22  upon what you were instructed by your instructors?
23      A   Yes, because this question was of concern to all
24  of us.
25      We have people that are proffering phony

Page 82

1    documents.  How does the employer -- is it simply a
2    matter of getting a driver's license and Social
3    Security card?
4         Because if that were the case, everybody in the
5    country could work.
6    Q    So if -- if your instructors were wrong in how
7    they instructed you.  Then you're still applying that
8    rule incorrectly today; right?
9    A    I don't believe they were wrong.  As an agent,
10   that's what we used to do -- we used --
11   Q    You don't believe they were wrong is your
12   testimony, right, sir?
13   MR. FOSTER:  Objection.
14        You cut him off, Mr. Hopson.  He wasn't
15   finished.
16   Q    BY MR. HOPSON:  Do you want to talk some more,
17   Mr. Cutler?
18   A    All I want to say is that we were concerned as
19   agents that people would be imposters.
20        We often found phony documents.  We often found
21   that people made false claims to U.S. citizenship,
22   false claims to resident alien status, and we raised
23   those issues with our instructors.
24        And we are told that employers should be
25   looking at the interview as the opportunity to

Page 83

1    determine the authenticity of the documents to make
2    sure that they truly relate to the job applicant.
3         If language is a component of that.
4    Q    And that's based on what you were instructed
5    when you went out to instruct employees --
6    A    Yes, employers.
7    Q    -- employers back in the mid-80's; is that
8    correct?
9    A    That's correct.
10   Q    The words coming out of your mouth in that last
11   answer are not based on you seeing some official U.S.
12   guidance that's different from what we are looking at
13   today; right?
14   A    No.  My understanding is there is guidance
15   along those lines but, no, that's not why I'm saying
16   this.
17        I'm telling you this is consistent with what we
18   were instructing way back then because we knew we had a
19   problem with imposters.
20   Q    Well, this English language issue seems to be
21   an important part of your opinion; is that fair,
22   Mr. Cutler?
23   A    Yes.
24   Q    And when you were carefully preparing your
25   opinion in this case, did you go look for the guidance

Page 84

1    that you just referenced?
2    A    No.  Because again, in my own experience, my
3    own knowledge of what our practice was going back to
4    1986, what we looked at were issues that would call
5    into question whether or not the documents relate to
6    the applicant seeking employment.
7    Q    So you stuck with your understanding from 1986
8    and didn't look for any further guidance or additional
9    guidance --
10   A    That's correct.  That's correct.
11   Q    Did you do any research in the kind of
12   handbooks, rules, regulations we're looking at today
13   when you were preparing your opinions?
14   A    Well, I was familiar with what the requirements
15   were back when I was doing the job.  And basically, we
16   were working with that same set of rules that the idea
17   is to make certain, first and foremost, that the
18   documents relate to the person proffering them.
19   Q    Let's go forward.
20        I want to ask you a few questions about Basic
21   Pilot.  You know what the Basic Pilot is; right --
22   Q    -- Mr. Cutler?
23   A    Yes. Absolutely.
24   Q    You consider yourself an expert on the Basic
25   Pilot program?

Page 85

1    A    Yes.
2    Q    You testified as an expert on the Basic Pilot
3    program in the City of Hazelton case; right?
4    A    That's correct.
5    Q    Is the Basic Pilot program today mandatory for
6    employers in the United States?
7    A    It's about to become.  Right now, my
8    understanding is it is not.
9    Q    So during the time relevant to this case, it's
10   not mandatory.
11        Fair statement?
12   A    Fair statement.
13   Q    Do you know that Tyson participates in the
14   Basic Pilot program?
15   A    Yes, I do.
16   Q    Do you know that Tyson has done so since 1998?
17   A    Yes, I do.
18   Q    What percentage of employers in the United
19   States participate in the Basic Pilot program?
20   A    Right now, I don't have the number, but I know
21   that they're adding new ones on an almost daily basis.
22   And the operation up in Vermont has been adding more
23   personnel and more computers to try to keep pace with
24   it.
25   Q    Less than 1 percent of employers participate in

Page 86

1     the Basic Pilot.
2         Is that a fair statement?
3     A    I don't know what the percentage is right now.
4     Q    If I told you that sources indicate that 2/10
5     of 1 percent of employers currently participate in
6     Basic Pilot, would that be consistent with your
7     knowledge?
8     A    I don't know what the percentage is.
9     Q    Did you say anything about Basic Pilot in the
10    two reports that you prepared in this case today?
11    A    They were prepared a number of months ago.  I
12    would have to take a look at it.
13    Q    If I told you you didn't mention Basic Pilot,
14    would you accept my representation in that regard?
15    A    Yes.  Sure.
16    Q    I guess the better question is:  To what extent
17    is Tyson's participation in Basic Pilot relevant to
18    your opinion that 91 of the individual files you have
19    reviewed appear to be unauthorized?
20    A    Say this again.
21    Q    Is Basic Pilot relevant to your review of the
22    497 files?
23    A    In what way?
24    Q    In any way.
25    A    I don't understand the question.

Page 87

1     Q    Okay.
2         Did you take into effect -- I'm sorry -- did
3     you take into account the fact that all 497 of the
4     employees whose files you've reviewed passed Basic Pilot?
5     A    Only to the extent that I know the numbers were
6     run.  But Basic Pilot isn't definitive in and of
7     itself.
8     Q    Is Basic Pilot helpful?
9     A    Can be helpful.  It can be a tool.
10    Q    I didn't say this exactly right.  Does Basic
11    Pilot work well?  Let's put it that way.
12    A    It depends on how the employer uses Basic
13    Pilot.
14    Q    Tell me what you mean when you say it depends
15    on how the employer uses Basic Pilot.
16    A    Basic Pilot does not provide any guidance to
17    the employer as to the authenticity of documents.  Only
18    that names and numbers match.
19        So it still falls upon the employer to make
20    certain that the person is who he claims to be.  That
21    the documents truly relate to the prospective employee.
22    So as I said, it's a tool that can be helpful.
23        It depends on how it's used, how it's
24    administered by the employer.
25    Q    Fair enough.

Page 88

1         And to kind of put it in a vernacular sense, if an
2     illegal alien goes out and gets good phony documents
3     that contain a real identity, those will get through
4     Basic Pilot.
5     A    Identity theft will not be stopped.
6     Q    There's lots of phony documents out on the
7     street and there have been for at least a decade?
8     A    Absolutely.  More than a decade.
9     Q    And is it your view, as an expert in this
10    field, that such documents are readily available to
11    illegal aliens in this country?
12    A    Yes.
13    Q    And is it also your view, as an expert, that
14    quite a few of those illegal documents would pass Basic
15    Pilot?
16    A    The information would pass.
17        But again, the Basic Pilot does not go to the
18    authenticity of the document.  All that they do is run
19    names and numbers.
20    Q    Right.
21    A    So it doesn't even address the issue of the
22    document itself.  If you wrote a name and number on a
23    piece of cardboard and ran the information, it would
24    get through.
25    Q    All Basic Pilot tells you is that there is a

Page 89

1     certain person, with a particular name, date of birth
2     and Social Security number?
3     A    And that's why it is only a tool.
4     Q    Right.  And it doesn't tell you that that's the
5     person who is sitting there applying for employment?
6     A    There's no biometric; that's correct.
7     Q    But given its limitations, if you were
8     counseling a company on trying to comply with the
9     immigration laws, would you tell them to participate in
10    Basic Pilot or not participate in Basic Pilot?
11    A    Certainly, I would tell them to participate.
12    Q    And given what it does, given its limitations
13    as you have described, it nevertheless works extremely
14    well?
15    A    Can work well.  Depending on how it is
16    administered by the company that uses it.  That's the
17    weak link in the chain.
18    Q    Is there a better system than Basic Pilot?
19    A    They're working on it.  I could certainly
20    devise one, but it doesn't exist right now.
21    Q    Okay.
22        But putting apart what the Cutler system might
23    look like, if you ran the country --
24    A    Okay.
25    Q    -- as we sit here today, there's no better

Page 90

1  system than Basic Pilot?
2      A   Right.  Right now.
3      Q   Do you speak any languages other than English,
4  Mr. Cutler?
5      A   I speak a little bit of Spanish.
6      Q   Okay.
7      A   A little Yiddish.
8      Q   Conversational Yiddish?
9      A   I used to.  It's gotten weaker since my parents
10  passed away, but yes.
11     Q   How about your Spanish?  How good is your
12  Spanish?
13     A   That's a little bit rusty but I use that as a tool,
14  as an agent.
15     Q   You could carry on a conversation on the street
16  in Spanish is basically it?
17     A   Yes.  I'm not as good as I used to be, but I could.
18     Q   You couldn't read "Don Quixote" in Spanish?
19     A   Absolutely not.  No way.
20     Q   You couldn't fill out a mortgage application in
21  Spanish?
22     A   Not even close.
23     Q   How about an employment application in Spanish?
24  Have you filled out an employment application in
25  Spanish?

Page 91

1      A   Yes.
2          (Defendants' Exhibit No. 12 was marked for
3          identification and is bound separately.)
4      Q   BY MR. HOPSON:  Let's pick up Exhibit 12, and
5  get back into the meat of your testimony here.
6      A   Bear with me one second.  And I'll catch up
7  with you.
8      Q   I'm still looking for the right place.
9      A   Thank you.  I appreciate the help.  Okay.  I
10  got it.
11     Q   I want to just get some terminology down first,
12  Mr. Cutler, so just bear with me a second.
13         If you turn to the fourth page, which would be
14  this one.
15     A   Okay.  Got you.
16     Q   It's the page that says "Statutory Authority"
17  down at the bottom?
18     A   Right.
19         You dropped your mike.
20     Q   Okay.
21         I want to focus your attention, sir, on the
22  second paragraph, up from the bottom.
23     A   "In my experience."
24     Q   "In my experience" exactly.  You say -- and
25  again, I'm going to paraphrase because I want to get

Page 92

1  some terminology down here.
2          You say someone who has been a resident for
3  several years generally will have acquired a minimal
4  understanding of the English language.
5          Fair enough?
6      A   Fair enough.
7      Q   Now, you also say, several lines down, "some
8  familiarity with the English language."  You're not
9  drawing a distinction between the words some
10  familiarity and minimal understanding; right?
11     A   Right.  I'm using that essentially
12  interchangeably.
13     Q   Okay.  And if you turn it over to the last page
14  where it says conclusion down at the bottom, you use the
15  following terminology.
16     A   Okay.
17     Q   And again, the terminology is that someone who
18  has been in the country for some period of time should
19  have the ability to, quote, converse in a basic
20  conversation with the English language.
21     A   I'm looking at my conclusion.  "Therefore."  Is
22  that the word you're looking at?
23     Q   Yes, sir.
24     A   Okay.
25     Q   If you go down to the second line up --

Page 93

1      A   Right.
2      Q   -- the terminology that you used there is
3  converse in a basic conversation in the English
4  language.
5      A   Right.
6      Q   And my question for you is:  You're not again
7  attempted to draw some fine distinction between that
8  terminology as opposed to minimal understanding or some
9  familiarity with English?
10     A   That's correct.
11     Q   They all -- in what you're communicating to me,
12  they all mean basically the same things; right?
13     A   Right.
14     Q   They mean basic conversational English skills?
15     A   You approach someone and you say what's your name,
16  where do you live whatever, they would be able to answer
17  that sort of thing.
18     Q   Okay.
19         Is it okay, going forward, we just refer to it
20  as basic conversational skills or --
21     A   If it works for you, it works for me.
22     Q   I don't want to use --
23     A   No.  You're not putting words in my mouth.  No.
24     Q   I just don't want to use all three terms every
25  time I phrase the question because I'll never get through

Page 94

1  it. Okay?
2      A  That's fine.
3      Q  It's to some degree -- the explanation you are
4  giving us in Exhibit 2, which is your March 8 expert
5  report, relates to what we've been talking about.
6          And specifically, it relates to drawing a line
7  in some circumstances between persons who have some
8  conversational English ability and persons who have
9  not?
10     A  Correct.
11     Q  Okay.
12         And I want to look at the conclusion paragraph.
13 I guess that's the best place to start.
14     A  Okay.
15     Q  You say:
16         "Based on your own experience, as well as
17 statutory requirements, an individual
18 who claims to be a naturalized U.S.
19 citizen, under the age of 55 and he
20 naturalized, but could not demonstrate
21 the ability to converse in a basic conversation
22 of the English language, was most likely an
23 illegal alien."
24         Is that one of your opinions in this case?
25     A  Absolutely.

Page 95

1      Q  Okay.  And that's an accurate statement of
2  your opinion?
3      A  Absolutely.
4      Q  Would I -- would the same opinion apply to
5  someone who claimed to be a natural born as opposed to
6  naturalized U.S. citizen?
7          Would you have the same opinion?
8      A  In my opinion, yes.
9      Q  Would it also apply to somebody who was a legal
10 permanent resident of the United States or claimed to
11 be a legal permanent resident of the United States?
12     A  Presuming they were here for a number of years,
13 yes.
14     Q  So basically, if I can paraphrase, what you're
15 saying in this part of your opinion is that you should
16 be suspicious of people who claim to have resided in
17 the United States for some period of time, but don't
18 have these basic conversational English skills?
19     A  Correct.
20     Q  And you applied that opinion as you were going
21 through the 497 files in this case?
22     A  Yes.
23     Q  Okay.
24     A  It was one of the factors.
25     Q  Okay.  I want to get a sense -- I realize we

Page 96

1  can't do this perfectly of how you would define basic
2  conversation skills.
3          Okay?  But whatever terminology we use --
4      A  Right.  Well, this is what I did as an agent,
5  also, even before the implementation of employer
6  sanctions.
7      Q  So tell me how --
8      A  You went into a factory and asked --  You
9  would identify yourself and say to the person, "What's
10 your name, where do you live, what country are you from,
11 what's your date of birth, how old are you?"
12         And in some cases the name -- the age that he
13 claimed didn't match his date of birth.  So right away,
14 you knew you had a problem.
15         The problem -- what you're looking at is the
16 potential to find out if the person is being on the
17 level with you.  And you're listening for language.
18         You're looking at a number of factors.  Some of
19 it can be taught.  Some of it becomes intuitive over
20 the course of time.
21         But basically, you would expect somebody to be
22 able to answer the basic questions of who are you, what
23 country were you born in, how long have you lived here,
24 what's your date of birth, how old are you, are you
25 married, are you single, how long have you worked in

Page 97

1  this company.
2          Basic stuff.  But we're not talking about
3  discussing literature, to use your Don Quixote example.
4      Q  Okay.
5          So for example, you wouldn't, in your days as
6  an agent, hand somebody the financial pages of the
7  "Wall Street Journal" --
8      A  Absolutely not.  That would be
9  counterproductive.
10     Q  You're really talking, as I understand,
11 Mr. Cutler, about kind of the basic conversational
12 ability that somebody should pick up if they've lived
13 in a country for a number of years, where that is the
14 language of the country; correct?
15     A  Absolutely.
16     Q  No different, then, if you and I went and lived
17 in Paris for a year, you would expect us to have some
18 basic conversation --
19     A  Of necessity, you'd be able to say to some
20 person "where is the bathroom" if you're in a
21 restaurant, you know.
22     Q  Or better yet, "Where can I get a cup of
23 coffee"?
24     A  Where can I get a cup of coffee, exactly.  It's
25 virtually inevitable.

Page 98

1    Q  I know that this is a hard question to ask, but
2  I want to try to narrow this a little bit.
3    A  Okay.
4    Q  You used the term in Exhibit 2, "several years"
5  and "a number of years."
6    Based on your years of experience, how long do
7  you think it takes someone to pick up the language --
8  what is several? Is it two? Is it three? Five?
9    A  If they've been here for more than a couple two
10  or three years, they are going to speak enough English
11  that at least they don't give you a blank stare when
12  you ask them their name and where they live -- you
13  know, basic stuff.
14    Q  And you would agree with me that, depending on
15  the home environment or the part of the country in
16  which people live, different immigrants develop these
17  conversational language skills at different speeds;
18  right?
19    A  Right. That's true.
20    Q  I mean, aren't there people who are born,
21  essentially, for example, in Chinatown, who live in
22  Chinatown all their life, and who develop very little
23  English language proficiency?
24    A  Most of those folks are bilingual, in my
25  experience, or they want to be.

Page 99

1    Q  How about people who are born in border towns
2  of Texas or Arizona? Are there people who are born in
3  the United States that have very little language
4  proficiency because everything they do with their
5  families is in Spanish or they speak Spanish on the jobs?
6    A  Oh, when I was down in the border area of
7  Texas, I went to Border Patrol Academy, and generally,
8  the folks that were in Brozal (phonetic) which is right on
9  the border, spoke English.
10    I didn't encounter too many folks, even if they
11  were Tex/Mexs, as they called themselves, who couldn't
12  speak English.
13    Q  So it's your opinion that no such people exist.
14  Is that it?
15    A  I've never encountered it, to be, you know,
16  flat out blunt about it. I can't recall meeting
17  anybody who was born in the United States and
18  unable to converse, at least, conversationally in the
19  English language.
20    Again, we're not speaking about literature, or as
21  you put it, about the financial times, but we are
22  talking basic conversation, I've never encountered
23  that.
24    Q  So to your -- I guess the way I should phrase
25  the question is: To your knowledge, no such people

Page 100

1  exist?
2    A  Right.
3    Q  On the I-9 form that we looked at -- and we can
4  pull it out again if you want -- let me see if I can
5  ask the question without following around here.
6    A  Sure. Let's try that.
7    Q  There is a section to be prepared by a, quote,
8  preparer or translator.
9    Do you recall that?
10    A  Yes.
11    Q  What's the difference between a preparer and a
12  translator?
13    A  Well, you can have somebody who is completely
14  illiterate in the English language, perhaps; so the
15  person can't read or write English, but you know he's in
16  manual labor, doesn't need to be able to even speak English.
17    So then somebody would do it for him. Or you
18  might have somebody whose vision is impaired and it
19  might be difficult for him, but he's answering
20  telephones, for argument's sake; so that it would
21  certainly behoove that company to have a preparer do it
22  versus a translator who has to help with the language.
23    Q  Fair enough.
24    My understanding -- tell me if I'm wrong -- is
25  you can't necessarily tell whether the person who is

Page 101

1  signing that section of the I-9 is functioning as a
2  preparer or a translator.
3    At least without looking at other documents. Is
4  that fair?
5    A  That's fair.
6    Q  And these preparers may be helping people who
7  are not -- to use your term -- completely illiterate;
8  right?
9    A  We're talking about the English language or
10  being able to read or write any language or just
11  saying illiterate? If we could define that, I could
12  maybe give you a better answer.
13    Q  That's a good point.
14    When you and I look at an I-9 form and we see
15  that a preparer signed it, assuming for a minute that
16  the person is a preparer and not a translator, we
17  can't necessarily conclude that the person doesn't read
18  or write English at all, as opposed to the person who
19  doesn't read or write English well; right?
20    A  Possibly. Or that the person might again be
21  impaired in some way.
22    Q  Right. You -- There are lots of different
23  reasons why a preparer might help somebody, who otherwise
24  speaks English, complete an I-9; right?
25    A  Possibly.

Page 102

1    Q    And do you know, based on your experience, that
2    employers have different approaches and different
3    availabilities and different ways in which they offer
4    people the right to have a preparer or a translator
5    assist them?
6    A    Well, I would imagine every company has
7    different ways of doing business as long as they arrive
8    at the same destination.
9    Q    So for example, a small company with 10
10   employees probably doesn't necessarily have translators
11   available for every language that could walk in and
12   seek employment at that place; right?
13   A    Right.
14   Q    Whereas, if you were a company with 100,000
15   employees, you might more readily make translators or
16   preparers available to your perspective employees.
17       Is that fair?
18   MR. FOSTER:  Objection.
19       Calls for speculation.
20   THE WITNESS:  I have no way of really knowing that.
21   That is something that I couldn't really answer.
22   Q    BY MR. HOPSON:  So you didn't take that into
23   account in forming your opinion in this case?
24   A    No.  I have no way of knowing how they do
25   their job or how they dealt with those issues.

Page 103

1    Q    Okay.  You did, in forming your opinion in
2    this case, look to see if one of the 497 people whose
3    files were there, you know, used a preparer or
4    translator; right?
5    A    Yes.
6    Q    And based on what you saw, you drew certain
7    inferences about the person's English language skills?
8    A    Yes.
9    Q    And you understand that individuals who work
10   for Tyson Foods do have a choice, for example, in which
11   form of employment application they used.
12       Do you understand that?
13   A    Yes.
14   Q    So you understand that a person could
15   choose, for example, to fill out an application in
16   Spanish rather than in English?
17   A    Yes.
18   Q    Did you consider, in the course of forming your
19   opinion in this case today, that somebody who did have
20   what you would consider conversational English skills
21   might, nevertheless, choose to fill out an application
22   in Spanish?
23   A    In my experience, when somebody was a resident
24   of the United States, it was a matter of personal pride
25   for them to function as best they can in the English

Page 104

1    language.
2        And I saw this almost universally as an agent.
3    Because, for them it was a matter of wanting to be part
4    of America.
5        So that when somebody was here for a length of
6    time and chose to use their native language, whether
7    it's Spanish or some other language, that would be one
8    of those things that would raise suspicions in my mind,
9    when I was out on the street as an agent.
10       Because so many people would be real proud to
11   say to me, "I'm here.  I speak the language."  That is
12   how many people would phrase it, "I speak the
13   language," meaning English.
14       Because to them, that's the language.
15   Q    I appreciate that, but let's try to get an
16   answer to the question.
17       Did you consider, in forming the opinion that
18   you're giving us under oath today, whether a person
19   could have what you would consider conversational
20   English language abilities, and nevertheless choose to
21   fill out an application in a language other than
22   English?
23   A    Yes.
24   Q    So you took that into account, that possibility
25   into account?

Page 105

1    A    Yes.
2    Q    When you were reviewing these files?
3    A    For the reason I just stated.
4    Q    And the last thing you just said makes me think
5    we're talking past each other, so I apologize for
6    asking the question again.
7    A    Sure.  Go ahead.
8    Q    When you were forming your opinion --
9    A    Right.
10   Q    -- did you consider the possibility that an
11   applicant could have basic conversational English
12   skills, but nevertheless, choose to fill out an
13   application in Spanish?
14       Did you consider that possibility into consideration?
15   A    That they chose for some unknown reason to do
16   that?  I would find that unusual.
17   Q    Okay.  So the answer is "no," you didn't take that
18   possibility into consideration?
19   A    That's correct.  It would seem unusual for me.
20   Q    Well, one of the reasons why a person might do
21   that, based on your broad experience, is that a person
22   who is a naturalized citizen with conversational English
23   skills might still feel more comfortable filling out a
24   court document in their native language.
25       Don't you agree with that?

Page 106

1    A   The form is a pretty straightforward form.
2  And again, my experience has been that when people have
3  that language ability, they very often want to
4  demonstrate it. It really comes down to a matter of
5  pride.
6        I've had people get insulted if I try to
7  speak with them in their native language.
8    Q   So the answer is no?
9    A   Right.
10    Q   And the same thing applies to the I-9 forms.
11  To the extent anybody used a preparer or a
12  translator, you use that as evidence of a lack of
13  conversational English ability; correct?
14    A   At times, especially, when they might have
15  filled the other form out in English, and then this
16  form is filled out in a different language, the
17  inconsistency was another one of those things that gave
18  me suspicion.
19    Q   In fact, the vast majority on the 91
20  individuals that you identify as appearing to be
21  unauthorized are based upon either filling out an
22  application in Spanish or using a preparer or
23  translator; right?
24    A   If they were here for a significant period of
25  time.

Page 107

1    Q   You understand that the I-9 form is filled out
2  under penalty of perjury; right?
3    A   Absolutely.
4    Q   And you understand that the applicant is told
5  that that form is filled out under penalty of perjury;
6  correct?
7    A   That's correct.
8    Q   But that doesn't affect your view that a person
9  with conversational English would never want that form
10  explained to them in their native language; right?
11    A   Again, my experience is that when they have the
12  ability, they will use the English language. I saw it
13  consistently when I was out there.
14    Q   I understand your experience. You've told it
15  to me three times. But the answer to the question is
16  no; right?
17    A   Rephrase it so that I understand what I'm saying
18  no to. I'm sorry, Counsel.
19    Q   The fact that the I-9 form is under penalty of
20  perjury does not influence your testimony here today
21  that a person with conversational English skills, but
22  proficiency in Spanish, would never choose to have a
23  translator explain that form to him; right?
24    A   Right.
25    Q   Your basic contention, subject to some

Page 108

1  circumstantial evidence that might cut one way or
2  another, is that if an applicant of Tyson Foods chooses
3  the Spanish language application form, that evidences,
4  for purposes of your opinion, an inability to have
5  basic conversational language.
6    A   It calls into question, and there were other
7  factors if you look at some of them where there were
8  other factors -- expired documents, predated I-9s --
9  there's a number a factors that caused me to be
10  suspicious of those employees that we set aside of
11  those individuals.
12    Q   To be precise, Mr. Cutler, sometimes, there
13  were other factors, and sometimes, you identified
14  people as appearing to be unauthorized solely because
15  they filled out an application in Spanish or used a
16  translator or a preparer in filling their I-9 form;
17  right?
18    A   If they were here for a period of time, yes.
19    Q   Last question and then we'll recaffeinate here.
20        Is it possible, in your mind, as you sit here
21  today, that somebody could use a translator or a
22  preparer and still have the basic English conversational
23  language skills that you reference in your opinion?
24    A   Very, very, very, unlikely.
25    Q   In fact, even informally, went the other way

Page 109

1  and didn't want your opinion?
2    A   Absolutely. Again, going back to my
3  experience.
4    Q   And with respect to English language
5  application, your opinion, again, does not account for
6  any possibility in any of the 497 cases that someone
7  had basic conversational English language skills and
8  still filled out the application in Spanish?
9    MR. FOSTER:  Objection.
10        Asked and answered.
11        You can answer.
12    THE WITNESS:  All right.
13        Yes.
14    MR. HOPSON:  Let's go ahead and take a break so we
15  can get a new tape.
16    THE VIDEOGRAPHER:  Going off the record. The time
17  now is 10:46 A.M. This is the end of videotape No. 2.
18        (A recess was taken.)
19    THE VIDEOGRAPHER:  We're back on the record. The
20  time now is 10:59 A.M. This is the beginning of
21  videotape No. 3.
22    Q   BY MR. FOSTER:  Okay.
23        Mr. Cutler, moving right along, I just want to
24  try to see if we can close out this English language
25  thing by just having you confirm for me that your

Page 110

1  opinion, to some degree, rests on making judgments
2  about individual people's English language skills.
3      A   Yes.
4      Q   Okay.
5          And the truth is, you didn't meet any of these
6  individuals; is that right?
7      A   That's correct.
8      Q   And you haven't been to the plants --
9      A   Absolutely not.
10     Q   -- on any occasion.
11     A   Never.
12     Q   You also didn't interview or communicate with
13 any of the HR personnel who actually made these kind of
14 decisions?
15     A   I met none of the people involved.
16     Q   If tomorrow I could bring you one or more of
17 these individuals who you talked to them and they had, in
18 your judgment, basic conversational skills, would that
19 affect your opinion as it currently stands?
20     A   As one of the number of components.
21         You know, again, there's a lot of aspects to
22 this.
23     Q   You don't recall, do you, Mr. Cutler, sitting
24 here today, in how many of the 91 instances the lack of
25 conversational English skills was dispositive to your

Page 111

1  opinion?
2      A   I didn't delineate it that way and I don't.
3      Q   Sidetrack here for just a second.
4          When we were talking about Exhibit 4, which is
5  the Handbook for Employers --
6      A   Let me just go back to that so I have it in
7  front of me -- give me one second.  There we go.  Got it.
8      Q   -- I asked you if there was some more recent
9  guidance on language issues, and you said you recalled
10 seeing something; right?
11     A   Right.
12     Q   You can't identify for me that specific
13 guidance; correct?
14     A   Correct.
15     Q   The question here is:  It's fair, and you would
16 agree with me, that employers have to follow the
17 guidance that exists; right?
18     A   Yes.
19     Q   Employers are not required to hire Michael
20 Cutler, with 30 years of INS experience, to make their
21 decisions for them on who to hire; right?
22     A   Right.
23     Q   And one of the guidances that employers right
24 now today have to follow is Exhibit No. 4, The Handbook
25 for Employers; right?

