IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BIRDA TROLLINGER, VIRGINIA BRAVO, KELLY KESSINGER, IDOYNIA McCOY, REGINA LEE, PATRICIA MIMS, LORI WINDHAM, and ALEXANDER HOWLETT, individually and on behalf of all others similarly situated, | MISCELLANEOUS CASE No. 1:07-mc-00341 |
| Plaintiffs, | |
| v. | |
| TYSON FOODS, INC. a Corporation, JOHN TYSON, ARCHIBALD SCHAFFER III, RICHARD BOND, KENNETH KIMBRO, GREG LEE, KAREN PERCIVAL, AHRAZUE WILT, TIM McCOY | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION TO COMPEL USCIS TO COMPLY WITH THEIR SUBPOENA**

Plaintiffs, by undersigned counsel, hereby submit their Reply Memorandum in Support of their Motion to Compel USCIS to Comply with their Subpoena ("Plaintiffs' Motion").  As will be discussed below, the information sought is relevant to Plaintiffs' case, and therefore, their Motion should be granted.[1]

## I.    THE INFORMATION SOUGHT WITH RESPECT TO ANA HART IS RELEVANT TO THIS CASE

Tyson contends that regardless of whether Ana Hart was an illegal alien or not, such an inquiry would have no bearing on whether Tyson formed a RICO enterprise with Hispanic

---

[1] This Reply Memorandum is being filed in opposition to the Response filed by the Defendants. *See* Court Doc. No. 10. As this Court is aware, the subpoena in question was served on the Department of Homeland Security, a non-party to this action. The Defendants in the underlying action are Tyson Foods, Inc. and several of its top officers and managers.  Plaintiffs refer to them collectively as "Tyson" unless otherwise indicated.

Rights Groups. *See* Response at 4. This is wrong. Plaintiffs allege that Tyson formed a RICO enterprise with Hispanic Rights Groups for the purposes of hiring illegal immigrants at its Facilities. *See* Second Amended Complaint ("SAC") at ¶¶ 49-56, attached as Ex. A. Therefore, it is certainly relevant whether Tyson installed an illegal immigrant as its full-time liaison to these groups. Plaintiffs believe that such evidence would show that Tyson intended to form the RICO enterprise with these groups *for the purpose of hiring illegal aliens.*

Additionally, Hart testified that she entered the country in 1995 after she was married to an American Citizen. *See* Deposition of Hart at 10-12, attached as Ex. B. She also testified that she received her legal permanent resident status *shortly* before she was divorced. *See* Id. at 13, 14, 16, 17. Though Hart claims she is legal, Plaintiffs need to be able to test the veracity of her statements made during her deposition. Plaintiffs intend to do so through the documents obtained in response to this subpoena. Moreover, as stated in Plaintiffs' Motion (Court Doc. No. 8 at 4), to the extent that such documents are protected by the privacy act, this Court has authority to order the production at issue here. *See* 5 U.S.C. § 552a(b)(11); *see also* Laxalt v. McClatchy, 809 F.2d 885, 888-889 (D.C. Cir. 1987) (holding that the Privacy Act permits disclosure by an agency pursuant to a court order). Thus, the subpoena requests relevant information with respect to Ana Hart which can be produced.

## II.    THE INFORMATION SOUGHT REGARDING THE 91 SUSPECTED ILLEGAL ALIENS IS ALSO RELEVANT TO THIS CASE

### A.    Discovery Is Not Closed With Respect to Third Party Subpoenas

Tyson contends that Plaintiffs' Motion should be denied because discovery is closed in this case. *See* Response at 5 ("Plaintiffs have had years, and discovery is now closed."). According to Tyson, Judge Collier's Management Order (E.D. Tenn. Court Doc. No. 241, attached as Ex. C) ended all discovery on July 30, 2007. This is not correct and Tyson cites no

authority in support of its position. As Plaintiffs discussed in their Response to Tyson's Motion to Quash filed in the Eastern District of Tennessee (in the underlying action), this "discovery cut-off date" did not foreclose third party subpoenas (*See* E.D. Tenn. Court Doc. No. 444, attached as Ex. D).

The Management Order, referred to by Tyson, simply states: "The parties informed the Court that they thought they could complete all discovery by July 30, 2007." *See* Ex. C, at 7. This Order did not actually set any firm deadline. Instead, consistent with the Management Order, the parties submitted a Joint Pre-Trial Discovery Plan (E.D. Tenn. Court Doc. No. 322, attached as Ex. E). In the Joint Discovery Plan, the parties agreed that all *written discovery* would be completed by July 31, 2007. Id. The Joint Discovery Plan made no mention about subpoenas issued to third parties, and the issue was not contemplated by the parties. Moreover, Plaintiffs' subpoena to DHS requested certain files to be produced. As such, the subpoena in question is not even requesting "written discovery." Nor does the subpoena place any burden on Tyson. Thus, they have no interest in quashing it other than precluding Plaintiffs from obtaining important evidence.

Tyson also attempts to characterize Judge Collier's previous decision not to alter to the *Daubert* schedule as support for its position here. *See* Response at 6 (*citing* Collier's Order from October 30, 2007, E.D. Tenn. Court Doc. No. 431). Contrary to Tyson's assertions otherwise, that Order has no relevance to this Motion. Judge Collier simply denied Plaintiffs' Motion to continue the date of the *Daubert* hearing pending the results of the subpoena (and any related motions). The Court did not address whether the subpoena was barred by any discovery cut-off date or whether it requested relevant information. Thus, Tyson's argument here should be

ignored.[2]  Finally, Judge Collier recently denied Tyson's Motion to quash this subpoena.  *See* Order, attached as Ex. F.

**B.    The Requested Files of the 91 Suspected Illegal Aliens Are Necessary for Plaintiffs to Prove Their Claims**

As stated before in Plaintiffs' Motion, the requested DHS files are the best evidence to enable Plaintiffs to prove that the 91 suspected illegal aliens were hired using fake/stolen identity/immigration documents.  *See* Plaintiffs' Motion at 3. The crux of Tyson's argument that these documents are "not essential" is that the Plaintiffs never disclosed this information in their previous discovery responses. *See* Response at 7 ("That the DHS files are not 'essential' to Plaintiffs is reflected by the fact that two days *after* filing the instant Motion to Compel, Plaintiffs failed to identify these files as part of their proof…") (emphasis in original).  Contrary to Tyson's argument otherwise, the DHS files were not identified in prior discovery responses because *Plaintiffs do not yet have the files.[3]*  Once the files are retrieved (if the Motion is granted), Plaintiffs will identify which DHS documents in particular support their position.[4]

---

[2]  Additionally, Tyson also argues that Plaintiffs' Motion should be denied because Plaintiffs' previous, unrelated Motion to Compel was denied by Judge Collier.  *See* Response at 11 ("Finally, this motion should be denied because it is nothing more than a renewed effort to obtain Privacy Act-protected information that already has been rejected by the Eastern District of Tennessee.").  The fact that the Court denied Plaintiffs' previous Motion to Compel Tyson to submit the social security numbers of all its employees to Social Security Administration for matching is also irrelevant.  Judge Collier denied this previous Motion to Compel *as moot* because Tyson had participated in the Basic Pilot Program, which already did the matching Plaintiffs requested.  *See* Minute Order (Apr. 30, 2007), attached as Ex. G; *see also* Transcript of the Proceedings (Apr. 30, 2007), at 32-36, attached as Ex. H.  Thus, Tyson's reference to this previous Motion to Compel is done purely for purposes of obfuscation.

[3]  Discovery in this case has been a constant battle with Tyson. Plaintiffs have had to file numerous Motions to Compel.  Thus, Plaintiffs recognize that it takes far too long to actually obtain requested documents.

[4]  Plaintiffs acknowledge that the "Ex. A" to the original subpoena only included 68 of the names instead of the 91.  This was an inadvertent mistake.  Plaintiffs have already issued a revised "Exhibit A" (attached hereto as Ex. I) to DHS (and copied to Tyson), which include all 91 names. The additional names do not change any of the arguments made by any of the parties regarding this Motion.

### C.       Mr. Cutler's Expert Opinion Is the Basis for the Requested DHS Files

Tyson also contends that Plaintiffs have no basis for selecting the DHS files of the 91 suspected illegal aliens for two basic reasons: (1) because their Expert's opinion was withdrawn. *See* Response at 8 ("The Cutler opinion, which forms the only basis for identifying these 91 individuals, has been withdrawn by Plaintiffs.  Accordingly, there is no factual predicate for selecting the files of these 91…"); and (2) Plaintiffs' expert opinions are incorrect as a matter of fact and law.  *See* Response at 8 ("Even if the opinions had not been withdrawn, the Cutler opinion provides no valid basis for seeking these files…The notion that all U.S. citizens or lawful permanent residents speak English is simply incorrect as a matter of fact and law.").  As will be discussed, Tyson is wrong on both points.

### 1.       Cutler's expert opinion was not withdrawn

While it is true that Plaintiffs withdrew Mr. Cutler's Declaration, *they did not withdraw his Expert Report*.  *See* Pls.' Resp. to Tyson's Defs.' Mot. to Exclude the Test. of Michael Cutler (E.D. Tenn. Court Doc. No. 435), attached as Ex. J, at 4.  Mr. Cutler submitted his *expert report* indicating that individuals who claim to be a U.S. Citizen or Legal Permanent residents, as a practical matter, should be able to speak English.[5]  *Thus, this opinion forms the factual predicate for selecting DHS files of these 91 individuals.*

### 2.       Mr. Cutler's expert opinions are valid

At the outset, whether or not Mr. Cutler is correct, or if there is some other reason for the suspected illegal alien's inability to speak English, is a question of fact to be decided by the jury. Nevertheless, Cutler's opinion that the inability to speak English can be used as a factor to

---

[5] Tyson challenged this opinion at the recent *Daubert* hearing.  The Court has not yet ruled on his their Motion, but Plaintiffs expect Tyson's Motion will be denied.

determine work authorization is consistent with the law.  *See, e g.,* <u>United States v. Holley</u>, 493 F. 2d 581, 582-83 (9th Cir. 1974) (holding that a cab driver's "knowledge" that his passengers were illegal immigrants could be inferred from, *inter alia,* their inability to speak English, rejecting the argument that an anti-discrimination ordinance was a defense); <u>Hernandez v. Balakian</u>, 480 F. Supp. 2d 1198, 1208 (E.D. Cal. 2007) ("the inability to speak English is a factor, among others, which may be considered in determining a defendant's knowledge that a person is in the United States illegally.") (internal citations omitted); <u>Brewer v. Salyer</u>, 2007 U.S. Dist. LEXIS 36156, at *13 (E.D. Cal. 2007) (same proposition).[6]

Moreover, The Eastern District of Tennessee has already rejected many of the same arguments raised by Tyson that using "language as a proxy" to determine work authorization is somehow discriminatory. *See* Response at 8-9.; *see also* <u>Trollinger v. Tyson Foods, Inc.</u>, 2007 U.S. Dist. LEXIS 38882, at *30-31 (E.D. Tenn. 2007) ("To the extent there is a conflict between a criminal and civil statute, obviously the criminal statute prevails…The Court sees nothing in the statutes involved in this litigation that suggest compliance with those statutes provides immunity to defendants.").  Simply because Mr. Cutler's conclusions may or may not ultimately be correct does not render the subpoena request invalid, as is argued by Tyson (*see* Response at 10-11).  To the contrary, Plaintiffs seek to *verify* the opinions of Mr. Cutler through the requested DHS files.  There is no other way to do it, and Tyson's strong objection indicates that it does not want the truth to be discovered.

---

[6] There are a few instances in which some of the 91 individuals were selected for reasons other than language.  Even though the Cutler Declaration was withdrawn, Plaintiffs still have a basis for selecting these files based on Cutler's review of these files and their deposition testimony.  For example, Pavel Shcherbina testified that he was a refugee fleeing religious suppression in the Ukraine in 1993, but that he *never* met with an immigration Judge.  *See* Pavel Dep., attached as Ex. K, at 32-33.  Additionally, when asked about the conditions in the Ukraine before he left, he simply noted that employers began laying people off and that he had trouble finding work, with no mention of any religious suppression he experienced.  *See* <u>Id.</u> at 46-47.  Such testimony calls into doubt the veracity of his claimed legal status and his reasons for coming here.

Similarly, the fact that the DHS files may not prove each and every element of the RICO predicate act does not mean that Plaintiffs' Motion (and subpoena) should be denied. *See* Response at 13 ("the requested records would not support Plaintiffs' claims, even if they were produced…[because] Plaintiffs' RICO claims rests upon a showing that Tyson [had actual knowledge].").  As this Court is well aware, "relevancy" under Rule 26 and 45 is quite broad, and the documents requested need not be admissible, let alone dispositive of every claim. *See*, *e.g.*, Alexander v. FBI, 192 F.R.D. 12, 15 (D.D.C. 2000) ("Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . . The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.").[7]  For these reasons, Plaintiffs' Motion should be granted.

## III.    CONCLUSION

For the reasons stated herein, and in Plaintiffs' Motion, Plaintiffs' Motion to Compel USCIS to Comply with their Subpoena should be granted and the requested DHS files of Ana Hart and the 91 Suspected Illegal Aliens should be produced.

---

[7] *See also* Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 40 F.R.D. 318, 323 n.7 (D.D.C. 1966) ("Since the instant subpoena was issued pursuant to [Rule 45], it could require production only of materials 'which constitute or contain evidence relating to any of the matters within the scope of the examination permitted by Rule 26(b)' which, in turn, restricts examination to matters 'not privileged.'"); 9 MOORE'S FEDERAL PRACTICE, CIVIL § 45.03[1] ("If a Rule 45 subpoena is served in conjunction with discovery, the deposition testimony or production sought must fall within the scope of proper discovery under Rule 26(b)(1) . . . .").

Dated November 28, 2007                    BIRDA TROLLINGER, et al., Plaintiffs

                                  By:      /s/ Howard W. Foster
                                           Howard W. Foster
                                           Johnson & Bell, Ltd.
                                           33 West Monroe Street, Suite 2700
                                           Chicago, IL 60603
                                           (312) 372-0770 (telephone)
                                           (312) 372-9818 (facsimile)
                                           Email:  fosterh@jbltd.com

                                           Stephen C. Leckar
                                           Butera & Andrews
                                           1301 Penn. Av., N.W., Suite 500
                                           Washington, D.C. 20004
                                           (202) 347-6875 (telephone)
                                           (202) 347-6876 (facsimile)
                                           Email:  sleckar@butera-andrews.com

                                           Attorneys for the Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL USCIS TO COMPLY WITH THEIR SUBPOENA has been filed electronically.  Notice of this filing will be sent by the operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

Dated this 28th day of November, 2007

By:  <u>/s/ Howard W. Foster</u>
      Howard W. Foster

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

BIRDA TROLLINGER, VIRGINIA BRAVO,
KELLY KESSINGER, IDOYNIA McCOY,
REGINA LEE, PATRICIA MIMS, LORI
WINDHAM, and ALEXANDER HOWLETT,
individually and on behalf of all others similarly
situated,

|                          | No. 4:02-cv-23                         |

                        Plaintiffs,

CLASS ACTION
JURY DEMANDED

    v.

R. Allan Edgar, Chief Judge

TYSON FOODS, INC. a Corporation, JOHN
TYSON, ARCHIBALD SCHAFFER III,
RICHARD BOND, KENNETH KIMBRO,
GREG LEE, KAREN PERCIVAL, AHRAZUE
WILT, TIM McCOY

United States Magistrate Judge
William B. Mitchell Carter

                        Defendants.

## SECOND AMENDED COMPLAINT

Plaintiffs, Birda Trollinger, Virginia Bravo, Kelly Kessinger, Idoynia McCoy, Regina

Lee, Patricia Mims, Lori Windham, and Alexander Howlett, individually and on behalf of all

others similarly situated, allege as follows:

### I.    NATURE OF ACTION

1.    This is a class action brought on behalf of all persons legally authorized to be

employed in the United States ("U.S.") who have been employed by defendant Tyson Foods, Inc.

("Tyson"), reportedly the world's largest processor and marketer of poultry, as hourly wage

earners at eight of its facilities ("the facilities"), which are located in Alabama, Indiana,

Missouri, Tennessee, Texas, and Virginia.

1

2.     The Complaint contends that all such persons have been victimized by a scheme perpetrated both by Tyson and through a conspiracy among its top management to depress the wages paid to its employees by knowingly hiring a workforce substantially comprised of undocumented illegal immigrants for the express purpose of depressing wages (hereafter "the Illegal Immigrant Hiring Scheme").

3.     The Illegal Immigrant Hiring Scheme violates the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (hereafter "RICO") and has directly and proximately caused the wages paid to plaintiffs and the class members to be substantially depressed, *i.e.*, below the level of wages Tyson would have to pay for this labor if it were not engaged in the Scheme.[1]

## II.     PARTIES AND JURISDICTION

4.     All of the named Plaintiffs are U.S. citizens and were legally authorized for employment at all relevant times.  They were employed by Tyson as hourly paid workers at its chicken processing plants.  Each one is a citizen of the state where he or she was employed by Tyson, as more fully set forth below in ¶ 16.

5.     Tyson is a corporation organized under the laws of the state of Delaware with its principal place of business in Arkansas.