Page 112

1      A   Right.
2      Q   And it was in effect during the entire time
3  this case was going on?
4      A   Right.
5      Q   And Tyson was obligated to follow the guidance
6  as it is set forth in there unless it's been modified
7  somewhere; right?
8      A   Right.
9      Q   You also would agree with me, I take it, that
10 employers are not in any way, shape, or form guarantors
11 that the persons they hire are authorized for
12 employment in the United States; right?
13     A   Right.
14     Q   I'm just looking for an exhibit number here.
15 Oh, it's Exhibit No. 2, sir.  Back to your March 8,
16 2007 --
17     A   Got it.  Okay.  I'm looking at it.
18     Q   I'd ask you to turn again to the fourth page,
19 and that's the page that has those words "statutory
20 authority" down at the bottom.
21     A   Okay.
22     Q   I just want to focus now on one particular
23 aspect of your opinion we haven't talked about yet --
24     A   Okay.
25     Q   -- and that is the statement, in your opinion,

Page 113

1  that says:
2          "A resident alien who claims to have
3      held lawful immigrant status for several years,
4      but who lacks any English language ability,
5      would cause me to question his actual
6      immigrant status."
7          And I guess what I'd like to ask you to do is
8  elaborate for me what you mean when you opine that that
9  would be a basis to, "question their immigration
10 status".
11     A   Well, as an agent, if I would go into a
12 factory, for argument's sake, and there was a woman
13 sitting at a sewing machine or a guy at a factory of
14 some sort, and I would attempt to converse with them in
15 the English language.
16         And the employer might have said to me, "Oh,
17 here's John," or whoever.  "He's been working here for
18 the last ten years."
19         And I would say, "How are you?"
20         And the person would look at you with this
21 blank look on his face.
22         You'd say to yourself, "Well, either the
23 employer is lying about how long the guy was there, or
24 the person is lying about who he is, because you might
25 question about how long you've been in the United States,

Page 114

1  and he can't speak a word of English."
2      Q   So the use of the term question there calls
3  into it all of your 30 years hands-on in-the-field
4  on-the-street experience as an immigration agent?
5      A   What I did day in and day out, yes.
6      Q   Okay.
7          The standards that you applied when you were an
8  INS agent out on the street are not identical to the
9  standards that employers apply when they're making this
10 determination of whether somebody is authorized employment;
11 right?
12     A   Right.
13     Q   Step back from this.
14         When you say you would question somebody based
15 on these factors, it wouldn't be probable cause to arrest
16 them, would it?
17     A   No.  But I might at that point detain somebody
18 and set them aside and say "have a seat," and then I
19 might call down to the office and have them pull a file
20 and go beyond it.
21         Because if I have someone who says, "I've been
22 here five years," and he can't speak a word of English,
23 and I had to question him entirely in Spanish, which
24 is why they gave us Spanish language training, then I
25 would detain him at that point for investigative

Page 115

1  purposes, not necessarily put handcuffs on him, but
2  certainly, I'd sit him down and say, "Have a seat."
3          And then I'd call the office and we would try
4  to determine if there was any documentation on back at
5  the office and so forth.
6      Q   So if I hear you right, what you're saying is
7  the words "would cause me to question" really means
8  would cause you to ask additional questions?
9      A   Exactly.
10     Q   Putting that issue in the context of an
11 employment decision, as opposed to an INS agent's
12 decision, the question I want to ask you is:  Would the
13 facts set forth there, a resident alien who claims to
14 have held lawful immigrant status for several years but
15 lacks any English language ability, given that fact
16 pattern, would you -- what would you expect an HR person
17 at a given employer to do?
18     A   To ask additional questions.  Maybe ask for
19 some other identity documents to make certain that the
20 person is who they claim they are.
21         It's incongruous.  It doesn't follow up that
22 someone is here for a number of years and has a blank
23 look when you're trying to get them to speak to you in
24 English.
25     Q   Okay.  And so the Cutler view is that that

Page 116

1  English language ability, or lack therefore, is a
2  sufficient basis to ask for additional documents?
3      A   Yes.
4      Q   The lack of English language ability is a
5  sufficient basis not to interrogate, but a least to ask
6  some additional questions?
7      A   Right.  I don't think employers should be doing
8  any interrogation.
9      Q   And do you believe that somebody requiring
10 assistance is either a translator or a preparer in
11 filling out their I-9 form, is a basis to demand
12 additional documents?
13     A   If that person is claiming to be either a
14 resident alien or a United States citizen and has been
15 here for a period of time, absolutely.
16     Q   And assuming that --
17     A   Okay.
18     Q   -- and they fill out the employment application
19 in Spanish, is that a basis on which you could
20 lawfully, in your view, demand additional documents?
21     A   Yes.
22     Q   Is it a basis on which the HR person we're
23 talking about in this hypothetical, the employer could
24 refuse to hire the person?
25     A   If the person refused to provide additional

Page 117

1  evidence and so forth.
2      Q   Uh-huh.
3      A   It would seem to be that that would be the
4  logical thing to do at that point.
5      Q   So at the end of the day, when that scenario we
6  just described has ended, that person, the hypothetical
7  HR person, has refused to hire an applicant because of
8  their lack of English language skills or lack of
9  conversational English language skills; right?
10     A   And either inability or unwillingness to
11 provide additional evidence to overcome the suspicions
12 that that situation raises in that HR person's mind.
13     Q   You were at a disadvantage, sir, when you did
14 your work here because you had to rely on a cold paper
15 record --
16     A   Right.
17     Q   -- as opposed to the kind of questioning you
18 were allowed when you were INS agent; right?
19     A   Absolutely.
20     Q   And I take it, it's fair and reasonable to
21 conclude that you recognized that you were at a
22 disadvantage at the time you were preparing your
23 opinions; right?
24     A   Right.
25     Q   And in particular, you recognized that if you

Page 118

1  could actually talk to these people and ask questions,
2  you might get a different outcome?
3     A   Possibly.
4     Q   Well, it's more than possible, isn't it?
5     A   Well, no, it would depend on the individual.
6  It's entirely possible that everything would continue
7  along -- Counsel, you're asking me to engage in
8  conjecture about something that I can't really answer.
9     Q   Right.
10        Well, one conjecture is whether or not these
11 people have conversational English language skills;
12 right?
13    A   Right.
14        That we don't know that they do or don't; so
15 that's why I'm saying I can't answer that question.
16    Q   Okay.
17        When I say "these people," we're talking about
18 the 497 people whose files you reviewed?
19    A   Correct.
20    Q   I want to review the process a little bit --
21 step back from the opinion.
22    A   Sure.
23    Q   You sat down in some room someplace and looked
24 at 497 employment files; right?
25    A   Correct.

Page 119

1     Q   Who decided that you look at 497 as opposed to
2  500 or a thousand?
3     A   Counsel.
4     Q   And did they explain to you the basis for their
5  decision to use 497?
6     A   Yes.
7     Q   What is the basis?
8     A   As I stated earlier, it was that they had
9  pulled every 10th employment file at random, and that
10 those were the files that they had provided me to
11 examine.
12    Q   And you understood, at the time you were
13 examining, that you were going to make some broader
14 inferences, or at least that in this case, the fact
15 finder would be asked to make broader inferences about
16 the extent to which Tyson hires unauthorized workers;
17 right?
18    A   Right.
19    Q   So did you undertake to determine if the 497
20 files you looked at are a statistically valid sample of
21 the universe of Tyson employees at issue in this case?
22    A   No.  I just looked at the files provided me by
23 counsel.
24    Q   All right.
25        You didn't include in your process, calculate

Page 120

1  these statistical error rate in your work?
2     A   No.  I did not.  I was told that it was a
3  representative random sampling.
4     Q   And who told you that?
5     A   Counsel.
6     Q   But you haven't seen anything from any
7  statistician or any expert that confirms that; right?
8     A   Right.
9     Q   And you don't have a background or training in
10 statistics?
11    A   No, I don't.
12    Q   Okay.
13        I want to look at the criteria you used in
14 reaching your conclusion here, sir.  And I want to get
15 out the right document so we don't have to talk about
16 it in the abstract.
17        If you look at your declaration, which we
18 previously marked as Exhibit 1-A.
19    A   Okay.  I've got it.
20    Q   Okay.
21        And in paragraph 3, you say:
22        "I worked with class counsel to determine
23 the following criteria."
24        And then you list 14 criteria; is that right?
25    A   Right.

Page 121

1     Q   What do you mean you worked with class counsel
2  to determine it?  Did the two of you agree that those
3  were the right criteria to use?
4     A   Well, I explained to them what I would consider
5  to be areas of concern.  So that was basically how that
6  process was done.
7        I would say to them, "Well, this is the areas
8  of concern for me based on my experience looking purely
9  at the paper you're providing me.  These are the things
10 that I would be focused upon."
11    Q   And at the end of the day, the two of you
12 agreed, or however many of you fellows agreed that that
13 was the criteria you'd use in this project?
14    A   Right.
15    Q   Okay.
16        Were there any particular criteria among the
17 14 selected or suggested by class counsel as opposed to
18 suggested by you?
19    A   No.  We went over it.  And I was told what I
20 would be given access to.  And I said that if we could
21 do it that way, then that would work.
22    Q   When you applied these criteria, you didn't
23 apply them mechanically.  You applied them, as you told
24 me many times today, in light of your experience and
25 judgment as an INS agent?

Page 122

1    A    That's correct.  That's always been the context
2  of what I do.
3    Q    And counsel gave you packets of documents
4  reflecting the 497 employment files; right?
5    A    Correct, correct.
6    Q    And as I understand it -- but I'm not
7  100 percent clear about this -- generally, they
8  included an I-9 employment application and copies of
9  the documents that were tendered; right?
10    A    Right.
11    Q    Not in every case, though?
12    A    That's correct.
13    Q    Did you tell them what you wanted to see in the
14  employment packets you reviewed?
15    A    No.  They just gave me whatever it was they had
16  and we went from there.
17    Q    And who decided that you'd examine personal
18  data from the LexisNexis database?
19    A    We had talked about it.  They said we have
20  access to LexisNexis.
21         And it seemed to me that, as you pointed out, I
22  was at a disadvantage not having a warm body in front
23  of me, that the ability to use LexisNexis would help to
24  augment my inability to interview these people.
25    Q    You wanted the LexisNexis database as another

Page 123

1  data point to use to do your work?
2    A    In lieu of the fact that I couldn't physically
3  speak to the people involved.
4    Q    Even though you understand most employers -- in
5  fact, I think it is fair to say no employers rely on
6  the LexisNexis database?
7    A    I understand that.
8    Q    Do you know what particular LexisNexis database
9  you looked at?
10    A    They provided it for me.
11    Q    Do you know how reliable the LexisNexis
12  database is?
13    A    No, I don't.
14    Q    Okay.
15         (Defendants' Exhibit No. 14 was marked for
16         identification and is bound separately.)
17    Q    BY MR. HOPSON:  Let's look at Exhibit 14.
18    A    (Witness complies.)
19    Q    I'm tendering to you, sir, a page from the
20  LexisNexis database.
21         Let me ask you, before I ask you about
22  Exhibit 14, did you look at this information on-line?
23  Or did you print it out before you reviewed it?
24    A    On-line.
25    Q    Did you see pages like this as you were going

Page 124

1  through and typing the information in?
2    A    Yes.
3    Q    I want to draw your attention -- you've seen a
4  page like this before on-line, I take it?
5    A    Correct.
6    Q    Let me draw your attention, then, to the
7  paragraph down at the bottom or bottom third of this
8  that begins with the word "important."
9    A    Right.
10    Q    And I want to ask you a couple questions about
11  that.
12    A    Sure.
13    Q    The paragraph states:
14         "Important:  The Public Records and
15  commercially available data sources used
16  in Smartlinx Reports have errors.  Data
17  is sometimes entered poorly, processed
18  incorrectly, and is generally not free from
19  defect.  The system should not be relied upon
20  as definitively accurate."
21         Did you look at that disclaimer before you
22  chose to use this database?
23    A    Yes.
24    Q    So you used this database despite the fact that
25  it, quote, has errors?

Page 125

1    A    Right.
2    Q    Were you trained to use this database at any
3  time during your tenure as an INS agent?
4    A    No.
5    Q    Is the Basic Pilot database, which draws upon
6  Social Security and INS records, more or less reliable
7  than the LexisNexis Smartlinx database?
8    A    I have no way to answer that.
9    Q    Despite your expertise --
10    A    Despite my expertise.
11    Q    Does the Lexis -- does the Basic Pilot database
12  contain a similar disclaimer about errors, documents
13  sometimes being entered poorly, processed incorrectly,
14  and generally not free from defect?
15    A    I'm not certain.
16    Q    So you think there might be that kind of
17  warning associated with the use of the Basic Pilot
18  database?
19    A    I know that Basic Pilot is the -- from
20  everything that I have heard from people working in the
21  region and so forth, they're working constantly to make
22  it as accurate as possible so that the defect rate is
23  as small as possible.
24         I know that it is a work in progress.
25    Q    You testified earlier you're an expert on Basic

Page 126

1  Pilot?
2     A  Right.
3     Q  But you don't know if there's any disclaimers
4  associated with the use of the Basic Pilot database;
5  right?
6     A  I'm not certain of that.
7     Q  I want to draw your attention again to the same
8  two paragraphs we just looked at, and ask you to
9  note -- and I'll read it for you -- that the disclaimer
10 says that:
11       "Data provided to you by use of this
12    product may not be used as a factor in
13    establishing a consumer's eligibility for
14    credit, insurance, employment or other
15    purposes."
16       Did you see that --
17    A  Yes.
18    Q  -- before you decided to use it?
19    A  Yes.
20    Q  Don't you think that using this database as
21 part of your opinion is really calling into question
22 the accuracy of the work that you're doing here?
23    A  No.  Because what we were looking for is simply
24 to see if Social Security numbers appeared to have been
25 used by other people.

Page 127

1       That was it.  That was the extent of my concern
2  with LexisNexis was is that Social Security number a
3  multiple use number.
4     Q  You used this database to see if it was a
5  multiple use number.
6       But you use a database that is riddled with
7  errors, according to the person who puts the database
8  together; right?
9     A  And this wasn't the only determining factor.
10 This was, again, in a broader context, I was trying to
11 offset the handicap that we have of not having a warm
12 body in front of us that I could talk to.
13    Q  How many of the 91 one people you identified as
14 appearing to be unauthorized -- in how many of those
15 cases did you rely on this database?
16    A  I don't remember the exact number.  I didn't
17 differentiate it that way.  It's in my notes if I did
18 use LexisNexis as a determinant.
19    Q  Do you know what you now know about the
20 database and what we just read, should we take those
21 people off the list of 91?
22    A  I don't believe so.
23       I believe that, again, it was only one of a
24 number of factors that we looked at when I looked at
25 those applications, trying my best to be as reasonable

Page 128

1  as possible in making my determination as to what their
2  status was.
3     Q  Sir, it may have been one of the things that
4  you looked at, but in a number of your conclusions, you
5  relied solely on this database; right?
6     MR. FOSTER:  I object to the form of the question.
7     THE WITNESS:  I'd have to go back into my notes.
8     Q  BY MR. HOPSON:  If you relied solely on the
9  Smartlinx database to find that a person is not
10 authorized to work in this country, or appears to be
11 not authorized to work in the country, should those
12 come off the list of 91?
13    A  Not summarily.
14       Again, I believe that those multiple use
15 numbers are of concern.
16    Q  If it's accurate, it's of concern?
17    A  If it's accurate.
18    Q  And we know now we can't rely on it being
19 accurate; right?
20    A  Well, there's a disclaimer.
21    Q  This concern about accuracy doesn't make you
22 want to change your opinion at all?
23    A  Again, what I'm saying is that, to the best of
24 my ability, I took all these factors into account with
25 these employees.

Page 129

1     Q  And I've told you that on some occasions, you
2  relied solely upon the Smartlinx database to determine
3  that someone appeared to be unauthorized?
4     MR. FOSTER:  Objection.
5     Q  BY MR. HOPSON:  -- isn't that true?
6     MR. FOSTER:  It misstates his testimony and the
7  report.
8     MR. HOPSON:  I'm not been stating his testimony.
9     Q  Isn't it true that you relied solely on the
10 Smartlinx database to find certain people that appeared
11 to be unauthorized?
12    A  Just a few of those I recall.
13    Q  You don't want to change your opinion about
14 those few, though?
15    A  It's troubling that someone would show up as a
16 multiple use.  If, in fact, it turned out to be wrong,
17 that's one thing.  But we don't know that it's wrong
18 either, though.
19    Q  We don't know either way; right,
20 Mr. Cutler?  We don't know either way whether that
21 database is right or wrong.
22       But you want to continue counting them in the
23 91.  That's where we're at; right, sir?
24    A  Yes.
25    Q  Let's look at your declaration, Exhibit 1-A.

Page 130

1     A    (Witness complies.)
2     Q    Were these 14 criteria ever used by you in
3  writing prior to the time you were hired to be an
4  expert in this case?
5     A    No.
6     Q    Had you ever used the Smartlinx database for
7  any purpose prior to the time you were hired to be an
8  expert in this case?
9     A    No.
10    Q    Has this 14 criteria ever been listed in any
11  INS, DOJ, or Homeland Security advice to employers?
12    A    Not in this fashion, no.
13         This is the way I did my job, and it was a
14  matter of enumerating them, sitting down and explaining
15  the process that I would use as an agent to make
16  determinations as to someone's eligibility to work in
17  the United States.
18    Q    Fair enough.
19         You used these criteria within the limitations
20  of the project that you did here; right?
21    A    Right.
22    Q    But the question is: Had these 14 criteria
23  ever been listed by anyone in any context, to your
24  knowledge, based on your 30 years of experience?
25    A    Not to my knowledge.

Page 131

1     Q    That means we can't find these criteria, to
2  your knowledge, in any INS or DOJ website; right?
3     A    Not that I'm aware of, although again, this is
4  the way we did our job as agents.  It was just a matter
5  of putting on paper what I would do when I was in the
6  field and what I would say my colleagues all did while
7  we were in the field.
8     Q    And you agreed with me earlier that the
9  standard that employers have to apply in going to the
10  I-9 process is a different standard than you applied as
11  an INS agent doing criminal investigations in the
12  field; right?
13    A    Yes.  But they still had a responsibility to do
14  what was reasonable to determine if the documents
15  relate back to the applicant for the job.
16    Q    Can you do this -- and we'll get off of this.
17    A    Sure.
18    Q    Can you point me to anything that would cause
19  Tyson Foods, or any other employer, to believe that
20  they should review their employees' documents pursuant
21  to these 14 criteria?
22         Point me to anything besides your own
23  experience.
24    A    Not as the 14.  But as a matter of the way that
25  we discussed these issues with the employers, we went

Page 132

1  out to do the training, and we explained to them was to
2  be mindful that there would be imposters, that people
3  would lie about their identities, would lie about their
4  immigration status, and that they needed to understand
5  that it was more than simply looking at a card and
6  saying, "Yeah, this guy is good."
7         But they've got to obviously make sure the
8  photo is of the person, make sure that it doesn't
9  appear to have been tampered with.
10         You know, make sure that language again -- if
11  the guy is a U.S. citizen, he's naturalized, that he
12  could speak to you in the English language because that
13  was a requirement.
14         So we went through a checklist of -- it wasn't
15  an official checklist.  But that was the reason we sat
16  and had a discussion with these folks that perhaps
17  spent an hour with them, going over what it is
18  they needed to -- otherwise, all you would say to
19  someone is that he's got a license and he's got a
20  Social Security card -- "you're good to go."
21         That wasn't what we did.
22    Q    Okay.  Fair enough.
23         That's wasn't what you did?
24    A    That wasn't what any of us did and it wasn't
25  what we were supposed to do.

Page 133

1     Q    Fair enough.
2         But you didn't go over these 14 criteria?
3     A    Not this way.  We just explained what they
4  should be able to look out for -- warning signs and so
5  forth.
6     Q    The bottom line --
7     A    Things that caused suspicion.
8     Q    The bottom line is the 14 criteria were
9  developed by you for your use in the particular
10  circumstances of this case; right?
11    A    Based on those years of experience.
12    Q    And I think I asked you this, and I apologize
13  if I did.
14         But it's also the case that the computer
15  couldn't apply these 14 criteria the same way Michael
16  Cutler applies these 14 criteria because you have
17  30 years of experience and judgment.
18         And that counts the way you apply these
19  criteria; right?
20    A    Correct.
21    Q    You make judgment calls.
22    A    Right.
23    Q    Let's look at factor No. 1.  Okay?
24         Again, just to be clear -- I don't want to beat
25  a horse that's dead or dying here.  But factor No. 1 is

Page 134

1  whether the applicant came to use or required the use
2  of a translator.
3          And we've already established, as I understand
4  it, that that would, "cause you to question
5  people;" right?
6      A   Absolutely.
7      Q   Okay.
8          And when you get to -- excuse me, one second,
9  when you get to the point of questioning in this case,
10  when you're sitting there looking at these files, you
11  can't actually do what you did as an INS agent, which
12  is ask the follow-up questions?
13      A   Right.  That was the limitation that I had.
14      Q   Okay.  So at that point, when the evidence causes
15  you to question the applicant's status, they go on the list
16  of 91 people who appear to be unauthorized?
17      A   Many did; not all.  I tried to be as reasonable
18  as possible about this.
19      Q   And that's what you just described is your use
20  of judgment?
21      A   Correct.
22      Q   And experience?
23      A   Right.
24      Q   And that's why you conclude in the concluding
25  language of your opinion, that the 91 appear to be

Page 135

1  unauthorized; right?
2      A   Right.
3      Q   You used the word that they appear to be
4  unauthorized because you didn't get a chance to ask the
5  follow-up questions; right?
6      A   Right.
7      Q   If you had had the opportunity, in fairness to
8  you, to actually sit down with 497 people, you could
9  give us a more refined assessment, you believe; right?
10      A   Possibly.
11      Q   Do you think that if you had the opportunity to
12  talk to the 497 people, that any one of your 91
13  conclusions would be likely to change?
14      A   My gut feeling is probably not.  But I can't
15  give you a definitive answer.
16      Q   So you believe that the -- in the context of
17  the opinion you're giving us here today, the ability to
18  talk to these people and question them, to use your
19  term, would be virtually worthless as far as the
20  accuracy of your opinion goes?
21      A   No.  We may actually have found more people
22  that shouldn't have been working in the United States.
23      Q   You might have found less, too.
24      A   Well, again --
25      Q   Well, again, yes, you might have found --

Page 136

1      A   It might have been less, but again, I was trying
2  to be as reasonable as possible.  There were some cases
3  where it seemed to be a fence sitter, I would error on
4  the side of saying he's okay.
5      Q   Do you have an example to use here?
6          Well, actually, we should just pull out, to
7  make this easier, is if you'll pull out, sir,
8  Exhibit 1-C.
9      A   Okay.
10          Give me a second and I should have that.  Those
11  are my notes.
12      Q   Yes, sir.
13      A   Got it.
14      Q   And look to the page that has the Bates label
15  1498 down at the bottom?
16      A   Okedoke, got it.
17      Q   Do you see somebody about halfway down the page
18  with the name Rocha?
19      A   Abbilio?
20      Q   Right.
21          What's the basis for Mr. or Ms. Rocha to be on
22  your list?
23      A   What I've read is that the person claims to be
24  a United States citizen, and yet filled out the
25  application for employment in Spanish.

Page 137

1      Q   Okay.  So that is the reason; right?  Because
2  you agree with me there is no hidden reasons?
3      A   Looking at this list, I missed something or I
4  neglected to add it.  This is the thing.  I hang
5  my hat on with this particular application.
6      Q   It's more than you neglected something or neglected
7  to add it.
8          The truth is -- that is the reason that you put
9  that person on the list of 91 people who appear to be
10  unauthorized; right?
11      A   As I said, these are the notes that I
12  took -- looking at this, that is the reason.
13      Q   Okay.
14          That's what I asked, and the answer is "yes,
15  that's the reason?"
16      A   Right.
17      Q   The sole and dispositive reason for the person
18  being on this list is that you have inferred a lack of
19  conversational English speaking ability in a person who
20  claims to be a U.S. citizen; correct?
21      A   Correct.
22      Q   So in this case alone, we know that the lack of
23  conversational English language skills is as found
24  lacking was dispositive?
25      A   Correct.

Page 138

1    Q   Do you think that if you talked to Rocha, it
2    might be possible for you to change your conclusion
3    about whether this person is unauthorized?
4    A   For a United States citizen to use a Spanish
5    application, in my judgment, is highly suspicious and
6    makes me believe that the person is not a United States
7    citizen.
8    Q   You say that -- you qualify your answer there, sir,
9    by saying in your judgment that is right?
10   A   Well, all of this is a matter of judgment.
11   Q   Well, the point I want to make is you reach
12   that conclusion in your judgment, but there's no
13   guidance to any employer anywhere that says if a person
14   uses a Spanish language application, you should deem
15   them to be -- and claims to be a U.S. citizen, you
16   should deem them to be unauthorized from employment;
17   isn't that right?
18   A   Yes.  That's right.
19   Q   When you were out training employers in the
20   mid-80's, did you say to them, in words or in
21   substance, if somebody uses the preparer or translator
22   form I-9, you -- and they came to be a U.S. citizen,
23   you should deem them to be unauthorized and not hire
24   them?
25   A   No.  I said that they should go beyond them and

Page 139

1    find out why the person is not demonstrating language.
2        And if they have no other documentation and no
3    way of explaining it, then you should presume that that
4    person is not who he claims to be, and that those
5    documents don't relate to him, or there otherwise is a
6    problem.
7    Q   The United States government created the I-9
8    form; right, Mr. Cutler?
9    A   Yes, sir.
10   Q   And they created a form that provides for the
11   use of a translator, didn't they?
12   A   Uh-huh.
13   Q   So the United States government creating that
14   form determined prima facie that the use of a
15   translator is not a basis for deeming somebody is
16   unauthorized to work in the United States; right?
17   A   Well, there's two factors here:  Number one,
18   in and of itself, no.  But again, taken in totality.
19       But number two, there's a third possibility
20   that the person is here temporarily on a temporary
21   visa, and as such, would not be expected to have
22   English language proficiency.
23   Q   I want to go back -- put that aside now.
24       I want to go back to the 1-A, I believe it is.
25   A   Which one is that?