6.     John Tyson is a citizen of Arkansas and is Tyson's Chief Executive Officer.

7.     Archibald Schaffer, III is a citizen of Arkansas and is a Senior Vice President of Tyson.

8.     Richard Bond is a citizen of Arkansas and is Tyson's Chief Operating Officer.

9.     Kenneth Kimbro is a citizen of Arkansas and is Tyson's Senior Vice President for Human Resources.

10.     Karen Percival is a citizen of Arkansas and is a Vice President of Tyson.

11.     Greg Lee is a citizen of Arkansas and is President of Tyson.

---

[1] Hereafter, this Complaint will cite the statutory sections of RICO as "§ 1961" (or whichever section applies) without the reference to Title 18 of the U.S. Code.

2

SECOND AMENDED COMPLAINT

12.    Tim McCoy is a citizen of Arkansas and a senior executive in Tyson's Human Resources department overseeing several plants.

13.    Ahrazue Wilt is a citizen of Missouri and is Tyson's Human Resources Complex Manager for its Sedalia, Missouri facility.

14.    This Court has subject matter jurisdiction over this one-count Complaint pursuant to 28 U.S.C. § 1331 as a federal question and by § 1964(a) of RICO, the statute's jurisdictional provision for civil actions.

15.    Venue is proper in this district because one of the facilities is located in Shelbyville, Tennessee, where Plaintiff Birda Trollinger was employed and was victimized by the Illegal Immigrant Hiring Scheme.

### III.    CLASS ALLEGATIONS

16.    This action is brought, and may be maintained, as a class action pursuant to FED. R. CIV. P. 23(b)(3). Plaintiffs bring this action on behalf of themselves and all other persons, legally authorized to be employed in the U.S., who have been employed by Tyson at the facilities as hourly wage earners. Each facility is a large chicken processing plant employing at least several hundred persons. The facilities are located in Ashland, Alabama (where Plaintiff McCoy was employed), Gadsden, Alabama (where Plaintiff Mims was employed), Heflin, Alabama (where Plaintiff Lee was employed), Corydon, Indiana (where Plaintiff Kessinger was employed), Sedalia, Missouri (where Plaintiff Bravo was employed), Shelbyville, Tennessee (where Plaintiff Trollinger was employed), Center, Texas (where Plaintiff Windham was employed), and Glen Allen, Virginia (where Plaintiff Howlett was employed).

17.    The Class for whose benefit this action is brought is so numerous that joinder of all Class members is impracticable. The actual number can only be ascertained through discovery of Tyson's books and records.

18.    Among the questions of fact and law that are common to the Class are:

a.    Whether Tyson is engaging in the Illegal Immigrant Hiring Scheme;

3

**SECOND AMENDED COMPLAINT**

       b.      Whether the individual defendants have conspired to perpetrate the Illegal Immigrant Hiring Scheme

       c.      Whether Tyson and the individual defendants are doing so in order to depress its employees' wages;

       d.      Whether the Illegal Immigrant Hiring Scheme has caused class members' wages to be depressed;

       e.      Whether the Illegal Immigrant Hiring Scheme violates the Immigration and Nationality Act and RICO; and

       f.      Whether Tyson should be enjoined from conducting further racketeering activity and whether the individual defendants should be barred from further association with Tyson.

19.    Plaintiffs' claims are typical of those of the Class in that they arise from the damages they have suffered as a result of the Illegal Immigrant Hiring Scheme. Plaintiffs seek no relief that is antagonistic to or adverse to other Class members.

20.    Plaintiffs are committed to the vigorous prosecution of this action, and have retained counsel who are competent in the prosecution of class actions, RICO and complex litigation. Plaintiffs' counsel have prosecuted this case since 2002, successfully obtaining a favorable decision from the Sixth Circuit Court of Appeals, and intend to continue to adequately protect and represent the interests of the Class.

21.    Questions of law or fact common to the Class predominate over issues affecting individual Class members. A class action is the only appropriate method for the fair and efficient adjudication of this controversy for the following reasons, among others:

4

a.    The individual amounts of damages involved, while not insubstantial, are

generally not large enough to justify individual actions;

b.    The costs of individual actions would unreasonably consume the amounts

that would be recovered;

c.    Individual actions would unduly burden the judicial system; and

d.    Individual actions brought by Class members would create a risk of

inconsistent results and would be unnecessarily duplicative of this

litigation.

22.    Plaintiffs anticipate no difficulty in the management of this action because the

evidence proving the Illegal Immigrant Hiring Scheme is ascertainable through discovery, the

identities of the Class members are known to Tyson, and damages can be calculated to a

reasonable certainty through expert testimony.

A.    **The Illegal Immigrant Hiring Scheme: Tyson Requires Its Hiring Personnel To Be
Willfully Blind And Subvert The Law Against Hiring Unauthorized Immigrants**

23.    The Immigration Reform and Control Act (hereafter "IRCA"), 8 U.S.C. § 1324(a)

*et seq.*, and its accompanying regulations, require employers to verify, under the penalty of

perjury, that they have examined documents produced by each employee which establish the

employee's authorization for employment in the U.S.  Specifically, the employer must verify the

documents are "genuine" and "relate" to the person tendering them.    8 C.F.R. §

274a.2(b)(1)(i)(B)(ii)(A) (hereafter "the verification requirement")

24.    Tyson is engaged in a long-term pattern and practice of violating IRCA and § 274

of the Immigration and Nationality Act, 8 U.S.C. § 1324(a)(3)(A), which like IRCA, prohibits

the employment of unauthorized immigrants.  Tyson does so in every possible way short of

outright refusal to comply at all.  These subversions are:

a.    Signing Employment Eligibility Verification Forms (I-9 forms) in mass

quantities, before any documents have been inspected, signing the forms

5

**SECOND AMENDED COMPLAINT**

more than three days after new hires have been employed, and signing
based upon review of copies of documents presented, not the original
documents.[2]

b.     Prohibiting hiring personnel from taking into account obvious facts which
indicate that documents do not relate to the people tendering them,
particularly the inability to speak English. As Tyson knows, persons who
do not speak English cannot, as a practical matter, be U.S. citizens or
lawful permanent residents. IRCA does not permit employers to engage in
willful blindness to the truth. (This is referred to throughout this
Complaint as the "Willful Blindness Policy.")

c.     Rehiring persons whom it previously hired under different names, usually
after a short absence during which they have acquired a new, stolen
identity.

d.     Hiring workers who appear decades younger than the pictures that appear
on their stolen identity documents.

e.     Using temporary employment placement services to hire illegal
immigrants and then "loan" them to Tyson for a fee.

f.     Giving employees leave to "get good documents" after Tyson has been
informed their employment authorization documents actually belong to
someone else. These employees are then rehired under new identities, but
often retain their seniority level or "points." Tyson supervisors will often
ask these employees, "Who are you this week?"

g.     Giving newly hired workers money to obtain housing, food, and other
living supplies (such as bedding and sheets), as well as providing
transportation to and from the Tyson facility, which when coupled with

---

[2] The I-9 form is the document designed by the federal government to be used in complying
with IRCA. 8 C.F.R. § 274a.2(a).

6

their inability to speak English, would put any reasonable employer on notice that these workers are not U.S. citizens or lawful permanent residents, as their "documents" indicate, and are therefore presenting stolen documents.

25.    The Willful Blindness Policy was implemented by co-conspirator William Jaycox, Tyson's Senior Vice President of Human Resources, in the late 1980's. (However, Mr. Jaycox is not named as a defendant.)  The Policy has been approved by all of the other co-conspirators and is still in existence today, despite Tyson's sordid history of legal troubles arising from its subversion of IRCA.

**B.    Tyson Uses The Basic Pilot Program As A Fig Leaf To Subvert IRCA**

26.    Since 1998, Tyson has used the federal government's Basic Pilot program in order to give the appearance of complying with IRCA while the company is actively subverting the law.

27.    Basic Pilot, an internet verification program, confirms that government-issued eligibility documents were actually issued and the name of the person to whom they were issued ("the issuee").  However, it does *not* establish that the person presenting the documents is the issuee.  The employer must still comply with its IRCA's verification requirement.  Tyson does not do this.  Thus, Tyson is abusing Basic Pilot to subvert its IRCA obligations, turning the program into a fig leaf to ward off future raids and enforcement actions.

**C.    The "Dalia Gutierrez" Workers**

28.    The result of Tyson's policies of subversion and Willful Blindness is the knowing employment of thousands of illegal immigrants using stolen identity documents.  Typical is an illegal worker in Tyson's Corydon, Indiana facility.  She entered the U.S. illegally from Mexico and then illegally assumed the name, social security number and birth certificate of a U.S. citizen named Dalia Gutierrez.

7

**SECOND AMENDED COMPLAINT**

29.    "Dalia Gutierrez," knowing of Tyson's noncompliance with the verification requirement and its Willful Blindness Policy, presented her stolen documents to Tyson. Tyson employed her in 2001 after she had "passed" the Basic Pilot program.

30.    Thus, pursuant to the Willful Blindness Policy, Tyson's Human Resources manager ignored her inability to speak English and falsely "verified" under oath that her documents "related" to her.

31.    Subsequently, Tyson learned from other employees at the facility that "Dalia Gutierrez" was an illegal immigrant. She was "investigated" (pursuant to the company's "protocol" for these inquiries) and "passed" by simply producing another stolen document, a copy of the real Dalia Gutierrez's birth certificate, issued by Starr County, Texas. As indicated, the real Dalia Gutierrez resides in Texas. The fake "Dalia Gutierrez," employed by Tyson, had been illegally using her social security number since her employment in 2001. Accordingly, Tyson's identity "investigation" was a farce designed not to obtain the truth, but to continue to obscure what it did not want to know, *i.e.*, that its employee is an illegal immigrant. "Dalia Gutierrez" remains employed by Tyson.

32.    The real Dalia Gutierrez has received bills from a hospital in Corydon, Indiana, where the illegal Tyson worker sought treatment with her stolen social security number.

33.    Tyson has hired hundreds of "Dalia Gutierrez" workers at each of the facilities each year since 1996 in the same manner. In every case, Tyson hiring personnel knew that the workers were unauthorized for employment. However, Tyson hiring personnel employed the workers, pursuant to the Illegal Immigrant Hiring Scheme, established by the individual defendants.

## IV.  TYSON HARBORS ILLEGAL IMMIGRANTS

34.    Numerous Tyson facilities have been raided and/or investigated by federal immigration authorities. Rumors of raids are common. When such rumors spread, Tyson

8

SECOND AMENDED COMPLAINT

supervisors tip off known illegal immigrants and recommend they leave the plant. This is harboring.

35.    Tyson rents trailers and other cheap housing units for its illegal workers, typically through front companies. It uses fronts because many landlords refuse to rent housing to Tyson, knowing it will be used to harbor illegal immigrants. This is particularly prevalent in the area of northern Alabama known as "Little Tijuana," where the facilities in that state are located. This is another widespread method of harboring illegal immigrants.

## V.    THE RACKETEERING ACTS

### A.    "Knowingly Hiring" Illegal Immigrants

36.    In order to perpetrate the Illegal Immigrant Hiring Scheme, Tyson has knowingly hired more than 10 unauthorized, illegal immigrants each year, since the enactment of 8 U.S.C. § 1324(a)(3)(A), in 1996, at each of the facilities. (Tyson may have acquired a few of the facilities after 1996. With respect to those facilities, Plaintiffs allege Tyson began knowingly violating this section as soon as it acquired these facilities.)

### B.    "Harboring" Illegal Immigrants

37.    Plaintiffs also allege that Tyson has violated 8 U.S.C. § 1324(a)(1)(A)(iii) by "harboring" unauthorized, illegal immigrants with knowledge or reckless disregard that each entered the U.S. illegally. Tyson's employment of each illegal immigrant constitutes "harboring." Moreover, as indicated, Tyson has shielded illegal immigrants from detection by federal immigration officials by warning them of possible raids and providing them with housing. Each of these acts constitutes "harboring."

38.    These two federal crimes are provisions of § 274 of the Immigration and Nationality Act and are made predicate offenses by § 1961(1)(F) of RICO.

9

SECOND AMENDED COMPLAINT

# VI.    THE RICO ENTERPRISES

## A.    The Temporary Employment Services Enterprises

39.    Tyson formed ongoing associations with temporary employment services for the purpose of supplying hourly paid workers to each of the facilities. These workers were both legal and illegal (though mostly illegal). They operated under written contracts with Tyson which provided that the services would insure that the workers were authorized for employment under IRCA. However, pursuant to the Illegal Immigrant Hiring Scheme, Tyson knew this promise would not be kept and that most of the workers hired would be illegal. The illegality of most of the workers was made apparent to Tyson when its senior management personnel reviewed the I-9 forms and saw they were improperly completed. Additionally, illegal workers made admissions to Tyson supervisors indicating they were unauthorized for employment. At all relevant times, Tyson management knew the workers supplied by the temporary employment services were driving down wages at the facilities below the level Tyson was able to depress them on its own.

40.    These relationships with the temporary employment services were in existence for extended periods of time, typically from 1998-2001, and resulted in the placement of at least 100 workers at each facility per year. (Plaintiffs are unable to be more specific because Tyson has refused to produce the relevant I-9 forms. Additionally, Plaintiffs have sought an order from this Court to release these documents, which were produced by the services to the grand jury which indicted Tyson for employing illegal immigrants in 2001. The Court has not yet ruled on Plaintiffs' Motion.)

41.    At all relevant times, the temporary employment services maintained their own legitimate business operations in their respective states. They were not Tyson's agents. Tyson paid each a fee for each worker supplied to the company. The temporary employment services and Tyson maintained close relationships during the relevant period including regular contact and supervision by Tyson. In some cases, the services opened hiring offices inside Tyson's plants to facilitate the hiring process. Tyson did not charge them rent for the office space.

10

**SECOND AMENDED COMPLAINT**

42.     Tyson reviewed the I-9 forms completed by the temporary employment services:
Tandem Staffing Solutions, Inc., Ready Staffing, Inc. and Outsource International (which
supplied workers to the Corydon, IN facility); Labor Pro Temporary Services and USA Staffing,
Inc. (which supplied workers to the Glen Allen, VA facility); Oxford Enterprises, Inc. and
InStaff Personnel (which supplied workers to the Ashland, AL facility); Kavanaugh Group
Temporary and Snelling Personnel Service (which supplied workers to the Center, Texas
facility); Tandem Staffing and Outsource International (which supplied workers to the Sedalia,
MO facility); and Randstad LTD. (which supplied workers to the Shelbyville, TN facility).
Additionally, pursuant to the Willful Blindness Policy, Tyson HR management at each facility
knew that most of the workers placed by the services spoke no English and were therefore likely
to be unauthorized for employment.  Tyson management acquiesced in this illegal hiring.

43.     Accordingly, Plaintiffs allege that each of the temporary employment services
named in the previous paragraph formed an association-in-fact RICO enterprise, pursuant to §
1961(4), with Tyson for the purpose of recruiting workers for Tyson.  Tyson participated in the
affairs of each of these association-in-fact enterprises by paying each service fees for what it
knew to be a pool of primarily illegal immigrant labor.  Despite language to the contrary in the
written contracts, which Tyson used in order to distance itself from the illegal hiring, Tyson was
the employer of the workers they recruited.  Tyson controlled every aspect of their work, and in
reality, paid their wages.  Tyson also paid each service a fee for its services in procuring low-
wage, mostly illegal immigrants.

44.     Each of these association-in-fact RICO enterprises affected interstate commerce.
Tyson participated in the affairs of each enterprise through a pattern of racketeering activity,
knowingly employing and harboring more than 10 illegal immigrants per year.  Thus, Tyson is a
RICO "person" pursuant to § 1961(3).

45.     Plaintiffs were proximately damaged as a direct result of the pattern of
racketeering activity perpetrated by Tyson through each of these association-in-fact enterprises

11

**SECOND AMENDED COMPLAINT**

because this pattern of racketeering activity caused the wages paid by Tyson to them to be depressed below what they would have been in a labor market consisting only of legal workers.

**B.    The Tyson Enterprise**

46.    The individual defendants have entered into a conspiracy, as detailed above, to carry out the Illegal Immigrant Hiring Scheme.  Additionally, each member of the conspiracy has personally agreed to, and has furthered, the conspiracy in some important way on an ongoing basis.  Defendants John Tyson and Lee have approved the Willful Blindness Policy and keep it in place.  Defendants Percival, Kimbro and Lee set compensation levels for hourly paid workers at the facilities which they know are too low to attract sufficient numbers of legal workers to staff the facilities.  Defendants John Tyson, Lee, and Kimbro approve of, and participate in, the association with the temporary employment services and the Hispanic groups (Tyson's relationships with these groups are detailed, *infra*).  Defendant Schaffer oversees the day-to-day relationships with the Hispanic groups and approves the payments to them.  Defendant Wilt carries out the Willful Blindness Policy at her facility and rents housing to illegal immigrants. Defendant McCoy enforces the Willful Blindness Policy at several facilities, reviews I-9 forms which are improperly completed, and then takes no action, thereby ratifying the pattern and practice of I-9 subversion described above.  He also recommended, to a meeting of 200 Tyson Human Resources managers, that they hire illegal workers to depress wages and labor costs.