Page 140

1    Q   I got it.
2    A   Bear with me, please, while I dig it out.
3    Q   Sure.
4    A   Thank you.  Got it.
5        This is my declaration again; correct?
6    Q   Right.  This is your declaration.
7    A   Okay, Counsel, I got it.
8    Q   And in fairness to you, while Exhibit 2
9    contains some explanation of your opinion, the bottom
10   line of your opinion is really set forth in your
11   declaration; right?
12   A   Right.
13   Q   And specifically, the bottom line of your
14   opinion is set forth in paragraph 6 on page 2, which
15   says -- and I'm quoting:
16       "Based on my analysis, I concluded that
17   91 out of 497 total current employees that
18   were part of the sample appeared to be
19   unauthorized to work in the United States."
20   A   Correct.
21   Q   Is that your opinion?
22   A   Yes.
23   Q   Is that worded as carefully as you possibly
24   can?
25   A   Yes.

Page 141

1    Q   Do you want to modify, delete, add to, put a
2    couple adjectives in there?
3    A   I'm happy with it.
4    Q   Okay.
5        You're not opining, in paragraph 6, anything
6    about what the specific HR personnel at Tyson did or
7    didn't do when they went through the process of filling
8    out the I-9; right?
9    A   Right.
10   Q   You don't know, for example, what conversations
11   they had, what questions they asked, what documents
12   they saw that they didn't make copies of.
13       Fair?
14   A   I would have no way of knowing that.
15   Q   Okay.
16       And you don't know what was on their minds when
17   they were filling out that I-9 form.
18   A   Beyond my purview.
19   Q   And you're not offering an opinion that the 91
20   people who appear to be unauthorized were actually
21   hired knowingly in violation of the law and with actual
22   knowledge that they were not authorized to work in the
23   United States?
24   A   That goes beyond my opinion.
25   Q   You're not offering an opinion that the

Page 142

1  individual HR personnel at Tyson acted in bad faith?
2      A   I was concerned about pre-signed I-9s in a
3  number of cases.  And that certainly called question as
4  to what was going on because that is in violation of
5  law and regulation to do that.
6      Q   It's -- okay.  Let's put that one aside.
7          Let's put however many pre-signed I-9s there
8  are to aside.  Putting aside pre-signed I-9s, you're not
9  going to take the stand in this trial and testify that
10  any particular HR person at Tyson operated in bad
11  faith, I take it?
12      A   Well, if someone would pre-sign it, you'd have
13  to wonder why; so that certainly raises concerns as to
14  the process itself by anybody who would have done that.
15      Q   My question wasn't clear.
16          Putting aside pre-signed I-9s -- are you with
17  me so far?
18      A   I'm with you so far.
19      Q   Putting aside pre-signed I-9s, other than that,
20  are you offering any opinion -- whether it's in writing
21  or not in writing -- about the good faith or bad faith
22  of the HR personnel who performed these hirings?
23      A   I can't put that aside now.
24      Q   Okay.  Then forget it.  Let's go forward.
25          Are you offering any opinion that the 91

Page 143

1  individuals who make your list were brought into this
2  country in violation of law?
3      A   In my experience, illegal aliens who enter the
4  United States illegally do so with the assistance of
5  smugglers.
6      Q   How many of the 91 came into the country with
7  the assistance of smugglers?
8      A   If they were here illegally and they were
9  entrance without inspection, then I would say virtually
10  all of them.
11      Q   So that is part of your opinion?
12      A   That's part of my opinion.
13          I was part of the smuggling unit in New York.
14  And I know that aliens, as a rule, were smuggled across
15  the border.  They did not generally make the truck by
16  themselves.
17      Q   So you're testifying, under oath here today,
18  that you're certain that all 91 of the people you've
19  identified were brought into this country in violation
20  of law?
21      A   If they were entrance without inspection.
22      Q   And you're testifying to that opinion with a
23  high degree of certainty?
24      A   With a high degree of certainty.
25      Q   And you're testifying to that opinion with

Page 144

1  respect to all of the 91 people?
2      A   If they entered without inspection.
3      Q   Do you know if any of them entered without
4  inspection?
5      A   The evidence doesn't indicate their method of
6  entry.
7          But if they entered without inspection, in my
8  experience, they would have done so with the assistance
9  of a coyote or a smuggler.
10      Q   I understand that.
11          But you can't tell me which of the 91 entered
12  without inspection, can you?
13      A   (No response.)
14      Q   Isn't that beyond the scope of your opinion
15  here, sir?
16      A   It would be.  But again, that's why I'm saying,
17  if they entered without inspection, it would have
18  happened with the assistance of a smuggler.
19      Q   But what you're doing, Mr. Cutler, if I can
20  paraphrase is, you're making an observation to me that
21  people who don't come in through a point of entry,
22  usually, or almost always, come in with the assistance
23  of some smuggler, who brings them into the country.
24      A   That way.  Or if someone comes in with a visa
25  that was purloined, or otherwise was not properly

Page 145

1  issued, there's assistance there also.
2          But what I'm saying is when they run the
3  border, it's with a smuggler.  If they come in with a
4  passport, there may still be some collusion or other
5  people involved in that process.
6      Q   And I'm not trying to nitpick --
7      A   Okay.
8      Q   -- but that observation is not an observation
9  that you are definitively applying to the 91 people
10  who you identified here; right?
11          Because you don't know whether they, "ran
12  the border or didn't run the border;" right?
13      A   Right.
14      Q   If you pick up Exhibit 1-A again, I just want
15  to follow up on something I see in paragraph 2.
16      A   Okay.
17      Q   And that is that your purpose, as you
18  understood it through your conversations with class
19  counsel, was to determine which of the 497 current
20  employees appear to be unauthorized for employment.
21          Is that fair?
22      A   That's fair.
23      Q   Okay.
24          You're not making a definitive pronouncement
25  that any one of all of the 91 are actually unauthorized

Page 146

1  for employment, are you?
2      A   As much as I can.
3      Q   Well, that's what my question is getting at.  I
4  want to know how much you can.
5      A   I believe that they are illegally present in
6  the United States.
7      Q   All 91 -- and again, correct me if I'm
8  misstating your opinion because you used the word in
9  paragraph 2 "appear to be."
10         Do you see that?
11     A   Right.
12     Q   I'm assuming that you chose the word "appear"
13 intentionally?
14     A   The way that I've expressed it is to indicate
15 that looking at the documents tells me that they are
16 illegally present in the United States.
17         I don't know how much clearer I can be than
18 that.
19     Q   Let me try to see if I can help you out a
20 little bit without pushing you.
21         You're qualifying your opinion, if I may say
22 so, based on the fact that you were limited to
23 reviewing documents?
24     A   Correct.
25     Q   So that's a qualification on your opinion here?

Page 147

1      A   Right.
2      Q   If you were not limited to reviewing documents,
3  and in some hypothetical world where you could have sat
4  down with 497 people, you might be more certain about
5  your opinion.
6          Is that a fair statement?
7      A   Well, I'd be surprised if my judgment was
8  wrong, though, based on my experience and based on
9  what I saw in those documents.
10     Q   Then do you want to take the word "appears" out
11 and tell us under oath that you're certain that 91 of
12 the 497 are unauthorized to work in the United States?
13     A   No.  I would leave it the way it is.  And as a
14 rule, this is how I express opinions that I have come
15 upon when I do my work.
16     MR. HOPSON:  Why don't we do this, if it's
17 acceptable to you, Howard.  Do you want to take a
18 slightly early lunch break?
19     MR. FOSTER:  Sure.
20     MR. HOPSON:  And that will allow me to maybe
21 organize my notes.  I won't claim to be able to
22 organize my thoughts, but I can certainly organize my
23 notes.
24     MR. FOSTER:  Sure.
25     MR. HOPSON:  And maybe we can move a little quicker

Page 148

1  through the rest of this.
2      MR. FOSTER:  Okay.  That's fine.  What time should
3  we resume?
4      MR. HOPSON:  Okay.  Do you want to resume at 12:15?
5      MR. FOSTER:  Yes.
6      THE WITNESS:  30 minutes is good.
7      THE VIDEOGRAPHER:  Going off the record.  The time
8  now is 11:41 A.M.  This is the conclusion of videotape
9  No. 3.
10         (A lunch recess was taken.)
11     THE VIDEOGRAPHER:  We're back on the record.  The
12 time now is 12:17 P.M.  This is the beginning of
13 videotape No. 4.
14     Q   BY MR. HOPSON:  Mr. Cutler, I want to turn to
15 some of the files that you reviewed here in a minute.
16         But just to clarify, there's one other question
17 I want to ask you.  And that is:  Are you aware that
18 there's at least a request pending, or perhaps notices
19 have been served, to take depositions of some of the
20 497 people that were part of the sample you reviewed?
21     A   No, I didn't know that.
22     Q   Were you planning to -- now that you know that,
23 do you plan to attend any of those depositions?
24     A   That's counsel's decision.
25     Q   Well, one decision I can ask you without asking

Page 149

1  Howard first is:  Do you think that would be
2  instructive to you to see how people testify under oath
3  when you're rendering your opinion?
4      A   I feel very comfortable with my findings.
5      Q   Very comfortable with your findings --
6      A   Yes.
7      Q   -- is where we're at now.
8      A   Yes.
9      Q   Okay.
10         If somebody asked to have their deposition
11 taken in Spanish, would that affect your opinion?
12     A   Say this again.  I'm sorry.
13     Q   If one of the deponents -- hypothetically the
14 deponents that you don't know about --
15     A   Right.
16     Q   -- says, "I would prefer to have a translator,
17 Spanish translator, when I have my deposition under
18 oath taken," would that affect your opinion in any way?
19     A   I'll stand with the way I wrote my notes and my
20 findings.  I'm not sure which one we're talking about,
21 whether it's somebody we found to be illegally or
22 legally, or you know.
23     Q   All right.  Fair enough.
24         You just told me that you're quite confident in
25 your conclusions on the 91?

Page 150

1   A   Yes.
2   Q   And I take it, when you tell me that, sir, you
3   mean you're confident on all 91?
4   A   Right.
5   Q   Have you reviewed your conclusions since the
6   time you originally looked at those 497 files?
7   A   No.
8   Q   At the time you originally looked at them, the
9   one thing we know is that you were looking at files in
10  hindsight; right?
11  A   I don't understand that.
12  Q   Well, you're making a decision, based on your
13  expert judgment and experience, of who appears to be
14  unauthorized based on the hiring that already occurred
15  some time ago -- maybe years ago; right?
16  A   Right.
17  Q   And all that you have in front of you is the
18  paper record?
19  A   Right.
20  Q   But despite the fact that you are limited to
21  the paper record, and you're operating in hindsight,
22  you think you got these right?
23  A   I do.
24  Q   Okay.
25      Let's look at a couple of the files, walk

Page 151

1   through them together.
2       Oh, before I get there, let me just ask you
3   something about the so-called I-551 card.
4       What's an I-551 card?
5   A   It's the alien registration receipt card,
6   now commonly referred to as a green card.
7   Q   Right.
8   A   It's evidence of alien registration if the
9   person is a resident alien.
10  Q   It sometimes goes by resident alien card?
11  A   Resident alien card.
12  Q   Sometimes goes by the term permanent resident's
13  card?
14  A   Yes.  It has four different names, but it means
15  the same thing.
16  Q   Can that card be used in connection with the
17  I-9 process?
18  A   Absolutely.
19  Q   Does it have an expiration date?
20  A   The newer ones do.
21  Q   Is the expiration date at all relevant to the
22  employer's obligation in connection with the I-9?
23  A   Yes.  If the card is expired, then they're not
24  supposed to accept it as evidence of lawful status.
25  Q   And that gets back to something you and I

Page 152

1   discussed.  You've got to make sure the employment
2   authorization exists at the time you're doing the
3   hiring?
4   A   Right.
5   Q   What if the card expires after the hiring, say
6   a year later.
7       Is the employer obligated to do anything at
8   that point?
9   A   No.
10  Q   All right.
11      Let's take a look -- Frank, you're going to
12  have to tell me what the numbers are because --
13  MR. VOLPE:  Exhibit 21.
14  Q   BY MR. HOPSON:  Exhibit No. 21.
15      (Defendants' Exhibit No. 21 was marked for
16      identification by the reporter and is bound
17      separately.)
18  Q   BY MR. HOPSON:  And while Frank is handing that
19  out, Mr. Cutler, you should look first, in fairness, at
20  Exhibit 1-C, which are your notes.
21  A   Goodness.  I've got a frog that doesn't go
22  away.
23      This is it, my notes.
24  Q   Yes.
25      And in particular, on 1495.

Page 153

1   A   Okay.
2   Q   Frank is going to hand out -- we're not going
3   to look at them right away -- but 21-A and 21-B.
4       And what I would like you to do, sir, is if you
5   don't mind, take a look at Mr. Garcia down at the end
6   of page and tell me --
7   A   Javier.  Okay.
8   Q   -- what is the reason he's on the list of 91?
9   A   He got a final notice of nonconfirmation of his
10  Social Security number.
11  Q   And so to paraphrase, he didn't pass Basic
12  Pilot?
13  A   Right.
14  Q   Is there any other reason he's on your list of
15  91?
16  A   Not that I noted.
17  Q   I'd like you to turn -- and unfortunately,
18  these are not easily numbered -- but there are Bates
19  numbers.
20  A   Okay.
21  Q   Do you know what a Bates number is?
22  A   Well, I presume these are numbers in the lower
23  right-hand corners.
24  Q   Yes.  This shows that we showed it to the
25  plaintiffs and we placed a number there.

Page 154

1        Okay?
2    A   Okay.
3    Q   And the Tyson number is Tyson S -- I'm sorry --
4   Tyson 104837?
5    A   Okay.
6    Q   If you'll look down -- well, what is this page,
7   first of all, that says "sensitive but unclassified" at
8   the top?
9    A   This is a document that -- it was issued in
10  conjunction with the Safe Program by DHS.
11   Q   Okay.
12       And does this relate to Javier Garcia?
13   A   Yes, it does.
14   Q   And does it not indicate at the bottom that the
15  case resolution is resolved and that Mr. Garcia's
16  employment is authorized?
17   A   The date on that was -- I'm sorry, bear with
18  me.  Because I have the final nonconfirmation.  It's
19  5/9/06.  And this is showing 5/15/06.
20       One moment, please.
21       Well, we had a nonconfirmation of 5/9/06.  The
22  one you're showing me shows that it came back confirmed
23  a week later.
24   Q   So what happened here, I think as you can
25  tell from the file and applying your expertise, is

Page 155

1   Basic Pilot gave a tentative nonconfirm, the employee
2   went and got it straightened out, and it got resolved,
3   and it comes back from Basic Pilot that that person is
4   authorized for what --
5    A   Well, in fact, there's some confusion about
6   that, as well, because we still have here, on the same
7   date, a report saying tentative nonconfirmation.
8    Q   Right.
9    A   The same date, 5/15.
10   Q   Look over, sir, on page 104840.  And I think
11  you'll find an explanation for what happened here.
12       Do you see a communication there, email that's
13  attached to the file with Kay Bernstein at the Social
14  Security Administration?
15   A   Right.
16   Q   Are you aware of --
17   A   I'm looking at that on 5 -- yes, this is
18  5/9/06.
19   Q   Right.
20   A   It says this TM -- I guess transmittal memo --
21  came back tentative nonconfirmation, unable to confirm
22  U.S. citizenship.
23       Okay.
24   Q   And then the question is asked to you, sir --
25  and disagree with me if you disagree -- Social Security

Page 156

1   has asked should they rerun this?
2    A   Right.
3    Q   And the response from Ms. Bernstein at Social
4   Security is "the record has now been updated.  He
5   should go through Basic Pilot."
6        Do you see that?
7    A   Right.  I'm looking for -- should they re-run
8   this, and I think -- yes.  Here it is.  He should go
9   through Basic Pilot.
10   Q   And that date on which Ms. Bernstein from the
11  Social Security Administration tells Tyson Foods that
12  he should go through Basic Pilot is May 15?
13   A   Right.
14   Q   And you see from document 104837, he did go
15  through Basic Pilot; right?
16   A   Right.
17   Q   And so will you agree with me now that you got
18  Mr. Garcia wrong and he should come off the list?
19   A   It would appear, but I don't know that this was
20  attached to the file when I had the file.
21       Because this is the back end of it; so I'm
22  not certain because I know that if I had seen this, I
23  certainly wouldn't have indicated.
24   Q   Did you keep a copy of the files that you
25  reviewed?

Page 157

1    A   No, I don't have them.
2    Q   Were they produced, to your knowledge, in
3   connection with your expert report?
4    A   I believe counsel has copies, but this one --
5   as I say, it indicates that the guy had a nonmatch.
6   And then this was a week afterwards; so I'm not certain
7   when this was added to the packet.
8    Q   Do you think, in terms of chain of custody and
9   good document policies that you follow as an expert,
10  that you should have kept a copy of what you reviewed?
11   A   I believe counsel has a copy of what I
12  reviewed.
13   Q   Has that been produced to us?
14   A   I don't know.
15   Q   You don't know.  Okay.
16       Let's look at another one.  I want you to look
17  over at your notes on page T1490.
18   A   Is this part of this?  You gave me this also.
19       (Witness complies.)
20       T1490?
21   Q   Yes, sir.
22   A   Okay.
23   Q   And I want you to tell us why Mohamed Dirie is
24  on your list of 91 unauthorized workers?
25   A   Well, again, the employer provided with the

Page 158

1    tentative nonconfirmation.  Nothing provided to
2    employer to amend that situation.  And he required a
3    translator in order to fill out his application.
4        Q    So as I read that, it sounds like you had two
5    reasons.
6        A    Right.
7        Q    One was the nonconfirm, and one was the
8    required a translator; right?
9        A    Right.
10       Q    Let's go ahead and hand out the next exhibit,
11   which is Mr. Dirie's file mark, is marked as 22, A
12   through C.
13       A    (Witness complies.)
14       Q    And I draw your attention, sir -- I mean,
15   you're free to look at the whole thing, if you want.  I
16   don't want to rush you.
17            But I would ask you to direct your attention
18   eventually to the page that is Bates stamped Tyson
19   084456, which is Exhibit B --
20       A    Right.
21       Q    -- as in boy?
22       A    Right.
23       Q    Does that document confirm for you that you're
24   incorrect in saying that nothing was provided to
25   employer to amend this situation?

Page 159

1        A    The problem that I had with this is, again,
2    tentative nonconfirmation seems incongruous with
3    employment authorized, if there's nonconfirmation of
4    the number.
5        Q    Really?  You think a tentative nonconfirmation
6    is inconsistent with getting employment authorization
7    from Basic Pilot?
8            Is that your testimony here today, sir?  Is it
9    your testimony, Mr. Cutler?
10       A    Well, I'm looking down below, it says that it was
11   resolved and that was how it was done.
12       Q    You know -- go ahead, sir.
13       A    No.  Go ahead.  I'm listening to you.
14       Q    You know that the Basic Pilot program works in
15   a way that allows employees who get a tentative
16   nonconfirm to go work with the Social Security
17   Administration and get it straightened out; right?
18       A    Correct.
19       Q    So it's not at all surprising to have a
20   tentative nonconfirm and have that person fix it and
21   get it authorized two days later.
22            In fact, that's commonplace, isn't it,
23   Mr. Cutler?
24       A    I don't know if it's commonplace.
25       Q    Have you ever heard of it before?

Page 160

1        A    Yes.
2        Q    Okay.
3            So at least in regards to your conclusions
4    about Basic Pilot, we can now agree they're wrong;
5    correct?
6        A    In this case.
7        Q    In this case, yes, it's wrong; correct?
8        A    Correct.
9        Q    Look again at 1490.  I see you say "also,
10   required translator.  Assist with application"; is that
11   correct?
12       A    Yes.
13       Q    Do you see the employment application in that
14   file?
15       A    Where are we?  Is this it here?
16       Q    The employment application, I believe -- and
17   you correct me if I am wrong -- is bates stamped Tyson
18   114209.
19       A    Right.
20       Q    Is there any indication that Mohammed Dirie
21   required a translator to fill out that application?
22       A    Somebody else filled out the application for
23   him.
24       Q    And how do you know that, sir?
25       A    Because the box marked preparer and/or

Page 161

1    translator.
2        Q    What document are you looking at, sir?
3        A    I'm looking at the employment eligibility --
4    the I-9 form.
5        Q    So you're not looking at the employment
6    application; right?
7        A    No.  I'm not looking at the employment
8    application.
9        Q    Your note says "required translator to assist
10   with application."
11       A    My error.
12       Q    Your error.  So now you're relying not on the
13   application, but the I-9; right?
14       A    The I-9 has either a translator or a preparer.
15       Q    Okay.  Is it a translator or a preparer?
16            Do you know?
17       A    No.
18       Q    So you don't know that Mohamed Dirie required a
19   translator to assist with the I-9 form, do you, sir?
20       A    No.
21       Q    Okay.
22            So you want to put this in the wrong file too?
23       A    (Witness complies.)
24       Q    I'm going to go ahead and withdraw that
25   question.

Page 162

1    And I'd like you to just bear with me just one
2  second here and look at -- you know what?  That horse
3  is getting dead again.  But does it look like you got
4  this one wrong, Mr. Cutler?
5    A  One moment, please.
6    Q  Let's turn to another one.  I'd like to ask you
7  again to look at your notes, and this time I would like
8  to direct your attention to T1500.
9    A  (Witness complies.)
10    Q  And I'd like to direct your attention to the
11  individual near the bottom of the page by the name of
12  Youngblood and ask you to tell me the basis for your
13  opinion that Ms. Youngblood appears to be unauthorized
14  to work in the United States?
15    A  According to my notes, she claimed to be a
16  United States citizen and needed a translator and
17  filled out the I-9 in Spanish.
18    (Defendants' Exhibit Nos. 23-A and 23-B were
19     marked for identification and is bound
20     separately.)
21    Q  BY MR. HOPSON:  Let's go ahead and look at
22  Ms. Youngblood's employment file that we've marked as
23  23-A and B.
24    Now, I'd like you to look at two things here,
25  if you will, sir, and I'm just referring you to a couple

Page 163

1  pages because it might be quicker.
2    You look at everything you want, but please
3  look at the I-9 --
4    A  Right.
5    Q  -- which is marked as 024142 and look at
6  Ms. Youngblood's employment application, which is at
7  113346.
8    A  (Witness complies.)
9    I'm sorry.  What numbers were those?  What
10  numbers are you referring --
11    Q  Just look at the front page of 23-A and 23-B
12  that's why we --
13    A  Okay.
14    Q  -- I say "we" -- that's why Frank marked them
15  that way to keep it easy.
16    23-A is the I-9 form; right?
17    A  Uh-huh.
18    Q  And 23-B is Ms. Youngblood's employment
19  application; is that correct?
20    A  Okay.  One moment -- yes.
21    Q  Let's start with the I-9 form.
22    Your note says I-9 in Spanish.  Will you agree
23  with me by looking at 024142, there's no Spanish
24  indicated, reflected, anywhere on the I-9 form?
25    A  Yes.

Page 164

1    Q  Okay.
2    Will you look at your employment application,
3  which is at 113346, and confirm for me that her
4  employment application is in English?
5    A  I don't understand how that happened.
6    Q  Well, regardless of whether you understand how
7  it happened or not, can we agree that this one is also
8  an error?
9    A  Yes.
10    Q  Thank you.  I'd like you to turn to your notes
11  at 1495.
12    A  (Witness complies.)
13    Q  I'd like to ask you, sir, to look at the
14  individual identified by the name Enrique Pacheco.  And
15  as always --
16    A  I'm -- wait.
17    Q  You can't find the second --
18    A  Oh, I see him, yes.
19    Q  -- from the bottom.
20    It's not my fault the handwriting here is bad,
21  Mr. Cutler.
22    Can you just go ahead and read for me the
23  reasons for your conclusion that Mr. Pacillo (sic) is
24  unauthorized --
25    A  I have Mr. Pacheco, but -- I have two factors,

Page 165

1  the alien card expired November 28, '03, and he was
2  employed by Tyson prior to acquiring LPR status.
3    Q  So in other words, if I've got this right, he
4  didn't have LPR status at the time Tyson hired him?
5    A  Right.
6    Q  That's the problem you had with this one?
7    A  Right.
8    Q  Okay.
9    Let's go ahead and look at -- how do you want
10  to pronounce it?
11    A  Pacheco.
12    Q  -- Pacheco's employment file which we're
13  marking as 24-A and 24-B.
14    (Defendants' Exhibit Nos. 24-A and 24-B were
15     marked for identification and are bound
16     separately.)
17    Q  BY MR. HOPSON:  Now, the first thing I'd like
18  to draw your attention to right on the very front of
19  the I-9 form, Exhibit 24-A, on page 102130, is that
20  Pacheco is hired, or at least we know fills out the I-9
21  on January 21, '02; correct?
22    A  Correct.
23    Q  Let's turn to the card that reflects -- excuse
24  me -- permanent resident status, which is further back
25  in that same exhibit at 102134.

Page 166

1    Do you see that? It's the last page of
2 Exhibit 24-A.
3    A   Yes.
4    Q   Will you confirm for me, Mr. Cutler, that the
5 permanent resident card you're looking at there was
6 effective November 28, '01?
7    A   Yes.
8    Q   So Mr. Pacheco did have permanent resident
9 status in January the next year when he was hired?
10    A   It would appear.
11    Q   Anything makes it appear to the contrary?
12    A   No.
13    Q   All right.
14    So we can agree that Pacheco is also on your
15 list of 91 unauthorized individuals in error; correct?
16    A   Yes.
17    Q   Okay.
18    Let's turn to page T1497 in your notes or
19 analysis, previously marked as Exhibit 1-C. And I draw
20 your attention to the individual named Kevin Heuerman.
21 Can you tell me why Kevin Heuerman is not authorized to
22 work in the United States?
23    A   Yes. He didn't have an I-9. And my practice
24 was that when there was a problem with a document, I
25 would then go to LexisNexis. I wouldn't use it

Page 167

1 otherwise.
2    Q   Okay.
3    A   So without the I-9, I was trying to understand
4 why he had no I-9. And LexisNexis came back and
5 indicated that the Social Security number was either
6 invalid or had not yet been issued.
7    Q   Okay.
8    So the primary reason -- hang on one second --
9 the primary reason Mr. Heuerman gets on the list is the
10 absence of an I-9 file.
11    Which you then later confirm by looking
12 him up on the LexisNexis Smartlinx database?
13    A   Right. We used that if there was any question
14 about the situation.
15    Q   Okay.
16    Let me go ahead and give Frank a second. He's
17 going to pass out the employment file or employment
18 documents for Mr. Heuerman.
19    Now, before we get down this path a little bit,
20 I take it that Mr. Foster, or somebody in his law firm,
21 selected the documents for you to review; right?
22    A   Right.
23    Q   I didn't select the documents for you to
24 review; right?
25    A   Right.