47.    Each of these individual defendants is a person pursuant to § 1961(3).  Each of the individual defendants has personally agreed to the objective of carrying out the Illegal Immigrant Hiring Scheme and that the Scheme would be perpetrated by the members of the conspiracy.  In addition, each co-conspirator knew that the Scheme would entail a pattern of racketeering activity, the ongoing employment of thousands of illegal immigrants, as described above. Additionally, each member of the conspiracy agreed that the conspiracy would be undertaken by participating in Tyson's employment practices and policies.  Each co-conspirator is in Tyson's management or participating indirectly in the company's management.

1253190

**SECOND AMENDED COMPLAINT**

48.    All of the conspirators agreed that the Illegal Immigrant Hiring Scheme would be conducted through Tyson, which is an enterprise, pursuant to § 1961(4), affecting interstate commerce. Finally, all of the conspirators agreed to the conspiracy to enrich themselves by enriching Tyson at the expense of Plaintiffs, whose wages they were depressing.

C.    **The Hispanic Groups Association-in-Fact Enterprise**

49.    After being indicted for employing illegal immigrants in 2001, Tyson faced a crisis in its relations with the Hispanic community, which correctly perceived Tyson was exploiting its Hispanic workers in various ways including the purchase of aliens smuggled to the U.S. from Mexico and Guatemala for work at its facilities and through the use of temporary employment services. Fearful of a Hispanic-led boycott of its products and a recommendation to its membership not to work for Tyson, the company began an aggressive campaign to placate two major Hispanic groups, League of United Latin American Citizens ("LULAC") and National Council of La Raza ("NCLR").

50.    Tyson formed long-term partnerships with these groups. Pursuant to the partnerships, Tyson gives them significant sums of money, conducts regular meetings with their leadership and cooperates in areas of common interest.

51.    Defendant Schaffer disburses the money to the groups on a periodic basis. He has also directed Tyson managers at the plants to make donations to the groups' local chapters, which they do.

52.    The common purposes and goals the groups and Tyson jointly advance are both legitimate and illegitimate. The legitimate purposes are advancing the education and welfare of the Hispanic community in general, and more particularly in the communities where Tyson has processing plants.

53.    However, the partnerships with the groups also advance a crucial and illegitimate objective: carrying out the Willful Blindness Policy without the use of alien smuggling or temporary employment services, as requested by the groups. Tyson acceded to these requests.

1253190

**SECOND AMENDED COMPLAINT**

Additionally, Tyson has made other adjustments to the Willful Blindness Policy at the behest of the groups.

54.    Tyson's partnerships with these groups have been extremely close for the last three years and are ongoing. Meetings have included defendants John Tyson, Kimbro, Schaffer, and Lee. Tyson has hired a full-time liaison, Ana Hart, to maintain and promote the partnerships. She is engaged in daily contact with the leadership of the groups and some of their chapters, particularly the chapters in Northwest Arkansas. Tyson has directed at least three of its employees, including Ms. Hart, to speak for the company, representing its views, in their capacity as chapter members of one of the LULAC chapters.

55.    Thus, Tyson, LULAC and NCLR have formed an association-in-fact RICO enterprise pursuant to § 1961(4) in 2001 which has been in continuous existence ever since. This enterprise affects interstate commerce.

56.    Tyson participates in the affairs of this enterprise in numerous ways, as described. Most significantly, Plaintiffs allege it participates by carrying out the Willful Blindness Policy, which is essential to the Illegal Immigrant Hiring Scheme, in the way LULAC and NCLR prefer. Thus, the association-in-fact enterprise is responsible for the manner in which the Illegal Immigrant Hiring Scheme has been executed since 2001. (However, the groups are not defendants.)

## VII.    THE DEFENDANTS HAVE CONSPIRED TO VIOLATE RICO

### A.    The Individual Defendants

57.    The individual defendants, John Tyson, Richard Bond, Kenneth Kimbro, Karen Percival, Tim McCoy, and Ahrazue Wilt have violated § 1962(d) of RICO by conspiring to violate § 1962(c) of RICO. Their agreement, as detailed, was and is, to execute the Illegal Immigrant Hiring Scheme. They have all knowingly and willfully entered this conspiracy, agreeing that members of the conspiracy, which also include unnamed individuals conducting hiring at the Tyson facilities, would, pursuant to the policies they had established, hire hundreds

14

SECOND AMENDED COMPLAINT

of illegal immigrants as hourly-paid workers for the purpose of depressing wages. Each co-conspirator also agreed that the RICO predicate acts constituting the Illegal Immigrant Hiring Scheme, detailed above, would be committed through Tyson Foods, Inc., a RICO enterprise. As indicated, this racketeering activity is open, ongoing and will not stop without judicial intervention.

58.     Each co-conspirator is jointly and severally liable for all of the damages to the Plaintiffs and the amount of money their wages were depressed during the entire class period, which began in 1998 and continues through trial.

**B.     Tyson Foods, Inc.**

59.     Tyson Foods, Inc., in addition to being the enterprise for the individual defendants detailed above, is also a RICO defendant. It has violated § 1962(c) of RICO by committing a pattern of racketeering activity, the Illegal Immigrant Hiring Scheme, through the temporary employment service association-in-fact enterprises and the Hispanic groups association-in-fact enterprise (Tyson, LULAC and NCLR). As indicated, this racketeering activity is open, ongoing, and will not stop without judicial intervention.

## VIII.   THE PLAINTIFFS HAVE ALL BEEN DAMAGED BY THE DEFENDANTS THROUGH THE VARIOUS RICO ENTERPRISES

60.     As stated, Plaintiffs have been proximately damaged by all the defendants (Tyson and the individual co-conspirator defendants) through the various RICO enterprises by the depression of their wages as a result of the Illegal Immigrant Hiring Scheme. At all relevant times the hourly wages earned by Plaintiffs were depressed below what they would have been had Tyson and the individual defendants not been executing the Illegal Immigrant Hiring Scheme.

## IX.   PRAYER FOR RELIEF

61.     Plaintiffs demand judgment and other relief as follows:

a.      Certification of the Class pursuant to FED. R. CIV. P. 23(b)(3);

15

b.     Judgment in an amount equal to three times the damage caused the putative Class by Tyson's racketeering activity, the Illegal Immigrant Hiring Scheme, pursuant to 18 U.S.C. § 1964(c) against the defendants: Tyson Foods, Inc. and the co-conspirator individual defendants named above;

c.     Preliminary and permanent injunctions enjoining Tyson from any further racketeering activity or any further association with the individual defendants; ordering the individual defendants to divest themselves of any stock and other interests they have in Tyson Foods, Inc. and barring them from any further involvement in the poultry industry;

d.     Appropriate attorneys' fees, pursuant to 18 U.S.C. § 1964;

e.     Trial by jury, pursuant to FED. R. CIV. P. 38; and

f.     For any other relief the Court deems just and proper.


DATED:  June 24, 2005

Respectfully submitted,
BIRDA TROLLINGER, *et al.,* Plaintiffs


s/**HOWARD FOSTER**
Johnson & Bell, Ltd.
55 E. Monroe Street,  Suite 4100
Chicago, IL 60603
(312) 372-0770
fosterh@jbltd.com

William G. Colvin (TN BPR # 006733)
1100 SunTrust Bank Bldg.
736 Market Street
Chattanooga, TN 37402
(423) 265-2214
bcolvin@swgwlaw.com

*Attorneys for the Plaintiffs*


16

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2005, a copy of the foregoing, Second Amended Complaint, was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/Howard Foster

Howard Foster
*Pro Hac Vice*
Johnson & Bell, Ltd.
55 E. Monroe Street
Suite 4100
Chicago, IL 60603
(312) 372-0770
Fax: 312-372-9818
fosterh@jbltd.com

17

# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TENNESSEE

WINCHESTER DIVISION


BIRDA TROLLINGER, et al.,          )

                                   )

          Plaintiffs,              )

                                   )

vs.                                )

                                   ) Case No. 4:02-CV-23

TYSON FOODS, INC.,                 )

                                   )

          Defendant.               )

                                   )


DEPOSITION OF ANA LORENA HART


Taken at the Niblock Law Firm, 324 North College

Avenue, Fayetteville, Arkansas, on June 7, 2005, at 11:00

a.m.

A P P E A R A N C E S

MR. HOWARD W. FOSTER                    FOR THE PLAINTIFF

Johnson & Bell

55 East Monroe Street, Suite 4100

Chicago, Illinois 60603

(312) 372-0770

(312) 372-9818 Fax

MR. FRANK R. VOLPE                      FOR THE DEFENDANT

MS. CASSIDY KESTER PINEGAR

Sidley Austin Brown & Wood LLP

1501 K Street, N.W.

Washington, D.C. 20005

(202) 736-8366

(202) 736-8711 Fax

```
 1                    I N D E X

 2

 3   TESTIMONY BY ANA LORENA HART                    Page

 4           Examination by Mr. Foster ------------------   3
             Examination by Mr. Volpe -------------------168
 5           Further Examination by Mr. Foster ---------170

 6

 7

 8

 9                 E X H I B I T S

10   Deposition
     Exhibit                                       Marked
11
     1 (January 29, 2003 E-mail)-------------------------- 40
12   2 (May 7, 2003 E-mail)------------------------------- 51
     3 (April 29, 2002 E-mail)---------------------------- 53
13   4 (October 15, 2003 E-mail)-------------------------- 53
     5 (October 1, 2003 E-mail)--------------------------- 67
14   6 (April 1, 2002 Letter)----------------------------- 86
     7 (October 19, 2004 E-mail)--------------------------141
15   8 (May 2, 2003 Letter)------------------------------165

16

17

18

19

20

21

22

23

24

25
```

1    My husband applied for the documentation proper for me to

2    stay here.

3    Q.    Were you married at that time, in 1994, when you

4    came in?

5    A.    Yes, I was.

6    Q.    What was your husband's name?

7    A.    Matt Leland.  Matthew Leland.

8    Q.    Could you spell Leland, please?

9    A.    L-E-L-A-N-D.

10    Q.    Was he an American citizen?

11    A.    Yes.

12    Q.    So when you entered the country in 1994, it was with

13    your husband; right?

14    A.    Yes.

15    Q.    Were you married in the United States or Mexico?

16    A.    Both.  I was married in Mexico by the church and

17    here by the civil law.  Even though I didn't need to do

18    that, but I insisted on having that as part of our

19    tradition in Mexico.

20    Q.    Was that the first time you were married?

21    A.    Yes.

22    Q.    And did you -- so am I correct, then, when you came

23    to the country in 1994 with your husband, you were

24    intending to live with him in the country permanently?

25    A.    Yes.

9

1    Q.    And did you indicate that to the United States

2    government when you obtained your six-month permit, that

3    you intended to remain permanently?

4    A.    I didn't need to.

5    Q.    You weren't asked about that?

6    A.    No.    That permit doesn't -- you know, it allows you

7    to move freely for the amount of that visa.    You don't

8    require to say that information.

9    Q.    Was that called a visa, do you believe?

10   A.    It's a permit.    It's a permit.    It's not a visa.

11   The visa was my border crosser.

12   Q.    You then said, if I'm correct, that your husband

13   then helped you get a -- some other more permanent status

14   after six months.

15         Could you tell me what happened?    What card you

16   obtained after the six months?

17   A.    Are you an immigration lawyer?

18   Q.    No.

19   A.    Then let me just go into detail because it is

20   complicated.    It's the right of every American citizen to

21   marry whoever they want to.    And the law allows for a

22   procedure so the -- in this case, my husband applied for

23   my residency.    So he fills out all the documentation,

24   submit it to the government, and then we just wait until

25   we receive that documentation.

1      The process is that initially you get a permanent

2  residency with a conditional.  It's conditional permanent

3  residency, the status that you get.  That conditional

4  status gets removed after a year.  And that is, I guess, a

5  mechanism to prove that these two people are not getting

6  married just because of one of them just wanting to stay

7  in the country or just to obtain the state to be here.

8  Q.    Are you a lawful permanent resident?

9  A.    Yes.

10  Q.    When did you get your -- I believe that's commonly

11  known as a green card?

12  A.    Yes.

13  Q.    When did you obtain your green card?

14  A.    I don't remember the date.

15  Q.    Do you remember the year?

16  A.    It had to be 1997.

17  Q.    So between 1994 and 1997 you were not a lawful

18  permanent resident; is that correct?

19  A.    1995, that's when I got here.

20  Q.    I thought it was 1994 you entered the United States.

21  A.    Well, the end part.  I mean, I got here to the

22  United States in this area 1995, January 1st of 1995.

23  Q.    Where did you first enter the United States?  You

24  weren't in this area.  I'm just trying --

25  A.    Mexicali, the border?  Where did I cross?

1    Q.    Yes.  And where did you live when you crossed into

2    the United States initially?

3    A.    Pineville, Missouri.

4    Q.    And that was in 1994 or --

5    A.    1995.  January 1st of 1995, that's when I came to

6    this area in Pineville, Missouri.

7    Q.    I'm asking you:  When did you first enter the United

8    States to remain here permanently?  Was it --

9    A.    Yes.

10    Q.    -- prior to January 1st, 1995?

11    A.    No.  I mean, that's when I crossed to stay here

12    permanently.  Before that we were married, but we were

13    living in Mexico, in Mexicali.

14    Q.    So about January 1st, 1995, you and your husband

15    entered the United States to remain here?

16    A.    Yes.

17    Q.    And you came initially to Missouri?

18    A.    Yes.  Pineville, Missouri.

19    Q.    Pineville, Missouri?

20    A.    Yes.

21    Q.    How long did you live in Pineville, Missouri?

22    A.    From January '95 'til '97, the second -- like June,

23    July.  Somewhere around there.

24    Q.    Were you employed during the time you lived in

25    Pineville, Missouri?

1   A.    Not until I got my documentation to work.  You can't

2   work if you don't have documentation.

3   Q.    When did you obtain your documentation?

4   A.    I can't remember the date, but I can look it up if

5   you need me to.

6   Q.    What was your first employer?

7   A.    I was self-employed.  I created a translation

8   business.  And I assisted the sheriff's department, the

9   police department, the prosecutor.  That was the first

10  thing I did.  A little bail bond system, I assisted with

11  interpretation.

12  Q.    When did you obtain your documentation that you

13  referred to?  You said that you --

14  A.    You want me to look it up?  I mean, I --

15  Q.    No.  You don't have to look it up.  Approximately.

16  Do you know what year?  '90 -- do you know what year?

17  A.    I mean, I don't know.  It had to be before me being

18  able to work, but I -- I can't remember.  I can't remember

19  the date.

20  Q.    The documentation that you obtained, you were

21  referring to, was your lawful permanent residency status?

22  A.    The conditional permanent residency, yes.

23  Q.    Conditional?

24  A.    Right.  That's the first step.

25  Q.    So you were a conditional LPR, if I can call it

1    that?

2    A.    Yes.

3    Q.    How long were you a conditional LPR?

4    A.    Usually it's a year, but I can't remember the date I

5    actually went before -- we got divorced -- my husband and

6    I got divorced.  And I had to go to immigration and go to

7    the process to remove the conditional, and prove that we

8    had got married because of love, and not because of me

9    wanting to be here in the United States.

10    Q.    When did you get divorced?

11    A.    It was finalized December of '97, I believe.

12    Q.    Did you get your conditional LPR, then, prior to

13    your divorce, before December of '97?

14    A.    Yes.

15    Q.    Do you think it was during the year 1997?

16    A.    There is a possibility that -- probably in the

17    beginning of that year, but I don't remember.  I don't

18    remember.

19    Q.    And so you were divorced in -- did you say December

20    1997?

21    A.    I think it was.  That's when it was final, 1997.

22    Q.    Do you know where your former husband lives now?

23    A.    I have no idea.

24    Q.    When was the last time you spoke to him?

25    A.    It had to be like three years ago or something like

1   that.

2   Q.    Did you have any children with him?

3   A.    No.

4   Q.    His name is Matthew Leland?

5   A.    Yes.

6   Q.    Do you know what occupation he's in?

7   A.    I don't know what he's doing right now, but he's a

8   record producer.  Sound technician, engineer.  Whatever

9   you want to call it.

10  Q.    You obtained your conditional LPR, and then you were

11  divorced.

12        What is the next step that you took --

13  A.    I hired an immigration lawyer -- I'm sorry.

14  Q.    If you could please let me finish.

15  A.    Sorry.  I apologize.

16  Q.    That's all right.  It happens.  What's the next step

17  that you took in the process of becoming an LPR?

18  A.    Hire an immigration lawyer, because I had to -- you

19  know, the removal of the conditional status had to take

20  place.  So I hired a lawyer.  And that process was removed

21  -- I mean, the status was removed, and then I was a

22  permanent resident.

23  Q.    So you were able to get your full LPR status, even

24  though you weren't married; right?