Page 168

1    Q   Okay.
2    (Defendants' Exhibit Nos. 25-A, 25-B and 25-C
3    were marked for identification and are
4    separately bound.)
5    Q   BY MR. HOPSON:  Look at the document marked as
6 Exhibit 25-A.
7    A   Okay.
8    Q   Is that an I-9 file for Kevin Heuerman?
9    A   Yes.
10    Q   Okay.
11    So at least we know, sitting here today,
12 regardless of what was in front of you when you did
13 your analysis, that as of June 12, '06, Mr. Heuerman
14 had completed an I-9 form; right?
15    A   Well, apparently so. That's what the date on
16 this says.
17    Q   And we also know, if you'll turn the page for
18 the next page, that Mr. Heuerman passed Basic Pilot.
19    Isn't that what this reflects for us,
20 Mr. Cutler?
21    A   Yes.
22    Q   And if you turn two more pages, you can see a
23 picture of Mr. Heuerman on his Missouri driver's
24 license, which indicates that he's a 6'1", 260 pound
25 blue-eyed Caucasian gentleman?

Page 169

1    A   Right.
2    Q   Did you look at that when you were concluding
3 that this guy was an illegal alien?
4    A   Say that question again?
5    Q   Did you look at his driver's license, as part
6 of the totality of the circumstances that you were
7 telling me about this morning, when you concluded that
8 Mr. Heuerman is an illegal alien?
9    A   Based on --
10    Q   It's a yes or no question?
11    A   -- that he's 6'1", that he has blond hair --
12    Q   Did you look -- it's "yes" or "no."
13    A   I don't recall what I saw at that time, but the
14 fact that he has blond hair does not mean that he might
15 not be an illegal alien.
16    I certainly have arrested people who were
17 illegally present in the country and who are not
18 Latino.
19    Q   The question is:  Did you look at this as part
20 of your totality of the circumstances analysis. And
21 you're saying you don't know?
22    A   I don't recall what I looked at, what documents
23 were made available to me at that time.
24    Q   Let's turn to the LexisNexis database that we
25 know you did rely upon because you put it in your

Page 170

1    notes.
2    A    Right.
3    Q    And that's marked as 25-C.
4        And you say that for Kevin Heuerman, this
5    LexisNexis database indicates the Social Security
6    number is invalid or not issued yet.
7        But, in fact, if you will look at Exhibit 25-C,
8    I'll ask you to agree with me that that's not the case.
9    A    At the time I did this, I can tell you that I
10    would not have indicated that if I did not get that
11    indication from the computer; so I'm not sure what this
12    is.
13    Q    Did you print out what you saw on the computer?
14    A    Not always.
15    Q    Ever?
16    A    This doesn't make any sense.
17    Q    Your comment is it doesn't make any sense?
18    A    No.  Because I would not have indicated that it
19    was invalid or not yet issued if, in fact, we had this.
20    Q    Unless you made an error; right, Mr. Cutler?
21    A    I don't believe I made an error.  I don't
22    understand -- that's why I'm saying it doesn't make
23    sense.
24    Q    Well, do your notes and reasons for putting
25    Mr. Heuerman on the list of unauthorized workers stand

Page 171

1    up to the scrutiny we just gave the file?
2    A    Right now this contradicts what I have there,
3    but I'm telling you that I do not believe that this
4    information was available or I would not have made that
5    indication at that time.
6    Q    Well, let me ask you one more time.
7    A    Okay.
8    Q    Do you have any documents that can establish
9    what you looked at when you were going through your
10    analysis and making this determination?
11    A    Any documents were retained by counsel.
12    Q    Did you print out a LexisNexis database so that
13    you and I can look right now and see what you looked at
14    when you made the determination on Mr. Heuerman?
15    A    I don't know that I did.
16    Q    Okay.
17        So sitting here today, based on what you know
18    in this deposition room, there's no evidence of what
19    you saw when you ran the LexisNexis on Mr. Heuerman
20    other than your notes; correct?
21    A    Correct.
22    Q    And your notes are contradicted by Exhibit
23    25-C; correct?
24    A    Correct.
25    Q    All right.

Page 172

1        Does it look like Mr. Heuerman is in error?
2    A    Again, I don't know what date I had at that
3    point, but I would not have made that indication if I
4    had had this data.
5    Q    Did you look at the I-9 in Mr. Heuerman's file?
6    A    I'm looking at an I-9 right now.  I'm saying
7    that what I had at that time was no I-9, or I would
8    have indicated that we had an I-9.
9    Q    Let's pick up another one.  Let's look at your
10    notes at page 1499.
11    A    (Witness complies.)
12    Q    I'd ask you to look at Linares, Iveth Linares
13    is third from the bottom --
14    A    Linares, yes.
15    Q    Okay.
16        What are your reasons for putting Ms. Linares
17    on the list of unauthorized workers?
18    A    Again, I indicated no I-9, no supporting
19    documents, sparse employment history, application --
20    employment application completed in Spanish.
21    Q    I understand what you mean by no I-9, no docs.
22        What's the relevance of a sparse employment
23    history?
24    A    Well, the person was old enough and was
25    supposed to have been here for a while.  I made a

Page 173

1    presumption that she would have been employed prior to
2    coming to the company.
3    Q    Okay.
4    A    There was no indication of where she had been
5    previously.
6    Q    So the failure of Ms. Linares to have an
7    employment history or to have only a sparse one
8    informed your opinions in this case?
9    A    It was only one of a number of components.
10    It wasn't the determining factor.  It was just an
11    overall picture.
12        (Defendants' Exhibit Nos. 26-A and 26-B were
13        marked for identification by the reporter and
14        are bound separately.)
15    Q    BY MR. HOPSON:  Let's go ahead and look at
16    Exhibit 26-A and 26 B.
17    A    (Witness complies.)
18        Okay.  We've got an I-9?
19    Q    Yes.  We can start with what you started with
20    which is no I-9.
21    A    Right.
22    Q    If you look at Exhibit 29 -- 26-A, which was
23    produced to plaintiffs with Bates No. Tyson 108522, we
24    can see that Ms. Linares did, in fact, complete an I-9
25    on January 20, '05?

Page 174

1    A    Yes.
2    Q    We can also see Ms. Linares didn't need a
3  translator or a preparer to complete her I-9; right?
4    A    Correct.
5    Q    That would tend to cut in favor of her being
6  authorized, based on what you told me this morning;
7  right.  Okay.
8         Now, let's look at no docs.  If you turn a few
9  pages back, you will see a TYS108526, that there is in
10  this employment file a Social Security card and a
11  Missouri driver's license; is that correct?
12    A    In this file, yes.  I am certain that I was not
13  given this at the time that I did my --
14    Q    Okay.
15         Well, what did you do to quality control the
16  files that these lawyers sitting across the table gave
17  you?
18    A    (No response.)
19    Q    The answer you're looking for is "nothing";
20  right?  You did nothing to quality control the files
21  you reviewed in this project; correct?
22    A    (No response.)
23    Q    You relied on plaintiffs' counsel, sir, to show
24  you what they said was in the employment file; isn't
25  that right?

Page 175

1    A    Yes.
2    Q    And so if they didn't show you the whole file,
3  you sometimes came to wrong conclusions; correct?
4    A    (No response.)
5    Q    Is the answer correct -- yes?  Yes?
6    A    It didn't have -- I didn't see this one when I
7  did the review.
8    Q    Okay.
9         When you were an INS agent, making
10  determinations about who was authorized, did you take
11  representations and documents of people at face value?
12  Or did you take some responsibility on yourself to
13  check it out and get it right?
14    A    You did everything in your power to have the
15  material available in front of you.
16    Q    I want you to turn to, in Exhibit 26-A, page
17  108526, which is Ms. Linares's driver's license.
18         And I'd like you to tell me what her birth date
19  is.
20    A    1/11/87.
21    Q    And she applied for a job in 2005 when she was
22  18 years old; right, sir?
23    A    Right.
24    Q    Do you think that might explain her sparse
25  employment history?

Page 176

1    A    (No response.)
2    Q    I'll rephrase the question.
3         Would you expect someone who is 18 years old to
4  have an extensive employment history?
5    A    No.
6    Q    Does it look like Ms. Linares is another error
7  in your analysis?
8    A    Yes.
9    Q    Turn to -- back to your notes, and I would ask
10  you to look at T1489.
11    A    (Witness complies.)
12    Q    And the individual I'd like to direct you to,
13  Mr. Cutler, is Adde Abdalle, or any other pronunciation
14  you might choose, but that's the second individual on
15  the page.
16         And I'd like again to read into the record --
17  have you read into the record, the reasons why you
18  believe Mr. Abdalle (sic) is unauthorized to work in
19  the United States.
20    A    Well, according to LexisNexis, a Social
21  Security number may be used by two separate individuals
22  if given common addresses, also Social Security number,
23  according to LexisNexis, worked less than three years
24  ago, he had an employment application, he claims first
25  working in the United States five years ago.

Page 177

1         (Defendants' Exhibit Nos. 27-A, 27-B and 27-C
2         were marked for identification and are bound
3         separately.)
4    Q    BY MR. HOPSON:  Okay.
5         Okay.  I'm going to go ahead and I'm going to
6  hand out to you Exhibit 27-A, B and C, which are
7  employment documents and application, and C is the
8  LexisNexis printout.
9         The first thing, if you've had a chance just to
10  flip through those, Mr. Cutler, tell me when you're
11  ready to --
12    A    Just give me a second.
13    Q    Yes.
14    A    (Witness complies.)
15         Okay.
16    Q    Okay.
17         Let's start at the beginning with the first
18  document in Exhibit 27-A, which is marked as Tyson
19  083192 --
20    A    Uh-huh.
21    Q    -- and can you confirm for me that Mr. Adde, or
22  Abdalle Adde applied for the job and completed the
23  employment application on June 30, '06?
24    A    Yes.
25    Q    If you turn two pages in, can you confirm for

Page 178

1  me that Mr. Adde was employment authorized by Basic
2  Pilot?
3      A   Yes.
4      Q   If you turn two more pages, can you confirm for
5  me that he produced an Ohio identification card and a
6  Social Security card?
7      A   Yes.
8      Q   Okay.
9          If you turn to his application for employment,
10 which is marked as Exhibit 27-B, and look at the front
11 page, can you confirm for me that he told Tyson Foods
12 that he was working in Nairobi, Kenya through October
13 of 2005?
14     A   Yes.
15     Q   So if my math is right, he's been in the United
16 States less than a year at the time he's applying for
17 this job at Tyson Foods; is that correct?
18     A   Yes.
19     Q   So the note that says -- and I'm quoting now
20 from your own notes -- yet on his employment
21 application, he claims he first worked in the U.S. five
22 years ago, that note at least is incorrect; right?
23     A   Yes.
24     Q   Let's look at the last exhibit marked as 27-C,
25 which is the printout from LexisNexis.

Page 179

1      A   (Witness complies.)
2      Q   And just to set this question up right, you say
3  in your notes, according to LexisNexis, the Social
4  Security number may be used by two separate individuals
5  who have given common address.
6          Was that your note at the time, sir?
7      A   Yes.
8      Q   If you look at this, can you confirm for me
9  that there appear to be two individuals named Abdalle
10 Adde and Muse Adde who both live at 516 Longhurst
11 Drive?
12     A   Yes.
13     Q   Can you confirm for me that you cannot tell
14 from this LexisNexis database that they have the same
15 Social Security number?
16     A   The way LexisNexis always kicked it out was
17 with the last four numbers, they weren't represented by
18 X's, but that it would come back that way if it was the
19 same number.
20     Q   Right.
21         This LexisNexis database does not say Social
22 Security number is in use by two or more persons;
23 correct?  It does not say that?
24     A   Well, what it does say is there's a high risk
25 indicator saying that you should go further.

Page 180

1      Q   Okay.
2          And when you went further, where you went was
3  to conclude this guy had been in the United States for
4  five years; right?
5      A   Yes.
6      Q   And that was wrong.
7          Let me just ask you a general question here.
8  Has it ever been your experience that a couple of legal
9  immigrants might come to the United States together,
10 for example, might be brothers?
11         Did you ever see that happen?
12     A   Yes.
13     Q   Those legal immigrants that come to the United
14 States together, do they ever live together at the same
15 location?
16     A   Yes.
17     Q   Is it possible that that's what's reflected in
18 the Social Security database?
19     A   I have no way of knowing if that's the case.
20 So I'm not going to speculate on that.
21     Q   I'm just asking you if that's possible.  That
22 doesn't require speculation.  It's either possible or
23 it's not possible.
24     A   Yes.
25     Q   Do you want to put Mr. Adde's file in the error

Page 181

1  pile?
2      A   Yes.
3      Q   Let's look at T1499.
4      A   (Witness complies.)
5      Q   And the individual who I would like you to
6  focus your attention on is Kulbayin (sic. -) or maybe
7  Kulyabin. But in any event, spelled for the court
8  reporter, K-u-l-y-a-b-i-n.  Second from the bottom.
9      A   (Witness complies.)
10         All right.
11     Q   Okay.
12         Now, read for us into the record the basis for
13 your conclusion that Mr. Kulyabin is unauthorized to
14 work in the United States.
15     A   They needed to see his alien card.  He was
16 originally admitted as a refugee and still requires
17 a translator.
18     Q   Okay.
19         (Defendants' Exhibit Nos. 28-A and 28-B for
20         identification and are included herewith.)
21     Q   BY MR. HOPSON:  I'm going to hand out marked
22 as Exhibit 28-A and B, employment documents relating to
23 Mr. Kulyabin and just ask you as always, sir, to take a
24 minute to flip through them so you have a sense of
25 what's there.

Page 182

1    A    (Witness complies.)
2        Okay.
3    Q    And let's start again with the I-9 file marked
4    as Exhibit 28-A.  We see from that, I think you'll
5    agree, this gentleman applied for a job and completed
6    the I-9 form on January 8, '04.
7    A    Correct.
8    Q    If you flip back a few pages, do you see that
9    the I-9 was reaccomplished?
10    A    Yes.
11    Q    What does that mean?  Tell us what that means
12    when the I-9 is reaccomplished?
13    A    There had been a problem with it, and he went
14    to fill out another one and have it run again.
15    Q    Do you recall when you saw this file whether
16    you had the reaccomplished I-9s in it?
17    A    I don't recall.
18    Q    Do you see as Tyson 108120, that there is a
19    Social Security number -- I'm sorry -- Social Security
20    card and a Missouri driver's permit for Mr. Kulyabin?
21    A    He doesn't have a resident card.  And I do not
22    believe I saw it at the time that I looked at the
23    paperwork.
24    Q    You're referring to the resident card that is
25    in this file at 108124?

Page 183

1    A    Right.
2    Q    So your note that said "need to see alien
3    resident card" has now been satisfied by you looking at
4    108124; correct?
5    A    Correct.
6    Q    Having seen the permanent resident or ARC card,
7    ARC card, does that indicate to you now that your
8    original assessment of whatever documents you saw was
9    erroneous?
10    A    Well, I won't say erroneous.  I said that there
11    was no card.
12        Now, apparently, there is a card that I didn't
13    have access to at the time that I --
14    Q    Fair enough.
15        And I'm going to say to you, Mr. Cutler, I
16    didn't control what you looked at, and apparently you
17    didn't control what you looked at, but we do have
18    documents here.
19        And I'm asking you to look at them and just
20    confirm for me that the file appears to be inconsistent
21    with the notes you made, based on the documents you saw
22    when you did your review.
23    A    Yes, yes.
24    Q    Okay.
25        Let's put aside Kulyabin.  What I'd like

Page 184

1    to do -- yeah, I thought we were getting close; so why
2    don't we take a very short five-minute break, and I'll
3    sort through these files and see if we can get to the
4    conclusion here.
5    A    Okay.
6        THE VIDEOGRAPHER:  Going off the regard.  Time now
7    is 1:08 P.M.
8        (A recess was taken.)
9        THE VIDEOGRAPHER:  We're back on the record.  Time
10    now is 1:16 P.M.  This is the beginning of videotape
11    No. 5.
12    Q    Mr. Cutler, before I get back to the files, let
13    me just make sure I understand the process that is
14    followed here.
15    A    Okay.
16    Q    If I understand your testimony correctly, you
17    did not retain, as a rule, a copy of the file that you
18    received in order to form your opinion; correct?
19    A    Right.  After I reviewed them, after I completed
20    my work with them, I returned them to counsel.
21    Q    Who made the determination that you weren't
22    going to retain those files but were going to send them
23    back to counsel?
24    A    Counsel requested to hold onto the files and I
25    gave them back to them for safekeeping.

Page 185

1    Q    And as I also understand your testimony, you
2    didn't print out the LexisNexis page that you looked
3    at; is that correct?
4    A    That's correct.
5    Q    Who made the decision that you shouldn't print
6    out the LexisNexis page that you looked at?
7    A    Well, the methodology was arrived at
8    collectively by myself and counsel.
9    Q    So you and counsel agreed that you would simply
10    look at the electronic version and not retain a paper
11    copy; is that fair to say?
12    A    That's fair to say.
13    Q    Okay.  Do you think, based on your 30 years of
14    experience and given the seriousness of the issue that
15    you're addressing, that you should have made a better
16    effort to maintain a trail, a paper trail, of what you
17    looked at in this case?
18    A    Well, I thought my notes as to what I was
19    finding on LexisNexis would suffice because we had
20    everything else, as best as I was given them;
21    so . . . .
22    Q    Well, putting aside LexisNexis, do you think
23    that if you do this again, you'll maintain a paper file
24    of what exactly that you looked at?
25    A    Well, it's actually just as easy to have

Page 186

1    counsel maintain them here. I was traveling, and this
2    is a secure place to keep them; so I saw no reason to
3    do it in any different fashion.
4          It's what I would have done if I was working as
5    an agent. Certainly, we wouldn't take files home with
6    us. It wasn't allowed to. They remained in an office.
7          So to my thinking, this is comparable to the
8    practice that I followed for 30 years as a federal
9    agent.
10    Q    I've got it.
11          Why don't we pick up again with Exhibit 1-C and
12    ask you to draw your attention to page 1496.
13    A    (Witness complies.)
14          Okay.
15    Q    Now, the particular person I want to read
16    into the record for me is named Shcherbina, third name
17    down on page 1496.
18    A    Pavel Shcherbina. Okay.
19    Q    Yes. What's the reason you determined Mr. or
20    Ms. Shcherbina was unauthorized to work in the United
21    States?
22    A    My notation is that the I-551 expired on
23    October 4, 2005.
24    Q    And the I-551, before we get into the paper, is
25    what sometimes colloquially is referred to as a green

Page 187

1    card.
2    A    Green card, alien registration receipt card,
3    alien resident card. It goes by a number of
4    descriptive names.
5    Q    And the rule that you've already described for
6    me -- I apologize for repeating it is --
7    A    No problem --
8    Q    -- that card must be valid at the time the
9    person is hired; correct?
10    A    Right.
11    Q    Okay.
12          (Defendants' Exhibit Nos. 29-A and 29-B were
13          marked for identification and are bound
14          separately.)
15    Q    BY MR. HOPSON: Let's go ahead and look at
16    Exhibit 29-A and B.
17    A    (Witness complies.)
18          Okay.
19    Q    As always, Mr. Cutler, slow me down if you want
20    to take more time to look at things. But as a simple
21    starting point, on page 109773, which is the first page
22    of Exhibit 29-A, we see that Shcherbina was hired and
23    completed the I-9 form on January 22, '01; correct?
24    A    That's the indication here. Let me look at the
25    card.

Page 188

1          Pardon me.
2    Q    Bless you. Do you want to get some water?
3    A    No. I've got my poisonous Coke.
4    Q    Okay.
5    A    (Witness complies.)
6          Well, I have a photostat of the alien card in
7    the file but it's impossible --
8    Q    But you were able to read it at one time, sir,
9    because you wrote in your notes the expiration date.
10          What did you write in your notes?
11    A    Well, again, I don't recall the document I saw
12    then because we're talking about almost 500 files. I'm
13    just saying that right now, looking at this trying to
14    refresh my recollection --
15    Q    You can't read it?
16    A    -- I can't read it.
17    Q    Look at Exhibit 1-C at page 1496, which is your
18    notes.
19          You wrote in your notes that the I-551 expired
20    on October 4, '05?
21    A    Right.
22    Q    So assuming, for purposes of argument, that
23    your notes are accurate, that alien registration card
24    was in effect and valid --
25    A    Right.

Page 189

1    Q    -- at the time Shcherbina was hired?
2    A    If that was the case, then I made an error.
3    Q    Okay.
4          Let's look at page 1499. And the person I want
5    you to look at on page 1499, on Exhibit 1-C, is Eloy
6    Cardenas, which is second from the top.
7    A    Eloy Cardenas. Okay.
8    Q    Whatever you want.
9          What's the reason that you determined Cardenas
10    was unauthorized to work in the United States?
11    A    Expired alien registration card. ARC is my
12    shorthand, again for an alien registration card, just
13    clarification for you.
14    Q    And you and I both understand that that's
15    sometimes referred to as a permanent resident's card or
16    green card?
17    A    Green card. Right. My only shorthand, I've
18    always used the term ARC going back years.
19    Q    And you note on page 1499, that the ARC expires
20    on October 18, '01; correct?
21    A    Correct.
22          (Defendants' Exhibit Nos. 30-A and 30-B were
23          marked for identification and are separately
24          bound.)
25    Q    BY MR. HOPSON: So let's look at Exhibit 30-A

Page 190

1   and 30-B.
2       A   (Witness complies.)
3       Q   Without, again, in any way undermining your
4   ability to look at these to the extent you want, can
5   you confirm for me that the first page of Exhibit 30-A
6   indicates that Cardenas was hired and filled out the
7   I-9 form on June 13th, 2001?
8       A   Yes.  That's what this shows.
9       Q   Okay.
10      So flip back with me until you get to the
11  resident alien card, which is at 103375.
12      A   Right.
13      Q   And you see that that card was valid on
14  June 30th, '01, and did not expire until October 18th, '01;
15  correct?
16      A   Yes, that's correct.
17      Q   So the resident alien card was valid at the
18  time Mr. Cardenas was hired; correct?
19      A   Yes.  And this also shows -- although I didn't
20  note it in my files -- again these notes are not
21  completely definitive.  There's sometimes things that
22  might not have been put in.
23      Looking at this file, it also shows, however,
24  they used a translator or a preparer in order to
25  prepare his I-9.

Page 191

1       Q   Okay.
2       Well, you're absolutely right about that
3   observation.  But it wasn't important enough for you to
4   put in the notes that you made while you were reviewing
5   the files; right?
6       A   Well, again, in some cases if I put down one
7   thing, there may have been several.  I generally listed
8   at least one or two reasons.
9       There may have been -- as I said to you before,
10  there may have been other reasons why I was concerned
11  about somebody.
12      In this case there's also --
13      Q   When I go back and read the transcript, am I
14  going to find you answering my question that all of the
15  reasons for your opinion are set forth in your notes,
16  or did I mishear you --
17      A   I don't recall precisely how I answered that
18  question.
19      But I'm telling you that these are notes that I
20  took, and it's entirely possible that in some cases, I
21  might not have articulated each and every reason.
22      Q   So to the extent that you told me before that
23  these notes fully represent the basis for your opinion,
24  you want to change that answer now?
25      A   Well, what I had said to you is that I -- I

Page 192

1   articulated -- in fact, I remember the expression I
2   used, as best I can recall it, that I would put down
3   what I hung my hat on.
4       But that doesn't mean that that was the only
5   thing that I notated.
6       Q   Do you remember when I asked you if there were
7   any hidden reasons for your opinion?
8       A   Well, I don't see it as a hidden reason.
9       Q   It's not in your notes.
10      A   I don't know what a hidden reason is.  I'm not
11  being covert about this.  It's just that --
12      Q   So you have reasons --
13      A   I have --
14      Q   -- for believing people that are unauthorized but
15  you didn't put them in Exhibit 1-C?
16      A   Well, here's an example of somebody --
17      Q   Well, can I get a "yes" or "no."  Are there reasons
18  for your opinion that 91 people are unauthorized from
19  employment in the United States that are not set forth
20  in Exhibit 1-C?
21      A   There may be instances that every reason was
22  not articulated in my notes.
23      Q   So the answer to my question now is "yes"?
24      MR. FOSTER:  Objection.
25      Misstating the witness's answer.