25  A.    Right.

```
 1   Q.      Do you know when you got your LPR status?
 2              MR. VOLPE:  Asked and answered.
 3   Q.      (Mr. Foster continued.)  Where was the immigration
 4   lawyer who helped you?
 5   A.      She's in Kansas City.
 6   Q.      So you were still living in Missouri --
 7   A.      Yes.
 8   Q.      -- at that point?
 9   A.      Yes.
10   Q.      Do you remember the lawyer's name?
11              MR. VOLPE:  I'm going to object to the
12   relevancy of this line of questioning, but she can answer
13   the question.
14   Q.      (Mr. Foster continued.)  Do you remember the
15   lawyer's name?
16   A.      No, I don't remember.  But I can get it.
17   Q.      So you're still an LPR --
18   A.      Yes.
19   Q.      -- lawful permanent resident?
20   A.      Yes.
21   Q.      Have you attempted to become a U.S. citizen?
22   A.      It is a process.  And I am getting to the point
23   where I do feel, you know, that I can honor this country.
24   Q.      As a lawful permanent resident, are you allowed to
25   leave the United States and then re-enter?
```

1    A.    Yes.

2    Q.    Freely?  As much as you want?

3    A.    Yes.

4    Q.    Have you gone back to Mexico since you left in 1995?

5    A.    Yes.

6    Q.    How many times have you gone back?

7    A.    At least once a year, but probably more than that,

8    just to visit my family.  And for work I have gone back

9    twice, I guess.

10   Q.    When did you become employed by Tyson Foods?

11   A.    1997.

12   Q.    Was that here in Arkansas?

13   A.    No.  That was in Missouri.

14   Q.    What was your first job for Tyson?

15   A.    I was retention coordinator.

16   Q.    What is a retention coordinator?

17   A.    A retention coordinator assists to maintain a

18   balanced workforce so we don't have a turnover.

19   Q.    What did your responsibilities consist of in that

20   position?

21   A.    My responsibilities were to understand the reasons

22   why our team members were leaving work; and to make sure

23   that we were doing everything we could so they would have

24   a stable, good work environment, and they wouldn't leave

25   their employment.

1    MR. FOSTER:  Did she bring any documents in

2  conjunction with today's notice?

3    MR. VOLPE:  Yes, she did.

4    MR. FOSTER:  Is that what you have there?

5    MR. VOLPE:  Yes.

6    MR. FOSTER:  Can I look at those?

7    MR. VOLPE:  Sure.

8    MR. FOSTER:  Why don't we take a break.  I'm

9  just going to quickly review these and then I will go back

10  on the record.

11   (Wherein, a break was taken from 11:16 a.m to 11:28 a.m.)

12    MR. VOLPE:  Ms. Hart wanted to clarify one

13  of her answers to the question you gave, if you don't

14  mind.

15    THE WITNESS:  The date that you were asking

16  me for my permanent residency is August '96.  Now I feel

17  better.

18  Q.    (Mr. Foster continued.)  So it was prior to your

19  divorce; is that right?

20  A.    Yes.

21  Q.    Have you been remarried?

22  A.    Yes.

23  Q.    Are you currently married?

24  A.    Yes.

25  Q.    What is your husband's name?

18

```
1    A.    Chris Hart.

2    Q.    Is that Chris as in Christopher?

3    A.    No.  Just in Chris.

4    Q.    Can you spell it, please?

5    A.    C-H-R-I-S.

6    Q.    Hart, H-A-R-T?

7    A.    Yes.

8    Q.    So your name is Ana Hart; right?  H-A-R-T?

9    A.    Yes.

10   Q.    You no longer use the name Leland; right?

11   A.    No.

12   Q.    I just asked because I've seen Leland around in some

13   of these documents.

14   A.    The old documents.

15   Q.    When did you marry Mr. Hart?

16   A.    March 14th of '90 -- three years ago.

17   Q.    2003?  Or approximately?

18   A.    Yeah, 2003.

19   Q.    Back to your first position -- this is where we were

20   -- at Tyson.

21         You were working in Kansas City, I believe?

22   A.    No.  In Noel, Missouri.

23   Q.    You were working at the Noel, Missouri facility?

24   A.    Right.

25   Q.    Do you remember when you were first hired by Tyson?
```

1   one of the core pillars of community involvement for Tyson

2   Foods.  So that's what this is talking about.

3   Q.    What are the other core pillars of community

4   involvement for Tyson Foods?

5   A.    Hunger relief, it's another one.

6   Q.    What else?

7   A.    It's based on programs that we sponsored at the

8   national level.  So we have the Watch Dogs program that I

9   also talked to you about before.  It's just the dads and

10  the kids, setting a good role model.  Primarily those are

11  the ones that we concentrate.  Education is very important

12  for us, hunger relief, and that program.

13  Q.    Do you know how this program is administered in

14  Sedalia, for example?  It says Sedalia.

15  A.    Right.  No, I don't.

16  Q.    Or Little Rock?

17  A.    I believe that was not necessarily formed.  That is

18  -- that's what this letter is talking about.  I had been

19  asking for reports, just to see what -- you know, where

20  the money was going and what they were doing with it.  And

21  I just got this, you know, report from Yvonne after asking

22  them, "What's happening?  What's going on there?  I

23  haven't seen any negative pictures."

24          So they're saying that -- I believe that the

25  leadership in Little Rock never got that center up and

1  running, to my knowledge.  Sedalia, I guess, was doing

2  pretty good.  And I can't remember about Seguin.  Either

3  Seguin or Sedalia was doing very good and one or the

4  other.  I can't remember.

5  Q.    So this is following up on one of Tyson's

6  contributions to LULAC?

7  A.    Yes.  To LNESC.

8  Q.    Tyson made a specific donation to LNESC?

9  A.    Yes.

10 Q.    Has it made any more or just once?

11 A.    That was it.  After that, that we saw our return

12 investment was not good, we didn't renew it.

13           **MR. FOSTER:**  That, actually, is all I have

14 for you.  No more questions.

15           **MR. VOLPE:**  I just have a few questions.

16                    EXAMINATION

17 BY MR. VOLPE:

18 Q.    Ms. Hart, you testified earlier about the LULAC

19 corporate alliance in which Tyson is a member; is that

20 correct?

21 A.    Yes.

22 Q.    Can you tell us some of the other members of the

23 LULAC corporate alliance?

24 A.    Ford, Verizon, Busch, the beer company.

25 Q.    Anheiser Busch?

1    A.    Yes.  Thank you.  Wal-Mart.  There's a list, like 36

2    different -- or more corporations.  And it's just top 100

3    corporations.

4    Q.    You mentioned earlier that -- about meetings that

5    happened at Tyson corporate headquarters.

6         And I wanted to ask you whether any other charitable

7    groups ever come to Tyson corporate headquarters for

8    meetings?

9    A.    Oh, yes.  A lot.

10   Q.    Can you name some of those groups?

11   A.    United Way, for example.  They will come and, you

12   know, meet with us.  Heart walk, the Heart Association.

13   Q.    Are you saying Heart, H-E-A-R-T?

14   A.    Yes.  The Boys and Girls Club.  You know, just all

15   kinds of different organizations will come and meet with

16   us.

17   Q.    Earlier on today you testified about some housing

18   that was available through Hudson Foods at the Noel plant,

19   and then ultimately, since Tyson bought the plant, the

20   housing was continued.

21        Was that housing offered only to Hispanics?

22   A.    No.

23   Q.    Was it offered to any other team members?

24   A.    It was for any team member that would submit an

25   application.

1  Q.    Do you know whether any African Americans ever

2  rented the housing?

3  A.    I believe so.  I mean, it was just -- it was just

4  not just for Hispanics.  It was for all of our team

5  members.  And it was, in a way, representative of the

6  workforce that we had in Noel.  You have Anglos, you have

7  American Indians, African Americans, Hispanics.

8         MR. VOLPE:  That's all the questions I have.

9  Thank you.

10                    FURTHER EXAMINATION

11  BY MR. FOSTER:

12  Q.    Just one more.  Back to the housing question.  You

13  just said that housing was available to other groups at

14  Noel.  Can you name -- right? -- you said that housing was

15  available not -- to not just Hispanics?

16  A.    Yes.

17  Q.    Can you name a single -- what you call Anglo person

18  who lived in that housing?

19  A.    No, but I can't name you any Hispanics either.  I

20  mean, I don't -- I didn't do the housing.  I just know.

21         MR. FOSTER:  That's all.

22         MR. VOLPE:  We're done.

23    (Wherein, at 4:19 p.m., the deposition was concluded.)

24

25

# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

BIRDA TROLLINGER, VIRGINIA       )
BRAVO, KELLY KESSINGER,          )
IDOYNIA MCCOY, REGINA LEE,       )
PATRICIA MIMS, LORI WINDHAM      )
and ALEXANDER HOWLETT,           )
individually and on behalf of all others )
similarly situated               )
                                 )
            Plaintiffs,          )
                                 )
v.                               )
                                 )
TYSON FOODS, INC., JOHN TYSON,   )
ARCHIBALD SCHAFFER III, RICHARD, )    No. 4:02-CV-23
BOND, KENNETH KIMBRO, GREG       )
LEE, KAREN PERCIVAL, AHRAZUE     )    Chief Judge Curtis L. Collier
WILT and TIM MCCOY,              )
                                 )
            Defendants.          )

**FIRST MANAGEMENT ORDER**

This Management Order relates to a class action lawsuit filed by plaintiffs Birda Trollinger,

Virginia Bravo, Kelly Kessinger, Idoynia McCoy, Regina Lee, Patricia Mims, Lori Windham and

Alexander Howlett (collectively "Plaintiffs") who allege they are individuals employed by

Defendant Tyson Foods, Inc. Plaintiffs bring their lawsuit against Defendants Tyson Foods, Inc.,

John Tyson, Archibald Schaffer III, Richard Bond, Kenneth Kimbro, Greg Lee, Karen Percival,

Ahrazue Wilt, and Tim McCoy (collectively, "Defendants" or " Tyson"). In essence, Plaintiffs

allege they are all present or past employees of Tyson who are "legally authorized to be employed

in the United States" (Court File No. 115, Plaintiffs Second Amended Complaint, ¶ 1). Plaintiffs

contend Tyson developed a "conspiracy among its top management" to depress the wages paid to its employees by "knowingly hiring a workforce substantially comprised of undocumented illegal immigrants for the express purpose of depressing wages" (*id.* at ¶ 2). Plaintiffs call this alleged conspiracy the "Illegal Immigrant Hiring Scheme" (*id.*). Specifically, Plaintiffs allege Defendants "knowingly hired more than 10 unauthorized, illegal immigrants" in violation of 8 U.S.C. § 1324(a)(3)(A), and Defendants "violated 8 U.S.C. § 1324(a)(1)(A)(iii) by 'harboring' unauthorized, illegal immigrants with knowledge or reckless disregard that each entered the U.S. illegally"[1] (*id.* at ¶¶ 36, 37). As a result of the Illegal Hiring Scheme, Plaintiffs claim they have been proximately damaged by the depression of their wages "below what they would have been in a labor market consisting only of legal workers" (*id.* at ¶¶ 45, 60).

At the initial Management Conference[2] held on January 29, 2007, the Court stated the goal of the conference, and the resulting plan was to promote efficiency, discourage duplication of work, strive to keep costs down, and pursue both a pretrial track and a mediation/settlement track simultaneously.

After considering the recommendations and arguments of counsel, the Court sets forth the following management decisions for this case.

## I.    SELECTION OF CLASS COUNSEL

---

[1]Plaintiffs allege the following of Defendants' actions constitute "harboring": Defendants' employment of each illegal immigrant; Defendants' warning illegal immigrant employees of possible raids and Defendants' providing illegal immigrant employees with housing. (Court File No. 115 at ¶ 37).

[2]Counsel present at the Management Conference for Plaintiffs were Howard Foster, William Johnson, Matthew Galin, Stephen Kabalka, and William Colvin.  Counsel present at the Management Conference for Defendants were Thomas Green, Roger Dickson, Frank Volpe, and Travis McDonough.

Howard W. Foster of Johnson & Bell, Ltd., is designated as class counsel. Mr. Foster has applied to be class counsel. After considering his application, background and experience in litigation of this type, the Court finds he possesses the necessary qualifications for appointment to represent the class.

## II.    DEADLINE FOR MOTIONS TO DISMISS AND MOTIONS FOR JUDGMENT AS MATTER OF LAW

The parties informed the Court they both contemplate filing motions to dismiss or motions for judgment as a matter of law. These motions will not involve any matters of fact but will only involve issues of law. The parties shall file any such motion on or before March 2, 2007, responses shall be filed on or before March 30, 2007, and any replies shall be filed on or before April 6, 2007. After March 2, 2007, no such additional motions to dismiss or motions for judgments as a matter of law shall be filed without explicit permission of the Court. If this Court so desires, oral argument on any motion to dismiss or motion for judgment as a matter of law shall be heard on a date set by this Court.

## III.    MEDIATION AND DISCOVERY

Pursuant to E.D.TN. L.R. 16.4, the Court ORDERS that mediation be conducted in this case and that it take place simultaneously with discovery and pretrial litigation. Mediation shall be conducted as soon as practicable and in good faith. Mr. William Johnson and Howard Foster shall be Lead Counsel for Plaintiffs in Mediation, and Mr. Roger Dickson shall be Lead Counsel for Defendants in Mediation. Within twenty (20) days of this Court deciding the anticipated Motions to Dismiss and Motions for Judgments as a Matter of Law, Lead Counsel shall meet with:

3

Mr. Howard Vogel
O'Neil, Parker & Williamson
416 Cumberland Avenue, S.W.
P.O. Box 217
Knoxville, TN 37902
Phone:  (865) 546-7190
Fax:    (865) 296-0393

who is appointed as mediator for these actions.  Lead Counsel shall have power to bind the party or parties whom he represents in all matters in Mediation.  Mr. Vogel is authorized to directly bill the parties periodically for his services.

At least ten (10) days prior to meeting with Mr. Vogel, Lead Counsel shall submit a confidential pre-mediation conference synopsis of the case, including its history and significant issues.  The submission should not exceed ten (10) pages in length.  At the meeting, counsel shall discuss with Mr. Vogel the development of a comprehensive plan and framework for mediation.  Among other issues the parties may decide are appropriate, this plan should encompass the following issues:

(a) when mediation can begin,

(b) what discovery must be obtained prior to the start of mediation,

(c) what discovery is necessary to allow the parties to ascertain the identity of members of the class and its size,

(d) how to structure discovery to facilitate mediation,

(e) information on Tyson's financial condition to the extent the parties decide such information is relevant,

(f) milestones or target dates for the accomplishment of certain mediation goals, and

(g) any other information Lead Counsels need in order to prepare for mediation.

4

Within five (5) days of the meeting, each Lead Counsel shall file with the Court a joint report confirming that they met with Mr. Vogel. If after meeting with Mr. Vogel any party discovers any reason why Mr. Vogel may not serve as mediator and that party has an objection to Mr. Vogel serving as mediator, such objections must be submitted within five (5) days of this meeting.

Within thirty (30) days of the meeting, the parties shall formulate a written comprehensive plan and submit the plan to Mr. Vogel for his approval. After approval, it must be submitted to the Court. Any revisions of the approved mediation plan must be approved by Mr. Vogel and the Court.

Thereafter, the parties shall submit to the Court on the first day of every second month a report on mediation setting out the following:

(a) their progress in mediation since the last report;

(b) whether they are on target to accomplish the goals set out in the mediation plan;

(c) whether they will be able to accomplish the goals set for the next target date;

(d) if they are behind schedule, how and why they fell behind, and if such failure was the fault of anyone, to identify that person;

(e) what mediation efforts are planned for the next reporting period; and

(f) whether additional assistance by the Court is needed to ensure mediation is successful. These periodic reports shall be shared with Mr. Vogel.

Mr. Vogel is specifically authorized to explore and suggest creative techniques to assist in mediation. If he desires, he is authorized to meet separately and privately with counsel for each party to engage in confidential discussions to obtain a frank evaluation of each side's case. He is also authorized to explore and suggest such techniques as summary trials, advisory juries, and conferences with decision makers.

5

Solely for the purpose of mediation, the parties are authorized to engage in separate, but limited, discovery that would be helpful in mediation.

After the approval of the mediation plan, the parties shall exchange mediation briefs and deliver them to Mr. Vogel within a time limit to be set by Mr. Vogel. Mr. Vogel will also be responsible for setting a schedule to commence the mediation, keeping in mind the goal of having mediation proceed as quickly as possible.

The compensation of the mediator shall be determined by the parties and Mr. Vogel in accordance with E.D.TN. L.R. 16.4(i).

## IV.    CLASS CERTIFICATION NOTICE

Plaintiffs have prepared a proposed notice to the class. Defendants raised some objections to the class. Plaintiffs indicated they were prepared to consider some of Defendants' reservations. Plaintiffs stated they should have the class members identified by May 1, 2007. The parties agreed to submit a joint proposed notice to the Court on or before May 1, 2007, or if they are unable to agree on a proposed notice, to submit their individual proposals.

## V.    SETTLEMENT NOTICE

The parties agreed that it was premature to decide upon settlement notice. In the event the parties are able to reach a settlement of all issues in this case, then the Court orders the parties to submit a joint proposed draft of the Rule 23(e)(1)(B) notice at the same time or within seven days from the date the parties submit a settlement for the Court's approval.

## VI.    ATTORNEY FEE NOTICE

6

The parties also agreed that it was premature to decide upon any notice regarding attorney

fees. In the event of a conclusion of litigation in favor of Plaintiffs or of a settlement in this case,

the Court is required to review applications for attorney fees. In the case of a settlement, the Court's

review of the settlement must include a review of the provisions regarding the payment of counsel.