Page 193

1       Q   BY MR. HOPSON:  Is the answer "yes," that there
2   may be other reasons that are not set forth in Exhibit 1-C?
3       A   Yes.  But they're not hidden reasons.  I don't
4   know what a hidden reason is.
5       Q   Well, put aside hidden reasons.  The answer to the
6   question is "yes."
7       MR. FOSTER:  Objection.
8       Q   BY MR. HOPSON:  You didn't completely set forth the
9   basis for your analysis in Exhibit 1-C is your current
10  testimony; right?
11      A   I'm saying that there may be instance -- I'm
12  trying to be as specific and answer your question to
13  the best of my ability, Counselor.
14      Q   The record is going to reflect what you're
15  trying to do.  Okay?  What I would like you to do is
16  answer the question.
17      A   That's what I'm trying to do, Counselor.
18      Q   Are there reasons that you're now going to rely
19  upon to argue that somebody is unauthorized for
20  employment that are not set forth in Exhibit 1-C?
21      A   On some cases, that might turn out to be the
22  case --
23      Q   You don't know?
24      A   These are notes that I took.
25      Q   Let's turn to --

Page 194

1    MR. FOSTER: Mr. Hopson, would you let him finish
2  his answer.
3    MR. HOPSON: Sure.
4    MR. FOSTER: You cut him off repeatedly.
5    MR. HOPSON: Okay.
6    THE WITNESS: What I'm trying to say is that if
7  there was a reason to put the person on the list, I
8  did.
9        And then, in some instances, it may be that all
10  of the reasons were not articulated as long as I
11  indicated that there was reasons.
12        And I'm just telling you that looking at this,
13  what I'm also observing is that this individual also
14  needed a translator to assist him with the preparation
15  of the documents.
16    Q  BY MR. HOPSON: Looking at that, do you also
17  conclude that the reasons that you articulated on
18  Exhibit 1-C are wrong?
19    A  I'm saying that this was in addition to --
20  looking at it prima facie, it would appear the card
21  was valid at the time of employment. That's all I'm
22  saying to you.
23    Q  So the reason you articulated --
24    A  On this sheet, it was wrong. Okay?
25        But I'm just telling you that in looking at

Page 195

1  this, what I'm also observing.
2    Q  So are you now opining that the reason
3  Mr. Cardenas is unauthorized for employment is that the
4  I-9 file indicates that he used either a preparer or a
5  translator?
6    A  Yes.
7    Q  Okay.
8        That's your reason now.
9        What did he use? Did he use a preparer or a
10  translator?
11    A  This isn't clear.
12    Q  You don't know whether --
13    A  It's an either/or.
14    Q  It's an either/or.
15        Well, if he used a preparer, is that the same
16  as using a translator in you formulating your opinion?
17    A  Well, I'll tell you -- I'm looking at the fact
18  that the man signed his signature in script. It
19  appears that he's literate in a language.
20        So I have to make the presumption that if
21  somebody assisted in the preparation, it wasn't that
22  he's unable to read or write, but that he's unable to
23  read or write English.
24    Q  You conclude that Mr. Cardenas is sufficiently
25  literate to fill out an I-9 form because he can sign

Page 196

1  his name in script?
2    A  In script. And in my experience, again, when
3  we've had people from towns and various parts of the world
4  that are illiterate, they'll either make a mark, or it will
5  be very difficult to discern what they're writing.
6    Q  Have you ever said before, in any context, that
7  a person who signs their name in script is literate in
8  the English language, meaning they --
9    A  I didn't say the English language.
10        That it would appear he's literate in a language.
11  This could be the Spanish language. But all I'm
12  saying --
13    Q  Let me rephrase the question.
14        Have you ever said before in any context,
15  orally, in writing, under oath, that a person who can
16  sign their name in script is literate in a language?
17    A  You mean during the course of my career as an
18  agent or --
19    Q  Yes.
20    A  I might -- well, if I don't recall all of my
21  testimony, that's certainly -- that's always been my
22  opinion, and I don't believe I'm alone in this.
23    Q  But that may be possible that's the first time
24  in your life you've articulated that opinion?
25    A  I would be doubtful of that. I can't give you

Page 197

1  a date and place and tell you when I may well have done
2  it previously.
3        But I'm telling you that --
4    Q  We can agree that you certainly didn't think it
5  was important enough to put it in the two written
6  opinions you produced in this case; right?
7    MR. FOSTER: Objection.
8    Q  BY MR. HOPSON: Okay.
9    MR. FOSTER: Misstates --
10    MR. HOPSON: Objection.
11    THE WITNESS: I'm just telling you that looking at
12  this, I had put down an error. Okay? I'm not
13  disputing the fact that I made an error.
14        But I'm also telling you that there's more than
15  one reason in this case that I would have been
16  suspicious of this individual.
17    Q  BY MR. HOPSON: Is there any guidance in the
18  materials from the INS, Homeland Security, the
19  Department of Justice, that tells employers that a
20  person who signs their name in script should be treated
21  as literate?
22    A  There is so much that agents do that's not in
23  writing anywhere that you acquire for what we would
24  refer to commonly as on-the-job training.
25        Just like a doctor in medical school, you can

Page 198

1  go so far in training and material. Part of it comes
2  from the physical experience of being out there and
3  making observations and so forth.
4        And it's been my experience that when people
5  can sign their name in script clearly, you couldn't do
6  it if you were illiterate in some language. That would
7  be something that would be beyond the ken or ability of
8  a person who was illiterate.
9        It's one thing if he had managed to remember
10 how to print his name. And I have seen that where they
11 print their first name. I've seen them put an X down.
12       But when somebody can, in neat cursive writing,
13 sign their name, that that indicates to me capability
14 of literacy.
15  Q   You just said in that last answer, that while
16 you don't know that this is written down, this is
17 something that INS agents know; right?
18  A   Yes. If we're looking at documents, that's one
19 of the things that we would pay attention to.
20  Q   But you've already agreed with me that an
21 employer can comply with the law and legally hire
22 someone without knowing everything that INS agents
23 know; right?
24  A   Yes.
25  Q   Do you think it's fair for you to call on

Page 199

1  esoteric knowledge --
2  A   Well --
3  Q   No wait. Let me finish my question.
4  A   Okay, Counsel.
5  Q   -- about what INS agents know when the question
6  in this case is whether Tyson Foods was hiring legally?
7  A   I think the ability to sign your name is -- I
8  would put it under the broad category of common
9  knowledge.
10       If you can't read and write, you couldn't sign
11 your name in clear cursive writing. I think if you
12 stop people in the street, they would say, yeah, if the guy
13 could sign his name, he probably could read and write
14 some language.
15       In this case, it could be Spanish because they
16 use the same alphabet that we do.
17  Q   So if a person can sign his name, it's common
18 knowledge that they're literate enough to read an I-9
19 form?
20  A   In one language or the other.
21       And the question that we're trying to raise is
22 whether or not it was a preparer or a translator or an
23 interpreter here.
24  Q   We don't know.
25  A   Right.

Page 200

1        And what I'm saying to you is that I deduced
2  from the fact that he was literate enough to clearly
3  sign his name, that he was literate in some language --
4  apparently not the English language.
5        It wasn't a matter of lacking the ability in
6  any language. It was a matter that he had a translator
7  rather than a preparer.
8  Q   Okay.
9        I see what you're saying.
10       What you're saying to me is someone who can
11 sign their name is literate enough in English, assuming
12 they're a native born English speaker, to read an I-9
13 form?
14  A   Yes.
15  Q   Very good.
16       Let's go look at page 1500 in Exhibit 1-C. And
17 let's look at Hilario Gonzalez.
18  A   The bottom.
19  Q   At the bottom.
20       What's the reason that Hilario Gonzalez is on
21 the list of persons who appear to be unauthorized to
22 work in the United States?
23  A   Expired alien card as of 3/23/02.
24       (Defendants' Exhibit Nos. 31-A was marked for
25       identification and is bound separately.)

Page 201

1  Q   BY MR. HOPSON: Let's go ahead and hand out
2  just the I-9 form, which we've marked as Exhibit 31-A.
3        What date was Gonzalez hired?
4  A   6/13/01.
5  Q   So we know, just from looking at the first page
6  of Exhibit 1-A, that the alien registration card was
7  valid at the time Gonzalez was hired; correct?
8  A   At the time that this I-9 was prepared; correct.
9  Q   And that means it was a legal hire.
10 A   (No response.)
11 Q   So not to belabor the point, it looks like this
12 was erroneous; right, Mr. Cutler?
13 A   (No response.)
14       He reaccomplished from the first application
15 in '96. Okay.
16 Q   So you agree that Hilario Gonzalez should not
17 be on the list of 91 individuals who are unauthorized
18 for employment or appear to be unauthorized for
19 employment; right?
20 A   Yes.
21 Q   Before we left for lunch, Mr. Cutler, you said
22 to me -- and I don't want to put words in your mouth,
23 but you said that you were reasonably confident or highly
24 confident that this process you engaged in of hindsight
25 review of these employment files yielded accurate

Page 202

1    results.
2         Do you recall that testimony?
3    A   Yes.
4    Q   After looking at the files we've looked at
5    since lunch, do you persist in your view that you're
6    highly confident of the accuracy of your methods?
7    A   I made a couple of errors, yes.  I made
8    several errors.
9    Q   So if we looked at 14 files today, are you
10   highly confident that the remaining are accurate?
11   A   I believe they are, and I'm still trying to
12   understand in some of these cases why, for example, why
13   the I-9 wasn't available, is available, and so forth.
14   Q   I understand you're struggling with that, sir,
15   and I don't mean to belittle it or make light of it.
16        But the question on the table is:  If we take
17   the ones we've looked at since lunch off your list, we
18   would be down to a list of 78, 77 illegals -- something
19   like that.
20        I'm asking you now the same question I asked
21   you before lunch.  Do you remain highly confident that
22   the methodology you followed, looking at these files in
23   hindsight, limited to the paper record, is a very
24   accurate method of determining who is authorized for
25   employment in the United States?

Page 203

1    A   I think it's accurate, and I think there were
2    failings in some of these applications.
3         But I do.
4    Q   Well, in the short time we've had since lunch,
5    we've demonstrated failings in more than 10 percent of
6    your conclusions; correct?
7    A   Correct.
8    Q   Pick up Exhibit 1-C and turn to 1489.
9    A   (Witness complies.)
10   Q   I'd like you to read to me the reason why Vong
11   Phanphaya in Shelbyville is unauthorized to work in the
12   United States.
13   A   Alien registration card, alien card on file
14   expired 11/2/02; she lived and worked in the United
15   States since 1994, and yet she still required a
16   translator even though she's been here for -- I'm
17   going to guess ten years.
18        I'm not sure of the date of the I-9, but I
19   think we're talking about a decade in the United
20   States.
21   Q   If somebody -- I think you just told me if
22   somebody actually writes their name in block letters as
23   opposed to script, that's an indication to you that
24   they may be illiterate, correct?
25   A   May.  Not necessarily.  The X is absolute.  The

Page 204

1    block letters raise some question.
2    Q   So the script is absolute, but the absence of
3    script is not absolute?
4    A   Right.
5         Because some people do print their name.  I'm
6    just saying that all people who can write in script are
7    literate, that doesn't mean to say that if someone
8    prints their name -- I had a boss that used to print
9    his name and he had a Master's degree; so go figure.
10        It's just a matter of -- I've never met anybody
11   who was illiterate who could sign their name accurately
12   in script.  Let's put it that way.
13   Q   Let me ask you to take a look at what we're
14   handing out now that's Exhibit 32-A and B.
15        (Defendants' Exhibit Nos. 32-A and B were
16        marked for identification and separately
17        bound.)
18   THE WITNESS:  (Witness complies.)
19   Q   BY MR. HOPSON:  If you look at the first page
20   of Exhibit 32, it's the I-9 showing that this
21   individual was hired on October 5, '01.
22        And that will allow us to conclude, won't it,
23   Mr. Cutler, that that person's alien registration card
24   was valid and in effect on the date that they were
25   hired October 5th, '01?

Page 205

1    A   On this form, yes, that's correct.
2    Q   Okay.
3         And so, to the extent that you were relying on
4    the alien resident card, that was an error; correct?
5    A   On this form -- I believe I saw the same form.
6    I don't know what the date was on the one that I had
7    examined, but here we have one that says that --
8    Q   Do you believe that somebody slipped in a
9    different I-9 file for you to look at?
10   A   I'm not drawing any conclusions.  I'm just
11   saying to you.
12   Q   The second reason that you're telling us that
13   this individual appears unauthorized to you is that
14   they required a preparer or translator; is that
15   correct?
16   A   That's correct.
17   Q   Is it a preparer or a translator?
18   A   In this case, I don't know.  I'm going to
19   presume -- I'm going to presume that the person used a
20   translator.  She was able to write the language in
21   block letters.
22        She might not have had good language command.
23   This is hard to determine.
24   Q   Well, you're going to presume that it was a
25   translator.

Page 206

1    A   Well, if you look at the way she signed her
2    name, she actually misspelled her own name.
3    Q   How much of your opinion in this case is based
4    on similar presumptions?
5    A   What presumptions are we talking about?
6    Q   What presumption did you just make?
7    A   That the woman is not able to write and read in
8    the English language.
9    Q   Right.
10    A   Because if you look at the way she spelled her
11    name, her name is misspelled and she purportedly signed
12    it.
13    Q   Sitting here today, you wouldn't bet your life
14    that this woman used a translator rather than a
15    preparer, would you?
16    A   I'm telling you what my feeling is.  I don't
17    bet my life very easily.
18    Q   Okay.
19        So now you're telling me that your testimony
20    about this individual is based on your feelings; is
21    that right?
22    A   Well, if you have a problem writing your own
23    name, the name is misspelled.  My presumption is if you
24    misspell your own name, that you have a problem
25    with the English -- now, remember, she's probably from

Page 207

1    Thailand with that name, and they use a different
2    alphabet.
3        My presumption is that she's having a problem
4    with the English alphabet -- the American alphabet.
5    Q   She has trouble writing her own name, which
6    leads you to believe she's illiterate; right?
7    A   Correct.
8    Q   And so if she's illiterate, it's really not a
9    question of her being able to engage in conversational
10    English, is it, Mr. Cutler?
11    A   After ten years, you --
12    Q   Forget ten years.
13        What's your basis for concluding that this
14    woman can't have a conversation in English, other than
15    your presumption?
16    A   The fact that she clearly used, in my judgment
17    an interpreter.
18    Q   In your judgment, what's your evidence that she
19    used an interpreter rather than a preparer?
20        Don't tell me about your feelings or your gut
21    or your experience.  Tell me about the evidence you're
22    relying on, under oath, for your opinion in this case.
23    A   Because she couldn't write her name.
24    Q   Well, you just told me that being able to write
25    your name in script was evidence of being literate;

Page 208

1    right?
2        Now, this woman can't write her name in script,
3    and you're telling me that's also evidence of literacy?
4    A   Of literacy, no.
5        I'm saying that she might well be literate in
6    her own language.  The person that signed the documents
7    in script was also from a country that also uses the
8    same alphabet we do.
9        She doesn't.
10    Q   Did you rely on presumptions in reaching your
11    opinion in this case?  "Yes" or "no"?
12    A   Yes.
13    Q   Did you rely on your feelings and your gut
14    reactions --
15    A   Experience.
16    Q   -- and four or five years of experience?
17    A   Yes.
18    Q   Turn to Exhibit 1-C?
19    A   (Witness complies.)
20    Q   Look at page 1487.  Look at Pedro Gaspar.
21    A   Okay.
22    Q   What's the reason that Pedro Gaspar is on the
23    list of persons who are unauthorized to work in the
24    United States?
25    A   The I-551 has expired.

Page 209

1    Q   Okay.
2        (Defendants' Exhibit Nos. 33-B and 33-B marked
3        for identification by the reporter and is
4        included herewith.)
5    Q   BY MR. HOPSON:  Let's look at Exhibit 33-A and
6    33-B.
7    A   (Witness complies.)
8    Q   On what day did Gaspar complete the I-9s?
9    MR. FOSTER:  Excuse me, Counsel.  Can I have a
10    form?
11    MR. HOPSON:  No.  You can't have a copy of the form.
12    We're going to withhold that from you.
13        Let the record reflect we gave plaintiffs'
14    counsel his copy of the form.
15    Q   Does the record reflect now, sir, on Exhibit
16    33-A, that Gaspar completed the I-9 form on 6/19/01?
17    A   This I-9 reflects that, yes.
18    Q   Okay.
19        And if you turn four pages back, will you look
20    at the alien registration card?
21    A   (Witness complies.)
22        I'm looking at it.
23    Q   It says that the alien registration card
24    expires on March 21st,'06; correct?
25    A   Correct.

Page 210

1    Q  So the conclusion in your notes that the I-551
2  has expired is erroneous.
3      Is that fair enough?
4    A  In this case, yes.
5    Q  Your conclusion is incorrect, as far as we can
6  tell from this record?
7    A  As far as we can tell.
8    Q  Okay.
9      Let me stop here and ask you again:  Do you
10  still persist in the view that your exercise, the
11  analysis that you went through here, is a highly
12  accurate way of determining who is authorized to work
13  in the United States?
14    A  All I can tell you is that the I-9 that I saw
15  indicated that the dates didn't coincide.  I'm not sure
16  how this happens.
17    MR. HOPSON:  Give me one second.  I don't want to go
18  off the record.  I just want to ask Mr. Volpe a question.
19  No more than 30 seconds.  I want to unclip first.
20    MR. FOSTER:  I'd like to go off the record.
21    MR. HOPSON:  We're back.
22    MR. FOSTER:  All right.
23    MR. HOPSON:  I'm going to conclude my examination
24  of the witness at this time.
25    MR. FOSTER:  Okay.  I'll take a break and then I'll

Page 211

1  ask Mr. Cutler some questions.
2    THE VIDEOGRAPHER:  Going off the record.  The time
3  now is 1:48 P.M.
4    (A recess was taken.)
5    (At this point Mr. Hopson left the deposition
6    proceedings.)
7    THE VIDEOGRAPHER:  We're back on the record.  Time
8  now is 1:58 P.M.
9    MR. VOLPE:  Howard, I just want to say that I've
10  taken over for Mr. Hopson who had to leave.
11    MR. FOSTER:  Sure.
12    MR. VOLPE:  Frank Volpe for the defendants.
13    MR. FOSTER:  Okay.  Very good.
14  //
15  //
16      EXAMINATION
17  BY MR. FOSTER:
18    Q  All right.
19      Mr. Cutler, I'd like to go over some of the
20  testimony that you've given here.
21    A  Okay.
22    Q  And review some matters with you.  Would you
23  start with Exhibit 1-A -- I want you to have a copy of
24  that -- which is your declaration --
25    A  Correct.

Page 212

1    Q  -- that you gave.
2      Okay?
3    A  Yes.
4    Q  I'd like you to look at paragraph 3.
5      Okay?
6    A  (Witness complies.)
7      Okay.
8    Q  And as Tyson's lawyer has already asked you,
9  paragraph 3 is a list of factors that you stated that
10  were criteria used in your review of each of the
11  employees' documents in determining whether you thought
12  they were unauthorized for employment; is that right?
13    A  That's right.
14    Q  Okay.
15      Now, there are 14 factors that you've listed in
16  your declaration --
17    A  Correct.
18    Q  -- is that correct?
19    A  Yes, it is.
20    Q  Now, did you list every single factor in your
21  work notes, which are labeled Exhibit 1-C, for
22  determining why individuals were unauthorized for
23  employment?
24    A  No, I did not.
25    Q  All right.

Page 213

1      Is it your testimony, however, that in every
2  instance where you formed an opinion that an individual
3  was unauthorized for employment, however, it was
4  because of the factors that you listed in paragraph 3
5  of your declaration?
6    A  Yes.
7    Q  Okay.
8      There were no other reasons that you relied
9  upon for believing that certain individuals were
10  unauthorized for employment?
11    A  Outside of the 14 that I've indicated?
12    Q  Right.
13    A  No.  Essentially I used the 14 as a guideline.
14    Q  Okay.
15      I would like to now go over every single one of
16  these that Tyson pulled out which they believed you
17  were incorrect about.
18      I first would like to ask you this:  When did
19  you do this review of these forms?
20    A  I believe it was in May or June of this year.
21    Q  Okay.
22    A  2007.
23    Q  Okay.
24      Were you told, when you were doing the review,
25  that all of the individuals you were looking at were

Page 214

1  currently employed by Tyson Foods as of that date?
2      A   Yes, I was.
3      Q   Okay.
4          Did you assume that in forming your opinions
5  about these workers?
6      A   Yes, I did.
7      Q   Okay.
8          (Defendants' Exhibit No. 33-A and 33-B were
9          marked for identification and are separately
10         bound.)
11     Q   BY MR. HOPSON:  Let's look at Exhibit 33-A, if
12 we could, which has been previously marked Pedro
13 Gaspar.
14     A   Okay.
15     Q   And do you have that handy with you -- 33-A,
16 Gaspar.  If not, we'll get it for you.
17     A   I've got Pedro Gaspar.
18     Q   I think you have a pile to your right,
19 Mr. Cutler.  I want you to please turn your attention
20 to Exhibit 33-A.
21     A   (Witness complies.)
22         Okay.  One second.  I have it.
23     Q   Okay.
24         Now, the first document on here is Pedro
25 Gaspar's I-9 form.  Okay.

Page 215

1          Do you see that?
2      A   Yes, I do.
3      Q   Does the form indicate that he -- assuming this
4  is a he -- used the translator to complete his I-9
5  form?
6      A   Yes, it does.
7      Q   Does it also indicate that he checked the box
8  as being a lawful permanent resident alien?
9      A   Yes, it does.
10     Q   Okay.
11         Based upon that, did you form an opinion as to
12 whether this person was unauthorized for employment?
13     A   Yes, I did.
14     Q   What was your opinion about this person?
15     A   Consistent with my training and experience, a
16 resident alien who has been living in the United States
17 for a number of years -- and this individual certainly
18 has been -- would be fluent enough in the English
19 language to prepare the I-9 on his own.
20     Q   So you believe this person was unauthorized for
21 employment; is that correct?
22     A   That is correct.
23     Q   Okay.
24         And do you believe Tyson broke the law when
25 they hired this person?

Page 216

1      A   Yes, I do.
2      Q   And do you think Tyson then -- the person at
3  Tyson Foods who signed the certification portion of the
4  form down there -- Angela Cole, did she -- do you think
5  that she lied on her I-9 form --
6      A   Yes.
7      Q   -- by saying she thought this person was legal?
8      A   Yes, I do.
9      Q   Okay.
10         Now, I want you to look also at 33-B.  There's
11 also, in addition to this I-9 form, an application for
12 employment.
13         Do you see that?
14     A   Yes, I do.
15     Q   Okay.
16         It was purportedly completed by Pedro Gaspar.
17     A   Right.
18     Q   Do you see that name written up there?
19     A   Yes.
20     Q   Okay.
21         Does the handwriting on that application seem
22 to match the handwriting on Section 1 of the I-9 form?
23     A   No, it does not.
24     Q   Do you think that the same individual completed
25 both documents?

Page 217

1      A   I do not.
2      Q   Okay.
3          Does that give you another reason to believe
4  that this person was not authorized for employment?
5      A   Yes, it does.
6      Q   And what reason is that?
7      A   Well, I'm concerned as to who actually filled
8  out the paperwork, whether or not they may have had
9  somebody do it, whether it was somebody at HR or
10 somebody else -- it is hard to determine who, but it
11 certainly doesn't appear that he filled it out.
12     Q   Okay.
13         I want to bring your attention to another
14 matter.  There's no work history, really, there.  Just
15 it says it has it but no dates.
16     A   Correct.
17     Q   Do you see that?
18     A   Yes, I do.
19     Q   Lack of work history.  Is that a factor that
20 you considered in forming your opinion about certain
21 people?
22     A   Yes, it is.
23         Usually, if somebody has been in the United
24 States for a significant period of time and they're
25 adults, then they're going to have a work history.

Page 218

1       The fact that they don't makes me suspicious of
2  the fact that they arrived relatively recently and are
3  possibly using a false alias.
4     Q   Okay.
5       I want to bring something else to your
6  attention about this person.
7       Do you see the date of the employment
8  application that this person allegedly filled out?
9     A   Yes, I do.
10    Q   Okay.
11      It's 5/3/99.  Do you see that in the upper
12  right corner on the application for employment?
13    A   Yes.  5/3/99.
14    Q   Okay.
15      Do you see the date of the I-9 form that he
16  allegedly filled out?
17    A   Yes.
18    Q   What date is that?
19    A   According to the I-9, he applied on June 19th
20  of '01.
21    Q   Does that give you cause for concern about the
22  authenticity of this person's documents?
23    A   Absolutely.  This is a two-year discrepancy.
24    Q   Okay.
25      I'm going to move on to the next.

Page 219

1       So in conclusion, do you believe that -- do you
2  believe that somebody at Tyson Foods either completed
3  the employment application for this individual, or
4  helped him complete section 1 of his I-9 form?
5     A   Yes, I do.
6     Q   Okay.
7       And do you maintain your opinion that Pedro
8  Gaspar was unauthorized for employment at the time he
9  was hired by Tyson Foods?
10    A   Absolutely.
11    Q   Okay.  I want to move on.
12      Next one.  Exhibit 32-A.  Would you pull that
13  out, please.
14      This is a person named Vong Phanphaya, or
15  however it's -- I'll spell it for the court reporter.
16  P-h-a-n-p-h-a-y-a.  Okay.
17    A   So was the -- I got it.
18    Q   First name is Vong, and the last name is --
19  begins with P.  It's Exhibit 32-A.
20    A   I have it.
21    Q   Okay.
22      Let's look at Exhibit 32-A?
23    A   Okay.
24    Q   Okay.
25      Exhibit 32-A is an I-9 form.  Am I correct?

Page 220

1     A   Yes, it is.
2     Q   Okay.
3       The I-9 form was allegedly completed by the
4  worker whose first name is Vong; right?
5     A   Yes.
6     Q   Okay.
7       And was also -- is the preparer and translator
8  portion completed?
9     A   Yes, it is.
10    Q   Okay.
11      So do you make a conclusion about that use of a
12  preparer or translator when the person indicates
13  they're a lawful permanent resident?
14    A   Yes.  It would appear that that person is not
15  really a lawful permanent resident.
16      They've been living here for a number of years
17  and needed a translator to assist with the preparation
18  of the I-9.
19    Q   Do you have any idea how long that this person
20  has been living here, based on these documents?
21    A   (No response.)
22    Q   Is there anything on the lawful permanent
23  resident card that would --
24    A   I'm just looking to see --
25    Q   -- that would indicate that?

Page 221

1     A   They've changed the codes around.  I'm not
2  certain.
3     Q   Okay.
4       In your experience, how long does it take to
5  obtain a lawful permanent resident card in the legal
6  manner?
7     A   Usually, it takes a number of years.
8     Q   Okay.
9       And in your experience, do people who lawfully
10  obtain lawful permanent resident status have a working
11  knowledge of English?
12    A   Yes, they do.
13    Q   Okay.
14      So does that enable you to conclude, then, that
15  this person was not authorized for employment at the
16  time he or she was hired by Tyson Foods?
17    A   Yes.
18    Q   Okay.
19    A   It would appear that she's actually not here
20  legally.
21    Q   Okay.
22      And do you believe that Tyson Foods then lied
23  on the I-9 form when they certified under oath that the
24  person related to the documents?
25    A   Yes.

Page 222

1    Q   Okay.  Let's move on.
2        So one final question about this person.
3    A   Yes.
4    Q   Is it still your opinion that this individual
5    was unauthorized for employment?
6    A   Absolutely.
7    Q   Okay.  Moving on.
8        Exhibit 31-A.  Okay.  This person is -- last
9    name Gonzalez.  First name Hilario.
10   A   Yes.
11   Q   Do you have that form in front of you?
12   A   Yes, I do.
13   Q   Okay.
14       This individual used -- purported to be a
15   lawful permanent resident; right?
16   A   Yes.
17   Q   Okay.
18       Looking at the list A part of the I-9 form, was
19   there an expiration date of the lawful alien resident
20   card that the person used?
21   A   Yes.
22   Q   Okay.  What's the expiration date.
23   A   March 23rd, 2002.
24   Q   Okay.
25       And when did you examine these papers?

Page 223

1    A   More than five years after that expiration
2    date.
3    Q   And you were told that Tyson was still
4    employing this person --
5    A   Yes.
6    Q   -- as of that date in '07; right?
7    A   That is accurate.
8    Q   Okay.
9        Would you think that Tyson then was unlawfully
10   employing that person in '07?
11   A   Yes.
12   Q   And do you think that employers have a duty to
13   either update or terminate records when documents
14   expire?
15   A   Terminate employees, you mean, yes.
16   Q   Terminate employees when their documents expire?
17   A   Yes.  If they don't update it, to indicate that
18   they've been renewed.
19   Q   Okay.
20       And is there any indication here that Tyson
21   updated this person to renew after the expiration of
22   the document?
23   A   There's no such indication.
24   Q   Do you still have the opinion that this person
25   was unlawfully employed at Tyson Foods when you looked

Page 224

1    at his materials in 2007?
2    A   Yes.
3    Q   Okay.  All right.
4        Next one, Exhibit 30-A.  The individual's name
5    is -- or the purported person used the name
6    Cardenas-Martinez, Eloy.
7        Do you see that?
8    A   Yes, I do.
9    Q   Okay.
10       Did this person use a translator to complete
11   his I-9 form?
12   A   Yes, he did.
13   Q   Did the person also indicate that he was a
14   lawful permanent resident on the I-9 form?
15   A   Yes, he did.
16   Q   Okay.
17       Based upon that combination of factors, do you
18   have any opinion about whether this person was
19   unauthorized for employment?
20   A   Yes.  I believe that this person, again, was an
21   alien who was illegally present in the United States.
22   Q   Okay.
23       And this first I-9 form was completed in '01.
24       Do you see that?
25   A   Yes.