Any such applications for attorney fees should be submitted as soon as possible after a settlement

is reached so that the required Fed. R. Civ. P. 23 (h)(1) notice of the fee request can be combined

with the required Rule 23(e) notice of settlement and sent to the class at the same time.

## VII.    PENDING MOTIONS

The Court reviewed with the parties the status of pending motions before the Court. Plaintiff

announced they had three pending motions for summary judgment before the Court. Both parties

announced there were additional non-dispositive motions pending before Magistrate Judge Carter.

## VIII.    COMPLETION OF ALL DISCOVERY

The Court also discussed with Counsel the matter of the time needed to complete all

discovery. The parties informed the Court they thought they could complete all discovery by July

30, 2007. The parties also discussed with the Court the particular discovery they envisioned,

including depositions and expert discovery. In connection with this discussion the parties informed

the Court that Mr. William Colvin would be Plaintiffs' Lead Counsel for Litigation and Mr. Thomas

Green would be Defendants' Lead Counsel for Litigation. The Court ORDERS that within thirty

(30) days of this Order becoming final, Lead Counsel for Litigation, Mr. William Colvin for

Plaintiffs and Mr. Thomas Green for Defendants, or any attorney designated by Lead Counsel, shall

confer regarding discovery. Within thirty (30) days thereafter Lead Counsel, or any attorney designated by Lead Counsel, shall formulate a discovery plan. This plan should address the scope, length, sequencing, timing, and nature of anticipated discovery. This plan should also address discovery needed for determining class membership, mediation, experts, if any, and the merits of the case. The plan may also include any other discovery issues Lead Counsels deem appropriate. Finally, the plan should include the parties' ideas on resolving discovery disputes. This plan must be submitted to the Clerk of Court for review by Magistrate Judge William B. Mitchell Carter and the Court.

## IX.    TIME AND EXPENSE RECORDS

The Court referred Counsel to the provisions of § 21.311 of the Manual on Complex Litigation regarding keeping records pertaining to cost and fees.

## X.    TRIAL AND PRETRIAL DATES

After conferring with Counsel and obtaining their recommendations, the Court set the date for the trial of this case for **Monday, March 3, 2008**. The trial will commence at 9:00 a.m. in the third floor courtroom, 900 Georgia Avenue, Chattanooga, Tennessee. The Parties expect the case will take five weeks to try. The trial will be before a jury. In preparation for trial, the Court, again after conferring with counsel and obtaining their recommendations, set the following dates:

| | |
|---|---|
| Disclosure of Intent to Use Courtroom Technology: | February 15, 2007 |
| Plaintiff's Disclosure of Expert Witnesses: | February 16, 2007 |
| Defendant's Disclosure of Expert Witnesses: | March 16, 2007 |
| Daubert Hearing: | October 15-17, 2007 |

| | |
|---|---|
| Dispositive Motion Deadline: | November 2, 2007 |
| Deadline for Submitting Jury Instructions: | December 3, 2007 |
| Disclosure of Final Witness List: | January 3, 2008 |
| Disclosure of Exhibit List and Deposition Designations: | January 3, 2008 |
| Disclosure of Content of Computer Technology: | January 3, 2008 |
| Confirm Compatibility of Technology with Court's Equipment: | February 4, 2008 |
| Motions in Limine Deadline: | February 4, 2008 |
| Deadline for Submitting Final Pretrial Order: | February 15, 2008 |
| Final Pretrial Conference: | February 22, 2008 |

## XI.     FINALITY: OBJECTIONS AND PROPOSED AMENDMENTS

The parties shall have thirty (30) days from the entry of this Order to file any objections or proposed amendments to the Order.  Any such objections or proposed amendments shall not be a reargument for proposals previously submitted and considered by the Court.  The First Management Order shall become final after the Court has ruled on any objections or proposed amendments.  In the event that no objections or proposed amendments are filed, the Order shall become final thirty (30) days from its entry.

**SO ORDERED.**

**ENTER:**

/s/_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| BIRDA TROLLINGER, *et al.*, | No. 4:02-cv-23 |
| Plaintiffs, | CLASS ACTION<br>JURY DEMANDED |
| v. | Judge Curtis L. Collier |
| TYSON FOODS, INC., *et al.*, | |
| Defendants. | United States Magistrate Judge<br>William B. Mitchell Carter |

## PLAINTIFFS' RESPONSE MEMORANDUM IN
## OPPOSITION TO DEFENDANTS' MOTION TO QUASH

Plaintiffs, by undersigned class counsel, hereby submit their Response Memorandum in Opposition to Defendants' Motion to Quash (Court Doc. No. 440, hereinafter "the Motion"). For the reasons stated herein, Defendants' Motion should be denied.

## I.    THE MANAGEMENT ORDER DID NOT SET A DEADLINE FOR THIRD PARTY SUBPOENAS

The crux's of the Defendants' Motion is based on their belief that the Court's Management Order (Court Doc. No. 241) ended all discovery on July 30, 2007. This is not correct. Initially, the Management Order, referred to by the Defendants, states: "The parties informed the Court that they thought they could complete all discovery by July 30, 2007." Id. at 7. The Order did not actually set any firm deadline. Instead, consistent with the Management Order, the parties submitted a Joint Pre-Trial Discovery Plan (Court Doc. No. 322). In the Joint Plan, the parties agreed that all *written discovery* would be completed by July 31, 2007. Id. The Joint Plan made no mention about subpoenas issued to third parties, nor was this issue even contemplated by the parties.

Moreover, Plaintiffs' subpoena to DHS requests certain files to be produced. As such, the subpoena in question is not even requesting "written discovery." Thus, the Defendants' argument here should be ignored.

Finally, the subpoena does not place any burden on Defendants. Thus, they have no interest in quashing it other than precluding Plaintiffs from obtaining important evidence. And on that score, Defendants are currently in violation of this Court's order to produce Defendant Kenneth Kimbro for his deposition (Court Doc. No 393). *See* Ex. A, November 9, 2007 E-mail of Colleen Lauerman to Howard Foster still refusing to provide a date for Mr. Kimbro's deposition.

## II.     THE DOCUMENTS REQUESTED FROM DHS ARE RELEVANT

Additionally, the Defendants also contend that the subpoena should be quashed because the documents requested from DHS are not relevant and will not prove individuals are unauthorized for work. *See* Motion at 3. This argument is frivolous. At the outset, the DHS files are highly relevant in determining whether the 91 individuals are actually authorized to work in the U.S. When the files are obtained, Plaintiffs will be able to compare the documents produced by these individuals (at Tyson and/or during their depositions) against the government records. Additionally, to the extent that the individuals have been deposed, the Plaintiffs will also compare the information these individuals gave in their testimony against the information contained in the government files. The ability to show that all or some of these individuals are not authorized to work

is relevant to proving Plaintiffs' central claim that Tyson has hired illegal immigrants. Indeed, it is essential to proving that claim.[1]

Moreover, as the Court is aware, the scope of discovery under the federal rules, including under Rule 45, is quite broad. *See, e.g.*, Miller v. Federal Express Corp., 186 F.R.D. 376, 383 (W.D. Tenn. 1999) ("Relevancy for discovery purposes is extremely broad. The information sought need not be admissible in court in order to be relevant. Rather, the relevancy burden is met if the party can show that the information sought 'appears reasonably calculated to lead to the discovery of admissible evidence.'"); Monsanto Co. v. Ralph, 2001 U.S. Dist. LEXIS 26151, at *7 (W. D. Tenn. 2001) ("The scope of the material that may be obtained pursuant to a Rule 45 subpoena duces tecum is as broad as that permitted under the rules of discovery.").[2]    Plaintiffs' use of the requested document files is therefore clearly relevant here.

## III.    DEFENDANTS' MOTION WAS BROUGHT IN THE WRONG COURT

Lastly, the Defendants have filed their Motion in the wrong court.  The subpoena was issued from the District Court of the District of Columbia.  *See* Ex. B.  Therefore, the D.C. court is the proper court to hear Defendants' Motion, not this Court.  *See* 9 MOORE'S FEDERAL PRACTICE, CIVIL § 45.50[4] ("A motion to quash or modify a subpoena is to be granted by 'the court by which a subpoena was issued.'  If a subpoena is issued by a district court other than the one in which the case is pending, the proper

---

[1] Plaintiffs have been diligently pursuing this information for several months.  *See* Ex. C, Amended Motion to Enforce the Subpoena, which details the series of violations of the Local Rules of the District of Columbia District Court committed by the U.S. Attorney's office.  Class Counsel believes the Motion to Enforce the Subpoena will be granted.

[2] *See also* 9 MOORE'S FEDERAL PRACTICE, CIVIL § 45.03[1] ("If a Rule 45 subpoena is served in conjunction with discovery, the deposition testimony or production sought must fall within the scope of proper discovery under Rule 26(b)(1) . . . .").

court in which to file a motion to quash or modify the subpoena is the issuing court, not the court in which the action is pending. As the Advisory Committee has noted, only the issuing court has the power to grant a motion to quash or modify the subpoena.") (citations omitted); *see also* In re Clients & Former Clients of Baron & Budd, P.C., 478 F.3d 670, 671 (5th Cir. 2007) (same proposition).[3]  Accordingly, the Defendants' Motion should be denied.

## IV.    CONCLUSION

For the reasons stated herein, the Defendants' Motion to Quash should be denied.

Dated: November 13, 2007                Respectfully submitted,

                                        BIRDA TROLLINGER, *et al.,* Plaintiffs

                                By:      /s/ Howard Foster
                                        Class Counsel
                                        William V. Johnson
                                        Matthew Galin
                                        Johnson & Bell, Ltd.
                                        33 West Monroe Street, Suite 2700
                                        Chicago, IL 60603
                                        (312) 372-0770
                                        (312) 372-9818 (Fax)
                                        Email: fosterh@jbltd.com

                                        William G. Colvin
                                        Horton, Maddox & Anderson
                                        One Central Plaza
                                        835 Georgia Avenue, Suite 600
                                        Chattanooga, TN 37402
                                        (423) 265-2560
                                        (423) 265-3039 (Fax)

                                        *Attorneys for the Plaintiffs*

---

[3] The Defendants have not moved to transfer their Motion to Quash to this Court.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing PLAINTIFFS' RESPONSE MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO QUASH has been filed electronically. Notice of this filing will be sent by the operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

Dated this 13th day of November, 2007

By: /s/ Howard W. Foster
Howard W. Foster

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| BIRDA TROLLINGER, *et al.*, | No. 4:02-cv-23 |
| Plaintiffs, | CLASS ACTION |
| | JURY DEMANDED |
| v. | |
| | Judge Curtis L. Collier |
| TYSON FOODS, INC., *et al.*, | Chief United States District Judge |
| Defendants. | |
| | United States Magistrate Judge |
| | William B. Mitchell Carter |

## PROPOSED JOINT PRE-TRIAL DISCOVERY PLAN

Pursuant to the Court's Case Management Order from February 9, 2007 (Court Document # 241), Plaintiffs and Defendants[1] ("the Parties" collectively), by and through their undersigned counsel, hereby submit their Proposed Pre-Trial Discovery Plan.

## I.    Agreed Proposed Pre-Trial Schedule

A.    Counsel for the Parties conferred on the following subjects on numerous occasions, and have agreed as to these proposed dates:

1.    Written Discovery Cut-Off Date:  July 31, 2007

2.    Deposition Cut-Off Date:  August 31, 2007

3.    Daubert motions:  September 30, 2007

4.    Deadline for Dispositive Motions:  November 2, 2007 (per the Management Order)

5.    Defendants' Expert Disclosures:  August 21, 2007

---

[1] "Tyson" will refer to all defendants in this case, unless otherwise noted.

**II.**     **Discovery Items in Dispute**

A.     Counsel for the Parties conferred on the following subjects, but have been unable to

agree as to these items.  Therefore, the parties are submitting separate plans with

respect to these discovery items:

1.     Plaintiffs Position on Remaining Depositions:

a.     Plaintiffs intend to take the depositions of the individual defendants

who have not yet been deposed (John Tyson, Richard Bond, Kenneth

Kimbro, and Greg Lee).

b.     Plaintiffs also intend to take ten additional depositions of Tyson

corporate representatives and/or hiring/administration personnel,

aside from the remaining individual defendants, including: Dan

Serrano, Libby Lawson, and possibly some others that may arise.

c.     Lastly, Plaintiffs intend to take the deposition of 91 current hourly

workers at each of the Facilities who Plaintiffs suspect are illegal

aliens. This list was compiled by Plaintiffs' expert, Michael Cutler,

and sent to Tyson on May 30, 2007. *See* Exhibit A.[2]  Plaintiffs may

ultimately limit these 91 depositions to a smaller number, but Class

Counsel would like the *opportunity* to depose these 91 individuals.

---

[2] On May 27, 2007, Tyson sold two of the eight processing plants at issue (both in Alabama)
to Koch Foods without informing Plaintiffs.  Plaintiffs are concerned about their ability to depose
employees at those plants.  Tyson has advised Plaintiffs that it will work with Koch Foods in an
effort to make any former Tyson employees on Mr. Cutler's list still working at the Koch plants
available for deposition.

2.    Tyson's Position on Remaining Depositions:

    a.    Defendants intend to take additional depositions, including Plaintiffs' experts, but not to exceed twenty-five total depositions.

    b.    Plaintiffs have already taken 26 depositions. Now, Plaintiffs are requesting up to 106 additional depositions, not including the third-party depositions Plaintiffs have indicated they wish to take. In Defendants' view, this is an unreasonable number of depositions. And Plaintiffs have failed to provide any justification for such an excessive (and arbitrary) number of depositions are required by Rule 26(b)(2). Thus, Defendants cannot agree to Plaintiffs' request. Defendants have agreed, however, to make the individual defendants who have not previously been deposed available for deposition. And Defendants will agree to a reasonable number of additional depositions, but not the nearly 140 total depositions Plaintiffs now seek.

Dated:  July 6, 2007                    Respectfully submitted,

                                        BIRDA TROLLINGER, *et al.*, Plaintiffs

                          By:      /s/ Howard Foster
                                   Class Counsel
                                   William V. Johnson
                                   Matthew Galin
                                   Johnson & Bell, Ltd.
                                   33 West Monroe Street, Suite 2700
                                   Chicago, IL 60603
                                   (312) 372-0770

                                   William G. Colvin
                                   Horton, Maddox & Anderson
                                   One Central Plaza
                                   835 Georgia Avenue, Suite 600
                                   Chattanooga, TN 37402
                                   (423) 265-2560
                                   423- 265-3039 (Fax)

                                   *Attorneys for the Plaintiffs*


                                        TYSON FOODS, INC., et al.  Defendants

                          By:      /s/ Frank R. Volpe
                                   Thomas C. Green
                                   Mark D. Hopson
                                   Frank R. Volpe
                                   Colleen M. Lauerman
                                   Sidley Austin LLP
                                   1501 K Street, NW
                                   Washington, D.C. 20005-1401
                                   (202) 736-8000

                                   *Attorneys for Defendants*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing PROPOSED JOINT PRE-TRIAL DISCOVERY

PLAN has been filed electronically.  Notice of this filing will be sent by the operation of the

Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties

may access this filing through the Court's electronic filing system.

Dated this 6th day of July, 2007

By:  <u>/s/ Howard W. Foster</u>
Howard W. Foster

# Exhibit F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

BIRDA TROLLINGER, VIRGINIA        )
BRAVO, KELLY KESSINGER,           )
IDOYNIA MCCOY, REGINA LEE,        )
PATRICIA MIMS, LORI WINDHAM       )
and ALEXANDER HOWLETT,            )
individually and on behalf of all others )
similarly situated                )        No. 4:02-CV-23
                                  )
        Plaintiffs,               )
                                  )
v.                                )        Chief Judge Curtis L. Collier
                                  )
TYSON FOODS, INC., JOHN TYSON,    )
ARCHIBALD SCHAFFER III, RICHARD,  )
BOND, KENNETH KIMBRO, GREG        )
LEE, KAREN PERCIVAL, AHRAZUE      )
WILT and TIM MCCOY,               )
                                  )
        Defendants.               )

## ORDER

Defendants Tyson Foods, Inc. et al ("Defendants") have moved this Court to quash the

subpoena to the Department of Homeland Security of Plaintiffs Trollinger et al ("Plaintiffs") (Court

File No. 440). Since the subpoena was filed in the District Court for the District of Columbia, this

Court lacks jurisdiction to quash the motion. *See* Federal Rules of Civil Procedure 45(c)(1, 3).

Accordingly, the Court **DENIES** Defendants' motion to quash the subpoena (Court File No. 440).