Page 225

1    Q   Okay.
2        So as of that time, you do believe the person
3    was unauthorized for employment; right?
4    A   Yes, I do.
5    Q   Okay.
6        Now, would you turn to the third page here.
7    There's another I-9 form.  And at the top right-hand
8    corner, it's stamp reaccomplished.
9        Do you see that?
10   A   Yes, I do.
11   Q   Okay.
12       In your experience as an INS officer, are you
13   aware of any lawful practice by which an employer can,
14   quote, reaccomplish an I-9 form?
15   A   Yes.  If there's a discrepancy about a Social
16   Security number on the data, they can then go back into
17   the system and attempt to verify whether or not the
18   person is employable.
19   Q   Okay.
20       Do you see a discrepancy here on the Social
21   Security numbers between the first I-9 form and the
22   second I-9 form for this particular worker?
23   A   One moment, please.
24       The numbers appear to be the same.
25   Q   Okay.

Page 226

1      So in your opinion -- let's look at the second
2  I-9 form here that was completed on or about 2/28/2000.
3      Do you see that?
4  A   2/28/2000.
5  Q   And the one that's stamped reaccomplished.
6  A   Yes.
7  Q   Okay.
8      Do you see that the person used the translator?
9  A   Yes, I do.
10  Q   Okay.
11      So apparently, this one came first before the
12  other I-9 form?
13  A   Right.
14  Q   The person also indicated on the initial I-9
15  form that we're looking at that he was a lawful
16  permanent resident alien?
17  A   Yes, he did.
18  Q   So do you have an opinion as to whether this
19  person was unauthorized for employment at the time of
20  the initial hire in 2000?
21  A   Yes.  In fact, his card reflects that he's been
22  living here since March 9th of 1988, which means he's
23  been living here for many years.
24      And certainly, by now, he should have language
25  proficiency.

Page 227

1  Q   Okay.
2      So do you have an opinion as to whether he was
3  unauthorized for employment when Tyson hired him in
4  2000?
5  A   I believe he was not authorized to be employed
6  in the United States.
7  Q   Okay.
8      Do you think Tyson lied, then, on the employer
9  certification part of the I-9 form?
10  A   Yes, I do.
11  Q   Both times?
12  A   Both times.
13  Q   Okay.  Next.  Move on.
14      Number 29.  The next person's name is -- I'll
15  spell it.  Shcherbina, S-h-c-h-e-r-b-i-n-a, first name
16  Pavel, P-a-v-e-l.  Do you have that?
17  A   Yes, I do.
18  Q   Okay.
19      This person purported to be a lawful permanent
20  resident alien when the I-9 form was completed.
21      Do you see that?
22  A   Yes, I do.
23  Q   And that I-9 form was completed in
24  January 22nd, '01.  That's the date the employee
25  completed his part.

Page 228

1      Do you see that?
2  A   Yes, I do.
3  Q   Okay.
4      And the employee wrote, or somebody wrote, that
5  his document expired on 10/4/05.
6      Do you see that?
7  A   Yes, I do.
8  Q   Okay.
9      So at the time you examined this document in
10  2007 was this person authorized for employment to Tyson
11  Foods?
12  A   No, he was not.  His alien card had expired.
13  Q   So do you believe that he was unauthorized for
14  employment at the time you looked at his documents?
15  A   Yes, I do.
16  Q   Okay.
17      And that may be true, even if he was not
18  unauthorized for employment at the time of hire; right?
19  A   That's correct.
20  Q   Okay.
21      Now, if I -- Okay.  Move on.
22      Exhibit 28-A.  The last name of this person is
23  Kulyabin.  K-u-l-y-a-b-i-n.  It's Exhibit 28-A.
24      Do you see that?
25  A   Yes, I do.

Page 229

1  Q   Okay.
2      This person purported to be a lawful permanent
3  resident alien; right?
4  A   Yes.
5  Q   Okay.
6      The person used a translator to complete the
7  I-9 form; is that correct?
8  A   That's correct.
9  Q   Okay.
10      Based upon that, did you form an opinion as to
11  whether this person was unauthorized for employment at
12  the time of hire?
13  A   Yes, I did.
14  Q   What was your opinion?
15  A   That the person was unlawfully employed in the
16  United States.
17  Q   Okay.
18      Is that still your opinion today?
19  A   Yes, it is.
20  Q   Okay.
21      If you'll turn --
22  A   He was first admitted, by the way, in '97; so
23  he's been living here for ten years now.
24  Q   Okay.
25      If you'll look on the third page of this

Page 230

1  package, if you would please, is the second I-9 for
2  this person?
3      A   Yes.
4      Q   Okay.
5          This one was completed on or about November 18,
6  2001 by the employee.
7          Do you see that up at the top?
8      A   Yes, I do.
9      Q   Top portion. Okay.
10         And then the bottom portion completed by Tyson
11 Foods is dated 11/13/01.
12         Do you see that?
13     A   Yes, I do.
14     Q   Okay.
15         And the expiration date of the foreign passport
16 that this person used on his I-9 form on that page was
17 9/26/07.
18     A   Yes.
19     Q   Is that correct?
20     A   That is correct.
21     Q   Nevertheless, Tyson completed another I-9 form
22 for him, which is the first page of his packet, in
23 2004.
24         Do you see that? The first page of the packet.
25     A   Yes.

Page 231

1      Q   1/8/04?
2      A   1/8/04. I have it.
3      Q   And at this point in time, he listed a new
4  expiration date of a new permanent resident card; is
5  that correct?
6      A   Yes, it is.
7      Q   And this one is 8/4/13?
8      A   Yes, it is.
9      Q   Okay.
10         But this time, the second time around, the
11 person needed the assistance of a translator --
12     A   Correct.
13     Q   -- to complete the second I-9 form in 2004;
14 right?
15     A   Right.
16     Q   But he didn't use one in 2001.
17     A   Correct.
18     Q   Does that make sense?
19     A   No, it seems like he's regressing.
20     Q   It seems like he's regressing.
21         So do you still have the opinion that this
22 person was unauthorized for employment --
23     A   Absolutely.
24     Q   -- by Tyson Foods?
25     A   Absolutely.

Page 232

1      Q   Okay.
2          I also want to bring another matter to your
3  attention.
4          On the initial I-9 form that Tyson completed in
5  2001, which is the third page in the document, do you
6  see the list A item document there, it says foreign
7  passport?
8      A   Yes.
9      Q   It says foreign passport issuing authority
10 Ukraine?
11     A   Right.
12     Q   In your opinion, does that -- a document -- a
13 passport issued by a foreign country authorize that
14 person for employment in the United States?
15     A   No. It does not.
16     Q   Okay.
17         Do you think that Tyson -- that this person was
18 unauthorized for employment just based upon that
19 reason?
20     A   It is certainly a strange thing to do.
21     Q   Could you answer my question.
22         Do you think the person was unauthorized for
23 employment, based on that reason alone?
24     A   Yes.
25     Q   Okay. I want to move on.

Page 233

1          Now we're up to Exhibit 27-A. This person name
2  is Adde, last name, A-d-d-e. And the first name is Abdalle,
3  A-b-d-a-l-l-e. Okay.
4          Do you have that, which is Exhibit 27-A?
5      A   I've got it.
6      Q   Okay. Very good.
7          This person purported to be a lawful permanent
8  resident alien?
9      A   Yes.
10     Q   The person also used a translator to complete
11 the I-9 form.
12         Do you see that?
13     A   Yes, I do.
14     Q   Okay.
15         Based upon that, did you form an opinion as to
16 whether this person was unauthorized for employment at
17 the time Tyson hired him?
18     A   Yes, I did.
19     Q   What was your opinion?
20     A   That he was unauthorized to work in the United
21 States.
22     Q   For the reasons you've already stated about
23 English ability?
24     A   About English ability, yes.
25     Q   Okay.

Page 234

1    Is that still your opinion today?
2    A   Yes, it is.
3    Q   Okay.
4    Now, if you would turn to the second part of
5    this exhibit.  It's 27-B.
6    Do you see it is an employment application?
7    A   Hang on one second, please.  27-B?
8    Q   Yes.
9    A   I don't know if I have it.
10   Q   It's connected -- it should be attached to your
11   27-A?
12   A   Is it attached -- oh, I have it.
13   Q   Do you see that it's an employment application?
14   A   Yes, I do.
15   Q   All right.
16   Now, the employment history section.  Could I
17   direct your attention there, please.
18   A   (Witness complies.)
19   Yes.
20   Q   This person indicated one prior job on the
21   application.
22   Do you see that?
23   A   Yes, I do.
24   Q   Okay.
25   Do you see where he was previously employed?

Page 235

1    A   Nairobi, Kenya.
2    Q   Nairobi, Kenya.
3    Until -- do you see the date of his
4    employment ended in Nairobi, Kenya?
5    A   Yes, '05.
6    Q   Yes, '05.
7    Based upon that, do you think that this person
8    could have obtained a lawful permanent resident card
9    and be employed in the United States one year later?
10   A   Very unlikely.
11   Q   Okay.
12   Does that support your conclusion that the
13   person was unauthorized for employment at the time
14   Tyson hired him?
15   A   Yes, it does.
16   Q   Okay.
17   Do you think that Tyson Foods, the individual
18   who signed the employer certification part of this
19   form, violated the law in hiring this person?
20   A   Yes, I do.
21   Q   Okay.  Moving on.  Exhibit 26-A.
22   This person's name -- last name is Linares,
23   L-i-n-a-r-e-s.  First name Iveth.
24   Do you see that, 26-A?
25   A   I have it.

Page 236

1    Q   This person purported to be a lawful permanent
2    resident alien?
3    A   Uh-huh.
4    Q   I want you to look at the employment
5    application, which is attached as Exhibit 26-B.
6    A   Yes.
7    Q   Okay.
8    Which language application did this person
9    choose to use?
10   A   Spanish.
11   Q   Okay.
12   Did that give you -- help you form your opinion
13   as to the employment authorization status of this
14   individual?
15   A   Yes, it does.
16   Q   Why?
17   A   Again, because this person purports to be a
18   resident alien unable to speak the English -- unable to
19   write in the English language, needed a translator.
20   Q   Did you assume that if the person couldn't
21   complete his employment application in English, he then
22   couldn't complete his I-9 form in English?
23   A   Yes.  It would appear reasonable to make that
24   assumption, yes.
25   Q   And then in that case, then, Tyson would have

Page 237

1    made a false statement by signing it stating
2    that -- failing to indicate that a translator was used;
3    right?
4    A   That's correct.  Yes, this doesn't show that a
5    translator or a preparer was involved.
6    Q   Right.
7    And you believe one was involved; right?
8    A   Must have had to have been if they did it here,
9    sure.
10   Q   Okay.
11   And so you believe this person lied on his I-9
12   form; right?
13   A   On her I-9.
14   Q   If it's a woman?
15   A   It's a woman, yes.
16   Q   On her I-9 form.
17   A   Yes.
18   Q   And that Tyson made a false statement by
19   signing the I-9 form, swearing that it was accurate,
20   the documents looked valid?
21   A   That's correct.  I believe that they made an
22   intentional false statement.
23   Q   Okay.
24   Moving on now to document -- I'm sorry -- to
25   Exhibit 25-A.  And this person is named Heuerman,

Page 238

1  spelled H-e-u-e-r-m-a-n, first name Kevin.
2      A  Uh-huh.
3      Q  Okay.
4         Kevin Heuerman, purported to be a U.S. citizen
5  on his I-9 form?
6      A  Right.
7      Q  Okay.  Hang on.
8      MR. FOSTER:  I want to go off the record a moment.
9  Okay.
10      THE VIDEOGRAPHER:  Going off the record.  Time now
11  is 2:23 P.M.
12         (A recess was taken.)
13      THE VIDEOGRAPHER:  We're back on record.  Time now
14  is 2:26 P.M.  This is the beginning of videotape No. 6.
15      Q  BY MR. FOSTER:  Okay.
16         Mr. Cutler, we were looking at Exhibit 25-A?
17      A  Right.
18      Q  All right.  This is an I-9 form completed by
19  Mr. Kevin Heuerman?
20      A  Yes.
21      Q  You stated under direct examination by Tyson's
22  counsel that you didn't have this I-9 form when you
23  examined your documents.
24         Could you look at your notes for reference to
25  that?

Page 239

1      A  I have it.  Yes, I'm looking at it right now.
2      Q  All right.
3      A  Right.
4      Q  Tyson mysteriously produced the I-9 form --
5      MR. VOLPE:  Object to form.
6      MR. FOSTER:  Okay.
7      Q  Tyson mysteriously produced an I-9 form for
8  Mr. Heuerman today?
9      A  Right.
10      Q  At this deposition.
11      A  Correct.
12      Q  Now, Tyson purportedly believed that this was
13  completed properly, and I just want to take you through
14  certain things on here today.
15      A  Okay.
16      Q  Okay.
17         Notice that where Mr. Heuerman signed his name,
18  employee's signature?
19      A  Right.
20      Q  Do you see that?
21      A  Yes, I do.
22      Q  Is there a date corresponding to his
23  signature?
24      A  No, there's no date.
25      Q  Does that raise any doubt in your mind as to

Page 240

1  the authenticity of the timing of the I-9 form?
2      A  Absolutely.
3      Q  Is the employee supposed to write the date in
4  there when it's completed?
5      A  Absolutely.
6      Q  Is it possible that Tyson completed this after
7  your report was filed and back dated it?
8      A  The possibility exists.
9      Q  It's possible?
10      A  Yes.
11      Q  Do you still have doubt as to the employment
12  authorization of this specific individual?
13      A  Yes, I do.
14      Q  And is there -- if a person didn't complete an
15  I-9 form, would it be prudent, then, to form the
16  opinion that the person was unauthorized for
17  employment?
18      A  Yes.
19      Q  Okay.
20      A  All employees are supposed to prepare one of
21  these forms.
22      Q  Okay.  Moving on.  Exhibit 24.
23         This is a person named -- last name -- Angeles.
24  A-n-g-e-l-e-s Pacheco, I think is how you were
25  pronouncing it before?

Page 241

1      A  Pacheco.
2      Q  Pacheco.  Okay.  It's 24-A.  Would you look at
3  this, please?
4      A  I have it.
5      Q  This person -- okay.  Look at 24-A.  You'll see
6  that the individual purported to be a lawful permanent
7  resident alien; right?
8      A  Correct.
9      Q  Okay.
10         And did not use a translator to help him
11  complete the form; is that correct?
12      A  That is correct.
13      Q  But then turn to Exhibit 24-B, which is
14  attached the employment application that this person
15  completed.
16         Do you see that?
17      A  Hang on one second.  I don't think I have it.
18      Q  If you don't have it, you can look at mine.
19      A  I don't know why, but I don't have it.
20      Q  Maybe Mr. Volpe has -- all right.  Take a look
21  at mine.  All right.
22      A  Yes.
23      Q  Okay.
24         That's Exhibit 24-B for you.  Do you have that
25  in front of you now, Mr. Cutler?

Page 242

1    A   Now, I do.  Yes, I do.
2    Q   Okay.
3        What language did that person complete the
4   employment application in?
5    A   In the Spanish language.
6    Q   And did you make any -- draw any opinion about
7   the fact that the person completed the Spanish language
8   employment application but then didn't use a translator
9   to complete his own I-9 form on or about the same date?
10   A   That inconsistency is of concern because it
11  would appear that he would have needed a translator to
12  assist him in the preparation of the I-9, which goes
13  back to the issue of whether or not he is who he claims
14  he is.
15   Q   So did that raise a doubt in your mind as to
16  the authenticity of this person's employment
17  authorization document?
18   A   Absolutely.
19   Q   Okay.  Can I have that exhibit?
20       Do you still have the opinion that the person
21  was unauthorized for employment when Tyson employed
22  him?
23   A   Absolutely.
24   Q   Okay.  I'll take that back.
25       And -- all right.

Page 243

1   Moving on now to Exhibit 23-A.  This person's last name
2   is Youngblood.  First name is spelled C-o-m-e-c-h-a-l-l-a?
3    A   Right.
4    Q   All right.  Would you take a look at this,
5   please?
6    A   (Witness complies.)
7    Q   This individual -- do you have it in front of
8   you, 23-A?
9    A   I have the employment application.  Let me see
10  if I have the I-9.
11   Q   20 -- the employment application is 23-B.  The
12  I-9 form is 23 --
13   A   I have it.
14   Q   The -- first of all, checked off the citizen
15  box.
16       Do you see that?
17   A   Yes, I do.
18   Q   Then the person needed the assistance of the
19  translator named Kristin Johnson to complete the I-9
20  form.
21       Do you see that?
22   A   Yes, I do.
23   Q   Does that give you any reason to doubt the
24  person's employment authorization?
25   A   Yes, it does.

Page 244

1    Q   Okay.
2        Is that for the reasons you've already stated?
3    A   Absolutely.
4    Q   Okay.
5        Well, all right.  And look at 23-B.  The
6   employment application that that person completed.
7    A   (Witness complies.)
8        Okay.
9    Q   Okay.
10       Do you see that that was completed -- do you
11  see which language that was completed in?
12   A   Yes, the English language.
13   Q   Which seems to be inconsistent with the fact
14  that the same person needed a translator to complete
15  the I-9 form?
16   A   Correct.
17   Q   Does that raise another doubt about this
18  person's authenticity?
19   A   It certainly does.
20   Q   Are you still of the opinion that this person
21  was unauthorized of employment by Tyson?
22   A   Yes, I am.
23       (Defendants' Exhibit No. 22-A and 22-B were
24       marked for identification and are bound
25       separately.)

Page 245

1    Q   Okay.  Moving on.  Exhibit 22-A.
2        This person's name is Mohamed Dirie, spelled
3   D-i-r-i-e.  Mohamed spelled M-o-h-a-m-e-d.  This is
4   Exhibit 22-A.
5        Do you see that?
6    A   Yes.
7    Q   Okay.
8        The person checked the lawful permanent
9   resident alien box on the I-9 form.
10       Do you see that?
11       Do you have Exhibit 22-A there, Mr. Cutler?
12  I'm sorry.  It's 22-A.
13   A   Sorry.
14   Q   I'm sorry.  I may have misspoken.  It's 22-A.
15   A   Well, I have three documents here.
16   Q   Okay.  22-A --
17   A   Got you.
18   Q   -- is the I-9 form for Dirie.  D-i-r-i-e.
19  Okay?
20   A   Yes.
21   Q   The person used a translator --
22   A   Correct.
23   Q   -- to complete the form.
24       Do you see that?
25   A   Yes, I do.

Page 246

1    Q   Okay.
2        In spite of the fact that the person used the
3    translator, the person also signed his name in the
4    wrong place and then crossed it out on the form.
5        Do you see that?
6    A   Yes, I do.
7    Q   Okay.
8        Nevertheless, the person checks off the lawful
9    permanent resident box?
10   A   Right.
11   Q   Did that give you reason to doubt the
12   employment authorization of this individual?
13   A   Yes, it does.
14   Q   Okay.
15       Do you still have that opinion today looking at
16   this?
17   A   Yes, I do.
18   Q   Okay.
19       Now, the person -- if you look at 22-C, it's
20   the employment application that this person allegedly
21   completed.
22       Do you see that?
23   A   Yes, I do.
24   Q   Okay.
25       I'd like you to look at the handwriting at the

Page 247

1    top of the form.
2    A   Right.
3    Q   Okay.
4        Do you see the Dirie is with a small "D"?
5    A   Yes, I do.
6    Q   And then do you see how the person signs his
7    name on the I-9 form?
8    A   Yes, I do.
9    Q   Do you see the person used a capital "D" over
10   there?
11   A   Yes, I do.
12   Q   Did that inconsistency in the signature give
13   you any doubt as to the authenticity of the person's
14   employment authorization?
15   A   Yes, it does.
16   Q   Why?
17   A   The inconsistency of the -- who filled out the
18   paperwork.
19   Q   So does that suggest to you that maybe
20   Mr. Dirie didn't really complete his own I-9 form?
21   A   Correct.  It would certainly make it seem
22   to be the case.
23   Q   Okay.
24       The fact that he also passed Basic Pilot, does
25   that change your opinion that this person was

Page 248

1    unauthorized for employment?
2    A   No, it does not.
3    Q   Why not?
4    A   Because Basic Pilot, as I've stated previously,
5    doesn't ascertain or verify the validity of documents.
6    All it is is a matter of running a name and numbers
7    through a system and seeing if they match.
8        There's no way that Basic Pilot could determine
9    the authenticity of the documents or the identity of
10   the person offering those documents.
11   Q   All right.  Do you still have the opinion today
12   that this individual, last name Dirie, was unauthorized for
13   employment at the time Tyson employed him?
14   A   Yes, I do.
15   Q   And do you think that Tyson acted in bad faith
16   in employing him?
17   A   Absolutely.
18   Q   Okay.  All right.
19       Now, I want to move on to -- I have one
20   exhibit for which I need an exhibit sticker, please.
21   Do you have any?  All right.  I'll just mark it myself.
22   Here's one.  Some kind soul left one.
23       All right.  It would appear that we're up to --
24   do you know what we're up to, Frank?
25       (Plaintiffs' Exhibit No. 1 was marked for

Page 249

1        identification and is bound separately.)
2    Q   BY MR. FOSTER:  Well, here's what I'll do.
3    I'll mark this Plaintiffs' Exhibit 1.  All right.
4    This is a copy of a statute.
5    A   Right.
6    Q   We call this -- again this is Plaintiff's
7    Exhibit 1.  You were asked many, many times this
8    morning by Tyson's counsel if there had been any
9    changes in the Immigration Reform and Control Act since
10   you were given your training in the matter in the
11   1980's --
12   A   Yes.
13   Q   -- is that correct?
14   A   Yes, I was.
15   Q   And I know that you were unable to cite any
16   specific changes in the law.
17   A   Yes.
18   Q   I now ask you, please, to turn to the second
19   page of this exhibit.
20       And you will see that there is a paragraph 6,
21   two lines of text that I have underlined.
22   A   Right.
23   Q   Okay.
24       I'd like you to, if you could, please read that
25   into the record, just the underlined portion.

Page 250

1    A   Just the underlined portion?
2    Q   Yes.  Just the underlined portion of
3    paragraph 6.
4    A   All right.
5        "If made for the purpose or with the intent
6    of discriminating against an individual
7    in violation of paragraph (1)."
8    Q   Okay.
9        Is it your understanding that this was a new
10    part of the anti-discrimination section of the
11    Immigration Reform and Control Act that was put into
12    the law?
13    A   Yes.
14    MR. VOLPE:  Object to form.
15    Q   BY MR. FOSTER:  Okay.  Do you believe that
16    this changed the basis for the employer's ability to
17    ask questions of potential employees regarding
18    anti-discrimination?
19    MR. VOLPE:  Object to form.
20    THE WITNESS:  Yes.
21    Q   BY MR. FOSTER:  Okay.
22        What was the effect of this new section that's
23    underlined here?
24    MR. VOLPE:  Object to the form.
25    THE WITNESS:  My understanding is that it protected

Page 251

1    employers and gave them the right to question the
2    prospective employees if they believed that they were
3    illegal aliens.
4        So illegal aliens would not enjoy protection
5    against discrimination so that they could then keep
6    requiring people who should not be working in the
7    United States.
8    Q   BY MR. FOSTER:  Do you know when this section
9    was added to the Immigration Reform and Control Act?
10    A   To my understanding, in 1986.
11    Q   Okay.
12        Do you believe that this gave employers
13    protection about what they can ask people that they
14    suspect might be unauthorized for employment in using
15    false documents?
16    MR. VOLPE:  Object to form.
17    THE WITNESS:  Yes.  It's my understanding that
18    that was the purpose behind this change.
19    Q   BY MR. FOSTER:  So that employers -- is it your
20    understanding that an employer, then, could ask to see
21    more documents if they were suspicious of the employee?
22    MR. VOLPE:  Object to form.  You're leading the
23    witness.
24    MR. FOSTER:  Okay.  You can make your objections.
25    MR. VOLPE:  I'm entitled to speak.  I'm objecting

Page 252

1    actually to all these questions.  They're leading.
2    MR. FOSTER:  All right.
3    MR. VOLPE:  Just so you understand that I'm
4    objecting to all your questions as leading.
5    MR. FOSTER:  I understand.  You have a standing
6    objection.
7    MR. VOLPE:  I have a standing objection going
8    forward and back --
9    MR. FOSTER:  No more speeches.  I understand.  Got it.
10    All right.
11    Q   Also, do you believe -- is it your opinion that
12    an employer who is suspicious about a document could
13    take into account the inability to speak a language in
14    forming an opinion about authenticity of the documents?
15    MR. VOLPE:  Same objection.
16    THE WITNESS:  I believe that employers, because of
17    this change, have more latitude and protection to delve
18    beyond the documents if questions were raised about
19    whether or not the documents related to the individual
20    proffering them.
21    Q   BY MR. FOSTER:  To make it absolutely clear,
22    your testimony was that you thought that employers
23    could already have done that before this was changed in
24    1996; is that correct?
25    A   That's correct.  I did.

Page 253

1        We instructed people that they could go beyond
2    the documents if there was suspicions raised by
3    specific factors.
4        It's my opinion that this change in statute
5    made that protection even clearer.
6    Q   Is this the change, that you were referring to
7    throughout the morning session, in the law?
8    A   Yes.
9    Q   That you were unable to cite?
10    A   Yes.
11    MR. VOLPE:  Objection.
12    MR. FOSTER:  All right.
13    Q   Looking back on your notes, which are Cutler
14    Exhibit 1-C, if you could get ahold of that,
15    Mr. Cutler.  All right.
16    A   (Witness complies.)
17    Q   Are these notes part of your opinion that
18    you've tendered in this case as an expert for the
19    plaintiffs?
20    A   No, it's not.
21    Q   What is it?
22    A   Just working notes that I took to help guide me
23    in preparing my opinion.
24    Q   Okay.
25        Do you believe that your actual opinion, which

Page 254

1  is Exhibit 2 -- could you please turn to that?
2      A    Give me a moment and I will find it.  It's here
3  someplace.  Bear with me please.
4          (Witness complies.)
5      Q    If you don't have it, you can look at my copy.
6      A    I've got it right here.
7      Q    All right.  Let's look at Exhibit 2.
8  Mr. Cutler --
9      A    Yes.
10     Q    -- would you please read into the record -- I'm
11  looking for one specific part -- "statement of opinion
12  and basis thereof," which is the third page of your
13  opinion.
14     A    I have it.
15     Q    Okay.
16         You said -- would you please read into the
17  record, the first paragraph beginning with "in my
18  experience"?
19     A    Certainly.
20     "In my experience, the majority of aliens
21  who enter the United States illegally, without
22  inspection, are assisted by others who enable
23  them to circumvent the inspections process.
24         Additionally, these aliens are also
25  generally assisted by others in traveling to

Page 255

1  their intended destinations in the United
2  States."
3      Q    Is that still your opinion today?
4      A    Absolutely.
5      Q    Okay.
6         You formed an opinion after reviewing the
7  documents that -- now, I'm turning to your declaration.
8      A    Okay.
9      Q    Okay.
10         Which is a different exhibit, which is 1-A.
11     A    I have that.
12     Q    Okay.
13         You examined 497 worker documents?
14     A    Packages of documents.
15     Q    Right.
16     A    Yes.
17     Q    And all of those documents were provided to you
18  by counsel in this case; right?
19     A    That is correct.
20     Q    And it's your understanding that all of those
21  documents were provided to plaintiffs' counsel, by
22  Tyson's counsel; is that correct?
23     A    That's my understanding.
24     Q    Okay.
25         And is that still your understanding?