**SO ORDERED.**

**ENTER:**

                                  /s/
                                  _____
                                  **CURTIS L. COLLIER**
                                  **CHIEF UNITED STATES DISTRICT JUDGE**

# Exhibit G

U. S. DISTRICT COURT for the EASTERN DISTRICT OF TENNESSEE at CHATTANOOGA
CIVIL MINUTES - GENERAL

CASE NO.: 4:02-CV-23

STYLE: Birda Trollinger, et al v. Tyson Foods, Inc, et al

PRESENT: Honorable Curtis L. Collier    U. S. District Judge/ ~~U. S. Magistrate Judge~~

Attorney(s) for Plaintiff(s): Howard Foster, William Colvin

Attorney(s) for Defendant(s): Roger Dickson, Travis McDonough,

Deputy Clerk: Cyndee Palmer    Court Reporter: Elizabeth Coffey

addtl defense counsel: Thomas Green, Eric Beene,

PROCEEDINGS: Colleen Lauerman

Hearing and arguments on plf's motion to
compel (#222) and defts' motion to dismiss
(#259).
Motion to compel denied as moot.
Motion to dismiss taken under advisement.

Time: 2:30 to 4:10    Date: 4/30/07

# Exhibit H

1                  IN THE UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF TENNESSEE

3                           AT WINCHESTER
    ----------------------------------------------------------
4                                   :
    BIRDA TROLLINGER, et al.,       :
5                                   :
              Plaintiffs,           :
6    -versus-                       :          4:02-CV-23
                                    :
7    TYSON FOODS, INC., et al.,     :
                                    :
8             Defendants.           :
    ----------------------------------------------------------
9                                    Chattanooga, Tennessee
                                     April 30, 2007
10

11           BEFORE:  THE HONORABLE CURTIS L. COLLIER,
                      CHIEF UNITED STATES DISTRICT JUDGE
12

13   APPEARANCES:

14
             FOR THE PLAINTIFFS:
15
             HOWARD W. FOSTER, ESQ.
16           Johnson & Bell Ltd.
             33 West Monroe Street, Suite 2700
17           Chicago, Illinois  60603-5404

18           WILLIAM G. COLVIN, ESQ.
             Horton, Maddox & Anderson, PLLC
19           One Central Plaza
             835 Georgia Avenue, Sixth Floor
20           Chattanooga, Tennessee  37402