Page 256

1      A    Absolutely.
2      Q    Okay.
3         And is it also your understanding that all of
4  those 497 workers were current workers at the time you
5  looked at the documents?
6      A    That is my understanding.
7      Q    Okay.
8         You used the word "current" in paragraph 1.
9         Do you see that "497 current workers."  Do you
10  see that --
11     MR. VOLPE:  Object to form.
12     A    Yes.
13     Q    Okay.
14     A    Paragraph 2.
15     Q    Right.  And you used the word current obviously
16  because that was your understanding at the time?
17     A    As of the time I prepared that declaration.
18     Q    Okay.
19         Is it your understanding that Tyson represented
20  to plaintiffs' counsel that all 497 of those people
21  were currently employed at Tyson?
22     MR. VOLPE:  Object to form.
23     THE WITNESS:  That's my understanding.
24     Q    BY MR. FOSTER:  Okay.
25         And your declaration states on paragraph 6 --

Page 257

1  would you please read that into the record?
2      A    "Based on my analysis, I concluded that
3  91 out of 497 total current employees
4  that were part of the sample appeared to be
5  unauthorized to work in the United States."
6         And then I went on and said:
7         "Additionally, below is the breakdown
8  per plant."
9         And then I enumerated the numbers that each
10  of the number of Tyson's --
11     Q    Is that still your opinion here right now?
12     A    Yes.
13     Q    That 91 out of 497 total current employees that
14  you reviewed were unauthorized for employment as of the
15  time you reviewed the documents?
16     A    Yes.
17     Q    And nothing that has happened here today has
18  changed your opinion on that?
19     A    No.
20     Q    You stated earlier, under questioning by
21  Mr. Hopson, you thought you were incorrect
22  about certain of these -- approximately 14 of
23  the ones that he went through with you?
24     A    Yes.
25     Q    That an error had been made in some respect.

Page 258

1    MR. VOLPE:  Object to form.
2    A   Yes.
3    Q   Okay.
4        When you stated that an error had been made in
5    some respect, I ask you now, in light of what we have
6    gone through, can you tell us what type of error
7    appears to have been made?
8    A   Well, the only error that I made was in not
9    considering the current date.  The applications
10   indicated that the alien cards had already expired by
11   the date that I did the review of the documentation so
12   that they were all expired.
13       It wasn't a matter of when they were signed,
14   but that the documents were all expired as of the time
15   that they were being employed.
16   Q   That seems to have been the case with some of
17   them?
18   A   Yes.
19   Q   That we looked through, but not all of the ones
20   that he went through; right?
21   MR. VOLPE:  Object to form.
22   THE WITNESS:  Right.
23   Q   BY MR. FOSTER:  Did you make errors in some
24   respect to certain others?
25   A   I'm not sure what you're asking me.

Page 259

1    Q   Okay.
2        Under questioning by Mr. Hopson, you stated
3    that you may have made an error in your conclusion
4    about some of these 91 people that he was looking at;
5    right?
6    MR. VOLPE:  Object to form.
7    THE WITNESS:  Yes.
8    Q   BY MR. FOSTER:  Do you still believe you made
9    an error about those people?
10   A   Only in one, where there was an indication that
11   an employee had overcome an initial no match.
12       But other than that, I believe that all the
13   others are, in fact, unauthorized to work in the United
14   States.
15   Q   It would appear the only error -- it seems --
16   you tell me if I'm wrong in stating it this way -- that
17   you may not have listed all of the bases for your
18   opinion in your notes which is what Mr. Hopson was
19   using to question you; is that correct?
20   A   That's absolutely correct.  That was not a
21   definitive list.  That was a guide for me in preparing
22   my opinion.
23   Q   Okay.
24       So you stand by all the others except for that
25   one; is that correct?

Page 260

1    MR. VOLPE:  Object to form.
2    THE WITNESS:  That's right.
3    Q   BY MR. FOSTER:  I believe a minute ago, in
4    response to my question, you said that you stood by
5    your conclusion in paragraph 6 of your declaration that
6    91 out of 497 total current employees were unauthorized
7    for employment?
8    A   Right.
9    Q   Am I correct, then, in assuming that you -- one
10   was not correct?
11   A   It would appear one was not correct.
12   Q   So is it possible, then, you really -- that 90
13   out of 497 were unauthorized?
14   A   If that one was right, then, yes, it went down
15   to 90 from 91.
16   MR. FOSTER:  Okay.  I have no further questions of
17   Mr. Cutler.
18   MR. VOLPE:  I have some additional questions.
19   //
20       EXAMINATION
21   BY MR. VOLPE:
22   Q   Mr. Cutler, this is Frank Volpe for the
23   defendants.  Tell me where your opinion is contained,
24   which document, which exhibit number?
25   A   My expert report is Exhibit No. 2.  And I also

Page 261

1    have Exhibit 1-A, which is my declaration of my
2    findings.
3        I think you have copies.
4    Q   Yes, I do.
5        And you're saying Exhibit 1-C is not part of
6    your opinion in this case?
7    A   1-C is?
8    Q   1-C is your notes?
9    A   No, it is not.
10   Q   Can you show me where, in either Exhibit 2 or
11   1-A, where you state the particular basis why any
12   individual is unauthorized to work in this country?
13   A   I didn't do a breakdown of individual by
14   individual.
15   Q   No.  You did the breakdown in your notes; isn't
16   that correct -- 1-C?
17   A   Yes.
18   Q   So there's nowhere in 1-A or 2, is there, any
19   basis for concluding that any individual is
20   unauthorized to work in this country; is that correct?
21   A   No.  That's not correct.  I did it in the
22   totality in terms of the numbers of employees that my
23   findings indicated were illegally working in the United
24   States.
25   Q   Mr. Cutler, you understand you're under oath,

Page 262

1  don't you?
2      A   Absolutely.
3      Q   Under penalty of perjury?
4      A   Absolutely.
5      Q   Didn't you testify this morning that the
6  I-551 -- which we understand to be the green card --
7      A   Right.
8      Q   -- doesn't have to be reverified?
9      A   My understanding of the law on that issue is
10 that changed after I stopped doing those cases.
11         My understanding is that if the card expires,
12 the employer needs to make certain that the person
13 still holds valid resident alien status.
14     Q   That's your understanding as an expert witness
15 in this case?
16     A   Yes, sir.
17         (Defendants' Exhibit No. 18 was marked for
18         identification and is bound separately.)
19     Q   BY MR. VOLPE:  Let me show you what's been
20 marked as Exhibit No. 18.
21     A   Okay.
22     Q   I want you to turn your direction to the second
23 page.
24     A   Okay.
25         (Witness complies.)

Page 263

1      Q   Do you see the title called -- the section called
2  "green cards"?
3      A   Yes.
4      Q   Let me just read this to you.
5         "The terms Resident Alien Card, Permanent
6  Resident Card, Alien Registration Receipt Card
7  and form I-551 all refer to documentation
8  issued to an alien who has been granted
9  permanent residence in the United States or the U.S.
10 Once granted, this status is permanent.
11 However, the document that an alien carries
12 as proof of this status may expire.  Starting
13 with the 'pink' version of the Resident Alien
14 Card (the 'white' version does not bear an
15 expiration date), and including the new
16 technology Permanent Resident Cards, these
17 documents are valid for either two years
18 (conditional residents) or ten years
19 (permanent residents).  When these cards
20 expire, the alien cardholders must obtain
21 new cards.  An expired card cannot be used
22 to satisfy form I-9 requirements for new
23 employment.  Expiration dates do not affect
24 current employment, since employers are
25 neither required nor permitted to re-verify

Page 264

1  the employment authorization of aliens who
2  have presented one of these cards to satisfy
3  I-9 requirements (this is true for
4  conditional residents as well as permanent
5  residents)."
6         Did I read that correctly?
7      A   Yes, sir.
8      Q   Would you like to change your testimony?
9      A   It would appear that even if the card is
10 expired at the time, that the company had no
11 responsibility.
12     Q   Right.  So answer my question.
13         Would you like to change your testimony that
14 you gave to Mr. Foster?
15     A   Yes.
16     Q   Well, now --
17         Do I need to go back through all these I-9's
18 with you again and talk about each alien registration
19 card that was expired that you used as a basis for
20 determining that somebody was unauthorized to work in the
21 country?
22         Don't look at counsel, Mr. Cutler.  I'm just
23 asking you if you would like to go back through all
24 these forms again?
25     A   There were instances where there was more to it

Page 265

1  than the date.  If it was only the date, then those
2  documents were by prima facie evidence of being
3  improper.
4      Q   Do we need to go through those again.  Are
5  you -- let me -- strike that question.
6      A   Okay.
7      Q   Are you now changing your opinion back to the
8  opinion you gave to Mr. Hopson this morning that these
9  people are authorized to work in this country?
10     A   If the only fault that I found was that the
11 alien card had expired, then that would not be enough
12 to not -- if there were other factors -- if there were
13 other factors beyond the expiration date, then they
14 would not be employable.
15         If that was the only factor, then that wouldn't
16 suffice to prove they were here illegally.
17     Q   Do you want to take a look at 25-A, which is
18 Mr. Heuerman's I-9 form?
19     A   Okay.
20         Let me see if I can find it.  Bear with me one
21 second, Counsel.
22     Q   Sure.
23     A   (Witness complies.)
24         I have it.
25     Q   What is the basis for you determining that

Page 266

1   Mr. Heuerman is not authorized to work in this country?
2      A   All right.
3         When I did my analysis, I did not have an I-9
4   for him, number one.
5         Number two, this one has no date on it, which
6   is highly irregular and improperly filled out, which
7   makes me wonder when it was actually signed.
8         I'm just telling you I didn't have an I-9 form.
9      Q   Okay.
10        But now you do, Mr. Cutler.  You have the I-9
11  form in front of you.  Let's just pretend you're doing
12  your analysis anew.
13        What is the basis for determining that
14  Mr. Heuerman is an unauthorized alien?
15     MR. FOSTER:  Objection.
16        Asked and answered.
17     THE WITNESS:  I'm just concerned with why I didn't
18  have this when I did the analysis and why this one
19  isn't dated.
20     Q   BY MR. VOLPE:  But you have the I-9 form in
21  front of you right now?
22     A   Right.
23     Q   So is your basis for determining that
24  Mr. Heuerman is an unauthorized alien is the fact that
25  he didn't date his I-9 form?

Page 267

1      A   No.  I'm just questioning when the I-9 form was
2   filled out because I didn't have it when I did the
3   analysis.
4         That's all I'm saying to you.
5      Q   But Mr. Cutler, that's not what you're
6   saying -- that's what you're saying your expert
7   opinion -- you said earlier that Mr. Heuerman is an
8   unauthorized alien?
9      A   We had no I-9.
10     Q   Okay.
11     A   I had nothing to go by.
12     Q   But now you do.
13     A   Okay.
14        I'm looking at it now and I'm saying to you
15  that based on this, I would say he's authorized.
16     Q   But you just told Mr. Foster he was
17  unauthorized, which is it?
18     A   Okay.
19        I'm trying to explain to you that I had no way
20  of knowing what his status was and it's calling into
21  question to me what his story is as to why we didn't
22  have the I-9 before.
23        All employees are required to provide I-9's,
24  whether they are U.S. citizens, resident aliens or here
25  temporarily.

Page 268

1         There was no I-9 in the file that I looked at.
2   This one isn't dated.  It makes me suspicious of what's
3   going on with this.
4      Q   Okay.
5         I grant you that.  You're suspicious?
6      A   Is that an unreasonable suspicion?
7      Q   You tell me.
8      A   Well, to me, it is a reasonable suspicion.
9      Q   All right.
10     A   This is the only one that hasn't been dated.
11  And when you look at these things, to have one appear
12  that we didn't have before, and now it's dated concerns
13  me.
14     Q   Excuse me, Mr. Cutler.  It's not been dated by
15  Mr. Heuerman.  He forgot to put the date in there.
16     A   But the person who reviewed it should have
17  noticed it.
18     Q   Let me direct your attention to the
19  certification.
20     A   Right.
21     Q   Was it dated?
22     A   This one is, but all I'm asking you is why
23  didn't the person who certified it not go back and say
24  "you didn't date it."
25        Wouldn't that be part of the process for the

Page 269

1   person at HR?
2      Q   Mr. Cutler, you're the expert witness.
3      A   The person at HR is supposed to attest to that.
4   That one of the factors is that it needed to be dated.
5   It's not dated.
6         So all I'm saying is is that the person at HR
7   didn't do the job properly.
8      Q   So there's something irregular about the I-9?
9      A   Absolutely.
10     Q   Okay.
11        Let's turn to the next page.
12     A   Okay.
13     Q   What is the next page in this document Bates
14  No. 16499?
15     A   This is the printout from the SAVE Program.
16     Q   Okay.
17        What's the date of this printout?
18     A   6/13/2006.
19     Q   Isn't that on or about the date that the I-9
20  was completed?
21     A   Yes, it is.
22     Q   Now, and Mr. -- Mr. Foster suggested to you
23  that this mysteriously appeared.
24     A   I didn't have it or I would have notated it in
25  my notes.

Page 270

1    Q   All right.
2        This printout was dated 6/13/2006; correct?
3    A   Correct.
4    Q   If you look at the bottom, what's the date on
5    the bottom of this document?
6    A   I see the date.
7    Q   What's the date?
8    A   6/13/2006.
9    Q   Does this call into question your opinion that
10   Mr. Heuerman is an unauthorized alien?
11   A   I'm just concerned that I didn't have this
12   document when I did the analysis, and that there's no
13   date on the I-9.
14       The HR should have made certain. If they're
15   supposed to be examining this, this is more than a
16   mechanical operation.
17       They're supposed to make certain that, number
18   one, the documents relate to the person, that the
19   person is who he claims he is, that the paperwork was
20   properly filled out.
21   Q   Okay.
22   A   In this particular case, there was laxness on
23   the part of the person who signed off on it. That's
24   all I'm saying.
25   Q   Are you using -- I understand what you're

Page 271

1    saying. But is that -- are you saying that
2    Mr. Heuerman is an unauthorized alien?
3    A   I'm saying that --
4    MR. FOSTER: Object to the form of the question.
5        His opinion was at the time.
6        Are you asking him today what his opinion is
7    today or what it was last month?
8    MR. VOLPE: You're not allowed to make speaking
9    objections and coach the witness. So knock it off.
10       And answer my question.
11   Q   Is Mr. Heuerman an unauthorized alien?
12   A   Looking at what I have in front of me right
13   now, my judgment is that most likely, he's authorized
14   to work in the United States.
15   Q   And other than the date missing -- the fact
16   that there's a blank, the date on the I-9 form, is there
17   anything else that would call into question
18   Mr. Heuerman's status to work in this country?
19   A   No.
20   Q   Now, when Mr. Hopson was questioning you, for
21   the 14 or 15 he went through, you said that you had
22   made an error that you had removed them from the list;
23   is that correct?
24   A   Yes, I was trying to recall -- to be honest
25   with you, the nature of the expiration date of the

Page 272

1    I-551. I was concerned that the I-551 came and went
2    the person who was still employed in the United States.
3        This is like a change in the procedure from
4    what I had worked with when I was in the field doing
5    these cases.
6    Q   You think that when you were an agent in the
7    field, that you had to re-verify I-551's?
8    A   Back then there were no expiration dates.
9    They were issued for life.
10       What started to happen was we started to get
11   people that were 25 and 30 years old walking around
12   with a picture of themselves when they were 14 which is
13   why the law changed.
14   Q   Okay.
15   A   That procedure changed since then.
16   Q   Let's look at 26-A. Ms. Linares's I-9 form.
17   A   Bear with me one second.
18   Q   Sure,
19   A   Okay. Counsel.
20   Q   What was the basis for you to say that
21   Ms. Linares is not authorized to work in the country?
22   A   Let me just refer to my notes. Give me a second,
23   please.
24       My concern here is that she filled out the
25   Tyson employment application in Spanish and did not

Page 273

1    need a translator to fill out the I-9.
2    Q   That's different than what you have in your
3    notes.
4        And by the way, when I asked you for the basis
5    for determining that Ms. Linares is an unauthorized
6    alien, you said "I have to look at my notes."
7        So which is it, Mr. Cutler? Are the notes part
8    of your expert opinion or not part of your expert
9    opinion?
10   A   The notes are only a partial guide for me to
11   determine how I made my determinations.
12   Q   So are they part of your expert opinion or they're
13   not part of your expert opinion?
14   MR. FOSTER: Objection.
15       Asked and answered repeatedly.
16   THE WITNESS: They were not part of my expert
17   opinion.
18   Q   BY MR. VOLPE: Take a look at 26-B, please.
19   A   Okay.
20   Q   Do you see where -- do you see where it asks
21   for the name and telephone number and then says
22   position --
23   A   Where am I looking?
24   Q   The third line on the application.
25   A   After her name?

Page 274

1  Q  No.  I want you to go to 113598.
2  A  Okay.
3     I'm sorry.  Now --
4  Q  See where she wrote poultry processor on the
5  top?
6  A  I see, yes.
7  Q  Is that Spanish?
8  A  No.  That's English.
9  Q  And do you see where her first job, what she
10 wrote down there?
11 A  Babysitter.
12 Q  Is that Spanish?
13 A  English.
14 Q  Didn't she fill this out in partial Spanish and
15 partial English?
16 A  I don't know who filled it out.  That's my
17 concern as to who filled it out.
18 Q  Mr. Cutler, are you saying that Ms. Linares is
19 an unauthorized alien because she filled out an
20 employment application using both Spanish and English?
21 A  No.  That's not what I'm saying.
22    What I'm saying is that the inconsistency
23 concerned me.
24 Q  Mr. Cutler, we're not talking about your
25 concern anymore.  We're talking about you saying that

Page 275

1  somebody is unauthorized to work in this country.
2     Would you like to retract your statement that
3  Ms. Linares is unauthorized to work in this country?
4  MR. FOSTER:  Object to the form of the question.
5  THE WITNESS:  It appears she filled out both forms.
6  Q  BY MR. VOLPE:  So she filled out both forms.
7  So is she an unauthorized alien or not?
8  A  It would appear she's not an unauthorized
9  alien.
10 Q  Let's take a look at 28-A, please
11 Mr. Kulyabin's I-9 form.
12 A  Okay.
13 Q  All right.
14    And we're going to look at the page 108106.
15 A  I don't know if I have the second half.  All I
16 have is 20.
17 Q  It's in that packet, Mr. Cutler.
18 A  Is it?  Okay.
19 Q  Look at the third page, I believe, in the
20 document.
21 A  Okay.
22 Q  It's the second I-9?
23 A  Second I-9.
24 Q  Okay.
25    Well, it's actually the first I-9; isn't it?

Page 276

1  A  Well, if you want to put it that way, yes.
2  Q  Here I put -- I believe you testified under
3  oath it caused you concern that Mr. Kulyabin used a
4  foreign passport; correct?
5  A  Correct.
6  Q  And you said a foreign passport is not an
7  appropriate document to use for employment
8  authorization; is that correct?
9  A  That's correct.
10 Q  Can you turn to the next page, please.
11 A  (Witness complies.)
12    Yes.
13 Q  What's the fourth document listed under the
14 List A?
15 A  That's says a foreign passport.
16 Q  Yes.  Would you like to retract your statement
17 that Mr. Kulyabin is an unauthorized alien?
18 MR. FOSTER:  Object to the form of the question.
19 Q  BY MR. VOLPE:  Mr. Cutler, is Mr. Kulyabin an
20 unauthorized alien in your expert opinion?
21 A  One moment, please.
22    No.
23 Q  I'm sorry.  I couldn't hear you.
24 A  No.
25 Q  Let's take a look at 29-A, please.

Page 277

1  Mr. Shcherbina.
2  A  Okay.
3  Q  And what was the basis for your expert opinion
4  that Mr. Shcherbina was an unauthorized alien?
5  THE WITNESS:  (No response.)
6  Q  BY MR. VOLPE:  I'm sorry.  Let me help you.
7  MR. FOSTER:  Why don't you read back his testimony.
8  MR. VOLPE:  Well, I think his testimony is wrong.
9  I'll give him a chance to clarify the record.
10 MR. FOSTER:  You asked what his basis was.
11 Q  BY MR. VOLPE:  Yes.  What's your basis for
12 determining --
13 A  I said that he had an expired alien
14 registration card.
15 Q  So this is one of the ones that you're
16 retracting your statement that he's an unauthorized
17 alien; right?
18 MR. FOSTER:  Object to the form of the question.
19 THE WITNESS:  Yes.
20 Q  BY MR. VOLPE:  Is Mr. Shcherbina an
21 unauthorized alien?
22 A  It doesn't appear to be.
23 Q  Is there anything in the file that you have
24 before you, Exhibit 29, 29-B, that would lead you to
25 conclude that Mr. Shcherbina is an unauthorized alien?

Page 278

1    A   No.

2    Q   By the way, when you were being asked a

3  question by Mr. Hopson, he gave you an opportunity to

4  look at the documents that were put before you, didn't

5  he?

6    A   Yes.

7    Q   He didn't push you along, did he?

8    A   No.

9    Q   Otherwise, you had a chance to review the

10  documents that were set before you?

11    A   Yes.

12    Q   By the way, what did you and Mr. Foster discuss

13  when you were on breaks?

14         Did you discuss the testimony you gave under

15  his examination?

16    A   The question was raised about whether or not an

17  expired alien card can enable an alien to continue

18  working in the United States.

19    Q   And what did you tell Mr. Foster?

20    A   My recollection of that was not good, to be

21  honest with you.

22    Q   Not --

23    A   I wasn't sure about what the regulation was on

24  that because this is something that had changed since I

25  was doing that particular --

Page 279

1    Q   So am I correct that Mr. Foster then put you

2  under oath and then asked you questions about

3  individuals in which their alien registration card was

4  expired and you gave testimony which said they're

5  unauthorized --

6    A   I was looking at the other aspect of it.  I

7  didn't get into that part of it.

8         My understanding was I went back and looked at

9  where there were other issues that were wrong with the

10  files.

11    Q   Well, Mr. Shcherbina was one of the people that

12  Mr. Foster just went over with you.

13    A   I was mistaken.  And when you just showed me

14  that notification, I realized that I had been mistaken

15  about that.

16         And I apologize for that.  That was a change in

17  regulation that I wasn't familiar with.

18    Q   But you're an expert in this area?

19    A   In determining whether people are illegally

20  present in the United States.

21    Q   And you don't know whether there's been a

22  change in the law regarding re-verification of I-551s?

23         Is that your testimony, Mr. Cutler?

24    A   I made an error on that one.

25    Q   Let's look at 23-A, please.

Page 280

1    A   (Witness complies.)

2         Bear with me.

3    Q   Sure.

4    A   Okay.

5    Q   What's the basis for concluding that

6  Ms. Youngblood was an unauthorized alien?

7    MR. FOSTER:  Are you asking what his basis was, in

8  his notes, or what his basis is now, or what he said

9  before?

10    MR. VOLPE:  Well, he's changed so many times,

11  Mr. Foster, I'm not sure what I'm asking him --

12    MR. FOSTER:  Well, since you're not sure what

13  you're asking, why don't you rephrase.

14    MR. VOLPE:  Stop.

15    Q   What is the basis for your opinion that

16  Ms. Comechalla -- or Ms. Youngblood is an unauthorized

17  alien?  Let me break it up.

18         What was your basis when you issued your expert

19  report for determining that Ms. Youngblood is an

20  unauthorized alien?

21    A   (No response.)

22    Q   It's on page 1500.

23    A   Thank you.

24    Q   You're looking at your notes; correct?

25    A   Yes.  I indicated that she claimed to be a U.S.

Page 281

1  citizen yet used a translator.

2    Q   No.

3    A   Isn't that what I have?

4    Q   Mr. Cutler, that's not what you have there.

5    A   I-9 in Spanish.  I see what I have.  I wrote

6  it wrong, I guess.

7    Q   The I-9 is not Spanish, is it?

8    A   No, it's not.  Hold on a second. I know what I

9  did, but, okay.  Yes.

10         No, it's not.  There was a preparer either a

11  preparer or translator who assisted her.  In my own

12  shorthand what I wrote was in Spanish and that was

13  wrong.

14    Q   But again as Mr. Hopson made clear with you this

15  morning you have no idea whether Ms. Youngblood needed

16  a translator or a preparer; correct?

17    MR. FOSTER:  Object.

18         Misstating his testimony.

19    Q   BY MR. VOLPE:  Do you have any idea,

20  Mr. Cutler, whether Ms. Youngblood needed a preparer or

21  a translator?

22    A   Well, she needed one or the other, if there is

23  one. I don't know which.

24    Q   You don't know which?

25    A   Right.  That's correct.

Page 282

1    Q   Okay.
2        Now, Mr. Foster didn't go over all the
3    individuals we discussed this morning, did he, when he
4    was asking you questions?
5    A   Absolutely not.
6    Q   So is it safe to assume for those
7    individuals -- you haven't changed your opinion that
8    you gave earlier in your direct testimony -- that those
9    people are not unauthorized aliens?
10   A   I'd have to go back and look at it, if you want
11   to do that now.  I want to be as accurate and right as
12   I can be.
13   Q   Well, you know, Mr. Cutler, I appreciate that.
14   So tell me why --
15   MR. FOSTER:  Can we go off the record for a second?
16   MR. VOLPE:  No, I have a question.
17   Q   Why don't you tell me, Mr. Cutler, which
18   individuals that you told Mr. Hopson this morning or
19   early this afternoon that you had opined an error that
20   they were unauthorized aliens.
21       Which ones you now are saying are unauthorized
22   aliens?
23   MR. FOSTER:  Object to the form of that question.
24   MR. VOLPE:  That was a bad question.
25   Q   Let me rephrase that question.