21

22

23                         MOTIONS HEARING

24

25


                    UNITED STATES DISTRICT COURT

2

```
1    APPEARANCES:   (Continuing)

2

3              FOR THE DEFENDANTS:

4              THOMAS C. GREEN, ESQ.
               COLLEEN LAUERMAN, ESQ.
5              Sidley Austin LLP
               1501 K Street N.W.
6              Washington, D.C.   20005

7              ROGER W. DICKSON, ESQ.
               TRAVIS R. McDONOUGH, ESQ.
8              Miller & Martin PLLC
               Suite 1000 Volunteer Building
9              832 Georgia Avenue
               Chattanooga, Tennessee  37402
10

11

12             FOR THE DEPARTMENT OF JUSTICE:

13             ERIC J. BEANE,
               Trial Attorney
14             Federal Programs Branch
               U. S. Department of Justice
15             Civil Division
               20 Massachusetts Avenue, N.W.
16             Washington, D.C.   20530

17

18

19                              - - -

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

3

1           THE COURT:  Please call the case.

2           THE CLERK:  Civil Action 4:02-23, Birda Trollinger

3   and others versus Tyson Foods and others.

4           THE COURT:  We have before us two motions this

5   afternoon, and I'd like to take them up in this order:  First

6   I'd like to take up the motion to compel, and then I'd like to

7   take up the motion to dismiss.  The plaintiff filed the motion

8   to compel.  So why don't we have the plaintiff speak first.

9   And I will allot 15 minutes to each side on that.

10          MR. FOSTER:  Thank you.

11          Your Honor, I'm Howard Foster, for the plaintiffs,

12  class counsel.  And this is our motion, as you've indicated,

13  to compel the defendant, Tyson Foods, to submit its list of

14  workers to the Basic Pilot program for matching.

15          THE COURT:  You're only interested in the Basic Pilot

16  program?

17          MR. FOSTER:  My understanding, Your Honor, is, the

18  government's opposition to the motion indicates that there are

19  two programs at issue; there is the Social Security

20  verification program and the Basic Pilot program, and --

21  however, that they're linked.  And a submission through the

22  Basic Pilot program, as I understand it, will indicate whether

23  the Social Security number matches the name that is associated

24  with that number, and give a yes or no answer, and that it will

25  also go through the other databases maintained by the

UNITED STATES DISTRICT COURT

29

1    worked for Tyson during the class period were submitted through

2    the Basic Pilot program, that the only thing that would come

3    back would just be a list of the employees of Tyson during that

4    same time period?

5          MR. BEANE:  It does seem to me that Tyson would

6    already be in possession of the type of records that plaintiff

7    is requesting here.  And the biggest concern from the

8    government perspective -- first and foremost, for us, this is a

9    privacy issue.  They're requesting access to the Social

10   Security Administration database.  And I don't need to tell the

11   Court that Social Security numbers are among the most sensitive

12   personal data that are out there.  And the more they get into

13   the discussions, it becomes less and less clear the precise

14   purpose for this request.  It seems almost like they're

15   requesting the right to rummage through the Social Security

16   database --

17         THE COURT:  I think what they wanted was for Tyson to

18   submit names and information.  So this would not be that they

19   would be doing it.  Tyson would be doing it.  Tyson has already

20   done it.  Tyson already has the material.  So I really don't

21   see a significant privacy concern there.  Tyson is already in

22   possession of the information.  The employees had to provide

23   the information to Tyson when they applied for the job.

24         MR. BEANE:  That's right.  And Tyson, in that

25   instance, would be doing what they typically do when they

UNITED STATES DISTRICT COURT

30

1    initially hire someone.  But there is another big problem with

2    that, and that's when Congress indicated this program, it

3    specifically set forth terms and conditions for its use, and it

4    said Basic Pilot couldn't be used in any other way than its

5    program policy allows.  And in the record before the Court, you

6    have the memorandum of understanding that Tyson Foods signed

7    with the Department of Homeland Security and the Social

8    Security Administration.

9         THE COURT:  There are some exceptions, though, for

10   court orders or as otherwise authorized by law, though, aren't

11   there?

12        MR. BEANE:  There is for the Privacy Act.  But one

13   thing that the counsel for plaintiff didn't mention is that in

14   order to access these records--  Both the Privacy Act and the

15   Social Security Act independently would justify denying the

16   motion to compel.  The Social Security Act applies an even

17   stricter standard of confidentiality in order to access them.

18        THE COURT:  But if Tyson had the information -- if

19   Tyson requested the information, Tyson had the information in

20   its files, there is nothing in the Social Security Act or the

21   Privacy Act that would preclude Tyson from sharing that

22   information with the plaintiff if it was pursuant to a court

23   order, is there?

24        MR. BEANE:  That's correct.  The documents that are

25   already in the possession of Tyson Foods, I'm not here today

UNITED STATES DISTRICT COURT

31

1    expressing a view on that.

2            THE COURT:  Now, Mr. Foster raised another issue, and

3    that is that he has some records that he's obtained from Tyson

4    where the Social Security Administration has advised Tyson that

5    people working for Tyson are perhaps using someone else's

6    Social Security number.

7            MR. BEANE:  Uh-huh.  (Moving head up and down.)

8            THE COURT:  Does the Social Security Administration

9    keep records of that sort?  And do you have any objection to

10    Tyson sharing that information with the plaintiff?

11            MR. BEANE:  I'm not aware of any objection that we

12    would have to the disclosure of the records that are already in

13    the possession of Tyson Foods.

14            THE COURT:  Okay.  Well, I think the Court is going

15    to make its decision on this based upon the Court's

16    understanding of the facts.  And I don't think that the

17    statutes that we have here really are going to be relied upon

18    that much.  So that means that you can go back and tell your

19    supervisor that you won.

20            MR. BEANE:  Okay.  Well, thank you, Your Honor.  I

21    appreciate that.

22            MR. GREEN:  May I be heard, Your Honor?

23            THE COURT:  Did you have something else to say,

24    Mr. Green?

25            MR. GREEN:  I apologize if I sound like I'm replaying

1    a record here, but when Mr. Foster was last standing here a few

2    minutes ago, what he's really asking this Court to do is help

3    him find evidence of the fact that Tyson hired undocumented

4    workers——put aside the elements of actual knowledge,

5    whatever——just that we hired undocumented workers, and he wants

6    to ask you to help him do that by using this Basic Pilot

7    mechanism.  This argument, as I say, has left its original

8    foundation on class notification and is now on the merits.

9          I want to make just two quick points.  When an

10   applicant comes in and we examine the documents, if the

11   documents pass muster and we send the data through Basic Pilot

12   and Basic Pilot comes back and says, "Match - Eligible for

13   hire," we've complied with the law.  The fact that a year

14   later, two years later, some evidence develops——much as your

15   hypotheticals, a medical situation, taxation paid here,

16   whatever——that causes a re-examination of that employee's

17   status says nothing.  It can't, as a matter of law, be

18   relevant or be probative or say anything about Tyson's initial

19   decision to hire that person.

20          THE COURT:  Well, that may or may not be the case.

21   But the case --

22          MR. GREEN:  Okay.

23          THE COURT:  The case is that Basic Pilot would not

24   help that at all.  And that's what we're really concerned

25   about, is having Tyson submit the documents to Basic Pilot.  It

UNITED STATES DISTRICT COURT

33

1    is conceivable that some employer could be providing applicants

2    with phony information, or could be referring them.  So that,

3    in and of itself, doesn't say anything at all.

4          MR. GREEN:  If he wants to prove that when the day

5    comes, if you let this case go forward --

6          THE COURT:  I don't think he's making that argument.

7          MR. GREEN:  I don't think he is, either.

8          THE COURT:  But the fact that information comes back

9    later on may or may not be relevant.  That's not where we are

10   right now.  Where we are right now is whether granting his

11   request to have information submitted through Basic Pilot is

12   going to be useful.  And I'm not convinced it's going to be

13   useful.

14         MR. GREEN:  Then I should shut up.  That's the

15   easiest.  If you're not convinced it's going to be useful, I

16   think I'm ahead.

17         He's going to get the same names.  Same names in;

18   same names out.  And each of these files has a document.  I

19   can put it on the Elmo if you want to see it.  They're all

20   there.  They've been run through Basic Pilot, and the

21   information is in the file, in the employee's file, period.

22         THE COURT:  Okay.  Mr. Foster, this is your motion.

23   And as I've said to all three of you, the Court's concern was

24   more with the facts than it was with the law.  The Court had

25   assumed that it had the authority to order what you were asking

UNITED STATES DISTRICT COURT

34

1    for.  But from the arguments it appears to the Court that if

2    the Court granted your motion, what you would get would be a

3    list of the employees of Tyson who had been employed for the

4    relevant time period.  And according to Mr. Green, you've

5    already been furnished that information.  To the extent you've

6    not been furnished that information, the Court will order that

7    Tyson provide you with a list of the names of the employees who

8    have been employed during the relevant time period.

9         Mr. Green has assured the Court that there are no

10   people who worked for Tyson who did not go through the Basic

11   Pilot program.  If you have any evidence to the contrary, the

12   Court will be happy to entertain that.  And the Court will

13   reconsider its decision if the Court is supplied with such

14   information.  And in making this statement, the Court

15   understands there are going to be some situations where people

16   fraudulently used somebody else's identification but they

17   would have gotten approved by Basic Pilot although they were

18   still illegal aliens.

19        The Court also will assume that -- knowing what it

20   does about our government agencies, that on some occasions the

21   government agency improperly approved people.  So there may be

22   people who were submitted through Basic Pilot, Basic Pilot

23   said yea, and in actuality the Basic Pilot program should have

24   said nay.  So the Court understands that there may be people

25   who were hired by Tyson who, although they had gone through

UNITED STATES DISTRICT COURT

35

1    Basic Pilot, they still were illegal aliens and were not

2    authorized to work in the United States and for Tyson.

3         The last category are people who worked for

4    employment agencies, outside employees.  And as I understood,

5    you agreed with Mr. Green that these were employees of these

6    outside agencies.  And there was a memorandum of understanding

7    with the government where Tyson would not submit the names of

8    these people to the Basic Pilot program.  If the Court's

9    understanding on that is incorrect, the Court will also be

10   willing to entertain that; although, the Court does not see

11   that this last category hurts your case at all.  If you are

12   able to show that there was a conspiracy involving Tyson and

13   some outside employment agencies, then the fact those outside

14   employment agencies did something improper that was in

15   furtherance of the conspiracy would still suffice to prove the

16   plaintiffs' case.

17        So based upon the arguments this morning, the Court

18   is going to deny the plaintiffs' motion because the Court

19   finds that the motion is moot, that is, that the plaintiff has

20   been supplied with the information he seeks through this

21   motion to compel.

22        MR. FOSTER:  Excuse me, Your Honor.  May I ask one

23   question to clarify --

24        THE COURT:  Yes.

25        MR. FOSTER:  -- one statement?  I believe Your Honor

UNITED STATES DISTRICT COURT

36

1    said that the plaintiffs are entitled to have the names of all

2    the people that Tyson employed during the class period.  And am

3    I correct that Your Honor also ruled "and their Social Security

4    numbers," or was that not part of it?  I'm sorry.  I'm not

5    sure.

6              THE COURT:  Is there any objection to supplying the

7    plaintiff with all the identifying information on these people,

8    that is, their home addresses, their Social Security numbers?

9              MR. GREEN:  Can you indulge me one moment?

10             (Off-the-record discussion.)

11             THE COURT:  When you see the files, Mr. Foster,

12   aren't the Social Security numbers in the files, or their alien

13   number in the file?

14             MR. FOSTER:  No.  Tyson keeps the -- what are these

15   I-9 forms, which are filled out at the time of employment.

16   They don't keep them with the employment files.  We have had an

17   opportunity to look at I-9 forms for their current employees.

18   We don't have, however, a--  What I would like to get Tyson to

19   do is to supply the plaintiffs with a list, on a computer disk,

20   of all the -- as what Your Honor said, all the names and all

21   the Social Security numbers of all the people that they have

22   employed at these plants during the class period, on a disk, so

23   we have it in a manner that can be used, which we do not have

24   currently right now.

25             THE COURT:  Well, let's take up the identifying

UNITED STATES DISTRICT COURT

37

1   information first, Social Security number and any other

2   identification.  Is there any objection to that?

3        MR. GREEN:  If we're talking about this lawsuit, this

4   class action, eight plants, the employees at eight plants--

5   And we offered Mr. Foster -- I can't represent to you that I

6   personally did it, but I believe that someone on our team did,

7   offered him exactly that information months ago.  It also is

8   reflected, just as you, I think, suspect, the basic identifying

9   data for every employee, to include Social Security numbers, in

10  the employee's file.  They've had access to all these files

11  during discovery.

12        I'm going to do what you tell me to do, because as

13  long as they are protective of that--  I mean, I don't know

14  what they're going to do with that information, but it is

15  sensitive information.  But they've already had access to it.

16  They've had their scores of lawyers in these plants, through

17  these files, looking at them, examining them, looking at the

18  documents.  They know exactly what's in there.  All that data

19  is there.  If they need it again, you know, we can put

20  together a list of the eight plants, the employees, and their

21  Social Security numbers.  If that's what you want me to do,

22  I'm going to do it because I'll do whatever you order me to

23  do.

24        THE COURT:  It sounds like Mr. Green is not

25  objecting, then, to supplying the Social Security numbers.  And

UNITED STATES DISTRICT COURT

38

1    I would prefer that you work that out between yourselves how

2    that is to be done.

3                MR. GREEN:  Okay, sir.

4                THE COURT:  I would prefer lawyers to talk and work

5    things out to the extent they can work things out.  If they

6    can't work things out, then they should ask for the Court's

7    assistance.

8                MR. GREEN:  Be happy to do that, Your Honor.

9                MR. FOSTER:  We'll try and do that, Your Honor.

10               THE COURT:  Okay.

11               MR. FOSTER:  Okay.  Thank you.

12               THE COURT:  Now let's take up the next matter, and

13   that is the motion to dismiss.  And that was filed by the

14   defendants.  And I will allot 15 minutes to each side for this,

15   also.  This is the defendants' motion.  So, Mr. Green, I assume

16   you will argue this and you will go first.

17               MR. GREEN:  Yes, sir.

18               THE COURT:  Would you like to save some time for

19   rebuttal?

20               MR. GREEN:  I would.  I'm going to have to talk

21   awfully fast if all I've got is 15 minutes.

22               THE COURT:  How much time would you like for

23   rebuttal?

24               MR. GREEN:  Well, I'll try to move quickly.  If you

25   think I'm abusing your restrictions, just -- you know, just

1    signal me.

2              THE COURT:  So you don't want rebuttal, then?

3              MR. GREEN:  I do want some rebuttal.

4              THE COURT:  How much time?

5              MR. GREEN:  Five minutes or so.

6              THE COURT:  Okay.  So at the ten-minute point,

7    Ms. Palmer, let Mr. Green know that he has used up his time.

8              Mr. --

9              MR. GREEN:  This is a pretty meaty motion, Your

10   Honor, to get through in ten minutes.

11             THE COURT:  Mr. Foster, how much time would you

12   like-- I'm sorry.  Mr. Foster, would you like a warning before

13   your 15 minutes expires?

14             MR. FOSTER:  Yes.  Could I have a warning at five

15   minutes -- at ten minutes?

16             THE COURT:  Okay.

17             MR. FOSTER:  Thank you.

18             THE COURT:  Ms. Palmer will let you know at the

19   ten-minute point, then.  Okay.  Mr. Green, you may proceed.

20             MR. GREEN:  Just may I ask, Your Honor, if you have

21   before you, or if you could get before you, a copy of the

22   second amended complaint, because I do want to make some

23   references to it if you have it.

24             THE COURT:  Yes, I'm familiar with it, but I can pull

25   it up.

UNITED STATES DISTRICT COURT

61

1    employees had been brought into the United States illegally?

2         MR. GREEN:  Because, first of all, I don't think you

3    can use common knowledge as a surrogate for one of these

4    elements, particularly the element of actual knowledge.  To

5    allege in the complaint --

6         THE COURT:  And why not?  Why can't we use common

7    knowledge?

8         MR. GREEN:  Because this is a statute which is

9    specifically directed to a particular set of circumstances that

10   surround particular conduct.  You have to show --

11        THE COURT:  If this was a criminal indictment and

12   someone alleged that the Mafia did X, Y, and Z, why could you

13   not argue that it's common knowledge that the Mafia is an

14   illegal crime organization so everybody knows what that word

15   means?  Why couldn't you do that?

16        MR. GREEN:  I don't know whether that would be an

17   element of the offense.  But if it's an element of the offense,

18   if it's an element of the offense, it has to be proved by

19   credible, probative evidence, to a preponderance; it can't be

20   assumed by common knowledge.  And an allegation that we hired

21   undocumented workers --

22        THE COURT:  Hundreds of them, or thousands of them.

23        MR. GREEN:  But it still cannot travel at the same

24   time as an allegation that we had actual knowledge that they

25   were brought into the country illegally.  If it could, you

UNITED STATES DISTRICT COURT

62

1    wouldn't have the --

2            THE CLERK:  That's your time, Mr. Green.

3            MR. GREEN:  -- you wouldn't have the language in the

4    statute; the statute could stop without making any reference to

5    "actual knowledge that the alien had been brought into the

6    United States in violation of this subsection."

7            As I walk to my chair sitting down, you've got the

8    opinions in Commercial Cleaning and Loiselle that say it is an

9    element of the offense, it has to be alleged, failure to

10   allege it results in dismissal.  We've been, you know, through

11   the third complaint in this case.  And there is not an

12   adequate allegation -- and there is not an adequate allegation

13   of the enterprises.  And the complaint should be dismissed.

14           THE COURT:  Thank you, Counsel.  I have enjoyed your

15   arguments.  The Court will consider what you have presented

16   this afternoon, and will issue a written decision.

17                        END OF PROCEEDINGS

18

19

20

21

22

23

24

25           I, Elizabeth B. Coffey, do hereby certify that I

# Exhibit I

# JOHNSON & BELL ltd.
## ——————— Attorneys at Law ———————

SUITE 2700
33 WEST MONROE STREET
CHICAGO, IL 60603-5404
TELEPHONE: (312) 372-0770
FACSIMILE: (312) 372-9818

SUITE A
9000 INDIANAPOLIS BLVD.
HIGHLAND, IN 46322-2501
TELEPHONE: (219) 923-5250
FACSIMILE: (219) 923-6170

SUITE 200
325 WASHINGTON STREET
WAUKEGAN, IL 60085-5572
TELEPHONE: (847) 662-7458
FACSIMILE: (847) 662-7366

WWW.JOHNSONANDBELL.COM

WRITER'S DIRECT DIAL NUMBER

November 21, 2007

**Via Certified Mail**
Megan Gemunder
Office of the General Counsel
Department of Homeland Security
425 Murray Lane, Building 410
Washington, DC 20528

Re:   *Trollinger, et al. v. Tyson Foods, Inc. et al.*
      U.S. District Court for the District of Columbia Case No. 1:07-mc-00341

Dear Ms. Gemunder:

Enclosed is an amended Attachment A to the subpoena served on the Department of Homeland Security in this case (issued on September 24, 2007, served to DHS on October 1, 2007). The original subpoena inadvertently left off 23 names of individuals. This revised subpoena now reflects the names of 91 suspected illegal immigrants identified by Plaintiffs in this case, as well as Ana Hart.

Sincerely,

Howard W. Foster

HWF:gar

Enclosure

cc:   Andrea McBarnette, Assistant United States Attorney
      via Certified Mail

      Frank Volpe, via facsimile and e-mail

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BIRDA TROLLINGER, VIRGINIA BRAVO, KELLY KESSINGER, IDOYNIA McCOY, REGINA LEE, PATRICIA MIMS, LORI WINDHAM, and ALEXANDER HOWLETT, individually and on behalf of all others similarly situated,<br><br>v.<br><br>TYSON FOODS, INC. a Corporation, JOHN TYSON, ARCHIBALD SCHAFFER III, RICHARD BOND, KENNETH KIMBRO, GREG LEE, KAREN PERCIVAL, AHRAZUE WILT, TIM McCOY<br><br>                      Defendants. | Case No. 1:07-mc-00341 |

SERVICE LIST:    Office of the General Counsel
                          Department of Homeland Security
                          425 Murray Lane, Building 410
                          Washington, DC 20528

## AMENDED EXHIBIT A

**YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified in the subpoena:**

All documents related to the immigration status, residency status, and/or work authorization status of the following individuals, including, but not limited to: Work Authorization Cards (and applications for same); Alien Registration Cards/Green Cards (and applications for same); social security cards (and applications for same); applications for U.S. citizenships; birth certificates, passports, state identification cards; and driver's licenses

        1.    Lorena Hart; aka Ana Leland; aka Ana Moreno
                 Oviedo; aka Ana Hart
        2.    Nix, Jerry
        3.    Cross, Raymond
        4.    Constanza De Torres, Berta
        5.    Andres, Emilio
        6.    Gaspar, Pedro
        7.    Nolasco, Maria Idalia
        8.    Hamed, Durriyah

Redacted

9.    Hernandez, Reina
10.   Ahmed, Sharo
11.   Hassan, Mohammed
12.   Gutierrez, Cipriano Huerta
13.   Reyna, Jose
14.   Orellana, Narciso
15.   Abdalle, Adde
16.   Phanphaya, Vong
17.   Nguyen, Iene Thi
18.   Hussein, Fatuma
19.   Corronado, Juan
20.   Ixcoy, Bernardo
21.   Davila, Daniel
22.   Dirie, Mohammed
23.   De Jesus, Vionette
24.   Gonzalez, Rose Marie
25.   Ahmed Salad, Elmi
26.   Mihile, Fadumo A.
27.   Mohammed, Halima A.
28.   Moreno-Marquez, Agustin
29.   Smith, Julia
30.   Maldonado, Miguel
31.   Mateo, Francisco Alberto
32.   Macias, Maria
33.   Flores, Juana
34.   Ramos, Marina
35.   Rodriguez, Silvia
36.   Rivera, Ricardo
37.   Trevino, Kandy
38.   Charles, Maria
39.   Ahmed, Abdillahi
40.   Ali, Suado
41.   Francisco Hernandez, Timoteo
42.   Juarez, Rubin
43.   Villegas, Eric
44.   Nava-Sanchez, Miguel
45.   Martinez, Jose
46.   Turcios, Encarinacion
47.   Soto, Martin
48.   Chayez, Elizabeth
49.   Agerues Pacheco, Enrique
50.   Garcia, Javier
51.   Garcia, Gerardo
52.   Torres, Rafaela
53.   Sheherbina, Paver
54.   Cano-Zacarias, Alberto
55.   Reyes, Robcedo Felipe
56.   Torres, Azucena
57.   Lopez, Bladimir
58.   Izoita, Nadezhda Ana Yevna
59.   Hernandez, Jimmy

Page 2 of 3

60. Heuerman, Kevin
61. Cardenas Martinez, Juan
62. Lemus-Corona, Abraham
63. Rodriguez, Orlando
64. Lopez, Roque
65. Geronimo, Jose
66. Rocha, Abilio III
67. Cruz (Linda Yesenia)
68. Maez, Joshua La Rocco
69. Rodriguez, Juan
70. Perez, Mario
71. Ramirez, Steven
72. Cardenas, Elroy
73. Aguilar, Luis
74. Martinez, Jerry
75. Soon Duck Lee
76. Linares, Iveth
77. Kluyabin, Aleksandr
78. Munoz, Christy
79. Quetzecua, Maria
80. Montano, Jose Manuel
81. Lira, Meliton
82. Hernandez, Gloria
83. Rafeal, Paulina
84. Youngblood, Camechalla
85. Gonzalez, Hilario
86. Santana Jr., Antonio
87. Bahena, Soledad
88. Griffin, Kimberly
89. Ledesma, Jose Luis
90. Rivera, Jimmy
91. Jenkins, Roger
92. Hammeck, Mark

REDACTED

# Exhibit J

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| BIRDA TROLLINGER, *et al.*, | No. 4:02-cv-23 |
| Plaintiffs, | CLASS ACTION<br>JURY DEMANDED |
| v. | Judge Curtis L. Collier |
| TYSON FOODS, INC., *et al.*, | |
| Defendants. | United States Magistrate Judge<br>William B. Mitchell Carter |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION
TO EXCLUDE THE TESTIMONY OF MICHAEL CUTLER**

Plaintiffs, by undersigned Class Counsel, hereby submit their Response to the

Defendants' Motion to Exclude the Testimony of Michael Cutler (hereinafter "the Motion"

and "Cutler," respectively).

**I.    BACKGROUND**

As the Court is aware, this is the first case to be tried on the Plaintiffs' RICO theory

of wage depression.  Accordingly, Plaintiffs bear the burden of proving that Defendants

employed ten or more illegal immigrants per year over several years.[1]  Plaintiffs will do so,

in part, with Mr. Cutler's testimony.  He will offer his opinion that persons who claim to be

U.S. citizens and lawful permanent residents speak enough English to complete the I-9 form

and do so.  This testimony, combined with government immigration files proving that many

of Tyson's hourly-paid workers used stolen identity documents will enable the jury to find

Tyson hired these workers with actual knowledge they were unauthorized for employment.

---

[1] *See* 8 U.S.C. § 1324(a)(3)(A) (hereinafter "the Hiring Violation").  The Court analyzed the
elements of this violation in its May 29, 2007 Order Denying Tyson's Motion to Dismiss, Court Doc.
No. 309.

This is an appropriate use of expert testimony. *See* 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.06[4] (2d ed. 1997) ("Expert testimony is useful to the trier of fact when it … reveal[s] a pattern that is relevant to an issue in the case, but that is not otherwise easily discernible.").

## II.    MR. CUTLER'S EXPERT REPORT

The crux of Cutler's opinion is that illegal aliens in the U.S. "pass themselves off either as United States citizens or resident aliens." Cutler Expert Report at 3.[2]    In his opinion, employers should verify the authenticity of documents tendered by persons purporting to be U.S. citizens or lawful permanent residents by trying to determine if these persons have actually resided in the U.S. long enough to obtain their status. "Another way that an employer may determine how long an alien has been a resident of the United States would be to review the application for employment filed by the prospective alien employee and in so doing, determine how many years the alien in question claimed he had been working in the United States." Id. at 4. Thus, Cutler deems the lack of English proficiency by persons claiming to be resident aliens "would cause me to question his actual immigration status inasmuch as a common strategy for illegal aliens is to make false claims to being a resident alien or even a United States citizen." Id. Plaintiffs' theory of the case is precisely that: Tyson is willfully blind in hiring persons who claim to be resident aliens or U.S. citizens but who know no English.[3]

What is immediately notable about the Motion is that is does not challenge Cutler's opinion that immigrants in the U.S. legally will have a working knowledge of English which

---

[2] Attached as Ex. 1 to Defendants' Motion (hereafter cited as "Cutler Op.").

[3] This is the profile of a large percentage of Tyson's hourly-paid workers. And as discovery has revealed, Tyson *never* takes the lack of rudimentary English proficiency into account in its hiring. (Plaintiffs have a summary judgment motion on this issue pending.)

will be reflected on the employment application and I-9 Form.  It challenges the Declaration

he submitted in conjunction with his Opinion which concludes that 91 of the 497 employees

who he reviewed "appeared to be unauthorized to work in the United States." Declaration of

Michael Cutler ¶ 6.[4]

## III.    THE PROPER *DAUBERT* ANALYSIS FOR A NON-SCIENTIFIC EXPERT

Federal Rule of Evidence 702 permits an expert witness to testify in the form of an

opinion, if (1) the testimony is based upon "sufficient facts or data," (2) the testimony is

"reliable" and (3) the expert "has applied the principles and methods reliably to the facts of

the case."[5] While the gatekeeping function of the district court applies to all experts, whether

or not they are scientists, Kumho Tire v. Carmichael, 526 U.S. 137, 147 (1999), this is not to

be done in a formulaic manner.  Thus, the Court held, "[w]e agree with the Solicitor General

that 'the factors identified in Daubert may or may not be pertinent in assessing reliability,

depending on the nature of the issue, the expert's particular expertise, and the subject of his

testimony.'" Id. at 150.  Accordingly, the scientific reliability factors, which the Motion

seeks to apply to Cutler, were held to be discretionary in cases where the expert is a non-

scientist. Id. at 150-51.

The Sixth Circuit has also acknowledged that "the factors enumerated in *Daubert*

cannot be readily applied to measure the reliability of such [non-scientific] testimony."

Surles v. Greyhound Lines, Inc., 474 F.3d 288, 295 (6th Cir. 2007) (holding former law

enforcement official was qualified to testify as an expert "on threat assessment issues" by

---

[4] Attached as Ex. 2 to Defendants' Motion.

[5] Rule 702 was amended in 2000 to reflect the requirements imposed by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  First Tenn. Bank Nat'l Ass'n. v. Barreto, 268 F.3d 319, 332 n.12 (6th Cir. 2001).

virtue of his background, rejecting the argument that more specific experience was needed). All that a non-scientist needs to do is "adequately explain[] how th[eir] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Id. at 296 (internal quotations omitted, second alteration in original); see also First Tenn. Bank Nat'l Ass'n v. Barreto, 268 F.3d 319, 335 (6th Cir. 2001) ("Daubert reliability factors [are] unhelpful in the present case, which involves expert testimony derived largely from [the expert's] own practical experiences throughout forty years in the banking industry. Opinions formed in such a manner do not easily lend themselves to scholarly review or to traditional scientific evaluation."). In short, "the trial court is to be granted 'broad latitude' both in selecting appropriate reliability factors for a given case as well as in applying each of those factors to the case's facts." Johnson v. Manitowoc Boom Trucks Inc., 484 F.3d 426, 436 (6th Cir. 2007).

　　As will be demonstrated, infra, the Motion fails to identify the applicable reliability factors to be applied to Mr. Cutler and also fails to cite any authority for precluding his testimony as to any opinion as expressed in his Expert Report. It is entirely devoted to contradicting his opinions as to the work authorization of the 91 suspected illegal workers as stated in his Declaration. In that regard, Plaintiffs have decided not to use Mr. Cutler to offer any opinion as to whether any particular Tyson employee or former employee is unauthorized. He will testify solely about his opinions as stated in his Expert Report. Plaintiffs intend to prove the 91 workers are unauthorized for employment based upon the

government's immigration files, which are under subpoena, and the depositions of the

suspected illegal workers.[6]

## IV.    CUTLER HAS ADEQUATELY EXPLAINED THE BASIS FOR HIS OPINIONS

Cutler's opinions were formed from his 30 year career as an I.N.S. agent (1971-

2002). He testified, "[a]nd I've never encountered a United States citizen who couldn't

speak English." Cutler Dep. 48:16-17.[7]  Additionally, he opines, Cutler Op. at 4:

> While there is no statutory requirement for resident aliens to ever develop any level of English language proficiency, in my 30 years of experience, a resident alien who has lived in this country for a number of years more often than not, will demonstrate at least some familiarity with the English language. A resident alien who claims to have held lawful immigrant status for several years but who lacks any English language ability would cause me to question his actual immigration status.

Cutler described in his deposition how he applied this experience as an I.N.S.

officer, Cutler Dep. 64:18-22:

> A: . . . I said because if someone is here for that length of time [over five years], in my experience -- and I've been doing this job for many years -- those folks are suspect of being imposters or otherwise lying about who they are, when they've been here and so forth.

Cutler Dep. 66:1-14:

> Q: -- you would agree with me that a lack of proficiency in English, standing alone, is not a reason to treat that person differently; right?
> A: What do you mean by treat the person differently?
> Q: Could you, in that circumstance, demand to see their green card?
> A: You would want to know prior working history, that sort of thing. Some way of explaining in your own mind why the person is unable to speak the language if they've been here for a good number of years. Because the likelihood is if they're in the work force, they would have acquired that English proficiency. My experience has been just that.

---

[6] There is no requirement that an expert testimony be permitted in toto. *Cf.,* Surles, 474 F.3d at 293, 297 (affirming the district court's decision to partially grant motion in limine excluding a portion of the expert's opinions).

[7] Attached as Ex. 3 to Defendants' Motion.

---

Cutler Dep. 82:18-83:3:

> A: All I want to say is that we were concerned as agents that people would be
> imposters. We often found phony documents. We often found that people made false
> claims to U.S. citizenship, false claims to resident alien status, and we raised those
> issues with our instructors. And we are told that employers should be looking at the
> interview as the opportunity to determine the authenticity of the documents to make
> sure that they truly relate to the job applicant. If language is a component of that.

His opinion that English proficiency is important in determining whether a job
applicant's documents "relate" to the applicant is derived from his background—he imparted
that opinion to employers, and it is highly relevant in this case.[8] Accordingly, Cutler's
opinions satisfy the reliability criteria established in <u>Surles</u> and <u>First Tennessee Bank</u>
opinions.[9] Plaintiffs have thus established the admissibility of his testimony.

## V.     CONCLUSION

In conclusion, Plaintiffs have established admissibility of the opinions expressed in
Michael Cutler's Expert Report. For these reasons, the Motion should be denied.

---

[8] *See also* Cutler Dep. 56:17-57:20, 63:23-64:17, 75:16-76:21.

[9] Cutler is not required to have familiarity with all of the relevant statutory and regulatory
provisions that apply to the area. *See, e.g.*, <u>Davis v. Combustion Eng'g, Inc.</u>, 742 F.2d 916, 919 (6th
cir. 1984) ("The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or
standards is not grounds for disqualification. Such lack of familiarity affects thew witness'
credibility, not his qualifications to testify.").

Dated:  November 1, 2007             Respectfully submitted,


                                     BIRDA TROLLINGER, *et al.,* Plaintiffs


                          By:        /s/ Howard Foster
                                     Class Counsel
                                     William V. Johnson
                                     Matthew Galin
                                     Johnson & Bell, Ltd.
                                     33 West Monroe Street, Suite 2700
                                     Chicago, IL 60603
                                     (312) 372-0770
                                     (312) 372-9818 (Fax)
                                     Email:  fosterh@jbltd.com


                                     William G. Colvin
                                     Horton, Maddox & Anderson
                                     One Central Plaza
                                     835 Georgia Avenue, Suite 600
                                     Chattanooga, TN 37402
                                     (423) 265-2560
                                     (423) 265-3039 (Fax)


                                     *Attorneys for the Plaintiffs*

---

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE
THE TESTIMONY OF MICHAEL CUTLER

#1733767                             - 7 -

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing PLAINTIFFS' RESPONSE TO DEFENDANTS'

MOTION TO EXCLUDE THE TESTIMONY OF MICHAEL CUTLER has been filed

electronically.  Notice of this filing will be sent by the operation of the Court's electronic

filing system to all parties indicated on the electronic filing receipt.  Parties may access this

filing through the Court's electronic filing system.

Dated this 1st day of November, 2007

By:  /s/ Howard W. Foster
Howard W. Foster

# Exhibit K

1              IN THE UNITED STATES DISTRICT COURT

2              IN THE EASTERN DISTRICT OF TENNESSEE

3                    WINCHESTER DIVISION

4

5    BIRDA TROLLINGER, ROBERT MARTINEZ, TABETHA

6    EDDINGS AND DORIS JEWELL, Individually and on

7    behalf of all others similarly situated,

8                    Plaintiffs,

9    VS                    Case No. 4:02-CV-23

10   TYSON FOODS, INC., a corporation,

11                   Defendant.

12

13          DEPOSITION OF PAVEL SHCHERBINA,

14   was taken on behalf of the Plaintiffs on

15   Wednesday, October 24, 2007 at the law

16   offices of Kempton & Russell, 114 E

17   5th Street, Sedalia, Missouri pursuant to

18   Notice in accordance with the applicable

19   Rules of Civil Procedure before Thomas

20   Roberts, RPR, CCR and a Notary Public for the

21   State of Missouri.

22

23

24

25

2