Page 283

1    A   Okay, counsel.
2    Q   Is it fair to say that under Mr. Hopson's
3    direct examination, you indicated that several
4    individuals were not unauthorized aliens?
5    A   I had errored about the issue of the
6    expiration -- of the I-551's, the alien cards.
7    Q   That's your testimony?
8    A   I'm just telling you what had happened.
9        The expiration date had not expired at the time
10   that they were hired, which makes them employable.  I
11   had errored on that point of the law.
12   Q   And that was the only error you told Mr. Hopson
13   you made this morning?
14   A   There was one other one that -- there were two
15   other ones, actually, that I believe happened.
16       One -- I'm still not sure about the other.  One
17   I told you about, the one that was reaccomplished where
18   the individual was given employment authorization even
19   though he had a no match.
20   MR. FOSTER:  Now, I ask because there's no question
21   pending, can we go off for a couple minutes?
22   MR. VOLPE:  Sure.
23   THE VIDEOGRAPHER:  Going off the record.  The time
24   now is 3:16 P.M.
25       (A recess was taken.)

Page 284

1    THE VIDEOGRAPHER:  We're back on the record.  Time
2    now is 3:28 P.M.  This is the beginning of videotape
3    No. 7.
4    Q   BY MR. VOLPE:  Mr. Cutler, we just took a
5    break.  And during the break, did you speak with
6    counsel?
7    A   Yes.
8    Q   What did you talk about with counsel?
9    A   About what I told you how I had heard about the
10   business about the expired alien cards.
11   Q   Did you look at any files?
12   A   No, I did not.
13   Q   Did plaintiffs' counsel ask you about any
14   files?
15   A   No, they did not.  Well, we were looking at one
16   individual by the name of Pavel.
17   Q   You looked at Pavel?
18   A   We were talking about Pavel.
19   Q   Are you -- I think you said that Pavel -- that
20   you had once again gone back to your position that you
21   stated with Mr. Hopson that Pavel is not an
22   unauthorized alien; is that correct?
23   A   If I could see that for a minute?
24   Q   Sure.
25   A   Yes.  The issuer here was one of those whose

Page 285

1    alien cards had expired at the time that I had reviewed
2    his form, but that was Adde.
3    Q   So Mr. Shcherbina is not an unauthorized alien
4    in your expert opinion?
5    A   Pavel Shcherbina, yes, that's right.
6    Q   Did I hear you testify this morning or just a
7    little while ago, Mr. Cutler, that you cannot become a
8    resident until you have lived in the country a number
9    of years?
10   A   Usually.  Not that you have to have lived here
11   -- some come in an with immigrant's visa, but many have
12   been here briefly, sure.  But that's a rare occurrence.
13       Many of the people are here for a number of
14   years and then become resident aliens.
15   Q   I'm sorry.  A number of people do that?
16   A   Quite a few.  Many of the people that I
17   encountered as an agent would do it that way.  They
18   would either come here, meet somebody, get a job offer.
19   They would go home, get their visa packet and come back.
20   But many of them have been here for instance a period
21   of time.
22   Q   Let's look at Exhibit 27.
23   A   Okay.
24   Q   Okay.  Give me a second.
25       Why don't you look at 27-A.

Page 286

1    A   Well, I'm doing that.
2    Q   Okay.
3    A   All right.
4        You told Mr. Hopson earlier today that it was
5    now your opinion that Mr. Adde was not an unauthorized
6    alien; is that correct.
7    MR. FOSTER: Object to the form of the question.
8    Misstates his testimony.
9    Q   BY MR. VOLPE: Mr. Cutler, did you tell
10   Mr. Hopson that it was your expert opinion Mr. Adde was not
11   an unauthorized alien?
12   A   As I recall.
13   Q   Did you tell Mr. Foster that Mr. Adde was an
14   unauthorized alien?
15   A   I'm not certain as to what his status is, again,
16   because of the use of the translator.  Although, use of
17   the translator, which was an area of concern, but it showed
18   that he had worked up until '05 in Kenya.
19   Q   And so, the use of a translator doesn't
20   surprise you, does it?
21   A    In this case if, in fact, he came here within
22   the last year, then that would not be unusual.
23   Q   I just want to be clear about this.
24   A   Okay.
25   Q   Is it your expert opinion, Mr. Cutler, that

Page 287

1    Mr. Adde is an unauthorized alien?
2    A   No.  In this case, based on when he was working
3    in Kenya, if this is accurate, it would not be unusual
4    for him to use the translator.
5    Q   Well, do you have any reason to believe that this
6    is not accurate?
7    A   No.
8    Q   So just to restate, is Mr. Adde an unauthorized
9    alien?
10   A   On the face of this application, no.
11   Q   Well, on the face of any of the documents here
12   before you?
13   A   In this case, no.
14   Q   Let's look at Plaintiffs' Exhibit No. 1.
15       Do you have it in front of you?
16   A   I will in a moment.
17   Q   Okay.
18   A   I have it.
19   Q   Okay.
20       Did you find this statute?
21   A   I'm sorry.
22   Q   Did you go out to a library and find this
23   statute?
24   A   No.  It was provided by counsel.
25   Q   Can you show me where in this document it says

Page 288

1    that you may take language skill into consideration?
2    A   Language skill in the totality of an interview
3    is an indication as to whether or not somebody is who
4    they claim they are.
5        It can be a factor in an effective interview.
6    In fact, that was how we trained the employers that we
7    spoke to back when I was doing my -- as we called it --
8    officer friendly assignment.
9        If somebody claims to be a resident alien for
10   ten years and it's over five years; if someone is a
11   naturalized citizen, can't speak English, you know that
12   there is something amiss.
13       So certainly, language is a component as to
14   whether or not somebody is credible, believable, might
15   be an imposter, might not be presenting documents that
16   truly relate to him.
17   Q   But Mr. Cutler, you said this morning that
18   there was some document regulation, statute,
19   guidance -- something out there which would indicate
20   that you may take language into consideration.
21       And then Mr. Foster asked you, essentially,
22   isn't this the document you were thinking of this
23   morning?
24   A   Well, I know that the procedure had made things
25   easier for the agents that were out there doing the

Page 289

1    employer sanctions cases to raise these issues for the
2    employers, when they were working with them.
3        In other words, the idea is that if somebody
4    was to question an alien, that they were entitled to be
5    more skeptical, if you will, if someone appears to be
6    an illegal alien, because a -- illegal aliens are not
7    protected by the discrimination clause.
8    Q   Are you aware, Mr. Cutler, of any document,
9    regulation, statute, note from an INS officer, some
10   piece of material which says that you may take
11   employers -- you may take language skill into
12   consideration in determining whether somebody is
13   authorized to work in this country?
14   A   The way that it was explained to us when I was
15   doing the training was that language can be considered
16   in the totality of interviewing the prospective
17   employee to determine if they are who they claim they
18   are, and if they're authorized in the United States.
19   Q   I understand that you're saying that's how it
20   was explained to you.  It doesn't really answer my
21   question.
22       Is there something on paper, CD, DVD, memos, pad,
23   voice mail -- is there something out there which says that
24   you may take language into consideration when
25   determining whether somebody is authorized to work in

Page 290

1  this country?
2      A   I'm not aware of any specific document.
3      Q   Now, back to my question which I had before the
4  break, which is:  Mr. Foster didn't go over every
5  individual that you told Mr. Hopson that you changed
6  your opinion about whether they were authorized;
7  correct?
8      A   (No response.)
9      Q   That's a bad question.  Let me rephrase that.
10     A   All right.
11         I don't understand what you're asking me.
12     Q   I understand.
13         Mr. Hopson went over 14 or 15 individuals this
14  afternoon with you; correct?
15     A   That's correct.
16     Q   Did Mr. Foster go over 14 or 15 individuals?
17     A   No, he didn't.
18     Q   So he didn't go over all the individuals --
19     A   No.
20     Q   -- that Mr. Hopson went over; correct?
21     A   No.  That's right.
22     Q   So to the extent you changed your opinion about
23  whether any of those individuals are authorized to work
24  in this country, or better stated, unauthorized to work
25  in this country, we can assume that what you told

Page 291

1  Mr. Hopson is still the state of your opinion?
2      A   Where it was based primarily -- primarily on
3  the expiration of an alien card; that is correct.
4      Q   Well, we just -- you and I just went through
5  five or six after Mr. Foster's questions; correct?
6      A   Right.
7      Q   And didn't you change your opinion again after
8  all five or six of those individuals?
9      A   I believe it was five of them, yes.
10     Q   Didn't you change your opinion?
11     A   Yes.  I'm trying to be as accurate as I can.
12     Q   Just so I'm clear --
13     A   Okay.
14     Q   -- you had an opinion coming in to this
15  deposition; correct?
16     A   Correct.
17     Q   You changed that opinion as to certain
18  individuals with Mr. Hopson, when Mr. Hopson was asking
19  you questions; correct?
20     A   Right.
21     Q   You then changed, when we got back to certain
22  individuals, that opinion back to that they were
23  unauthorized; correct?
24     A   Right.
25     Q   And now --

Page 292

1      A   Well, what I'm saying --
2      Q   Wait.  Let me finish my question.
3      A   All right.  I'm listening, Counsel.
4      Q   Okay.
5          And now you've changed your opinion again that
6  they are authorized to work in this country; correct?
7      A   In some cases.
8      Q   Of the 14 that Mr. Hopson went over with you
9  and then to the extent Mr. Foster went over some of
10  them, which ones are you saying are unauthorized
11  aliens?
12     A   Okay.
13         If I can go back over it with you, I'd be
14  happy.
15     Q   Sure.
16     A   Which ones are we looking at?  And I'll explain
17  to you what my thought processes are.
18     MR. FOSTER:  Can you give him the list and the
19  complete pile, the list that Mr. Hopson went over so
20  we're all clear about which ones?
21     MR. VOLPE:  Well, I don't care about the ones that
22  Mr. Hopson went over.
23         I want to talk about the ones that Mr. Foster
24  went over.
25     MR. FOSTER:  Well, I thought your question was

Page 293

1  the ones that Mr. Hopson went over.
2      MR. VOLPE:  No.
3      Q   Of the ones -- okay.
4          Of the ones that Mr. Hopson went over with you
5  and then Mr. Foster went over with you, which ones are
6  you confident are unauthorized aliens?
7      A   Let me see what I can re-create from here.
8      MR. FOSTER:  Okay.
9          I ask that we can go off the record so he can
10  put together his pile.
11     MR. VOLPE:  Sure.
12     MR. FOSTER:  Okay.  Let's go off the record.
13     THE VIDEOGRAPHER:  Going off the record.  Time is
14  now 3:40 P.M.
15         (A recess was taken.)
16     THE VIDEOGRAPHER:  We're back on the record.  Time
17  now is 3:44 P.M.
18     Q   BY MR. VOLPE:  Mr. Cutler, are you unable to
19  determine which individuals you went over with
20  Mr. Foster?
21     A   Well, I believe he has the files of those.
22     Q   Okay.
23     MR. VOLPE:  Mr. Foster, do you want to hand
24  Mr. Cutler your files.
25     MR. FOSTER:  Well, they're not my files.  What they

Page 294

1    are are copies of exhibits that were given to me during
2    this deposition.
3        MR. VOLPE:  Okay.
4        MR. FOSTER:  I believe these are the ones that --
5    all the ones that Mr. Hopson went through with
6    Mr. Cutler.  That's what they are --
7        MR. VOLPE:  Mr. Foster, I really just asked you to
8    give him the files.  Just give him the files.  Let him
9    go through them.
10       MR. FOSTER:  Okay.  I will.
11           I was just clarifying for the record what it is
12   we're doing.
13       MR. VOLPE:  Okay.
14           I think we're clear what we're doing.
15       MR. FOSTER:  Do you have a question pending?
16       MR. VOLPE:  I sure do.
17       MR. FOSTER:  What is it?
18       MR. VOLPE:  Can I have the question read back,
19   please.  I think the word confident was in the
20   question.
21       MR. FOSTER:  Can I have the question read back,
22   please.
23           (The record was read.)
24       MR. FOSTER:  Okay.
25           Well, there's no question pending.

Page 295

1        MR. VOLPE:  All right.
2        MR. FOSTER:  There is no question pending.  Do you
3    want to ask the question, Mr. Volpe?  Or are you --
4        MR. VOLPE:  Mr. Cutler, Mr. Foster, I want to go
5    off the record for a second.
6        THE VIDEOGRAPHER:  Going off the record.  Time now
7    is 3:46 P.M.
8            (A recess was taken.)
9        THE VIDEOGRAPHER:  Back on the record.  Time now is
10   3:46 P.M.
11       Q   BY MR. VOLPE:  Mr. Cutler --
12       A   Yes.
13       Q   -- before you are the files, the documents that
14   you looked at with Mr. Hopson; is that correct?
15       A   Yes.  As far as I can tell, yes.
16       Q   Okay.
17           Now, are those the same documents that
18   Mr. Foster showed you?
19       A   Yes.
20       Q   Okay.
21       A   As far as I can determine.  Again, this was
22   months ago.  I'm presuming they are.
23       Q   No.  I'm not asking that.
24           I'm asking the files that Mr. Foster showed you
25   during his examination.

Page 296

1            Are those the documents?
2        A   When I was in his office --
3        Q   No.  Right now.
4        A   Oh, right now.  Yes, these -- absolutely.
5        Q   Okay.
6            And my question to you is:  We've gone over a
7    half dozen, five or so, of these in which you've gone
8    back to your opinion that you gave to Mr. Hopson that
9    the individuals are not unauthorized aliens; correct?
10       A   Correct.
11       Q   And my question to you is:  Which of those
12   individuals are you confident are unauthorized aliens?
13       A   Okay.
14           And that's what I'm trying to devise for you
15   right now.
16       Q   Okay.  Perfect.
17       A   Okay.
18       Q   Take all the time you need.
19       MR. FOSTER:  Let's go off the record, then, while
20   he does that.
21       MR. VOLPE:  No.  We'll stay on the record.
22       THE WITNESS:  (Witness complies.)
23           In the case of Youngblood, it seems highly
24   unusual that somebody claims to be a United States
25   citizen had somebody prepare the application for her.

Page 297

1            And I know we've been going back and forth on
2    Youngblood, but I'm looking at this, and this doesn't
3    make any sense that a United States citizen would have
4    the preparer fill out her form when she signed it in
5    script and claims to be a United States citizen.
6        Q   BY MR. VOLPE:  So now you're saying that
7    Ms. Youngblood is an unauthorized alien?
8        A   Is unauthorized -- I'm just telling you -- what
9    I'm looking at is here's where she's saying she's a
10   United States citizen, she had a preparer or translator
11   do this for her, yet she signs it fluently.
12           It doesn't make sense for a U.S. citizen to
13   need somebody to prepare her paperwork for her, if, in
14   fact, she's a United States citizen.
15           Okay?
16       Q   It doesn't make sense, Mr. Cutler, according to
17   you, but does it make her an unauthorized alien?
18       A   I believe she is because of this -- I've never
19   seen an American citizen who could sign her name who
20   needed a translator or a preparer to fill out a form.
21           That's exactly what happened here.
22       Q   How many I-9s would you say are filled out in a
23   year throughout this country?  Millions?
24       A   Probably so.
25       Q   Have you reviewed all those I-9s?

Page 298

1    A    No.  Of course I haven't.
2    Q    So now -- so I'm clear, now you're back to the
3  opinion that Ms. Youngblood is an unauthorized alien;
4  is that correct?
5    A    In her case, that's correct.
6        I'm looking again at the fact that a United
7  States citizen had a translator or a preparer fill out
8  her paperwork.
9        It's inconsistent with what I know citizens to
10  do.  Somebody by the name of Kristin Johnson filled out
11  her paperwork, and yet she claims to be a United States
12  citizen.
13    Q    And you don't think it is possible, Mr. Cutler,
14  as a matter of convenience, somebody helped fill out
15  the form?
16    A    I can't imagine how it's convenient to have
17  somebody else sit there and take your information and
18  have to write it when you could simply write it
19  yourself.
20        What would be easier?  For you to fill out a
21  form or for you to have to go back and forth to me and
22  tell me:  My address is, my date of birth is, and so
23  forth.
24        I would find it much less convenient to do it
25  that way, sir.

Page 299

1    Q    So Ms. Youngblood is an unauthorized alien?
2    A    Correct.
3        Mr. Kulyabin has been a resident of the United
4  States since 1997, also needed a translator, which
5  makes no sense.  Which makes him unauthorized.
6        I'm trying to do this as methodically as I can
7  and go through this with you as best I know how to.
8    Q    Isn't Mr. Kulyabin somebody we just went over
9  and said --
10    A    Yes, we did.  And I'm looking at it because I
11  didn't just arbitrarily do this, and I'm reviewing it
12  to try to understand what I did and why.
13        And I'm telling you this guy, according to his
14  alien card, has been residing in the United States as a
15  resident for a decade and still needed a translator,
16  which is, again, unusual.
17        Ten years is an awfully long time not to be
18  able to fill out an application in the English
19  language.  And that was my original finding with this
20  guy.
21    Q    But we had -- we've gone back and forth twice;
22  is that correct?
23    A    I apologize, but, yes, we have.
24    Q    All right.
25        You know what?  Mr. Cutler, this exercise is

Page 300

1  not -- this is -- this is silly.
2        MR. VOLPE:  I'm finished.
3        MR. FOSTER:  We're done.  I have no more questions.
4        THE VIDEOGRAPHER:  Going off the record.  Time now
5  is 3:52 P.M.
6            This is the conclusion of videotape No. 7.
7
8        (The Deposition concluded at 3:52 P.M.)
9
10              *  *  *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 301

1    STATE OF                )
                              )
2    COUNTY OF               )
3
4
5        I, the undersigned, declare under
6  penalty of perjury that I have read the
7  foregoing transcript, and I have made any
8  corrections, additions, or deletions that I
9  was desirous of making; that the foregoing
10  is a true and correct transcript of my
11  testimony contained therein.
12
13    EXECUTED this      day of          ,
14  at              ,              .
            (City)              (State)
15
16
17
            MICHAEL CUTLER
18
19
20
21
22
23
24
25

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION**

| | |
|---|---|
| BIRDA TROLLINGER, et al., | No. 4:02-cv-23 |
| Plaintiffs, | CLASS ACTION |
| | JURY DEMAND |
| vs. | |
| | Judge Curtis L. Collier |
| TYSON FOODS, INC., et al. | |
| | United States Magistrate Judge |
| Defendant. | William B. Mitchell Carter |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF THEIR MOTION TO COMPEL**

Plaintiffs, by undersigned counsel, hereby submit their Reply in Support of their Motion to Compel Defendants to submit the names and social security numbers of Tyson employees to the Social Security Administration for verification (hereafter "SSA matching").

**I.    BACKGROUND**

As Plaintiffs' Memorandum In Support Of Their Motion To Compel (hereafter "Plaintiffs' Memo.") indicates, the results of the proposed SSA matching are not merely evidence to be used in support of Plaintiffs' case, but also are an essential part of the manner of identification of class members. *See* Plaintiffs' Memo. at 1-2 (*citing* Judge Collier's Class Certification Order recognizing the utility of this procedure in identifying class members).   Moreover, evidence of non-matching social security numbers would help establish that Tyson has not used SSA matching, contrary to its assertions made throughout this case. *See* Defendants' Memorandum In Opposition To Plaintiffs' Motion To Compel (hereafter "Defendants' Memo." at 3, 8).[1]

---

[1] Tyson refers to the SSA matching program both as "the Social Security Number Verification System" ("SSNVS"). and "Basic Pilot."  Defendants' Memo. at 3.  SSA refers to the program as "Basic Pilot," as the exhibits to Tyson's Memorandum indicate.

---

Finally, the existence of significant numbers of non-matching social security numbers (which Tyson obviously fears will be discovered) offers highly relevant evidence going to the heart of Plaintiffs' case, *i.e.*, that Tyson knowingly hires illegal immigrants. Tyson makes the statement that no such inference can be drawn from non-matching names and numbers but at the same time concedes that it *relies upon these results in determining employment authorization.* Defendants' Memo. at 8 ("Tyson Uses Basic Pilot To Verify Employment Authorization…"). Thus, an order compelling Defendants to submit their employees' data to SSA matching will yield crucial evidence.

## II.   TYSON'S ARGUMENTS MAKE NO SENSE

As indicated, Tyson admits it uses SSA matching to verify the employment authorization of its workers. Id. Then, it takes the position that Plaintiffs should not be allowed to do the same thing.[2] This is absurd. Since a valid social security card evidences "employment authorization" under the Immigration Reform and Control Act, then both sides need to know whether Tyson's employees presented valid numbers.[3] Hence, the SSA matching data is crucial. As it stands, Tyson will seek to introduce its use of Basic Pilot as evidence of its compliance with IRCA at trial to prove its innocence. This one-way use of the matching results would deprive Plaintiffs the ability to prove

---

[2]Tyson asserts "the sole purpose of the SSA database… is for wage reporting (*i.e.*, W-2 forms) purposes." Defendants' Memo. at 2. If this were the "sole purpose" of the SSA database, then SSA would not offer the nation's employers access to this data to establish employment authorization pursuant to the Immigration Reform and Control Act. Yet it does, pursuant to congressional authorization. *See* 8 U.S.C. 1324a *et seq.* This is made manifestly clear by the Basic Pilot documents Tyson submitted as exhibits to its Memorandum. *See* Ex. F at 10 ("The Basic Pilot Program enables employers to verify *employment eligibility* of all their newly hired employees…") (emphasis added).

[3]The Immigration Reform and Control Act (hereafter IRCA), codified at 8 U.S.C. §1324a *et seq.* "IRCA forcefully made combating the employment of illegal aliens central to the policy of immigration law." Hoffman Plastic Compounds, Inc. v. N.L.R.B., 535 U.S. 137, 147 (2002). Thus, aliens are not authorized for employment unless lawfully admitted for permanent residence or, otherwise by the Attorney General. 8 C.F.R.§ 274a.1(a). One method of evidencing employment authorization is for perspective employees to tender a valid "social security account number card." 8 U.S.C. § 1324a(C)(i).

---

it is not actually using the system or that it is hiring persons who it has been told have non-matching SSA numbers.  This is, needless to say, violative of the very purpose of discovery, to provide "mutual knowledge of all the facts…"  Hickman v. Taylor, 329 U.S. 495, 507 (1947).

Additionally, the proposed regulation cited by the Plaintiffs, F.R. 34281, 34282 (June 14, 2006), Plaintiffs' Memo. at 2, lends further support to their position that evidence of "non-matching" constitutes constructive knowledge of an employee's lack of work authorization.  Tyson contends the Court should ignore the proposed regulation, Defendants' Memo. at 6, n.5.  It cites no authority for its position.  Though proposed regulations are not binding, such regulations provide persuasive authority on issues of statutory interpretation, such as what constitutes "knowledge."  *See, e.g.,* Horn v. McQueen, 353 F. Supp. 2d 785, 807 (W. D. Ky. 2004) ("Regulations on the subject were proposed by the Secretary of Labor almost 16 years ago…The regulations, though never adopted, are treated as persuasive authority by most courts and writers."); *accord* Frank Bros., Inc. v. Wis. DOT, 409 F.3d 880, 891 (7th Cir. 2005) ("Although not binding precedent, the courts have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," referring to agency's proposed rule) (internal citations and quotations omitted); *see also* Midway Mfg. Co. v. Dirkschneider, 543 F. Supp. 466, 482 (D. Neb. 1981) ("Although the proposed regulations are not binding on the Court, they do suggest a persuasive interpretation of the requirements…").  Therefore, Plaintiffs should be entitled to obtain the results of SSA matching for all of Tyson's employees to determine which of them are, and are not, authorized for employment.

**III.    TYSON'S ARGUMENT THAT THE BASIC PILOT USER MANUAL TRUMPS THE FEDERAL RULES OF CIVIL PROCEDURE IS WRONG**

Tyson contends that it is "prohibited" from conducting the SSA matching by the "Basic Pilot User Manual (Exhibit F)," the Privacy Act and the Social Security Act. Defendants' Memo. at 9 (additionally footnotes 9 and 10). Tyson is wrong. The Sixth Circuit has expressly held that federal regulations and agency procedures cannot "divest a court of jurisdiction over discovery…" In re: Bankers Trust Co., 61 F.3d 465, 470 (6th Cir. 1995) (ordering defendant to produce all documents it submitted to the Federal Reserve "including regulatory reports" over the objections of the defendant and the agency itself, which sided with the defendant, citing its own express regulations, rejecting the argument that disclosure would violate those regulations and even risk "criminal penalties").[4] Under the rule enunciated in Bankers Trust, Tyson's argument would only have force if it could cite a statute expressly "empowering [the SSA] to prescribe regulations that direct a party to deliberately disobey a court order, subpoena, or other judicial mechanism requiring production of information." Id. Tyson has failed to cite Bankers Trust, much less seek to comply with the extremely high hurdle it erected for sustaining its argument. Thus, Tyson's position that it is barred from complying with discovery requests in this case must be rejected.[5]

---

[4] The SSA has not appeared in this case, despite the urging of Tyson's counsel that it do so, as Mr. Green admitted in open court on January 29, 2007. However, the Bankers Trust decision plainly indicates such intervention would have no effect on the Plaintiffs' right to obtain their evidence pursuant to Fed. R. Civ. P. 34. Moreover, it must also be noted that Tyson fails to cite any regulation prohibiting SSA matching, making its argument even weaker than that rejected in Bankers Trust. Similarly, Courts have reached the same result in interpreting the Privacy Act. Laxalt v. McClatchy, 809 F.2d 885, 889 (D.C. Cir. 1987)("We therefore hold that a party can invoke discovery of materials protected by the Privacy Act through the normal discovery process…"). This decision has been expressly followed by this Court. Gary v. United States, 1998 U.S. Dist. LEXIS 16722 at *10 (E.D. Tenn. 1998).

[5] It should also be noted that Tyson concedes it has the ability to seek SSA matching. Defendants' Memo. at 4 n.4 ("Tyson does not dispute that if it is registered for SSNVS [Basic Pilot], it can request matching information for its current and former employees").

---

IV.     **CONCLUSION**

For the reasons stated herein, and in Plaintiffs' Memo., Plaintiffs respectfully request that their Motion to Compel be granted and that Tyson be ordered to conduct the SSA matching as proposed in their Motion and described in the Motion for Class Certification.

Dated:  February 16, 2007                Respectfully submitted,

                                         BIRDA TROLLINGER, *et al.,* Plaintiffs

                                         By:     _/s/ Howard Foster
                                                 One of Their Attorneys
                                                 Howard Foster
                                                 Matthew Galin
                                                 Johnson & Bell, Ltd.
                                                 33 West Monroe Street, Suite 2700
                                                 Chicago, IL 60603
                                                 (312) 372-0770

                                                 William G. Colvin
                                                 Horton, Maddox & Anderson
                                                 One Central Plaza
                                                 835 Georgia Avenue, Suite 600
                                                 Chattanooga, TN 37402
                                                 (423) 265-2560
                                                 423- 265-3039 (Fax)

                                                 *Attorneys for the Plaintiffs*

CERTIFICATE OF SERVICE

I hereby certify that the foregoing PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO COMPEL has been filed electronically.  Notice of this filing will be sent by the operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail and/or facsimile or hand delivery. Parties may access this filing through the Court's electronic filing system.

Dated this 16th day of February, 2007

By: /s/ Matthew Galin
Matthew Galin