```
 1                 A P P E A R A N C E S

 2   For the Plaintiffs:  MR. MATTHEW A. GALIN

 3                        Johnson & Bell

 4                        55 E. Monroe Street

 5                        Suite 4100

 6                        Chicago, Illinois 60603

 7                             AND

 8                        MR. ROBERT W. RUSSELL

 9                        Kempton & Russell

10                        114 E. 5th Street

11                        Sedalia, MO 65310

12

13   For the Defendant:   MR. KYLE W. EISELSTEIN

14                        Miller & Martin

15                        Volunteer Bldg. STE 1000

16                        832 Georgia Avenue

17                        Chattanooga, TN 37402

18

19   ALSO PRESENT:        MS. INGA VERESHCHAGINA

20                        Interpreter

21                        One East 34th St. STE 305

22                        Kansas City, MO 64111

23

24

25
```

1                         I N D E X

2                                      PAGE NUMBER

3    **WITNESS:** PAVEL SHCHERBINA

4    Direct Examination by Mr. Galin            5

5    Cross Examination by Mr. Eiselstein        46

6    Redirect Examination by Mr. Galin          49

7

8

9                         E X H I B I T S

10   Plaintiffs                             MARKED

11   Exhibit #1  Passport                      27

12   Exhibit #2  Permanent Resident Card       29

13   Exhibit #3  Social Security Card          34

14   Exhibit #4  Employment Application        36

15   Exhibit #5  Eligibility Verification      38

16   Exhibit #6  Driver's License             45

17

18

19

20

21

22

23

24

25

1          Number 2.

2

3                         (A certain document was marked

4                          Plaintiff's Deposition Exhibit

5                          Number 2 for identification by

6                          the Reporter.)

7

8     Q    (BY MR. GALIN CONTINUING:) For the record, is

9          this a copy of one of the documents that

10         you've brought here today?

11    A    Yes.

12    Q    What is this a copy of?

13    A    This is green card.

14    Q    When did you first obtain this card?

15    A    I think approximately it was one year ago.

16    Q    Had you had any other green cards before this

17         one?

18    A    Yes.

19    Q    How many?

20    A    One.

21    Q    How did you get the first one?

22    A    After one year, we filled out documents.

23    Q    After one year of what?

24    A    After arrival to America.

25    Q    Can you describe for me in more detail the

1       documents you filled out when you actually

2       came to America?

3    A   In New York we got a white card after live

4       for one year and filled out documents for the

5       green card.

6    Q   When did you receive the white card?

7    A   As soon we arrived to New York.

8    Q   Who gave you the white card?

9    A   The one who met us.

10   Q   Can you describe for me what the white card

11      looked like?

12   A   I know might be like this, a white card.

13   Q   Did it have your picture on it?

14   A   No.

15   Q   And I know you were briefly mentioning it

16      before, but what happened to the white card?

17   A   We had all documents.  With these documents

18      we came here.  And after arrival we were

19      taken to someplace.  I don't know.  It is a

20      room or a building.  And we gave all those

21      documents, what we had with us, and got a

22      white card.

23   Q   One point:

24          When you're giving your answers, I would

25      try and maybe break up some of your answers

|     |   |                                                      |
|-----|---|------------------------------------------------------|
| 1   |   | to let the translator translate it and then          |
| 2   |   | you could say the rest of it, and she'll             |
| 3   |   | translate it.                                        |
| 4   | A | Okay.                                                |
| 5   | Q | Where is the white card now?                         |
| 6   | A | While I was getting green card, a lady took          |
| 7   |   | from us the white card.                              |
| 8   | Q | I know we spoke a little bit about this              |
| 9   |   | before, but can you explain for me how you           |
| 10  |   | got the green card?                                  |
| 11  | A | We filled out documents for Immigration, and         |
| 12  |   | we were called for the interview.  And they          |
| 13  |   | checked everything and gave us a temporary,          |
| 14  |   | and after we got these cards.                        |
| 15  | Q | Where were you when you applied for the green        |
| 16  |   | card?  What city?                                    |
| 17  | A | I don't remember.  Seattle.                          |
| 18  | Q | How long after you had the white card did you        |
| 19  |   | apply for the green card?                            |
| 20  | A | One year was white card, and after, I think         |
| 21  |   | six months, before we got a green card.              |
| 22  | Q | When you obtained the white card in New York,        |
| 23  |   | did anybody ask you any questions about your         |
| 24  |   | refugee status?                                      |
| 25  | A | White card received, my wife, because her            |

1           brother called for her.

2    Q     Who gave you your white card?

3    A     My wife was receiving it.  I don't remember.

4    Q     Where did she receive it?

5    A     In New York.

6    Q     Where in New York?

7    A     Right there in the airport.  I don't know.

8    Q     Do you know if anyone asked your wife any

9          questions about your refugee status?

10   A     No.  I don't know.

11   Q     When you were applying for your green card,

12         did you meet with any Immigration officials?

13   A     Yes.  Inside where we were called for

14         appointment, we met.

15   Q     Who did you go with?

16   A     All my family.

17   Q     Does that include anyone other than your wife

18         and children?

19   A     No.

20   Q     When you went in for your appointment for

21         your green card, did they ask you any

22         questions about your refugee status?

23   A     I know that all documents were checked, but I

24         don't remember anything else.

25   Q     Did they ask you any questions about your

```
 1        religion?

 2   A    No.

 3   Q    Have you ever met with an Immigration judge?

 4   A    No.

 5   Q    What happened to your first green card?

 6   A    It was only for ten years, and it was already

 7        expiring.  So we got another one for ten

 8        years.

 9   Q    When did it expire?

10   A    I don't remember exactly.

11   Q    How did you obtain the second green card?

12   A    That card was expiring, so we filled out

13        documents for another one and took it to

14        Immigration.

15   Q    Did you have to pay any fees to obtain either

16        green card?

17   A    Yes.

18   Q    Do you remember what those fees were?

19   A    Hundred eighty-four one.

20   Q    Do your wife and children all have green

21        cards?

22   A    Yes.

23   Q    Have you applied to become a US citizen?

24   A    Not yet.  We are thinking.

25   Q    Do you know why you haven't yet?
```

34

| | | |
|---|---|---|
| 1 | A | We didn't prepare because we have to learn |
| 2 | | all those questions, and we don't understand |
| 3 | | English very well. |
| 4 | Q | Have any of your family members, and by that |
| 5 | | I mean your wife or children, applied to |
| 6 | | become US citizens? |
| 7 | A | Yes. |
| 8 | Q | Which ones? |
| 9 | A | Sister and brother of my wife, they already |
| 10 | | received it. |
| 11 | Q | Have any of your children applied to become a |
| 12 | | US citizen? |
| 13 | A | No. |
| 14 | Q | Let me show you what we'll mark as Exhibit 3. |
| 15 | | |
| 16 | | (A certain document was marked |
| 17 | | Plaintiff's Deposition Exhibit |
| 18 | | Number 3 for identification by |
| 19 | | the Reporter.) |
| 20 | | |
| 21 | Q | (BY MR. GALIN CONTINUING:) Is this a copy of |
| 22 | | the social security card that you've brought |
| 23 | | here today? |
| 24 | A | Yes. |
| 25 | Q | Do you know why this card is not signed? |

```
 1   A    I received it just recently and didn't sign

 2        yet.

 3   Q    How recently?

 4   A    Might be one year ago.  Might be nine months.

 5   Q    Have you ever shown anyone from Tyson this

 6        particular social security card that you've

 7        brought here today?

 8   A    Yes.

 9   Q    When?

10   A    When I started to work and then we were

11        talking.

12   Q    When did you start to work?

13   A    Six years ago.

14   Q    Did you have this particular card that I'm

15        holding in my hand six years ago?

16   A    We changed it because it was destroyed in

17        water.

18   Q    Did you ever -- my question is:

19            Did you ever show this card, not the

20        number but this actual physical card, to

21        someone at Tyson's?

22   A    Yes, I showed.

23   Q    When?

24   A    Might be three, two weeks ago.

25   Q    Why?
```

| | | |
|---|---|---|
| 1 | A | Because I received new green card, and they |
| 2 | | asked me for documents.  So I brought this |
| 3 | | card and other documents. |
| 4 | Q | When did you receive the new green card? |
| 5 | A | Approximately a year ago.  I don't know.  I |
| 6 | | don't know exactly. |
| 7 | Q | Let me show you what we'll mark as Exhibit |
| 8 | | Number 4. |
| 9 | | |
| 10 | | (A certain document was marked |
| 11 | | Plaintiff's Deposition Exhibit |
| 12 | | Number 4 for identification by |
| 13 | | the Reporter.) |
| 14 | | |
| 15 | Q | (BY MR. GALIN CONTINUING:) Do you recognize |
| 16 | | this document, sir? |
| 17 | A | Yes. |
| 18 | Q | Is this your handwriting on this document? |
| 19 | A | Yes. |
| 20 | Q | If you will turn to the second page of this |
| 21 | | document or documents, is that your signature |
| 22 | | on the bottom? |
| 23 | A | Yes. |
| 24 | Q | Is that how you spell your last name? |
| 25 | A | Yes, it is my sign, Pavel Andreyevich |

1        with me.

2    Q   Was that when you brought your green card in?

3    A   No.  It was that time, and also later I

4        brought it.

5    Q   When was the later time?

6    A   One week ago I brought it.

7    Q   Why did you bring it one week ago?

8    A   Yeah, because it is a new one, so copies were

9        made because it was hard to understand and

10       read on the old one.

11   Q   Who did you show the new green card to?

12   A   Mark.

13   Q   Did he ask you any questions about it?

14   A   No.

15   Q   Did you also show Mark your social security

16       card at that time?

17   A   Yes.

18   Q   Did you show him anything else?

19   A   Passport.

20   Q   Anything else?

21   A   No.

22   Q   I want to show you what we will mark as

23       Exhibit Number 6.

24

25

```
 1                    (A certain document was marked

 2                    Plaintiff's Deposition Exhibit

 3                    Number 6 for identification by

 4                    the Reporter.)

 5

 6    Q    (BY MR. GALIN CONTINUING:) Is this a copy of

 7         the Missouri commercial driver's license that

 8         you brought here today?

 9    A    Yes.

10    Q    Do you remember when you received this card?

11    A    As soon I came to Missouri because before I

12         had Washington license.  So after I came to

13         Missouri, I changed it for Missouri.

14    Q    Is this the only Missouri driver's license

15         that you have ever received?

16    A    I think I was changing it because it was

17         expired.

18    Q    When did you get the newest Missouri driver's

19         license?

20    A    I don't remember.

21    Q    Approximately?

22    A    When I came to Missouri, they change it.  And

23         I don't remember if it was expired and they

24         changed it again.  I don't remember.

25
```

1        **MR. GALIN:**  I don't have any

2    other questions.

3                **MR. EISELSTEIN:**  I have just a

4    few questions.

5

6                CROSS EXAMINATION

7    BY MR. EISELSTEIN:

8  Q    Are the Russian and English alphabets

9        different, or do the Russian and English

10       alphabets have different letters?

11 A     The letters the same, and also they sound

12       different.  Even though they are similar,

13       they sound different.

14 Q    Do the differences in the Russian and English

15       alphabets make it difficult to spell Russian

16       words or names in English?

17 A     Yes.

18 Q    Can you describe briefly what the conditions

19       in the Ukraine were before you came to the US

20       and specifically the conditions for your

21       family, for your work and providing for your

22       family?

23 A     I had good work.  I worked as a manager.  And

24       after money were exchanged for coupons and

25       the stores were empty, there were no

```
 1          groceries, nothing.  And also work and they
 2          start to lay people out.  I didn't work for
 3          approximately half a year before I left for
 4          America.  So we were going and looking for
 5          any -- some small jobs just to be able to
 6          live.
 7    Q     In the refugee program that you described
 8          that brought you over to the United States,
 9          were you responsible for paying back any
10          money to anybody?
11
12               MR. GALIN:  Objection to the
13          form.
14               THE WITNESS:  We paid for the
15          plane.
16
17    Q     (BY MR. EISELSTEIN CONTINUING:) Who did you
18          pay?
19    A     To the company what gave us the tickets.
20    Q     How did you pay them, or when did you pay
21          them?
22    A     After we were already in America for half a
23          year, we received documents from there.  So
24          we start to pay down.  During three years was
25          every time little amount of money.
```

```
 1   Q    And you paid this to the program sponsor; is
 2        that correct?
 3   A    Yes.
 4
 5                  MR. GALIN:  Objection.
 6                  THE WITNESS:  Could you explain
 7        also, please, what do you mean when you say
 8        objection?
 9                  MR. EISELSTEIN:  Tell him it's
10        okay.  He can answer the questions.
11
12   Q    (BY MR. EISELSTEIN CONTINUING:) When you
13        entered the United States in 1993, you were
14        authorized to begin working in the United
15        States at that time; is that correct?
16   A    Yes.
17   Q    And you have been authorized to work in the
18        United States ever since you entered the
19        United States in 1993; is that correct?
20   A    Yes.
21   Q    And you first began to work for Tyson in
22        2001; is that correct?
23   A    Yes.
24
25                  MR. GALIN:  Objection.
```

1          **MR. EISELSTEIN:**  No other

2      questions.

3

4                      REDIRECT EXAMINATION

5      BY MR. GALIN:

6   Q   What was the name of the agency that helped

7      you come here?

8   A   What company?  A refugee status, and we came

9      here.

10  Q   Was there any agency that helped you come

11     here?

12  A   Yes.

13  Q   What was that agency?

14  A   I think it's like -- I can't tell for sure.

15     I don't remember how to say.

16

17         **MR. GALIN:**  I don't have any

18     other questions.

19         **MR. EISELSTEIN:**  Read and sign

20     like all of them.

21         (Deposition concluded at 7:40 p.m.)

22

23

24

25